# DECLARATION OF JAMES R. DICKENS
## EXHIBIT A
## (PAGES 1-20)

Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF ALASKA

MYRNA I. JOHNSON,                    )
                                     )
          Plaintiff,                 )
                                     )
v.                                   )
                                     )
FRED MEYER STORES, INC.,             )
a Delaware corporation;              )
and JAIME SAN MIGUEL,                )
                                     )
          Defendants.                )
_____)

Case No. J04-008 CV

DEPOSITION OF MYRNA JOHNSON
Pages 1 through 264, Inclusive
Taken:  Monday, January 23, 2006
Place:  Juneau, Alaska

_Ex. A, p. 1_

Myrna Johnson * 1/23/2006
Johnson v. Fred Meyer * J04-008 CV (JWS)

Page 7

1    A.    She lives in Los Angeles, California.

2    Q.    And your 21-year-old daughter, what is

3    her name?

4    A.    Anna, A-N-N-A, Melissa, Pascual,

5    P-A-S-C-U-A-L.

6    Q.    And where is she?

7    A.    She is living in 90 Maginao, Bulacan,

8    Philippines.   90 M-A-G-I-N-A-O, B-U-L-A-C-A-N,

9    Philippines.

10    Q.    And how long has Anna been in the

11    Philippines?

12    A.    Since March of 2002.

13    Q.    We'll come to this a little bit later,

14    but my understanding from the records is, you took

15    her over to the Philippines in February of 2002

16    when you initially took your leave.  Is that

17    correct?

18    A.    Yes, sir.

19    Q.    So she's been there ever since that

20    period of time?

21    A.    She comes to visit here too.

22    Q.    Right.  But I mean she has been a

23    resident of the Philippines since approximately

24    February of 2002?

25    A.    Yes, sir.

*Ex. A, p. 2*

Myrna Johnson * 1/23/2006
Johnson v. Fred Meyer * J04-008 CV (JWS)

Page 11

1   your attorney, I understand that you went to high

2   school in the Philippines and got an undergraduate

3   college degree in the Philippines?

4        A.    Yes, sir.

5        Q.    Now, I have gotten two different pieces

6   of information on what your degree was.  Can you

7   tell me in what area your Philippine degree was?

8        A.    Excuse me, sir?

9        Q.    Sure.  What was your degree from the

10  University of the Philippines in?

11       A.    I took liberal arts.

12       Q.    Did you also spend some time in pre-law

13  prep?

14       A.    I took two years of -- they call it

15  preparatory law.

16       Q.    So some type of preparation to go to

17  law school; is that what I understand?

18       A.    Yes, sir.

19       Q.    Did you ever go to law school?

20       A.    No, sir.

21       Q.    Ms. Johnson, prior to the present

22  lawsuit, how many other civil lawsuits have there

23  been in which you have been a party?

24       A.    Can you say the question again?

25       Q.    Sure.  This is a civil lawsuit, as

Ex. A, p. 3

Page 17

1      Q.      Pardon?

2      A.      Excuse me?  I didn't hear.

3      Q.      Sure.  When did you first come to
4   Juneau?

5      A.      Sometime in November of 1992.  I'm not
6   sure exactly.

7      Q.      And did you stay, then, and live in
8   Juneau for basically the next ten years?

9      A.      Yes, sir.

10      Q.      Did you intend to stay in Juneau when
11   you came, or was that just a visit that was one
12   where you stayed on and got a job?

13      A.      I'm planning to stay here.

14      Q.      Did you have a job when you came?

15      A.      No.

16      Q.      Why was it you planned to come to
17   Juneau?

18      A.      My brother has been inviting me for a
19   long time.

20      Q.      Is Christobal your brother?

21      A.      Yes, sir.

22      Q.      Can you tell me what you did, then, to
23   obtain employment after you came in approximately
24   November 1992?

25      A.      I went to unemployment office.

Ex. A, p. 4

Myrna Johnson * 1/23/2006
Johnson v. Fred Meyer * J04-008 CV (JWS)

Page 32

1    manager, were you paid by the hour, or were you

2    paid a salary?

3          A.    I started as salary.

4          Q.    Under Mr. Laney?

5          A.    Yes.

6          Q.    Okay.  Did you go to hourly?

7          A.    Yes.

8          Q.    And both as salary and as hourly, were

9    you evaluated by Mr. Laney?

