# DECLARATION OF JAMES R. DICKENS
## EXHIBIT A
## (PAGES 21-40)

Myrna Johnson * 1/23/2006
Johnson v. Fred Meyer * J04-008 CV (JWS)

Page 69

1    ever overrule you on a recommendation for a hire?

2        A.     There's a few times.

3        Q.     And can you give me any examples?

4        A.     I think -- excuse me.  Actually, I am

5    not very sure if it was at his time when I hired a

6    guy named Mr. Harabata.

7        Q.     A man?

8        A.     Yes.  And he's one of my hires, but he

9    did not oppose to that.  I tried to -- I can't

10   remember who.  I interviewed a lot of people, sir,

11   but I'm not very sure if I recommend to hire them.

12   Yes.  I'm not very sure.

13       Q.     After Mr. San Miguel became the apparel

14   manager, did he ever come to you with any criteria

15   that you should apply in interviewing employees and

16   making recommendations on whom to hire?

17       A.     Yes.

18       Q.     Okay.  And what did he tell you?

19       A.     That I should hire warm bloods.

20       Q.     Warm bloods?

21       A.     Yes.

22       Q.     What are warm bloods?

23       A.     Because --

24       Q.     No, what are warm bloods?

25       A.     Younger.

Ex. A, p. 21

Myrna Johnson * 1/23/2006
Johnson v. Fred Meyer * J04-008 CV (JWS)

Page 70

1    Q.    Well, you didn't say younger.  You said

2    warm bloods.

3    A.    Yes.  That's his term, warm bloods.

4    Q.    When did he tell you that?

5    A.    A lot of times.

6    Q.    How do you know that is a term for

7    younger?  It could be hiring people of Filipino

8    background, right?

9    A.    Yes, it could be.

10   Q.    It could be hiring people with Hispanic

11   background, right?

12   A.    Right.

13   Q.    Warm bloods is also a term used for

14   certain types of horses.  Did you know that?

15   European warm bloods?

16   A.    I don't understand.

17   Q.    All right.  That's an aside.

18         So when did Mr. San Miguel ever

19   use this term, "hire warm bloods"?

20   A.    He uses that all the time.

21   Q.    In what context?

22   A.    Like he will say, "We need warm bloods

23   in here."

24   Q.    You didn't take that to mean somebody

25   who was going to be moving around and being active

Ex. A, p. 22

Myrna Johnson * 1/23/2006
Johnson v. Fred Meyer * J04-008 CV (JWS)

Page 71

1    and getting the work done, as opposed to sitting?

2        A.    No.

3        Q.    Why not?

4        A.    What he meant by warm blood are

5    younger -- younger people.

6        Q.    Did he tell you that?

7        A.    He -- whenever a person passed by, he

8    will make a comment, "That is one of the warm

9    bloods."

10       Q.    I don't understand that.  Explain that

11   to me?

12       A.    He make gestures to me.  He make

13   comments.

14       Q.    Like what?

15       A.    When we are standing at the desk on the

16   computer working there, and if somebody passed by,

17   like a customer, he will make a comment, "That is a

18   warm blood."

19       Q.    Well, what kind of customer fit the

20   reference to "warm blood"?

21       A.    A younger woman.

22       Q.    Younger than whom?

23       A.    20 years old.

24       Q.    Are you talking about the computer up

25   in the office in the back?

Ex. A, p. 23

Myrna Johnson * 1/23/2006
Johnson v. Fred Meyer * J04-008 CV (JWS)

Page 72

1    A.    No.  We have a computer close to the

2  fitting room, sir.  That's where we do our

3  communications.

4    Q.    Can you recall a specific incidence

5  when this happened?

6    A.    I cannot recall a date because it is a

7  lot of times that he mentioned that.

8    Q.    Did he laugh?

9    A.    Yeah, he would laugh up there.

10    Q.    All right.  Did you laugh?

11    A.    No.

12    Q.    Why not?

13    A.    Because employee -- it does not matter

14  to me whatever they are -- I find it -- it is not

15  funny to me.

16    Q.    Did you ever say anything to him about

17  that?

18    A.    Yes.

19    Q.    Did you ever say, "Jaime, look, I'll

20  just hire the best people I can"?

21    A.    I say, "What we have to hire is

22  somebody who can do the job."

