# DECLARATION OF JAMES R. DICKENS
# EXHIBIT A
# (PAGES 41-60)

Myrna Johnson * 1/23/2006
Johnson v. Fred Meyer * J04-008 CV (JWS)

Page 107

1    Q.    Okay.  As far as inquiring about your

2    daughter, that seems a rather natural question,

3    wouldn't you agree?

4    A.    Yes.

5    Q.    Did you take offense at that?

6    A.    No.  I feel sad.

7    Q.    Oh, I understand.  But he expressed his

8    empathy for your situation, did he not?

9    A.    Yes.

10    Q.    Other than inquiring about how she is,

11    any other comment about your daughter or your

12    absence by Mr. San Miguel?

13    A.    Not on the first day.  Not that day.

14    Q.    Was there on another day?

15    A.    The following day.

16    Q.    Okay.  What happened the following day?

17    A.    He -- he -- we were talking at the

18    office.

19    Q.    And what did you discuss?

20    A.    About the projects that has to be done.

21    Q.    Okay.  What did you discuss about

22    those?

23    A.    He also mentioned about the recovery.

24    Q.    Well, did he make some comment about

25    your daughter?

Ex. A, p. 41

**Myrna Johnson * 1/23/2006**
**Johnson v. Fred Meyer * J04-008 CV (JWS)**

Page 108

1    A.    Yes.

2    Q.    What?

3    A.    He said that my recovery the previous

4    night was not good, and he said that "I know that

5    because of the problem with your daughter, you are

6    distracted."

7    Q.    Well, it was true, you were distracted,

8    weren't you?

9    A.    No.

10    Q.    You mean to tell me, as a mother who

11    was taking her daughter to the Philippines and had

12    her attempt suicide, that that wasn't something in

13    your thoughts, and you weren't concerned about

14    that?

15    A.    I was sad, sir, but I was not

16    distracted.

17    Q.    Okay.  Would you agree that sometimes

18    how we see ourselves is not how other people see

19    us?

20    A.    No, sir.

21    Q.    So you think everybody sees us the way

22    we see ourselves?

23    A.    I don't know.  I cannot think for

24    somebody's opinion, sir.  But me, I -- I do what

25    has -- I have to do.

Ex. A, p. 42

Page 111

1    Q.    All right.  And so this was when you
2  first came on work, which would have been
3  Wednesday, that second day?
4    A.    This was on the 13th.
5    Q.    The 13th.  And I think that's
6  Wednesday, if I recall the calendar correctly.
7    A.    Maybe so.
8    Q.    All right.  Any other discussions on
9  the 13th with Mr. San Miguel about the prior
10  evening's performance?
11    A.    He showed me a picture.
12    Q.    A picture of what?
13    A.    Of -- he said that -- of recoveries.
14    Q.    Of the recovery the night before?
15    A.    No.
16    Q.    Of what?
17    A.    Of recoveries when I was gone.
18    Q.    And he said what about them?
19    A.    He said mine is a little bit better
20  than that.
21    Q.    But still not up to his standards?
22    A.    Not up to his standards.
23    Q.    All right.  Why did he show you a
24  picture of other recoveries that weren't up to his
25  standards?  Do you know?

Ex. A, p. 43

Myrna Johnson * 1/23/2006
Johnson v. Fred Meyer * J04-008 CV (JWS)

Page 112

1    A.    I think so that I can see how bad

2   recoveries before was.

3    Q.    And did this, as you understood it, tie

4   in with his earlier statement to you that standards

5   had been raised and were going to be implemented,

6   higher standards?

7    A.    That the standard has been raised.  We

8   use that all the time to motivate our employees.

9    Q.    So how did Tuesday go then, or the

10   second day go -- Wednesday, I guess it is?

11    A.    He send me an e-mail about the baby

12   furniture plan-o-gram.

13    Q.    Okay.  And what was that e-mail

14   addressing, regarding the baby furniture

15   plan-o-gram?

16    A.    That Minerva and Julita haven't

17   finished the baby furniture plan-o-gram.

18    Q.    Did you assign the baby plan-o-gram to

19   Minerva and Julita?

20    A.    No.

21    Q.    Then why were they working on it, if

22   you had not assigned it to them?

23    A.    Mr. San Miguel assigned it to them

24   prior to, when I was gone.

