# DECLARATION OF JAMES R. DICKENS
## EXHIBIT A
## (PAGES 61-80)

Myrna Johnson * 1/23/2006
Johnson v. Fred Meyer * J04-008 CV (JWS)

Page 164

1    learning tool."

2         Q.      What did you understand Mr. San Miguel

3    was suggesting with that comment?

4         A.      We are trained, sir, that when we get a

5    feedback, we couldn't -- we should not be defensive

6    or we should not be upset.  Our responsibility, if

7    it's a negative feedback, is to go over to wherever

8    it is and fix it and do it the right way.

9         Q.      All right.  So these comments were

10   almost four years before March 2002, right?

11        A.      Yes, sir.

12        Q.      And on the next page, under Section 16,

13   what was your overall performance evaluation?

14        A.      "Meets Expectations."

15        Q.      Now, on the last page, then, the

16   signature on the left is -- that's

17   Mr. San Miguel's.  It says "June 5, 1998"?

18        A.      Yes, sir.

19        Q.      And then is that Mr. Laney's below his?

20        A.      Yes.

21        Q.      And --

22        A.      And this was Mike Vincent, our director

23   at that time, the one on the --

24        Q.      Michael Vincent?

25        A.      Yes.

Ex. A, p. 61

Page 165

1    Q.    Okay.  Now, at the bottom of those is

2    your handwritten comments?

3    A.    Yes, sir.

4    Q.    And what is that last sentence you

5    wrote, right above your signature?

6    A.    "Will try very hard this year to meet

7    more than expectations next year."

8    Q.    During the time that you worked at Fred

9    Meyer, did you ever get a rating above "Meets

10   Expectations"?

11   A.    Can you say that again?

12   Q.    Sure.  I'll rephrase it so it's clear.

13         After June 2, 1998, you were

14   evaluated again every year, were you not?

15   A.    Yes.

16   Q.    Did you ever have an evaluation, after

17   June 2, 1998, that was above "Meets Expectations"?

18   A.    I do have some, but there is also a

19   common law in our --

20   Q.    Listen to my question.  I just want a

21   yes or no.

22   A.    Yes.

23   Q.    After June 2, 1998, did you ever have a

24   performance appraisal form where the overall

25   performance was rated higher than "Meets

Page 166

1    Expectations"?

2         A.    I -- I don't really remember, sir, but

3    I think I have some.

4         Q.    All right.

5              (Exhibit 6 duly marked)

6    BY MR. DICKENS:

7         Q.    Ms. Johnson you have been handed what

8    has been marked as Exhibit 6 to your deposition.

9    Can you identify that, please?

10        A.    This is a Performance Appraisal Form.

11        Q.    On you?

12        A.    Yes.

13        Q.    Done by whom?

14        A.    By Mr. Laney.

15        Q.    Mr. Laney and you were friends, right?

16        A.    Yes, sir.

17        Q.    And that's his handwriting on this

18   form?

19        A.    Yes, sir.

20        Q.    Can you read that bottom paragraph that

21   he wrote on this first page?

22        A.    "Myrna is learning better to sort the

23   day's work load to accomplish what is most

24   important today.  She needs to allow herself to be

25   more open to continued training and not lose

Ex. A, p. 63

Myrna Johnson * 1/23/2006
Johnson v. Fred Meyer * J04-008 CV (JWS)

Page 167

1    information already learned."

2        Q.     Did Mr. Laney explain to you what he

3    meant by that comment?

4        A.     Yes, sir.

5        Q.     What was it?

6        A.     He said that I have info from the prior

7    appraisal that I am learning to figure out which is

8    the most important for the day, and I am

9    continually learning and training.

10       Q.     Can you tell me why Mr. Laney did this

11   evaluation, and Mr. San Miguel did the one the year

12   before?

13       A.     He does that as a preparation because

14   if somebody get promoted, they should learn that

15   this is part of our training as managers.

16       Q.     So, actually, Mr. Laney was the one who

17   should been doing it, and he had Mr. San Miguel do

18   it the year before the training?

19       A.     To give Mr. Laney the chance -- excuse

20   me.  To give Mr. San Miguel the chance to do this.

21       Q.     So then, really, the evaluation was

22   subject to Mr. Laney's review and concurrence of

23   Mr. San Miguel's evaluation of your performance?

24       A.     The what, sir?

25       Q.     Sure.  Mr. San Miguel did your

Ex. A, p. 64

**Myrna Johnson * 1/23/2006**
**Johnson v. Fred Meyer * J04-008 CV (JWS)**

Page 168

1    evaluation in 1998 at the direction of Mr. Laney to

2    assist Mr. San Miguel in training for evaluations,

3    right?

