# DECLARATION OF JAMES R. DICKENS
# EXHIBIT A
# (PAGES 81-105)

Myrna Johnson * 1/23/2006
Johnson v. Fred Meyer * J04-008 CV (JWS)

Page 184

1    Q.    Now, without going back and locating
2  all of them, as I read the various Performance
3  Appraisal forms we have just reviewed, which are
4  exhibits 2, 5, 6, 7, and this is now 8, on about
5  every one of them you were rated as "Meets
6  Expectations."  Do you concur?
7    A.    Yes, sir.
8    Q.    And this one actually is the most
9  positive of any evaluation you have had, that is,
10  it has more "Very Good" checks than any other one.
11  Would you agree?
12                THE WITNESS:  Can I explain --
13                MR. CHOATE:  Sure.
14    A.    Can I explain for you why this is like
15  that?
16    Q.    Well, no --
17    A.    I agree.
18    Q.    Now, apparently you want to explain why
19  you think that happened.
20    A.    Yes, sir.
21    Q.    Why do you think Mr. San Miguel is
22  actually giving you what appears to be a positive
23  evaluation at this point in time?
24    A.    Mr. San Miguel had given me a lot of
25  positive evaluations.  Mr. Laney had given me

Ex. A, p. 81

Myrna Johnson * 1/23/2006
Johnson v. Fred Meyer * J04-008 CV (JWS)

Page 185

1   positive and "meets expectations" evaluations.

2   There was a silent law in the Fred Meyer, in there.

3   The law was that when you are overrated -- it is

4   always "Meets Expectations," so that you have more

5   room for improvement.  Because if you get "Very

6   Good" or "Over Expectations," there is no more room

7   for improvement, and we do not believe that we can

8   reach a person -- it has always room.

9               But the proof to that, that we are

10  doing a great job, are the raises that we get from

11  our paycheck.  And --

12      Q.      And what?

13      A.      That is why I mean to say, if a person

14  is not doing a good job, then that person will not

15  have a raise.

16      Q.      Did you get a raise?

17      A.      I get a raise, sir.

18      Q.      All right.  Now, how would you

19  characterize your relationship with Mr. San Miguel

20  as of the date of this performance review, which

21  appears to be June 12, 2001?

22      A.      Good, sir.

23      Q.      Had he ever made a comment to you that

24  you were too old to work?

25      A.      Sometimes he'd say that, because I did.

Ex. A₁ p. 82

Page 186

1    Q.    I didn't understand the answer.  Can

2  you explain that?

3    A.    I was doing the work, sir.

4    Q.    But my question to you was, did

5  Mr. San Miguel ever say something to you like,

6  "Myrna, you are just too old to be doing this job"?

7  Did he ever say anything like that?

8    A.    No, sir.  He say thank you --

9    Q.    All right.

10    A.    -- for doing all the work.

11    Q.    So he was appreciative of the effort

12  you put in, wasn't he?

13    A.    Yes, sir.

14    Q.    And was it about this time that

15  Mr. San Miguel was wrapping up his personal

16  situation regarding his divorce, or do you recall?

17    A.    I think, yes.

18    Q.    And was it about this time that he also

19  began to have another woman that he was seeing and

20  dating?

21    A.    Maybe, yes.

22    Q.    Did you ever go out with Mr. San Miguel

23  and his girlfriend, Kaylonna, sometime after this

24  evaluation?

25    A.    I do not go out, but they came to our

Ex. A, p. 83

Page 187

1    house.

2        Q.      And when was that, 4th of July?

3        A.      Yes, sir.

4        Q.      All right.

5                MR. DICKENS:  Time for a break.

6    2:34 PM

7                (Off record)

8                (Exhibit 9 duly marked)

9    2:59 PM

10   BY MR. DICKENS:

11       Q.      Ms. Johnson, with the addition of that

12   last page, we now have a five-page exhibit marked

13   as Exhibit 9, and it has got document stamp numbers

14   at the bottom, 200137 through 141.  Is that what

15   you have?