10         A.    Yes, sir.

11         Q.    All right.  Now, during the time that

12   Mr. Laney evaluated you, what do you recall he

13   listed as your strengths?

14         A.    My people skills, my good customer

15   service, my reliability, and I'm very good in

16   helping people, and a hard worker.

17         Q.    What do you recall he listed as areas

18   in which improvement was needed?

19         A.    Yes, I -- I think, yes.

20         Q.    No, no.  The question is, what areas

21   did he list as ones in which you needed

22   improvement?

23         A.    I'm not very sure.  I don't really

24   recall.

25         Q.    All right.  As the second assistant

Ex. A, p. 5

Myrna Johnson * 1/23/2006
Johnson v. Fred Meyer * J04-008 CV (JWS)

Page 33

1   manager, did you direct other people in the store?

2        A.     Yes, sir.

3        Q.     And which people, by position or title,

4   did you have responsibility to direct?

5        A.     The closing employees.

6        Q.     And which positions were those?

7        A.     The closing cashiers, the closing

8   part-time employees, and some section heads when

9   they are working on the closing too.

10       Q.     Now, as second assistant manager, what

11  kind of shifts did you work?  When did you begin

12  and when did you finish?

13       A.     I worked as the closing manager.

14              MR. CHOATE:  What time?

15       Q.     That's what is called a closing PIC?

16       A.     Excuse me?

17       Q.     Were you the closing PIC?

18       A.     Yes, sir.

19       Q.     Is that only for apparel?

20       A.     Yes.

21       Q.     Okay.  And what hours did you normally

22  work then?

23       A.     1:30 on wintertime.

24       Q.     1:30 to what?

25       A.     To closing.

Ex. A, p. 6

**Myrna Johnson * 1/23/2006**
**Johnson v. Fred Meyer * J04-008 CV (JWS)**

Page 34

1    Q.    Which is when?

2    A.    11:30, when the store close on winter;

3    and 12:30, when the store close on summer.

4    Q.    So in the summer, did you work 1:30 to

5    12:30?

6    A.    Yes, sir.

7    Q.    Did those shifts ever change because of

8    people absent, or did you ever work a different

9    shift than 1:30 to closing?

10    A.    Very seldom.

11    Q.    Well, were there times when they did?

12    A.    Yes.

13    Q.    Now, during the time that you reported

14    to Mr. Laney -- which, as I understand, was from

15    about September 1996 until about January 2000 --

16    first of all, is that a correct time frame?

17    A.    Yes, sir.

18    Q.    All right.  So a little over three

19    years.  Did you report directly to Mr. Laney, or

20    was there someone between you and Mr. Laney in the

21    chain of command?

22    A.    There is someone.  There was --

23    Q.    Who was that?

24    A.    Mr. San Miguel.

25    Q.    Mr. San Miguel was the first assistant

Ex. A, p. 7

Page 35

1    manager?

2         A.    Yes, sir.

3         Q.    Okay.  During that time frame, what

4    shift did Mr. Laney work between, let's say,

5    January 1997 to January 2000?

6         A.    Morning.  Opening.  We call it opening.

7         Q.    All right.  Opening is from what time

8    to what time?

9         A.    Sometime he come in at 6:00, sometime

10   7:00.  The store opened at 7:00, so they come in

11   one hour early sometimes -- most of the time,

12   excuse me.

13        Q.    So he works, what, like 6:00 a.m. to

14   3:00 p.m. or whatever --

15        A.    4:00.

16        Q.    4:00.  And during that same time frame,

17   from '97 to January of 2000, as you recall, what

18   kind of shifts did Mr. San Miguel work?

19        A.    8:00 to 5:00.

20        Q.    All right.  So then in the afternoon,

21   when you came to work, at some period of time from,

22   say, 1:30 until 4:00 or 5:00, all three of you were

23   at the office?

24        A.    Yes.

25        Q.    All right.  So having a shift that

Myrna Johnson * 1/23/2006
Johnson v. Fred Meyer * J04-008 CV (JWS)

Page 44

1    A.    Yes, sir.

2    Q.    And in that computer e-mail, it lists

3    the position, the location, the hiring supervisor,

4    and the time frame that the position is open; is

5    that right?