23    Q.    Did he ever disagree with that?

24    A.    He wouldn't say anything.

25    Q.    When was this?  What time frame?

Ex. A, p. 24

Myrna Johnson * 1/23/2006
Johnson v. Fred Meyer * J04-008 CV (JWS)

Page 82

1      A.    That January -- February.

2            MR. CHOATE:  What year?

3      A.    Of 2002.

4      Q.    All right.  So after the holidays were

5  over and the store was a little more relaxed, you

6  took a vacation beginning in January 2002?

7      A.    Yes, sir.

8      Q.    Okay.  And where did you go?

9      A.    I went to the Philippines?

10     Q.    And this was Anna, your youngest

11  daughter?

12     A.    Yes, sir.

13     Q.    And did she go with you or stay in

14  Juneau?

15     A.    She stayed here.

16     Q.    With her father?

17     A.    With Russell.

18     Q.    I'm sorry.  That's her stepfather.

19     A.    Yes, sir.

20     Q.    All right.  Where did you go on your

21  vacation?

22     A.    I went to the Philippines.

23     Q.    With whom?

24     A.    By myself.

25     Q.    And you were gone for how long?

Ex. A, p. 25

Myrna Johnson * 1/23/2006
Johnson v. Fred Meyer * J04-008 CV (JWS)

Page 84

1    with my daughter.  I have a problem.

2         Q.      And what was the problem?

3         A.      She run away from home.

4         Q.      Well, in Juneau you can't run very far.

5    Where did she go?

6         A.      She goes from one friend's to another,

7    and then she check herself in a hotel.

8         Q.      So where did you find her when you got

9    home?

10        A.      I found her in one of the apartments

11   here in downtown with -- partying with friends.

12        Q.      Did you take her in and bring her home

13   at that point in time?

14        A.      I take her in and bring her to Bartlett

15   Memorial.

16        Q.      And where is that?

17        A.      Here in Juneau.

18        Q.      All right.  Were you scheduled to

19   return to work at that point in time?

20        A.      I was back to work already.

21        Q.      And I would assume that you had some

22   difficult days there trying to find out what your

23   daughter's situation was?

24        A.      Yes, sir.

25        Q.      Did you miss work?

Ex. A, p. 26

Page 85

1    A.    Yes.

2    Q.    And did you miss work and not advise

3  Mr. San Miguel in advance any of those days?

4    A.    I went over there in Fred Meyer and

5  talked to him.

6    Q.    And how did he respond?

7    A.    I told him that -- he -- I told him

8  that my daughter runs away, and I cannot work

9  because I have to look for her.  So I'm using my

10  sick leave, my leftover sick leave, to find --

11  because I have to look for my daughter.

12    Q.    Okay.  And did Mr. San Miguel assist

13  you and say, "Go ahead and do whatever you can to

14  take care of your daughter"?

15    A.    He said, yes, I can do that.

16    Q.    In no way did he try to restrain you

17  from doing that, did he?

18    A.    He did -- he does that too.

19    Q.    He does what too?  Just answer my

20  question.

21    A.    No, no, he didn't.

22    Q.    Okay.  All right.  Did you have to fill

23  out any paperwork?

24    A.    I -- not on the sick leave.  All we

25  have to do there is to call the time and attendance

Ex. A, p. 27

Page 86

1    and say that we are using our sick leave.

2         Q.      And how many days in February of 2002

3    did you take sick leave for whole or part of the

4    day?

5         A.      I think around three days.

6         Q.      Three days?

7         A.      After I found my daughter.

8         Q.      Well, who was covering for you while

9    you were gone on vacation and then on this sick

10   leave?

11        A.      Who was, sir?

12        Q.      Who was taking over your

13   responsibilities at Fred Meyer while you were on

14   vacation and then later when you were supposed to

15   come back, while you were on sick leave working

16   with your daughter?

17        A.      Charina.

18        Q.      Anybody else?

19        A.      Jaime.

20        Q.      Okay.  Now, after you returned from

21   your vacation, did you ever go back and work

22   several days at Fred Meyer before you took another

23   leave of absence?

24        A.      After I get done from vacation, yes.

25        Q.      How many days did you work before you

Ex. A, p. 28

Myrna Johnson * 1/23/2006
Johnson v. Fred Meyer * J04-008 CV (JWS)

Page 87

1    took the next leave to go to the Philippines again?

2         A.    Okay.  You are asking me, sir, that --

3         Q.    Let me be clear.  I know we have gone

4    through a lot of dates.  In January, you took two

5    weeks of vacation that overlapped with the first of

6    February 2002?

7         A.    Yes, sir.

8         Q.    Okay.  Upon your return from that

9    vacation, you discovered that your daughter needed

10   some assistance?