25    Q.    But then you were supervising them

Ex. A, p. 44

Myrna Johnson * 1/23/2006
Johnson v. Fred Meyer * J04-008 CV (JWS)

Page 120

1    Q.    So what did you do?

2    A.    I went downstairs.

3    Q.    Now, when you say "his office," so that

4  we're clear, in the Juneau store you go in the back

5  where the storage area is, and you go up a flight

6  of stairs.  And there is a conference room, the

7  storage director's office, and then a larger office

8  for the department managers?

9    A.    That's our office, yes, sir.

10    Q.    All right.  And so it is at the

11  managers' office where you initially talked to

12  Mr. San Miguel?

13    A.    Yes.

14    Q.    All right.  You went back downstairs,

15  and how long were you downstairs working before you

16  next talked to Mr. San Miguel?

17    A.    Around 30 minutes.

18    Q.    Then what happened?

19    A.    He called me on the phone.

20    Q.    And said what?

21    A.    And he said, "Okay.  You can go

22  upstairs now."

23    Q.    And did you?

24    A.    Yes.

25    Q.    And did you talk to Mr. San Miguel when

Ex. A, p. 45

Myrna Johnson * 1/23/2006
Johnson v. Fred Meyer * J04-008 CV (JWS)

Page 121

1    you went upstairs?

2         A.    He told me again -- when I got there,

3    he was on the phone, and he said, "Oh, I'll just

4    call you back again."

5         Q.    And did he do that?

6         A.    Yes.

7         Q.    How much later?

8         A.    Probably around 15 minutes or 30.  I

9    can't remember.

10        Q.    All right.  And did he call you on the

11   floor again and say, "Come on up"?

12        A.    Yes.

13        Q.    And did you go on up?

14        A.    Yes.

15        Q.    Okay.  And did you meet with him in his

16   office?

17        A.    No.  He was at the door.  I didn't have

18   the chance to go inside the office.

19        Q.    So did you just talk to him at the

20   door?

21        A.    No.  He led me to Fred Sayre's office,

22   to the director's office.

23        Q.    Well, "led" -- they are side by side.

24   Instead of going in the second doorway, you simply

25   went into the first doorway, right?

Ex. A, p.46

Page 122

1    A.    Yes.  We were standing in there, and he

2    said, "Come on in here."

3    Q.    All right.  So you went into Fred

4    Sayre's office, and he's got a separate office as

5    the store director?

6    A.    Yes, sir.

7    Q.    Did you sit down?

8    A.    He make a gesture for me to sit down.

9    I sit down.

10   Q.    And was Mr. San Miguel standing or

11   sitting?

12   A.    Standing.

13   Q.    And where was Mr. Sayre?

14   A.    Sitting at his desk.

15   Q.    All right.  What happened at that

16   point?

17   A.    He put out a written warning notice and

18   start to read it to me.

19   Q.    Well, which "he"?

20   A.    Mr. San Miguel.

21   Q.    All right.  Are you saying he stood

22   there, or he sat down and read it to you?

23   A.    He stood blocking the door.

24   Q.    Well, the door was closed, wasn't it?

25   A.    Yes, he close it.  So I was sitting,

Ex. A, p. 47

Myrna Johnson * 1/23/2006
Johnson v. Fred Meyer * J04-008 CV (JWS)

Page 125

1    Mr. San Miguel asked you to sign that at the time?

2        A.    Yes, sir.

3        Q.    And what did you say?

4        A.    I said, "I cannot sign this.  This is

5    not true."

6        Q.    Why is it not true?

7        A.    Because I know I did a good recovery.

8    I know that my job performance is still the same

9    thing from the first day that I took that job.

10       Q.    Have you had employees ever disagree

11   with your evaluation of their job performance and

12   walk off the job?

13       A.    No, sir.

14       Q.    So all the time you worked at Fred

15   Meyer, no one who worked when you were supervising

16   them at the time ever disagreed with your

17   evaluation of their performance?

18       A.    They walk out of the job, but not with

19   job performance, with evaluation.  I do not do the

20   evaluation, sir.

21       Q.    All right.  Let's go back.  So your

22   testimony is that Mr. San Miguel reads you this

23   warning and then asks you to sign it, and you say

24   you won't sign it.

25       A.    Yes, sir.  I start to -- I was crying

Ex. A, p. 48

Myrna Johnson * 1/23/2006
Johnson v. Fred Meyer * J04-008 CV (JWS)

Page 126

1   already by the time he finish reading it.  I was

2   already crying.