4         A.    Yes.

5         Q.    But wouldn't you agree that

6    Mr. San Miguel's evaluation was subject to review

7    and concurrence by Mr. Laney?

8         A.    Yes.

9         Q.    All right.  Let's go back to Exhibit 6,

10    page 2.  Under Item 3, "Commitment to Excellence,"

11    he's written, "Must improve promptness" and "Needs

12    Improvement."  Do you know what that is all about?

13        A.    Where is that, sir?

14        Q.    It is Item No. 3, "Commitment to

15    Excellence," and Mr. Laney has written, "Must

16    improve promptness" and "Needs Improvement."

17        A.    Yes.

18        Q.    Well, did he explain to you what he

19    meant by that?

20        A.    He meant that I have to make sure that

21    I am always there on time.

22        Q.    All right.  Were you having trouble to

23    getting to work at time?

24        A.    There were a few times kind of like I

25    run a few minutes late.  I know this might sound

Ex. A, p.65

Myrna Johnson * 1/23/2006
Johnson v. Fred Meyer * J04-008 CV (JWS)

Page 169

1    funny.  At that time I was driving a Thunderbird,

2    and I always get stuck on the highway, because when

3    it is snowing, I always get late.  My car would not

4    run.  So there were a few times that I didn't make

5    it there on time.

6         Q.       Thunderbirds are only built for

7    Southern California.

8         A.       Exactly.  Yes, sir.

9         Q.       Under Section 6, under "Controlling,"

10   he's written, "Must seek out more information to be

11   more independent in areas of operational

12   understanding," and he's checked both "Needs

13   Improvement" and "Meets Expectations."  Do you know

14   what he meant by that?

15        A.       Yes, sir.

16        Q.       What?

17        A.       That I have to try to learn more so

18   that I do not -- I have to be independent and I do

19   not have to ask questions.  I can make my own

20   decisions.

21        Q.       And why did Mr. Laney write, under the

22   "Communication" section, that you need to be

23   more -- need to be open-minded?

24        A.       What he meant by that is, that I need

25   to keep my eyes open about everything that is going

Ex. A, p.66

Myrna Johnson * 1/23/2006
Johnson v. Fred Meyer * J04-008 CV (JWS)

Page 170

1    on.

2         Q.      On the next page under "Leadership,"

3    he's checked both "Needs Improvement" and "Meets

4    Expectations."  He's written, "Must develop a

5    better acceptance of different personalities."

6    What did he mean by that?

7         A.      What he meant by that is sometimes,

8    because I have a very different work ethic, sir,

9    I -- when I walk in there, in that store -- just

10   give me a moment.  (Crying).

11        Q.      Certainly.

12        A.      I work very hard, sir, when I walk into

13   that store, and I do not understand why other

14   people higher than me, and make a lot, lot more,

15   and have more responsibilities, do not work as hard

16   as I am.

17        Q.      So you think this refers to people at a

18   higher level, or does it refer to --

19        A.      It refers to everybody, sir, either

20   lower level or higher up.  But what I said was, I

21   grew up that when we hired -- when we got hired,

22   our loyalty to our company is 100 percent.  We work

23   there.  They give us paycheck to bring home to feed

24   our family.  We are not there to goof.  We are

25   there to take care of our employer.  And I get

Ex. A, p.67

Page 171

1    offended when I see some young kids or some older

2    kids who do not do the thing I think has to be

3    done.

4         Q.     I understand that.  So what Mr. Laney,

5    as you understood it, is telling you is that you

6    need to understand this is sort of the way the

7    world is now, and some people don't have the same

8    work ethic you do?

9         A.     Yes, sir, that I cannot impose all of

10   those to everybody.

11        Q.     Did it also suggest to you that you

12   were maybe somewhat rigid in your approach to

13   issues and criticism, and maybe you needed to be a

14   little more broad in your understanding of people

15   and how they approach matters?

16        A.     No, sir.

17        Q.     All right.  Now, if Mr. Laney said

18   something to the effect that, "I was trying to get

19   across to Myrna that she was too narrow-minded

20   about what had to be done, and she refused to

21   accept criticism.  I was trying to suggest to her

22   to be a little broader in understanding," would you

23   concur in that evaluation?

24        A.     Actually, I have never been defensive,

25   sir.  No.