16       A.      Yes, sir.

17       Q.      For the record, can you identify the

18   documents that comprise Exhibit 9?

19       A.      The first page is the request for

20   personal leave of absence.

21       Q.      And why did you request a personal

22   leave of absence?

23       A.      Because I was going to take my daughter

24   in the Philippines.

25       Q.      Well, now, earlier I kept talking about

Ex. A, p. 84

Myrna Johnson * 1/23/2006
Johnson v. Fred Meyer * J04-008 CV (JWS)

Page 188

1    a personal leave of absence.  You kept saying a

2    family leave of absence.  Looking at page 1 of

3    Exhibit 9, you did ask for a personal leave of

4    absence at that time, did you not?

5        A.    I asked for a personal leave of

6    absence.

7        Q.    And is the first half of that your

8    handwriting above the dotted line, "Approval

9    guarantees the employee's return"?

10       A.    Yes, sir.

11       Q.    And who signed it in the middle there?

12       A.    That is Fred.

13       Q.    Fred Sayre, the store director?

14       A.    Yes, sir.

15       Q.    And was the leave approved, as you

16   understood it, the personal leave?

17       A.    Yes.

18       Q.    And at the bottom it says "Human

19   Resources Authorization, leave approved, yes."  And

20   then it refers to "You qualify for a FMLA LOA.  As

21   soon as I receive a completed Certification of

22   Healthcare Provider, I'll be able to put you on a

23   FMLA LOA."  Do you know whose signature that is?

24       A.    No, sir.

25       Q.    Do you know what the date is there,

Ex. A, p. 85

Myrna Johnson * 1/23/2006
Johnson v. Fred Meyer * J04-008 CV (JWS)

Page 195

1    first.  Whatever is left will be applied to my

2    family leave.

3        Q.    So what difference does it make whether

4    your leave was approved, from a personal

5    standpoint -- was listed as personal leave or FMLA

6    leave, from a practical standpoint?

7        A.    Because if I get a personal leave and a

8    family leave, I will have a paycheck for the whole

9    time I was gone.

10       Q.    Where did you get that opinion?

11       A.    From him.  From -- that is how we

12   understand the family leave.  We use first our

13   personal leave, our vacation.

14       Q.    Well, didn't you understand that you

15   could use your personal -- I mean your vacation

16   toward your family leave?

17       A.    I don't have enough hours for vacation,

18   for personal vacation.

19       Q.    Okay.  But you can get an unpaid

20   personal leave, and you got, basically, four weeks

21   of personal leave, didn't you?

22       A.    Yes.

23       Q.    I'm trying to understand, from a

24   practical standpoint, what difference does it make

25   to you whether the leave that was approved from

Ex. A, p. 86

Myrna Johnson * 1/23/2006
Johnson v. Fred Meyer * J04-008 CV (JWS)

Page 196

1    February 12, 2002, to March 13, 2002, was personal

2    leave or family leave?

3         A.      There would be no difference.

4         Q.      That's what I understand.  So why are

5    we making an issue of whether or not you got family

6    leave or not?

7         A.      Because I do not have enough for a

8    personal leave.  I don't have enough hours to get a

9    paycheck for personal leave.  I have only few,

10   maybe two weeks or something.  I don't remember how

11   many hours was that.

12        Q.      Are you saying that -- go ahead.

13        A.      So that I can have a paycheck when I

14   was gone.  What he said is, I will use all my

15   vacation left, and then whatever, for the other two

16   weeks or how many days, that will be my family

17   leave.

18        Q.      Are you paid family leave?

19        A.      Yes.  It is almost like you are sick --

20   you are sick.

21        Q.      Did you lose any pay while you were on

22   your personal leave from February 12, 2002, to

23   March 13, 2002?

24        A.      I didn't lose any on personal leave.

25        Q.      So you were paid for that period of

Ex. A, p. 87

Myrna Johnson * 1/23/2006
Johnson v. Fred Meyer * J04-008 CV (JWS)

Page 201

1      A.      I told him that I will talk to all my

2   employees, and I will make sure that recovery was

3   taken care of to the ways that he wants it.