6    A.    Yes, sir.

7    Q.    And from your experience, about how

8    long would those positions remain open for

9    interested applicants to apply?

10   A.    The application, at the bottom, tells

11   you until when is that position available for

12   applicants to apply.  It don't have always similar

13   dates.

14   Q.    But in your experience, wasn't it true

15   that most positions were open for at least a week?

16   A.    Yes, sir.

17   Q.    All right.  Now, when Mr. San Miguel

18   was promoted to the apparel manager, then did he

19   list the opening for the first assistant manager?

20   A.    Yes.

21   Q.    And you applied?

22   A.    Yes.

23   Q.    Do you know who else applied?

24   A.    I do not recall, sir.

25   Q.    Okay.  Did you interview with Mr. San

Ex. A, p. 9

Page 45

1    Miguel?

2         A.    Yes.

3         Q.    And when did you find out that you had

4    been selected?

5         A.    Probably after two weeks.

6         Q.    All right.  Now, you had worked with

7    Mr. San Miguel, at that point in time, for how many

8    years?

9         A.    From the day that Mr. Laney leaves

10   until that time, March 18 of 2002.

11        Q.    My question must not have been clear.

12   I'll rephrase it.

13              When did Mr. San Miguel come to

14   the Juneau Fred Meyer?

15        A.    I think around 1994.  I'm not very

16   sure.

17        Q.    Okay.  So before he became the apparel

18   manager, you and he had worked together for

19   approximately six years?

20        A.    Yes, sir.

21        Q.    And during that six years, had he

22   always been the first assistant, and you had been

23   the second assistant?

24        A.    Yes, sir.

25        Q.    Okay.  How would you describe your

Ex. A, p. 10

Myrna Johnson * 1/23/2006
Johnson v. Fred Meyer * J04-008 CV (JWS)

Page 47

1    A.    Yes, sir.

2    Q.    But for the record, would you tell us

3    what a plan-o-gram is?

4    A.    A plan-o-gram is the schematic design

5    that all the retail stores have in every store so

6    that the customer will not have a problem finding

7    merchandise from one store to another.

8    Q.    So, in other words, you'd like a

9    customer to walk into a Fred Meyer store in Juneau

10   and walk into a Fred Meyer store in Anchorage and

11   feel familiar with where things are?

12   A.    Yes, sir.

13   Q.    And let's define "freight."  What, at

14   Fred Meyer, is "freight"?

15   A.    The stocks that we have to put on the

16   floor, the merchandise.

17   Q.    The merchandise.  All right.  And what

18   was the issue in that December 1999 or whenever --

19   between you and Mr. San Miguel with regard to

20   putting out the freight?

21   A.    We have so much freight for the

22   holidays.

23   Q.    Uh-huh.  So what --

24   A.    Mr. Laney assign us to three shifts,

25   three schedules.

Glacier Stenographic Reporters Inc.          Ex. A, p. 11
glaciersteno@gci.net * 907.789.9028

Page 52

1    manager?

2        A.      Yes.  That's all we have.

3        Q.      Okay.  Did you talk to Mr. Laney about

4    the situation?

5        A.      Yes.

6        Q.      And did you and Mr. Laney and

7    Mr. San Miguel, all three, talk about it?

8        A.      Yes.

9        Q.      How was it resolved then, just --

10       A.      Then we came out of the stockroom as

11   friends again.

12       Q.      All right.  Were you not friends before

13   that?

14       A.      No, we are friends.  That means as if

15   nothing happened, as if we had no misunderstanding.

16       Q.      And as friends, did you ever invite

17   Mr. San Miguel to your house?

18       A.      Yes.

19       Q.      How many times?

20       A.      Numerous times, sir.

21       Q.      What were the occasions?

22       A.      He was at my house on my daughter's

23   birthday when I used to live on Nancy street.  His

24   family, his father and his kids and brothers, were

25   at my house on July 4th to watch the fireworks.

Ex. A, p. 12

Myrna Johnson * 1/23/2006
Johnson v. Fred Meyer * J04-008 CV (JWS)

Page 53

1    Q.    Any other times?

2    A.    There's a few more, but I don't really

3    remember when are the dates.