11        A.    Yes, sir.

12        Q.    Okay.  And in order to assist your

13   daughter, there were, oh, approximately three days

14   when you took sick leave in order to help her check

15   into Bartlett Hospital and get treatment, correct?

16        A.    That is when I applied for the family

17   leave of absence, sir.

18        Q.    All right.  Now, what I'm asking is,

19   after you took those three days of sick leave, then

20   you applied for a leave because of your daughter's

21   situation.  Did you ever go back and work any

22   number of days in February 2002 before you took the

23   family leave?

24        A.    No, sir.

25        Q.    All right.  So then, just to make sure

Ex. A, p. 29

Page 88

1  I have got this -- understand it, because it wasn't

2  clear from the documents -- is that you took a

3  two-week vacation.  You returned.  You found your

4  daughter had a medical situation, took some days of

5  sick leave, applied for what you call a family

6  leave of absence, and then you didn't return to

7  Fred Meyer until mid-March 2002?

8        A.    Yes, sir.

9        Q.    All right.  Now, let's go back, and I

10  want to be as clear as we can.  Tell me about the

11  sequence of events where you have got your daughter

12  checked in, and you go back to the Fred Meyer store

13  and you talk to someone about taking a family leave

14  or a leave to assist your daughter.  With whom did

15  you talk?

16       A.    To Mr. San Miguel.

17       Q.    And where did you talk?

18       A.    We talk at the shoe department.

19       Q.    Was he just in there, or is that where

20  you were?

21       A.    I call him, and he was close by, so he

22  went down there.

23       Q.    Now, there is an office where

24  Mr. San Miguel did a lot of his work as a

25  department manager, which is in the back upstairs,

Ex. A, p. 30

Myrna Johnson * 1/23/2006
Johnson v. Fred Meyer * J04-008 CV (JWS)

Page 92

1    A.    Yes.

2    Q.    All right.  Let's go back to your

3  discussion with Mr. San Miguel.  You said you found

4  your daughter.  You need to apply for leave.  What

5  else did you tell him at that time about the

6  situation?

7    A.    That's it, and he told me to come back

8  the next day and get the paperwork.

9    Q.    That took 30 minutes to tell him you

10  found your daughter and you needed to apply for

11  family leave or medical leave?

12    A.    We talk a little bit more, like what

13  happened that we found her at that house, that

14  there was a substance abuse.  Yes.  I don't -- I

15  don't remember exactly what we talk about, but we

16  talk about that problem.

17    Q.    So Mr. San Miguel said to come back the

18  next day?

19    A.    Yes.

20    Q.    And do what?

21    A.    And he -- he will give me the

22  paperwork, and I will fill it out.  And he said to

23  bring all the doctor's paperwork that you have.

24    Q.    Any other discussion that day in the

25  shoe department on whatever day it was in early

Myrna Johnson * 1/23/2006
Johnson v. Fred Meyer * J04-008 CV (JWS)

Page 93

1   February?

2        A.      No, sir.

3        Q.      Okay.  And did you return the next day?

4        A.      Yes.

5        Q.      And what did you bring back at that

6   time?  Anything?

7        A.      The doctor's -- the note from Bartlett

8   and the doctor's note about medicine, about my

9   daughter.

10       Q.      Okay.  Did Mr. San Miguel give you any

11  documentation?

12       A.      Yes.  And I fill it out right there.

13       Q.      And what do you recall that was?

14       A.      It was the family leave of absence.

15       Q.      One page, two pages?

16       A.      I think three or four -- three pages,

17  probably.  Or two -- it has pink and then white.  I

18  don't remember if there is another color.

19       Q.      Okay.  Those are just the copies, I

20  know.  But how many documents did you fill out?

21       A.      Oh, two pages, sir.

22       Q.      Did you give those back to

23  Mr. San Miguel?

24       A.      Yes.

25       Q.      Did you go talk to anyone at time and

Ex. A, p. 32

Myrna Johnson * 1/23/2006
Johnson v. Fred Meyer * J04-008 CV (JWS)

Page 94

1   attendance at all?

2       A.     NO.  He said he will take care of it

3   and I can buy my ticket.

4       Q.     Had you ever previously requested a

5   family leave?

6       A.     No, sir.

7       Q.     Had you ever referred anyone else to

8   time and attendance to take a family leave?