3        Q.    Did you expect this?

4        A.    No.

5        Q.    You just told me earlier that you had

6   received several OVs that week from Mr. San Miguel

7   which were critical of your job performance, had

8   you not?

9        A.    In the course of the job, sir, we

10  always receive OVs a lot of time, and also because

11  I know that I am doing a good job.

12       Q.    Well, you just told me a few minutes

13  ago that Mr. San Miguel told you the very first

14  thing that standards are going to be higher when

15  you returned.  Didn't he tell you that?

16       A.    He tell that to me because he was

17  showing me all those that has not been done.

18       Q.    All right.  Let's go back to the

19  meeting on March the 18th, 2002.  You start to cry.

20  Do you say anything else to Mr. Sayre or

21  Mr. San Miguel at that time?

22       A.    I was crying so hard, sir, and I said,

23  "I need to go.  I need to go."

24       Q.    Go where?

25       A.    Downstairs, where I have more space and

Ex. A, p.49

Myrna Johnson * 1/23/2006
Johnson v. Fred Meyer * J04-008 CV (JWS)

Page 127

1    where I can get something -- a glass of water or

2    something.

3         Q.    Did Mr. Sayre say anything?

4         A.    He said that "We know that your job

5    performance is affected by what happened to your

6    daughter."

7         Q.    And did you respond to that?

8         A.    Yes.  I cry more.

9         Q.    Did you respond to --

10        A.    I said, "Please don't say that."  I

11   said, "I have never left this store from the day I

12   come in here -- from the moment I come in here

13   until the moment that we close the store.  I do not

14   leave this store.  Please, do not say that, because

15   I am working harder when I was -- before what

16   happened to my daughter."

17        Q.    All right.  You come back from having

18   taking your daughter in a difficult family

19   situation, and upon your return, for several days

20   the department manager concludes that you are not

21   performing as -- in a satisfactory manner.  Do you

22   think it unusual that he and the store director

23   would attribute that to a family situation?

24        A.    No --

25        Q.    Well then --

Ex. A₁ p.50

Myrna Johnson * 1/23/2006
Johnson v. Fred Meyer * J04-008 CV (JWS)

Page 128

1    A.    I don't understand the question, sir.

2    I get a little bit confused on that.

3    Q.    Let me ask you this.  What else did

4    Mr. Sayre say?

5    A.    Nothing.  He look at me there, while I

6    was crying, and I stood up.

7    Q.    Did he say anything to you about,

8    "Don't leave.  If you do, it will be considered a

9    quit"?

10    A.    No, sir.

11    Q.    Are you sure?

12    A.    Yes.

13    Q.    As a first assistant under Fred Meyer

14    policy in effect in March 2002, who at the store,

15    if anyone, had authority to terminate an employee

16    at your level?

17    A.    Mr. San Miguel and Mr. Sayre.

18    Q.    Do you know if Mr. San Miguel actually

19    had authority, or if it only could be Mr. Sayre?

20    A.    Mr. San Miguel.

21    Q.    And on what do you base that

22    conclusion?

23    A.    Because he is our immediate boss.

24    Q.    Have you ever known a situation where

25    the department manager had the authority to fire a

Ex. A, p. 51

Myrna Johnson * 1/23/2006
Johnson v. Fred Meyer * J04-008 CV (JWS)

Page 129

1  first assistant without the actual approval and

2  firing done by the store director?

3      A.    No, sir, I don't.

4      Q.    Okay.  Do you recall anything else that

5  was said by Mr. San Miguel or Mr. Sayre at that

6  point in time before you left the room?

7      A.    No.

8      Q.    Okay.  You have no recollection of any

9  comments by Mr. Sayre as to what he would conclude

10  would be your situation if you got up and walked

11  out of the room before the discussion ended?

12      A.    No, sir.  I was crying very, very hard,

13  sir.  I was saying something, and I don't even know

14  if they understand.  I was saying, "I know you have

15  somebody in your mind" --

16      Q.    Did you say that to them, or do you

17  know if they understood that?

18      A.    I said, "You must have somebody in mind

19  to replace me."

20      Q.    Now, why would you say that?

21      A.    Because prior to that, I notice some

22  changes in the store -- in the department.