Ex. A, p. 68

Page 172

1    Q.    Well, we have spent most of the morning

2    with you being defensive about your recovery in

3    March of 2002, haven't we?

4              MR. CHOATE:  Objection.

5    Mischaracterizes her testimony.

6              MR. DICKENS:  I'll rephrase the

7    question.

8    BY MR. DICKENS:

9    Q.    Weren't you defensive about

10   Mr. San Miguel's comments about your performance

11   when you came back in March 2002?

12   A.    I told him, sir, I will do more

13   recovery.  I will do the plan-o-gram.

14   Q.    Let's look at No. 10 here.  Under

15   "Creativity and Imagination," he's written, "Needs

16   to learn stronger merchandising skills."  What did

17   you understand him to mean by that comment?

18   A.    Mr. Laney, sir, is a very good

19   merchandiser.  Displaying, putting up everything.

20   And he wants me to learn how to put the right

21   merchandise in the right areas.

22   Q.    Under Item Section 14, "Employee

23   Management Development," he's written, "Positive

24   attitude towards all employees needed.  Learn to

25   work better with challenging personalities."  And

Ex. A, p.69

Page 173

1   he's checked "Needs Improvement" and "Meets

2   Expectations."  What did you understand him to mean

3   by that comment?

4       A.     He wants me to always be positive when

5   I deal with employees.  And that I learn to -- I

6   should learn to deal differently with every

7   employee, especially if they are a challenging one.

8       Q.     Well, thinking back on it, as of May

9   1999, who were the challenging personalities with

10  whom you were working?

11      A.     Excuse me, sir?

12      Q.     Sure.

13             MR. DICKENS:  Read it back,

14  please.

15             THE REPORTER:  "Question:  Well,

16  thinking back on it, as of May 1999, who were the

17  challenging personalities with whom you were

18  working?"

19      A.     There is a lot, sir.  Yes.

20      Q.     And who were they?

21      A.     There are some young high school

22  students.  There are -- Mr. San Miguel, sometimes.

23  Other employees.

24      Q.     All right.  Let's pick on

25  Mr. San Miguel.  That's the only one you identified

Ex. A, p. 70

Page 174

1    by name.  What was challenging about his

2    personality in 1998, 1999?

3        A.    We are learning to work with each

4    other, and sometimes we have differences of

5    opinion.

6        Q.    That's it?

7        A.    Yes, sir.

8        Q.    All right.

9        A.    And work habits.

10       Q.    Okay.  What was the overall performance

11   evaluation that Mr. Laney gave you?

12       A.    "Meets Expectations."

13            (Exhibit 7 duly marked)

14   BY MR. DICKENS:

15       Q.    Ms. Johnson, is Exhibit 7 a copy of the

16   Fred Meyer Performance Appraisal done on you as of

17   May 10, 2000, done by Mr. Laney?

18       A.    Yes, sir.

19       Q.    Is that Mr. Laney's handwriting on it?

20       A.    Yes.

21       Q.    Okay.  Let's go to page 2, Section 2,

22   on "Commitment to Employees."  Mr. Laney has

23   handwritten, "Avoid negative reactions or

24   comments."  What was that about?

25       A.    Where was that, sir?

Ex. A, p. 71

Page 175

1      Q.     Page 2, Item 2, "Commitment to

2   Employees."  He's written --

3      A.     Yes.

4      Q.     He's written, "Avoid negative reactions

5   or comments."  Did he explain to you the reason for

6   that comment?

7      A.     Because when I see things that don't

8   get done, I say something.  "This should have been

9   done a long time ago."  I say those things.

10     Q.     That sort of sounds like what you are

11  telling us that Mr. San Miguel said to you the week

12  of March 12, 2002.  Right?

13     A.     Yes.

14     Q.     And now under "Communication," under

15  Item 7, he checked, "Needs improvement" and "Meets

16  Expectations."  He's written, "Improve your

17  relations with coworkers by being a better

18  communicator."  Is that about the same thing, that

19  is, your interaction with your coworkers?

20     A.     I don't really -- let me read it.

21     Q.     Sure.  Go ahead.  Take your time.

22     A.     No.  This one is about delegating,

23  about telling the employees what has to be done.

24     Q.     So were you having difficulty

25  delegating and explaining what you wanted the

Ex. A, p. 72

Myrna Johnson * 1/23/2006
Johnson v. Fred Meyer * J04-008 CV (JWS)

Page 176

1    subordinates to do?