4      Q.      And in his e-mail to you, he refers to,

5   "This morning Fred called me to the men's section

6   to walk the ALE department.  I was embarrassed by

7   the conditions in some areas.  This is not

8   acceptable any longer."

9              Is Fred, Fred Sayre?

10     A.      Yes.

11     Q.      And he goes on to talk about,

12  "Expectations are a lot higher now, especially when

13  the lead assistant is closing."  Did he explain to

14  you what he meant by that?

15     A.      He did not explain it to me.  He send

16  me kind of like an e-mail.

17     Q.      Another one, or this one?

18     A.      It is a long one that has all the

19  little projects that our district manager wants to

20  be done.

21     Q.      All right.  So was this the first

22  e-mail after you got back that was critical of the

23  recovery?

24     A.      Yes.

25              (Exhibit 11 duly marked)

Myrna Johnson * 1/23/2006
Johnson v. Fred Meyer * J04-008 CV (JWS)

Page 202

1    BY MR. DICKENS:

2        Q.    Ms. Johnson, could you identify

3    Exhibit 11, please?

4        A.    This is what I called the tour.

5        Q.    Is this the result of someone walking

6    around the department and making a note of things

7    that need to be done?

8        A.    Yes, sir.

9        Q.    And that's normally done at the

10   beginning of the shift by the department manager?

11       A.    This is done in the morning, yes.

12       Q.    Right.   At the beginning of the day?

13       A.    Yes.

14       Q.    And whose handwriting is this?

15       A.    Mr. San Miguel.

16       Q.    Did you receive a copy of this?

17       A.    He showed me this copy.

18       Q.    He showed it to you or gave you a copy?

19       A.    He showed this to me, because this

20   is -- on that day, this is not part of my job.

21       Q.    Whose job is it?

22       A.    These are the things that has to be

23   done in the morning.

24       Q.    Oh, all right.

25       A.    Before -- when the -- from the morning.

Ex. A, p. 89

Myrna Johnson * 1/23/2006
Johnson v. Fred Meyer * J04-008 CV (JWS)

Page 189

1    whether it is 2-27-02 or 3-27-02?

2         A.    I have not seen this, sir, before.

3         Q.    Now, as you sit here today,

4    Ms. Johnson, do you know what is meant by a

5    "Completed certification of healthcare provider"?

6         A.    I don't understand what it meant, sir.

7         Q.    And where did you get this Request for

8    Personal Leave of Absence form?

9         A.    From -- this is the one that

10   Mr. San Miguel gave me.

11        Q.    All right.  Let's look at page 2.  That

12   says, "Application for Family Medical Leave of

13   Absence."  Where did you get that one?

14        A.    From him also.  These were all

15   together, sir.

16        Q.    Okay.  So both pages 1 and page 2, it

17   is your recollection that Mr. San Miguel gave those

18   to you?

19        A.    Yes.

20        Q.    And, again, it is not your recollection

21   that you got these from Ms. Harmon?

22        A.    No.

23        Q.    All right.  Now, the first part of

24   that, page 2, is that in your handwriting?

25        A.    Yes.

Ex. A, p. 90

Myrna Johnson * 1/23/2006
Johnson v. Fred Meyer * J04-008 CV (JWS)

Page 203

1    Q.    Okay.  So whoever was on that morning,

2  like Mr. San Miguel and whoever else was filling in

3  in the daytime in the management job, would be

4  doing this?

5    A.    If I was scheduled in the morning, sir,

6  Mr. San Miguel will walk and then will hand this to

7  me so that I have this done before I leave at 5:00.

8    Q.    Okay.  Then who was there at that time

9  that would have gotten a copy of this as part of

10  their responsibility?

11    A.    Probably Johnna or whoever was working

12  with him that day.

13    Q.    Now, did Mr. San Miguel indicate that

14  any of the "job to be completed" comments on this

15  were your responsibility from the night before?