4    Q.    Would it be fair to say, before

5    Mr. San Miguel became the apparel manager, that you

6    and he got along reasonably well at work, and you

7    also were friendly outside of work?

8    A.    Yes, sir.

9    Q.    Okay.  Did Mr. San Miguel talk to your

10   husband?

11   A.    Yes.

12   Q.    Was there any time before January 2002

13   when you thought that Mr. San Miguel, for one

14   reason or another, was unhappy with you?

15   A.    No.

16   Q.    Okay.  Did Mr. San Miguel ever, before

17   January 2002, give you a performance evaluation?

18   A.    Yes, sir.

19   Q.    How was it?

20   A.    It was good.

21   Q.    Okay.

22        MR. CHOATE:  We have been going

23   just about an hour.  Whenever you have time to make

24   a natural break --

25        MR. DICKENS:  Just a few more

Myrna Johnson * 1/23/2006
Johnson v. Fred Meyer * J04-008 CV (JWS)

Page 54

1    minutes.

2                        MR. CHOATE:  Sure.

3                        MR. DICKENS:  Well, that's fine.

4    Let's just take one here.  That's good.

5    10:02 AM

6                        (Off record)

7                        (Ms. Srader is not present)

8    10:18 AM

9    BY MR. DICKENS:

10          Q.    Ms. Johnson, where did Mr. Laney go

11    after he left the company?

12          A.    He went to Seattle, I think.  Yeah.  He

13    went to Seattle.

14          Q.    Okay.  And he was replaced by

15    Mr. San Miguel?

16          A.    Yes.

17          Q.    Did you apply for Mr. Laney's position?

18          A.    No.

19          Q.    Why not?

20          A.    I'm not qualified for that position.

21          Q.    What did you think the qualifications

22    were?

23          A.    You have to be a first assistant before

24    you are qualified to become a manager.

25          Q.    All right.  So it is sort of a stepping

Page 55

1    stone, you go from second assistant to first

2    assistant, first assistant to department manager?

3        A.    Yes, sir.

4        Q.    All right.  After Mr. San Miguel became

5    the apparel manager in January, how did you and he

6    get along that next year?

7        A.    I promise him I will -- we get along

8    good.

9        Q.    Were there any areas in your

10   performance that Mr. San Miguel counseled you were

11   ones in which improvement would be good for you,

12   where improvement was needed?

13       A.    No.  I can't remember.

14       Q.    Did you ever hear the word

15   "prioritize"?

16       A.    Yes.

17       Q.    Did Mr. San Miguel ever discuss that

18   issue with you, you need to work on prioritizing

19   your responsibilities?

20       A.    Yes.

21       Q.    And in what context did that discussion

22   take place?

23       A.    That when he give me a project, I have

24   to look at the project and prioritize which is the

25   most important thing.

Ex. A, p. 15

Myrna Johnson * 1/23/2006
Johnson v. Fred Meyer * J04-008 CV (JWS)

Page 56

1    Q.    Did you work on that skill?

2    A.    I did on that -- I work on that skill,

3    sir.

4    Q.    Now, as the first assistant, what

5    schedule did you work, then, that year of 2001?

6    A.    I am the opening manager.

7    Q.    So what hours did you have?

8    A.    8:00 till 5:00.

9    Q.    That's 8:00 a.m. to 5:00 p.m.?

10   A.    That was the schedule.

11   Q.    Now, when were schedules prepared at

12   Fred Meyer during the calendar year 2001?

13   A.    Excuse me, sir?

14   Q.    Sure.  Isn't it true that schedules are

15   posted by the department manager for the following

16   week?

17   A.    Yes.

18   Q.    And what was the work week at Fred

19   Meyer?

20   A.    Sunday to Saturday.

21   Q.    When were those schedules prepared?

22   A.    It has to be posted at least before

23   Friday of the previous week.

24   Q.    All right.  Just to make sure we are

25   clear, by Friday, January 19, 2006, the department

Ex. A, p. 16

Page 57

1    manager would post the schedule for the week

2    beginning Sunday, January 22?

3        A.    Yes.

4        Q.    All right.  So your schedule, then, for

5    working 8:00 a.m. until 5:00 p.m. would have been

6    posted the prior Friday?