9       A.     NO.

10      Q.     I thought you told me earlier you knew

11  that's where you normally would go, would be time

12  and attendance.

13      A.     I know that is where most people would

14  go because all the paperwork was there.  But we

15  also have some in our office, in the -- convenient

16  for us.

17      Q.     All right.  When you finished the

18  paperwork, did you talk to anyone at time and

19  attendance?

20      A.     I gave all the paperwork to

21  Mr. San Miguel.

22      Q.     Did you keep copies?

23      A.     I think I did.

24      Q.     Did you then go buy your ticket, and

25  you and your daughter went to the Philippines?

Ex. A, p. 33

Myrna Johnson * 1/23/2006
Johnson v. Fred Meyer * J04-008 CV (JWS)

Page 95

1    A.    Yes.  We bought our ticket, and after

2  seven days, we left.

3    Q.    Oh, you had to have a seven-day advance

4  notice?

5    A.    Yes.

6    Q.    Was that because the ticket price was

7  less if you had seven days' notice?

8    A.    I think that was when the available

9  flights and everything.  I'm not very sure why.

10    Q.    All right.  You went to the

11  Philippines, got your daughter situated, and you

12  stayed with her for about a month?

13    A.    Less -- a few days less than one month.

14  I think around two weeks, sir, two or three weeks.

15    Q.    Well, we'll look at that.  My

16  recollection is that you left like on February the

17  12th and returned on March the 10th, 2002.

18    A.    That is what I applied for my leave of

19  absence, but I don't think I leave here in Juneau

20  because I have to -- when I bought the ticket, we

21  still have to --

22    Q.    Oh, all right.  So you took the leave,

23  but you stayed in Juneau for another week?

24    A.    Yes.  And now I remember, because we

25  have to wait -- we have to -- we were here, but he

Ex. A, p. 34

Myrna Johnson * 1/23/2006
Johnson v. Fred Meyer * J04-008 CV (JWS)

Page 96

1    knows I was in town.  But I already started my

2    leave of absence because I have to watch my

3    daughter.

4         Q.    Okay.  What date did you return from

5    the Philippines?

6         A.    I think on the 10th, 10th or 11th.

7         Q.    Do you recall what day of the week that

8    was?

9         A.    Might be Sunday, or -- it might be

10   Sunday.

11        Q.    That you returned, or Saturday?

12        A.    I think I returned Sunday.  I'm not so

13   clear.

14        Q.    Well, Saturday would have been March 9,

15   2002.

16        A.    Okay.  So it must be --

17        Q.    Must be what?

18        A.    Sunday, maybe.

19        Q.    Sunday, March 10, 2002?

20        A.    Yes.

21        Q.    After you returned, how long before you

22   went to the Fred Meyer store?

23        A.    I call him that day.  I didn't go there

24   yet.  I call him the minute I got here.  I call

25   Mr. San Miguel.

Ex. A, p. 35

Myrna Johnson * 1/23/2006
Johnson v. Fred Meyer * J04-008 CV (JWS)

Page 97

1    Q.    You mean when you got into Juneau off

2    of the flight, you went home and called

3    Mr. San Miguel and told him you were here?

4    A.    The next day -- I got here in the

5    afternoon.  So the next morning, I call him and I

6    told him I was here.  I was back.

7    Q.    Ms. Johnson, in the course of going

8    back over this, it has been -- we have been advised

9    that you actually went to the Fred Meyer store on

10   one of your vendor jobs and were seen by a Fred

11   Meyer employee, who advised Mr. San Miguel that you

12   were here, and he didn't know about that.

13   A.    We already talked before that.  He

14   knows I was here.  I asked him, "When do you want

15   me to go back to work?"  Because I was scheduled to

16   work for my family leave of absence on March 13.

17   But I come back early, so I call him and I told

18   him, "I'm here in town.  When do you want me to

19   work?"  And he said, "Why don't you come" -- if I

20   was not mistaken, I think the -- Wednesday was the

21   12th, something like that.  I'm not very sure.  But

22   he told me, "Why don't you come in on the 12th?"

23   And I asked him, "What is my schedule?"

24   Q.    Wait a minute.  Let's go back.  Isn't

25   it true that you didn't tell Mr. San Miguel you

Ex. A, p. 36

Myrna Johnson * 1/23/2006
Johnson v. Fred Meyer * J04-008 CV (JWS)

Page 98

1    were back until he found you in the store on

2    Sunday, March the 10th?

3        A.    No, sir.  I call him the day I got

4    here.