23      Q.    What changes?

24      A.    Mr. San Miguel had put me to the

25  schedule that is supposed to be for the second

Ex. A, p. 52

Myrna Johnson * 1/23/2006
Johnson v. Fred Meyer * J04-008 CV (JWS)

Page 131

1    Q.    Let's start with my question.  We'll go

2    back.  You got up and left the room?

3    A.    Yes.

4    Q.    You started to tell me that you tried

5    to say something to them like you thought they were

6    going -- had someone in mind to replace you.

7    A.    Yes.

8    Q.    But you never followed up on that.

9    That's what I am trying to understand.

10    A.    Okay.  Now I understand.  Because all

11    week long, Mr. San Miguel has been blaming me for

12    all that wrong that has been happening at the

13    store.  He was blaming me for a bad recovery on

14    Saturday, on the 18th -- on the 16th, excuse me, on

15    the 16th while I was so -- he know that I was so

16    understaffed on that day.

17    Q.    Well, weren't you the person in charge

18    on the 16th?

19    A.    Yes, sir.

20    Q.    So your defense of the poor recovery is

21    because you were understaffed?

22    A.    My recovery is good.  It has always

23    been good.  But instead of praising me or giving me

24    some -- I mean to say realizing that, he's blaming

25    me.  He knows that I was short of staff that day.

Ex. A, p. 53

Page 132

1    Q.    Why were you short of staff?

2    A.    One of the employee call in sick, and

3    then he took Julita Lim for a long lunch.

4    Q.    Well, now, wait a minute.  That's not

5    true.  He didn't come up and pick up Julita Lim and

6    take her, did he?

7    A.    They went to a long lunch.

8    Q.    Mr. San Miguel didn't even work that

9    time, that lunch, didn't he?

10   A.    I know that, sir.  But Julita Lim was

11   working.

12   Q.    So let's be clear.  Mr. San Miguel was

13   not working, and Julita Lim was entitled to a

14   lunch, was she not?

15   A.    Yes, sir.

16   Q.    And so she left on a lunch break?

17   A.    Yes, sir.

18   Q.    Now, what you are telling me is that

19   you are contending she did not come back in a

20   timely fashion?

21   A.    Yes, sir.

22   Q.    But Mr. San Miguel was not working at

23   that time, so he could take whatever time he

24   wanted, could he not?

25   A.    Yes, sir.

Ex. A, p. 54

Page 135

1  saying he thought you had a bad recovery?

2      A.     Yes.

3      Q.     All right.  So that led to the meeting

4  on the 18th.  Now, let's finish that up and then we

5  can take a break here.

6                You left the room and went

7  downstairs crying?

8      A.     Yes, sir.

9      Q.     And when you say "downstairs," is that

10 in the back area where the product is stored?

11     A.     That is in our apparel stockroom.

12     Q.     I'm sorry.  What do you call it?

13     A.     We call it apparel stockroom.

14     Q.     Oh.  Apparel stockroom.  All right.

15 And who was there?

16     A.     I think Sarah Dexter, Monica Batsch,

17 and Annmarie.

18     Q.     What is Annmarie's last name?

19     A.     I think it was Stout.

20     Q.     And what did you tell them was the

21 reason why you were crying?

22     A.     I was crying, and I said, "I think he

23 was trying to get rid of me."

24     Q.     Now, why would you say that?  You'd

25 worked for the man for six years.  You had reported

Ex. A, p. 55

Myrna Johnson * 1/23/2006
Johnson v. Fred Meyer * J04-008 CV (JWS)

Page 154

1      A.     Yes, sir.

2      Q.     And is that your signature at the

3  bottom?

4      A.     Yes.

5      Q.     We earlier talked about the Fred Meyer

6  Employee Responsibilities form.  Is this the one

7  that you understood I was talking about and asking

8  you questions about?

9      A.     Yes.

10     Q.     All right.  Now, at the top on the

11  second line, it has got a clause that says, "You

12  need to know and understand the principal reasons

13  for the action outlined below," and it has got

14  several categories.

15           Now, was this document ever

16  covered with you in any of your sessions upon

17  hiring or thereafter, when you signed it on a

18  regular basis?

19     A.     Yes, sir.  We read these.  Then we sign

20  it.

21     Q.     Right.  Did you get a copy of this?

22     A.     No.

23     Q.     Well, if you look down at the bottom,

24  it has "Distribution."  It's one of those documents

25  with, I think, at least three copies -- a white for

Ex. A, p. 56

Myrna Johnson * 1/23/2006
Johnson v. Fred Meyer * J04-008 CV (JWS)

Page 157

1    "Employee conduct which will result in immediate

2    termination without prior warning."  And the first

3    one is "Dishonesty of any kind on or off the job."