2        A.    No, sir.

3        Q.    Well, then, what was occurring?

4    Explain it to me.

5        A.    He was trying to tell me that I should

6    make sure that each of them understand what was the

7    goal.

8        Q.    Do you know if, during this time frame

9    covered by this performance appraisal, which would

10   have been approximately from June 1999 to May 10,

11   2000, some of the people that you were supervising

12   were complaining about you and your actions?

13       A.    No, sir.

14       Q.    You don't know, or they were not

15   complaining?  I'm not clear from your answer.

16       A.    They do not complain.

17       Q.    Would you be surprised if several of

18   them said they did complain?

19       A.    If they complain, I was not told.

20       Q.    Did they have the right to go to

21   Mr. Laney and complain about you?

22       A.    Everybody have the right, yes.

23       Q.    Did they have the right to go to

24   Mr. San Miguel and complain about you?

25       A.    Yes.

Ex. A, p.73

Page 177

1       Q.      All right.  And can you tell us,

2   please, Ms. Johnson, what was your overall

3   performance evaluation for the period ended in

4   May 2000?

5       A.      "Meets Expectations."

6       Q.      Is that your handwriting at the bottom

7   there under "Employee being appraised completes the

8   items below this line"?

9       A.      Yes, sir.

10      Q.      Could you read that first sentence?

11      A.      "I want to stay focused in this job,

12  get promoted some day, and gain more respect from

13  my co-employees, and achieve more goals and

14  responsibilities.  Thank you for all your

15  patience."

16      Q.      Was Mr. Laney -- were you testing his

17  patience with your performance?

18      A.      No, sir.  It is my trait that I pay

19  gratitude to everything that has been given to me.

20  See, he was patient in training me.  I just want to

21  show my appreciation.

22      Q.      So did you recognize that you needed to

23  improve the respect from your co-employees?

24      A.      Yes.  Yes, sir.

25      Q.      So, to your knowledge, did some of your

Ex. A, p. 74

Myrna Johnson * 1/23/2006
Johnson v. Fred Meyer * J04-008 CV (JWS)

Page 178

1  coworkers express a lack of respect for your

2  performance?

3      A.    No, sir.

4      Q.    So what was to improve?

5      A.    I was training a new assistant.  I was

6  very new in that position.  I wanted to gain more

7  respect because teamwork is very important to me.

8            I grew up that there is a

9  difference between fear and respect.  If you train

10  the people for fear, they will not do anything when

11  you are not around.  If the employees respect you,

12  they will do everything, whether you are around are

13  not.  That is why I always respect my employers,

14  sir.

15      Q.    All right.

16            (Exhibit 8 duly marked)

17  BY MR. DICKENS:

18      Q.    Ms. Johnson, you have been handed what

19  has been marked as Exhibit 8 to your deposition.

20  Take a minute and look at that, please.

21      A.    (Reading).

22            MR. CHOATE:  Let me raise sort of

23  a standing objection, in general, that she is

24  reading what somebody else has written and giving

25  her impressions of what she thinks they meant.  It

Ex. A, p. 75

Myrna Johnson * 1/23/2006
Johnson v. Fred Meyer * J04-008 CV (JWS)

Page 179

1    is not meant -- or she has no clue or no idea,

2    actually, as to what they intended or meant.

3              It's a speculation objection.  You

4    are asking her to guess or speculate what somebody

5    else means.  I don't mind her giving her

6    impressions of what she thought was going on.

7              MR. DICKENS:  Well, I thought I

8    phrased my questions by asking her what he told her

9    -- "he" being the evaluator -- meant by the

10   comments.  But anyway -- all right.

11   BY MR. DICKENS:

12        Q.    Ms. Johnson, is Exhibit 8 a copy of the

13   performance appraisal done on you by Mr. San Miguel

14   as of June 12, 2001?

15        A.    Yes, sir.

16        Q.    Now, is that the first time that

17   Mr. San Miguel evaluated you in his position as the

18   apparel department manager?

19        A.    I think this is the first time.

20        Q.    Now, on page 1, the third full

21   paragraph, he's written, "Myrna has become the new

22   ALE assistant manager.  Myrna will have new

23   objectives set forth on this appraisal."

24              Now, did you understand that you

25   had new objectives because you had moved into a

Ex. A, p. 76

Myrna Johnson * 1/23/2006
Johnson v. Fred Meyer * J04-008 CV (JWS)

Page 180

1    higher-level management position?