16    A.    Okay.  My responsibility, sir, is to

17  grab and finish whatever the person who works

18  before me could not finish this -- did not get

19  finished.

20    Q.    My question, though, was, did

21  Mr. San Miguel say to you, "Myrna, all of these

22  things should have been done the night before, so

23  we shouldn't have these problems this morning."

24          Did he say that or words similar

25  thereto?

Ex. A, p. 91

Myrna Johnson * 1/23/2006
Johnson v. Fred Meyer * J04-008 CV (JWS)

Page 204

1    A.    The tour, sir, is different every day.

2    Q.    I understand that.

3    A.    Yes.

4    Q.    Do you understand my question, though?

5    A.    Yes.

6    Q.    What did Mr. San Miguel say, if
7  anything, to you about your responsibility for some
8  of the items that needed to be done that day which
9  are listed on Exhibit 11, the daily tour report?

10    A.    Yes.  These are supposed to be done
11  that day, on the 14th.  We have to finish it on the
12  14.

13    Q.    All right.  I'll try this one more
14  time.

15          Exhibit 11 is a daily tour done in
16  the morning by Mr. San Miguel?

17    A.    Yes.

18    Q.    Do we agree?

19    A.    Yes.

20    Q.    It lists things that needed to be done
21  that morning as soon as possible, correct?

22    A.    Yes, sir.  The whole day.

23    Q.    Now, you say Mr. San Miguel showed this
24  to you, Exhibit 11?

25    A.    He gave -- yes, he showed it to me.

Ex. A, p. 92

Page 205

1    Q.    Did he give you a copy?

2    A.    The copy was there at the desk.

3    Q.    Okay.  Did he say to you, "Myrna, there

4    are too many things on this that should have been

5    done last night, and you can't fail to get this

6    work done so that it makes such a busy day for

7    those of us in the morning"?  Did he make any

8    comment like that to you?

9    A.    Maybe he did.  I don't really remember

10   if he say that.

11   Q.    That's fine.  All right.

12              (Exhibit 12 duly marked)

13   BY MR. DICKENS:

14   Q.    Ms. Johnson, do you recognize

15   Exhibit 12?

16   A.    Yes, sir.

17   Q.    What is it, for the record?

18   A.    It is an Office Vision from

19   Mr. San Miguel.

20   Q.    So initially it starts off with your OV

21   to Mr. San Miguel about the plan-o-gram, and then

22   Mr. San Miguel advising you on Wednesday, March 13,

23   2002, that "Minerva or Julita must complete this

24   plan-o-gram tonight.  It has been a week.  I can't

25   wait any longer.  I want it done tonight."  Isn't

Ex. A, p. 93

Page 206

1    that what he's telling you?

2        A.    Yes.

3        Q.    Did he talk to you in person or just

4    send you the OV?

5        A.    On the 12th, he talked to me in person.

6        Q.    Okay.  Then the next morning -- the

7    12th was Tuesday, your first day back, wasn't it?

8        A.    Yes.  He told that to me.

9        Q.    So then the next day he's telling you

10   it didn't get done, so let's get it done; is that

11   right?

12       A.    Yes.

13       Q.    Is this the one that never got done?

14       A.    Excuse me?

15       Q.    This is the plan-o-gram that never got

16   done while you were still at Fred Meyer?

17       A.    It got done by me.

18       Q.    It did?

19       A.    Yes, but not to his standard.

20       Q.    Oh, okay.

21                   (Exhibit 13 duly marked)

22   BY MR. DICKENS:

23       Q.    Ms. Johnson, can you identify

24   Exhibit 13, please?

25       A.    This is an Office Vision from

Ex. A, p.94

Myrna Johnson * 1/23/2006
Johnson v. Fred Meyer * J04-008 CV (JWS)

Page 207

1    Mr. San Miguel.

2        Q.    Okay.  This is the one you got on

3    Saturday evening about things to be done by the

4    following day, Sunday, March 17, 2002?