7        A.    Yes.

8        Q.    Now, during 2001, then, now that you

9    are working during the day shift, 8:00 to 5:00

10   p.m., when did you do all those vendor jobs?

11       A.    In the afternoon sometimes.

12       Q.    I thought you were working at Fred

13   Meyer in the afternoon?

14       A.    Excuse me, sir.  You are talking about

15   when I was the second assistant?

16       Q.    No.  Let's try it again.  In 2001, you

17   were the first assistant, correct?

18       A.    Yes.

19       Q.    In calendar year 2001, when did you do

20   those vendor jobs if you were working the day shift

21   at Fred Meyer from 8:00 a.m. to 5:00 p.m.?

22       A.    On my day-offs, I do the vendor jobs.

23       Q.    And what days off did you have?

24       A.    Sometimes Thursday, sometimes Wednesday

25   and Thursday, or sometimes -- it varies.

Ex. A, p. 17

Myrna Johnson * 1/23/2006
Johnson v. Fred Meyer * J04-008 CV (JWS)

Page 62

1    from the doctor.

2        Q.    No.  All you submitted was a doctor's

3    note.  Am I correct?

4        A.    Yes.

5        Q.    And you didn't fill out the form or

6    have your doctor fill out the form that is called

7    "Certification by Healthcare Provider."  It is a

8    four page form.

9        A.    They didn't give me that.

10       Q.    Who is "they"?

11       A.    Mr. San Miguel.

12       Q.    You were sent down to talk to Rebecca

13   Harmon, the time and attendance clerk, weren't you?

14       A.    No.

15       Q.    You weren't?

16       A.    No.

17       Q.    What forms did you get?

18       A.    The family leave -- application for

19   family leave of absence.

20       Q.    So you are telling me if Ms. Harmon

21   tells me that she talked to you and gave you the

22   forms, but she never gave you the healthcare

23   certification form, her recollection is incorrect?

24       A.    No.  Mr. San Miguel give me the form.

25       Q.    Form singular, or forms plural?

Ex. A, p. 18

Myrna Johnson * 1/23/2006
Johnson v. Fred Meyer * J04-008 CV (JWS)

Page 63

1      A.      Excuse me?

2      Q.      He gave you one form or multiple forms?

3      A.      Mr. San Miguel gave me one form that

4   has four copies with it, I think.

5      Q.      Okay.

6      A.      Like duplicates.

7      Q.      Right.  And did you ever talk to

8   Rebecca Harmon?

9      A.      No.

10     Q.      Do you know who Rebecca Harmon?

11     A.      Yes.

12     Q.      Who is she?

13     A.      I don't know her position now.  I know

14  that she works for Fred Meyer.

15     Q.      Okay.  In January 2002, what position

16  did Rebecca Harmon hold?

17     A.      She might be working at the time in

18  attendance, but the person I know working at the

19  time and attendance was James, not Rebecca.

20     Q.      What is James' last name?

21     A.      I don't remember.

22     Q.      Did you ever, as a first assistant or

23  second assistant, send an employee to the time and

24  attendance clerk to get any forms for medical leave

25  at any time?

Ex. A, p. 19

Myrna Johnson * 1/23/2006
Johnson v. Fred Meyer * J04-008 CV (JWS)

Page 64

1      A.      Yes.

2      Q.      Who?

3      A.      I don't remember the employees.

4      Q.      Was that not the procedure that, if you

5  needed to get forms for a leave, you go to the time

6  and attendance clerk?

7      A.      Normally that was the procedure.

8      Q.      All right.  Now, let's go back to the

9  questions I was asking.  Did you, before you took

10  the leave in February 2002, talk to Mr. San Miguel

11  about taking six months or more off that year

12  because you thought you'd be staying in the

13  Philippines or going back to the Philippines?

14      A.      Not before two thousand -- March of

15  2002.

16      Q.      Did you ever tell anybody, before March

17  of 2002, that you had that discussion with

18  Mr. San Miguel?

19      A.      No.

20      Q.      All right.  Let's go back to calendar

21  year 2001.  Did you hire anybody that year?

22      A.      Did I hire?

23      Q.      Yes.  In calendar year 2001, as first

24  assistant, did you hire any employees to work under

25  your direction at that time in the apparel

Ex. A, p. 20