5        Q.    All right.  We'll go over that.

6    Anyway, when you talked to him, whichever day it

7    was, he asked you to come on Monday and you said,

8    "How about Tuesday?"  Isn't that right?

9        A.    No.  I call him and I told him, "I'm

10   back.  When do you want me to come here to work?"

11   And then he said, "Come on the 12th."  And I said,

12   "What is my schedule?"  He gave me my schedule.

13   And then I went to Fred Meyer and I talk to him.

14       Q.    Now, did he give you your schedule at

15   that time, or did you not know what your schedule

16   was until you walked in?

17       A.    He gave me my schedule on the phone.

18       Q.    On Sunday, March 10?

19       A.    No, on -- I think it's Monday when I

20   call him, the next day.

21       Q.    Well, you'd already been in the store

22   Sunday, though, had you not?

23       A.    No, I was not in the store on Sunday,

24   sir.

25       Q.    All right.  Okay.  So you went in -- as

Ex. A, p. 37

Myrna Johnson * 1/23/2006
Johnson v. Fred Meyer * J04-008 CV (JWS)

Page 99

1    you were telling me, you went into the store on

2    Monday, which would have been March 11, 2002?

3         A.    No, sir.

4         Q.    All right.

5         A.    What I was telling you was, I got here

6    in town.  The next day, I call Mr. San Miguel.  I

7    told him I was in town.  I am ready to work.  So he

8    said, "why don't you come in on the 12th?"  So

9    he -- so he put me on the schedule to work on the

10   12th, the 13th, the 14th, and then the 15th.  He

11   gave me the schedule that I am supposed to work on

12   the phone.  I was not on the schedule.

13        Q.    I understand that.

14        A.    Yes.  He gave me the schedule on the

15   phone.

16        Q.    All right.  So you came back.  You are

17   telling me you called him and said, "I'm back."

18   And then you and he talked about when you should

19   come to work, and he gave you some time frames,

20   correct?

21        A.    Yes.

22        Q.    All right.  Now, do you recall going to

23   work on Monday, March 11th, or was it Tuesday,

24   March 12th?  Or do you recall at all?

25        A.    I work on the 12th.  I don't recall the

Ex. A, p. 38

Myrna Johnson * 1/23/2006
Johnson v. Fred Meyer * J04-008 CV (JWS)

Page 100

1    day.

2         Q.      And did you -- well, strike that.

3                 That work week, which would have

4    been beginning as of Sunday, March 10, from your

5    prior testimony, the schedule would have been

6    prepared as of, at least -- and posted the prior

7    Friday, which would have been March 8, 2002,

8    correct?

9         A.      Yes, sir.

10        Q.      All right.  So when you come back,

11   other people have already been assigned their

12   hours, and he has to work you in someplace else;

13   isn't that right?

14        A.      Yes.

15        Q.      Before you left to go to the

16   Philippines in February 2002, what had been the

17   schedule you were working -- well, actually, you

18   didn't work since January 2002.  What schedule had

19   you worked then?

20        A.      Daytime.

21        Q.      Okay.  Now, when you came back on

22   March 10 or March 11, 2002, what schedule did you

23   get at that time?

24        A.      1:30 to 11:30.

25        Q.      All right.  Had the first assistant

Ex. A, p. 39

Myrna Johnson * 1/23/2006
Johnson v. Fred Meyer * J04-008 CV (JWS)

Page 101

1  hours already been assigned to someone for that

2  week?

3      A.    Yes.

4      Q.    And who was that?

5      A.    Johnna Havard.

6      Q.    Had you ever met Ms. Havard before you

7  came back from your trip to the Philippines in

8  March 2002?

9      A.    No, sir.

10     Q.    And did you come to understand

11 Ms. Havard had been brought in from the Wasilla

12 store to fill in during your absence?

13     A.    He explained that to me on the 12th

14 when I show up, when I come to work.

15     Q.    And so you worked, then, the next

16 several days -- Tuesday, Wednesday, Thursday -- the

17 1:30 to closing shift?

18     A.    Yes, sir.

19     Q.    Same shift you had worked as a second

20 assistant?

21     A.    Yes.

22     Q.    Was there a schedule posted that

23 Friday, which would have been March 15, 2002, for

24 the following week?

25     A.    I saw the schedule on Friday, yes.

Ex. A, p.40