4    And you understood that was a basis for immediate

5    termination, did you not?

6        A.    Yes, sir.

7        Q.    Okay.  Under 1, Section 6,

8    insubordination is also conduct that will result in

9    immediate termination.  Did you understand that?

10       A.    Yes, sir.

11       Q.    And then down under Item III, it has

12   got a heading, "The following conduct is regarded

13   and accepted as an employees's voluntary

14   resignation (quit) of his or her employment."

15   Number 1, "Walking off of the job."  Did you

16   understand that?

17       A.    Yes, sir.

18       Q.    Section III, paragraph 4, "Failure to

19   return to work from an approved leave of absence as

20   scheduled."  That's also a basis for concluding

21   that you have voluntarily quit.  Did you understand

22   that?

23       A.    Yes, sir.

24             (Exhibit 3 duly marked)

25

Myrna Johnson * 1/23/2006
Johnson v. Fred Meyer * J04-008 CV (JWS)

Page 160

1      Q.      All right.

2                   (Exhibit 4 duly marked)

3    BY MR. DICKENS:

4      Q.      Ms. Johnson, can you identify

5    Exhibit 4, please?

6      A.      Yes, sir.

7      Q.      What is it?

8      A.      This is our Employee Responsibilities,

9    same as the other exhibit.

10     Q.      But just signed on April 1, 1997?

11     A.      Yes.

12     Q.      Any different understanding about this

13   one than the prior one?  I'm sorry.  Did you

14   understand my question?

15     A.      I didn't understand what you say.

16     Q.      Well, between the sneezing -- I'll try

17   again.

18                   Ms. Johnson, with regard to No. 4,

19   is your understanding of the information on it the

20   same as for Exhibit 2, that first Employee

21   Responsibilities form?

22     A.      I understand, sir.  Yes.

23     Q.      Okay.

24                   MR. DICKENS:  Mark this, please.

25                   (Exhibit 5 duly marked)

Ex. A, p. 58

Myrna Johnson * 1/23/2006
Johnson v. Fred Meyer * J04-008 CV (JWS)

Page 162

1    A.    "Needs to improve on how to follow up

2  better on employees.  Be aware of what is going on

3  in other areas."

4    Q.    What did you understand him to mean

5  with regard to those comments about your planning?

6    A.    He means to say that I should follow up

7  whatever project I give to the employees.  And I

8  need to pay attention -- even if I have a project,

9  I need to pay attention in what is going on around

10  me.

11    Q.    All right.  Now, under Section 5, under

12  "Organizing," the check is "needs improvement," and

13  can you read what he's written there, since you are

14  familiar with his handwriting?

15    A.    "Organize your work for the day.

16  Prioritize the task.  Hard time getting work done.

17  Establish lines of responsibilities."

18    Q.    Did you discuss those comments with

19  Mr. San Miguel?

20    A.    Yes, sir.

21    Q.    And what did you understand he was

22  asking you to do?

23    A.    He wants me to prioritize the task.

24  What is meant by that, was when he give me the

25  project, or whoever give me the project, sir, we

Ex. A, p. 59

Page 163

1    have to look at it, and we have to look -- which is

2    the most important thing?

3              As an assistant manager, I was

4    also trained that if we have a project -- it is on

5    our hands and we are doing it -- our most priority

6    is customer service and sales.  So what is meant by

7    prioritize the task is, I could have 20 piece of

8    projects, but if I need to go there and make some

9    sale, I have to give that up, because our priority

10   is business, sales.

11        Q.     Okay.  Now, Item 6, under

12   "Controlling," he's written on "Focus on the

13   F/UPs."

14        A.     It means focus on follow-ups.

15        Q.     Follow-ups.  So, again, he's asking you

16   to go back and make sure you follow up on things

17   you have begun earlier?

18        A.     Yes, sir.

19        Q.     Under "Communication," 7, he'd checked,

20   it looks like, "Needs Improvement," and then that's

21   kind of scratched out, and then "Meets

22   Expectations."  Can you read what he's written

23   there?

24        A.     "Focus on accepting feedback from

25   supervisor in a positive manner.  Use it as a

Ex. A, p. 60