2         A.    Yes, sir.

3         Q.    And how did you understand that to be

4    different from your position as a second assistant

5    manager?

6         A.    I will be now his delegator.  I will be

7    the one in charge of the floor whenever he's not

8    there.  I am his second -- his first assistant, so

9    I have to make sure that everything has to be done.

10        Q.    As the department manager, were there

11   meetings of the various department managers to

12   which you, as the first assistant, did not attend?

13        A.    I only attend when the -- the meeting

14   when the manager is not available.

15        Q.    All right.  So the answer to my

16   question is, there were manager meetings on a

17   regular basis that you did not attend?

18        A.    Yes, sir.

19        Q.    And do you know how frequently those

20   occurred?

21        A.    Once -- once a week.

22        Q.    And did Mr. San Miguel, as the apparel

23   department manager, have responsibilities that kept

24   him in his office on the computer?

25        A.    Yes, sir.

Ex. A, p. 77

**Myrna Johnson * 1/23/2006**
**Johnson v. Fred Meyer * J04-008 CV (JWS)**

Page 181

1    Q.    And what kinds of responsibilities were

2    those, as you understood them, at least?

3    A.    To do the schedule, to read memos and

4    everything that was sent to us, to check the profit

5    and loss, the operations.

6    Q.    There was a separate operations

7    manager, was there not?

8    A.    Yes.  What I mean by "operations" were

9    our profit or loss, if we are making money, or to

10   see what is the sale that is coming, so that he can

11   relay them to me.

12   Q.    Okay.  And by "profit and loss," you

13   mean for the apparel department?

14   A.    Yes, sir.

15   Q.    Okay.  Let's go back to Exhibit 8,

16   please.  On page 2, under Item 2, "Commitment to

17   Employees," the first note looks like, "Keep

18   feedback positive."  Did Mr. San Miguel explain to

19   you what he meant by that?

20   A.    I think what he meant is when I give

21   feedback, it has to be positive feedback to the

22   employees.

23   Q.    Now, under Item 5, "Organizing," it

24   looks like Mr. San Miguel has written, "Complete

25   one task at a time."  Did he explain to you what he

Ex. A, p. 78

Myrna Johnson * 1/23/2006
Johnson v. Fred Meyer * J04-008 CV (JWS)

Page 182

1    meant by that?

2         A.     Yes, sir.

3         Q.     What did he mean?

4         A.     That is the prioritizing.  Like if I

5    have a project, I have to finish it before I start

6    another project.

7         Q.     Ms. Johnson, throughout the time that

8    Mr. San Miguel was the department manager, was this

9    kind of a recurring issue between you and him, that

10   is, he was asking you to work on prioritizing your

11   responsibilities?

12        A.     Yes.

13        Q.     Turn to page 3, please.  Under Section

14   7 on "Communication" he's written, "Be more

15   open-minded.  Think out of the box.  Be on top of

16   OVs, callbacks, et cetera."

17               He's checked "Needs Improvement"

18   for "Communication," with those comments.  Did he

19   explain to you what he meant by that?

20        A.     He wants me to -- what he mean by

21   "think out of the box" is he wants me to look on a

22   different scenario to solve the problem.  And "be

23   on top of the OVs" is to read all of the e-mails.

24   "Callbacks" are those merchandise that I have to

25   take care to return, or to send to other companies

Myrna Johnson * 1/23/2006
Johnson v. Fred Meyer * J04-008 CV (JWS)

Page 183

1    and others.

2         Q.    All right.  Now, on the prior page, I

3    want to go back.  Under "Customer Service,"

4    Mr. San Miguel has rated you as "Very Good."  Do

5    you see that, at the very top, Item 1?

6         A.    Yes, sir.

7         Q.    And then on the second page, under

8    "Teamwork," he's also rated you as "Very Good," and

9    he's written "Great team player.  Asset to my

10   team."

11        A.    Yes, sir.

12        Q.    At that point in time, did you think he

13   was positive about your performance, in general?

14        A.    Yes.  Yes, sir.

15        Q.    And was that during the same period of

16   time when, on occasion, you had him over to your

17   house for different social events?  That is, the

18   time frame being calendar year 2001.

19        A.    Throughout the period that we worked

20   together, sir, he has been in my house numerous

21   times.  So I don't really pay attention.

22        Q.    All right.  That's fine.  Now, on the

23   last page, under "Overall Performance," he has

24   "Meets Expectations."  Do you see that?

25        A.    Yes, sir.

Ex. A, p. 80