5        A.    Yes, sir.

6        Q.    Now, is this a typical OV for you

7    coming on at the closing shift, on a day when

8    Mr. San Miguel was off, as to things he wanted to

9    have you do during that day?

10       A.    Yes.  When he did this Office Vision,

11   sir, he send it to all of us.

12       Q.    Who is "all of us"?

13       A.    The section head, me.

14       Q.    Okay.  But you are the person who is

15   the highest-ranking management person at that time?

16       A.    Yes, sir.

17       Q.    What is a pass-down log?

18       A.    I don't exactly remember it now.

19       Q.    All right.

20       A.    Let me think.  (Pause).

21       Q.    Rather than go over all of these things

22   here, do you have a recollection in general,

23   Ms. Johnson, as to whether there were any items to

24   be completed by Sunday, March 17, 2002, that were

25   not done that are on this OV list to you from

Ex. A, p. 95

Page 208

1    Mr. San Miguel?

2        A.    That I sent an e-mail to Steve Nichols.

3        Q.    Who is Steve Nichols?

4        A.    He was, I think, assistant or manager

5    from a different store.

6        Q.    Now, let me make sure I'm clear on

7    this.  Is this a regular, common type OV that you

8    would get for this situation -- that you are

9    working Saturday evening, Mr. San Miguel is off on

10   Sunday, and he's listing things to cover on Sunday?

11       A.    Yes.

12       Q.    All right.  So did you see anything

13   wrong with this OV, as far as the request for

14   things to do?

15       A.    No.

16       Q.    This wasn't harassing?

17       A.    No.

18              (Exhibit 14 duly marked)

19   BY MR. DICKENS:

20       Q.    Ms. Johnson, for the record, what is

21   Exhibit 14?

22       A.    It is an e-mail, sir, or OV from

23   Mr. San Miguel.

24       Q.    And what is this one about?

25       A.    It is about the Read and Signs,

Ex. A, p.96

Myrna Johnson * 1/23/2006
Johnson v. Fred Meyer * J04-008 CV (JWS)

Page 209

1    Intersection Transfers/Return Policy, and Employee

2    Appraisals, Lockout/Tagout -- that was in our

3    training.

4         Q.    So what is that asking you to do, as

5    you understood it?

6         A.    That OV from him about progress of all

7    of these.

8         Q.    Again, just making sure that certain

9    administrative tasks had been done?

10        A.    These are done, sir.  I did this.

11        Q.    Right.  But I'm saying, he's asking,

12   "Just tell me these were done," just so he knows?

13        A.    Yes.

14        Q.    All right.  Again, fairly common as far

15   as an everyday responsibility?

16        A.    Yes, sir.

17        Q.    All right.

18                  (Exhibit 15 duly marked)

19   BY MR. DICKENS:

20        Q.    Ms. Johnson, what is Exhibit 15?

21        A.    It is another e-mail from

22   Mr. San Miguel.

23        Q.    So it looks like the third one we have

24   had here on Saturday, March 16th?

25        A.    Yes, sir.

Ex. A, p. 97

Page 237

1    Q.    His what?  SBS?

2    A.    Yes.

3    Q.    What is that?

4    A.    That's for working for the State of

5  Alaska.

6    Q.    All right.  And has this been

7  satisfied, this judgment?

8    A.    No, sir.

9              (Exhibit 21 duly marked)

10  BY MR. DICKENS:

11    Q.    Ms. Johnson, taking a look at

12  Exhibit 21, can you identify that, please?

13    A.    This is the Alaska State Commission for

14  Human Rights Intake Questionnaire.

15    Q.    Did you fill that out in your own

16  handwriting?

17    A.    Yes.

18    Q.    Under Section 2, it starts off -- it

19  says, "I believe I was discriminated against

20  because of my," and then it says to check a box.

21  You checked "age," did you not?

22    A.    I check "age," yes.

23    Q.    You checked "parenthood," did you not?

24    A.    Yes, I check parenthood.

25    Q.    You never checked "race"?

Page 238

1    A.    No, sir.

2    Q.    You don't think race is an issue, do

3    you?

4    A.    No.

5    Q.    You never checked "sex"?

6    A.    No.

7    Q.    You don't think sex is an issue, do

8    you?

9    A.    I -- I don't think so.

10    Q.    Now, you have checked "employment" down

11    below.  So I understand that your contention is,

12    that you are contending that your age and

13    parenthood was an issue in your employment.  Is

14    that one of your contentions in this lawsuit?

15    A.    Yes, sir.

16    Q.    Look on page 2 under Paragraph 6.  It

17    says -- this is your handwriting, is it not?

18    A.    Yes.

19    Q.    It says, "I work for Fred Meyer since

20    December 2, 1992.  Last February 13 to March 12,

21    2002, I took a leave of absence/vacation to take

22    care of my daughter."  Is that what you wrote at

23    the time?

24    A.    Yes.  I refer the personal leave of

25    absence as vacation.

Ex. A, p. 99

Myrna Johnson * 1/23/2006
Johnson v. Fred Meyer * J04-008 CV (JWS)

Page 242

1    Q.    Didn't you tell her on April 30, 2002,

2  about a month after you left Fred Meyer, that,

3  "when I left the meeting with Mr. Sayre and

4  Mr. San Miguel, I felt I had quit my job"?

5    A.    I was so embarrassed to say I was

6  fired, sir.  Even now, I -- because --

7    Q.    My question is, isn't that what you

8  told Erin Collins on April 30, 2002, "when I left,

9  I felt I had quit my job"?

10    A.    If that is was that says, the paperwork

11  says.

12    Q.    Well, that's what it does say.  I'm

13  asking if you did say that?

14    A.    Yes.

15            MR. DICKENS:  Would you mark that,

16  please?

17            (Exhibit 22 duly marked)

18  BY MR. DICKENS:

19    Q.    Ms. Johnson, can you identify

20  Exhibit 22, please?

21    A.    This is -- I typed this to recall what

22  happened from March 12 to March 18.

23    Q.    Okay.  When did you prepare it?

24    A.    After I found out that -- on the 20th.

25    Q.    Well, when after the 20th?

Ex. A, p. 100

Myrna Johnson * 1/23/2006
Johnson v. Fred Meyer * J04-008 CV (JWS)

Page 249

1   remember what -- but it is also doing the same

2   thing.

3        Q.     And then the last page is the Foster

4   Grant.  That's a fairly small thing?

5        A.     Yes.

6        Q.     Now, tell me about Foster Grant.  One

7   of your allegations is that after your employment

8   with Fred Meyer ended on March 18, 2002, you

9   continued to service the Foster Grant products at

10  the Fred Meyer store?

11       A.     Yes.

12       Q.     Did an incident ever come up when you

13  were asked to restrict the timing of your visits?

14       A.     Yes.

15       Q.     Tell me about that.

16       A.     I was working at Fred Meyer putting out

17  sunglasses.  And Johnna Havard came to me.  Jaime

18  was standing at the shoe department watching Johnna

19  Havard and me.  And Johnna Havard said, "Jaime sent

20  me to talk to you, that he only wants you to work

21  in here when he's around."

22       Q.     And so what's wrong with that?

23       A.     That has never been a policy on any

24  vendor job that I do.  It will be hard, because the

25  reason why I am fast on this job, sir, is I start

Ex. A, p. 101

Page 250

1  from one store, move -- finish the job as much as I

2  can, move to the other store, do it again.  And if

3  I will have to call and ask when is Mr. San Miguel

4  at the store to work in there, it will almost be

5  making just less than minimum wage.  It will be

6  kind of very -- it is hard.  Because I don't know

7  what time he gets there.  And besides, it is not

8  the policy to do that.

9      Q.    Let's talk a minute.  You are arguing

10  with me.  I just asked you what happened.  You only

11  earned $430 at Foster Grant, so what is the big

12  deal?

13      A.    Sir, I lost my job at Fred Meyer at the

14  time.  So even $1 or $2 was important to me.

15      Q.    Did you quit servicing Foster Grant?

16      A.    I have to.

17      Q.    Well, why?  You could come in when he's

18  there.  He's there six days a week, most of the

19  time during the daytime.  So I don't see that you

20  are restricted, are you?

21      A.    I wasn't very comfortable, sir.

22      Q.    Didn't you have a nephew that worked

23  for you?

24      A.    No.  It is my nephew works for my

25  husband.

Ex. A, p. 102

Myrna Johnson * 1/23/2006
Johnson v. Fred Meyer * J04-008 CV (JWS)

Page 251

1      Q.      Did you ever have your nephew service

2   the Foster Grant display?

3      A.      No, sir.

4      Q.      Did you ever have your husband service

5   the Foster Grant display?

6      A.      No.

7      Q.      Was your husband ever precluded from

8   servicing anything at Fred Meyer?

9      A.      No.  I was not even precluded to.

10     Q.      No.  You were just limited on the time

11  frame, correct?

12     A.      The what, sir?

13     Q.      You were simply limited, as to the

14  hours you could service, during the regular

15  business hours that Mr. San Miguel was there?

16     A.      It was hard for me to be standing in

17  there and working a minimum-wage job while my boss

18  is watching -- my former boss was watching me.  It

19  was -- it was very, very hard, sir, to -- to think

20  of such failure.

21     Q.      All right.

22             (Exhibit 24 duly marked)

23  BY MR. DICKENS:

24     Q.      Ms. Johnson, can you identify

25  Exhibit 24 for me, please?

Ex. A, p. 103

Page 259

1      A.      From November until March.

2      Q.      And I would expect there were no

3  documents to confirm those discussions?

4      A.      No, sir.

5      Q.      Do you know anyone who has any records

6  that would refer to any emotional distress that you

7  have been suffering for any reason after March 18,

8  2002, to the present day?

9      A.      No, sir.

10      Q.      All right.

11              (Exhibit 25 duly marked)

12  BY MR. DICKENS:

13      Q.      For the record, Ms. Johnson, what is

14  Exhibit 25?

15      A.      This is our weekly schedule.

16      Q.      For when?

17      A.      From March 17 to March 23.

18      Q.      As I understand, the abbreviations at

19  Fred Meyer, at the top, it is the apparel weekly

20  work schedule for the week ending March 23, 2002?

21      A.      Yes.

22      Q.      So this would have been posted the

23  Friday before, which would have been, it looks

24  like, March 14, 2002?

25      A.      Yes, I think so.

Ex. A, p. 104

Myrna Johnson * 1/23/2006
Johnson v. Fred Meyer * J04-008 CV (JWS)

Page 260

1      Q.      Okay.  As I read this for your

2   schedule, you were set to work 1:30 to 11:30,

3   Sunday, Monday, Tuesday; off Wednesday, Thursday;

4   1:30 to 11:30 on Friday; and then you have 10:00 to

5   8:00 on Saturday, and 7:00 to 5:00 on Sunday.

6      A.      Yes, sir.

7      Q.      So it looks as of Saturday that you

8   were scheduled back more on a day shift, correct?

9      A.      On one day, sir, yes.

10     Q.      And then on Sunday, it is the regular

11  early 7:00 a.m. shift, right?

12     A.      This one Sunday, sir, is not a final

13  schedule.  This is what -- this is a tentative

14  schedule.  This one is subject to change.

15     Q.      How do you know that?

16     A.      That is our policy, because that is

17  only what we thought about.  When the manager do

18  the next schedule, the schedule for the following

19  week, that will be the final.

20     Q.      All right.  But if that holds, it would

21  look, as of the Sunday starting on March 24, you

22  are going to be back on the day shift schedule?

23     A.      If he will not change it.

24     Q.      All right.  And as I read this

25  schedule, you are working that week, under this

Ex. A, p. 105