# DECLARATION OF JAMES R. DICKENS
## EXHIBIT B
## (PAGES 1-22)

Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF ALASKA

MYRNA I. JOHNSON,                )
                                 )
        Plaintiff,               )
                                 )
v.                               )
                                 )
FRED MEYER STORES, INC.,         )
a Delaware corporation;          )
and JAIME SAN MIGUEL,            )
                                 )
        Defendants.              )
_____ )

Case No. J04-008 CV (JKS)

VIDEOTAPED DEPOSITION OF JAIME SAN MIGUEL

Pages 1 through 270, Inclusive

Taken: Tuesday, January 24, 2006

Place: Juneau, Alaska

Ex. B, p. 1

Page 26

1    department.  I don't remember her exact title.  She

2    works out of the Fred Meyer main office.

3          Q.      Is that in Portland?

4          A.      That's correct.

5          Q.      Okay.  Is that main office still in

6    Portland, even though they have been taken over by

7    Kroger?

8          A.      That would be correct, yes.

9          Q.      Okay.  I didn't know how that affected

10   any of the other Fred Meyers.

11                 Beyond that statement -- beyond

12   the statement to Erin Collins and the statement to

13   Peggy Callahan, have you given statements to

14   anybody else that is not associated with your

15   lawyer, that is not in Mr. Dickens' office?

16         A.      No.

17         Q.      Okay.  Where were you born?

18         A.      San Juan, Puerto Rico.

19         Q.      Okay.  In what year?

20         A.      1968.

21         Q.      And your date of birth?

22         A.      It's November 5th.

23         Q.      And were you educated in Puerto Rico?

24         A.      That would be correct.

25         Q.      Okay.  Did you go to high school there?

Ex. B, p. 2

Jaime San Miguel * 1/24/2006
Johnson v. Fred Meyer * J04-008 CV (JWS)

Page 102

1    A.    Not that I'm aware of.

2    Q.    Now, in February, February or March of

3    2001, you became the manager of the apparel

4    department; is that correct?

5    A.    That's correct.

6    Q.    Okay.  And how did you learn there was

7    going to be an opening?

8    A.    When the manager resigned from his

9    position.

10    Q.    And do you know under what

11    circumstances Mr. Laney resigned from his position?

12    A.    I don't know that.

13    Q.    Any reason, any understanding as to why

14    he resigned?

15    A.    No, I don't.

16    Q.    So Mr. Laney resigned, and then was

17    there again a posting for an opening?

18    A.    That's correct.

19    Q.    Okay.  And you applied for that?

20    A.    That's correct.

21    Q.    Okay.  And when you applied for that,

22    who interviewed you?

23    A.    Fred Sayre, the store director.  And

24    also Dennis Affleck was involved in some manner.

25    Q.    And do you know what the -- are the

Jaime San Miguel * 1/24/2006
Johnson v. Fred Meyer * J04-008 CV (JWS)

Page 103

1   requirements for the job given with the posting in

2   terms of what the prerequisites are?

3        A.    Yes.

4        Q.    Okay.

5        A.    Yes, it is.

6        Q.    Is there a preference in Fred Meyer to

7   hire internally?

8        A.    Yes.

9        Q.    Were there education requirements for

10  the manager job?

11       A.    There -- well, they have some education

12  requirement, yes.

13       Q.    Okay.  Did you meet those requirements?

14       A.    Yes.

15       Q.    When you became manager, did that then

16  leave an opening for lead assistant or first

17  assistant?

18       A.    Yes.

19       Q.    Okay.  When did that job get noticed

20  out?

21       A.    I don't remember the date.

22       Q.    Okay.  Do you recall, did you have any

23  discussions with Myrna Johnson regarding that job?

24       A.    Probably after it got posted and she

25  showed some interest in applying for the job.

Ex. B, p. 4

Jaime San Miguel * 1/24/2006
Johnson v. Fred Meyer * J04-008 CV (JWS)

Page 104

1      Q.      Okay.  Did you expect that she would
2  not have interest in the job?
3      A.      No.  I thought she would be interested
4  in applying for the job.
5      Q.      And why did you think she'd be
6  interested?
7      A.      Because it would be a promotion, and I
8  know she has talked to me about her goals, things
9  that she wanted to do.  And I know she had told me
10 in the past that she was interested in applying for
11 the job if that position came open.
12     Q.      So you knew that when you became
13 manager?
14     A.      When I became manager, yes.
15     Q.      And at that time, did you have any
16 other jobs besides working as the lead assistant at
17 Fred Meyer, any other sources of income?
18             MR. DICKENS:  At which time,
19 Counsel?
20     Q.      In 2001, right before you became the
21 manager.
22     A.      Right before, yes.
23     Q.      Okay.  What other ways were you earning
24 income?
25     A.      I had a part-time job with Burton

Ex. B, p. 5

Jaime San Miguel * 1/24/2006
Johnson v. Fred Meyer * J04-008 CV (JWS)

Page 109

1    tough time dealing with losing your marriage; isn't
2    that right?
3         A.     Yes.
4         Q.     Okay.  And did that -- was that
5    reflected in -- did you have trouble at work
6    because of that in terms of concentrating and
7    paying attention?
8         A.     Yes.
9         Q.     Okay.  And you guys have children,
10   right?
11        A.     Yes, we do.
12        Q.     Okay.  And there are two kids?
13        A.     One.
14        Q.     One child?  And is that a boy?
15        A.     It's a boy.
16        Q.     Okay.  And he's a -- you're a baseball
17   player, right?
18        A.     I play baseball, yes.
19        Q.     And you were doing everything you could
20   to keep your relationship with your son while
21   dealing with the stuff with your wife, right?
22        A.     That's correct.
23        Q.     Okay.  So did you find that you'd
24   leave work at times, either because you were
25   emotionally upset or to take care of your son,

Ex. B, p. 5A

Jaime San Miguel * 1/24/2006
Johnson v. Fred Meyer * J04-008 CV (JWS)

Page 122

1    given that manual to complete to review and to sign

2    off on?

3         A.    I don't know that, no.

4         Q.    Okay.  How about when you promoted her

5    to first assistant, to the lead assistant manager

6    position, was she given training in regards to that

7    manual?

8         A.    I make the training manual available to

9    Ms. Johnson.

10        Q.    Well, that wasn't my question.  My

11   question was, was she given training in regards to

12   that manual?  Was she given the manual and told,

13   "You need to read this manual and fill out this

14   section at the end and give it to me"?

15        A.    Right.  We get the book and we go "Here

16   is" -- I don't remember exactly how many chapters

17   there is in the book.  But "This is all the areas

18   that you need to perform at an acceptable level so

19   you are to -- so you are successful, so you can

20   keep moving on to the next level of management."

21        Q.    Okay.  And you gave that to

22   Ms. Johnson?

23        A.    Yes, I did.

24        Q.    Okay.  The manual.  And did she, in

25   turn, then return to you the section at the back of

Ex. B, p. 6

Jaime San Miguel * 1/24/2006
Johnson v. Fred Meyer * J04-008 CV (JWS)

Page 144

1    Q.    Is that just an average because that's
2    always how many there are?

3    A.    That's correct.

4    Q.    Okay.  There wouldn't have been a
5    reason why the department would have fewer than
6    normal or more than normal at that time?

7    A.    There could be reasons why, but . . .

8    Q.    If you wanted to pull an employee list
9    of everybody working in January of 2002, how would
10    you go about doing that?

11    A.    I think my first step would be to ask
12    the time and attendance office.  Now, if they have
13    the ability to look for that or not, I don't know.
14    But that would be my first contact.

15    Q.    Of the 25 to 30 employees that you had
16    in that department in January of 2002, do you know
17    how many men were working in the department?

18    A.    I don't remember.

19    Q.    More than 10?

20    A.    No.

21    Q.    Couldn't you pretty much count them on
22    one hand, normally?

23    A.    Anywhere between three to six.

24    Q.    Okay.

25    A.    At any one point.

Ex. B, p. 7

Jaime San Miguel * 1/24/2006
Johnson v. Fred Meyer * J04-008 CV (JWS)

Page 146

1    Meyer.  And it states it is a list of employees

2    supervised by Jaime San Miguel from January 1,

3    2002, to June 30, 2002.  In reviewing that list,

4    does that appear to be a complete list of the

5    individuals you supervised during that time period?

6         A.    No.  I supervised these employees, but

7    it seems pretty -- a pretty short list.  Those are

8    employees that I did supervise.

9         Q.    This is only 20 people.  So it is

10   probably missing maybe 10?

11        A.    You know, it could be at this point it

12   was 20, but my best recollection is, usually we

13   carry anywhere between -- employees -- between 25

14   and 30 employees.

15        Q.    Okay.  And so the place that you would

16   go to request that would be from time and

17   accounting?

18        A.    Time and attendance.

19        Q.    Time and attendance.

20        A.    I'm sure there would be a way for them

21   to --

22        Q.    Okay.  Well, at least was Sarah Batsch

23   working for you in the beginning part of 2002?

24        A.    What was the name again?

25        Q.    Sarah Batsch -- Monica Batsch.  I'm

Ex. B, p. 8

Jaime San Miguel * 1/24/2006
Johnson v. Fred Meyer * J04-008 CV (JWS)

Page 147

1    sorry.

2         A.    I think so.  I know they -- they left

3    town, but I think it was after their dad --

4         Q.    Okay.  Well, let's just go through

5    their list.  I take it -- Sonny Cortez, male or

6    female.

7         A.    Male.

8         Q.    And ethnic background, if you know?

9         A.    Filipino.

10        Q.    Okay.  How about Darwin Daoang?

11        A.    Male, Asian descendant.

12        Q.    Okay.  How about Nicole Davis?

13        A.    Female.

14        Q.    Do you recall her race?

15        A.    White.

16        Q.    Okay.  Sarah Dexter?

17        A.    Female.

18        Q.    Uh-huh.

19        A.    White.

20        Q.    Dolores Doogan?

21        A.    Female, white.

22        Q.    Charina Fontenot?

23        A.    Female, Filipino.

24        Q.    Jeff Furber?

25        A.    Male, and he was white.

Jaime San Miguel * 1/24/2006
Johnson v. Fred Meyer * J04-008 CV (JWS)

Page 148

1    Q.    Sherry Garrison?

2    A.    Female.  I think she has some Native --

3    Q.    Okay.  Johnna Havard?

4    A.    Female.

5    Q.    And white?

6    A.    Well, she has some -- if I remember

7    right, that she has some Asian, also, blood in her.

8    Q.    Okay.  So she might be a mix?

9    A.    Yeah, I --

10    Q.    Okay.  You just don't know?

11    A.    I guess I don't feel comfortable with

12    saying, you know, white, black --

13    Q.    Right.  Well, I mean --

14    A.    I don't know.

15    Q.    My kids are mixed.  You can say "mixed"

16    or anything else you want to.  I mean, in Hawaii we

17    say "happa," or half something.  But let's say --

18    let's say we don't know, but some mix.

19                    Myrna Johnson?

20    A.    Female.

21    Q.    And Filipino?

22    A.    Filipino.

23    Q.    Jennifer Kipple?

24    A.    She's a female.  Appears to be white.

25    Q.    Julita Lim?

Ex. B, p. 10

Jaime San Miguel * 1/24/2006
Johnson v. Fred Meyer * J04-008 CV (JWS)

Page 149

1    A.    Female, Filipino.

2    Q.    Hugh McCrummen?

3    A.    Male.  Not sure.

4    Q.    Montana Meyers?

5    A.    Female.  Appears to be white.

6    Q.    Felicisima Oney?

7    A.    Female, Filipino.

8    Q.    Rosena Salazar?

9    A.    Female, Filipino.

10   Q.    Vivien Siangco?

11   A.    Female, Filipino.

12   Q.    Jeffry Smith?

13   A.    Male, white.

14   Q.    Annmarie Stout?

15   A.    Female, mix.

16   Q.    And Jeff Wilson?

17   A.    Male, and white.

18   Q.    Okay.  And then Monica Batsch, what is

19   her race?  She's obviously female.

20   A.    She's female.  White.

21   Q.    Okay.  And was there an employee named

22   Anjelica who was employed during this time period?

23   A.    I don't remember the time period.  I

24   know that I supervised Anjelica, but I don't

25   remember the times she worked.

EX. B, p.11

Jaime San Miguel * 1/24/2006
Johnson v. Fred Meyer * J04-008 CV (JWS)

Page 150

1      Q.      Do you remember her last name?

2      A.      Masius.

3      Q.      Masius?

4      A.      Uh-huh.

5      Q.      What was her racial background?

6      A.      She was Hispanic.

7      Q.      Now, what arrangements did you make to

8  have Ms. Johnson's position covered while she went

9  on vacation to the Philippines in January of 2002?

10     A.      At that time, I'd have Ms. Fontenot,

11 but I don't know if she was out on leave or not.

12 That was like the first plan.  Then we also have

13 Jeff Furber, which at times performed duties of the

14 PIC.

15     Q.      Where is Jeff Furber right now, if you

16 know?

17     A.      I don't know.

18     Q.      You don't know where he's working?

19     A.      I have no idea, no.

20     Q.      When did he leave Fred Meyer?

21     A.      2-28-02.

22     Q.      Okay.  Who else?

23     A.      And I would probably -- if I need to,

24 probably use Julita, if there is nobody else

25 available.  She'd be like the only one that

Jaime San Miguel * 1/24/2006
Johnson v. Fred Meyer * J04-008 CV (JWS)

Page 151

1    might -- or used to perform that -- that job.

2        Q.    Was Julita your last choice?

3        A.    Out of this group, if everybody was

4    available, probably, yes.

5        Q.    Why is that?

6        A.    Because -- because of the schedule.

7    She'd only work like after 6:00, so there was no --

8    not a lot of overlap.  So I couldn't give a lot of

9    direction.  And she also was talked to by me about,

10   you know, recovery not being complete or to

11   standards.  So I tried not to use it -- not to use

12   her, you know, unless it was completely necessary,

13   like a sick call or nobody else available.

14       Q.    Okay.  Now, Julita -- she was just a

15   clerk?

16       A.    Yes.

17       Q.    And had she ever been the PIC for

18   closing shift?

19       A.    She was at times.

20       Q.    Okay.  And that's when you were unhappy

21   with recoveries from her?

22       A.    Can you be more clear?  I guess I don't

23   understand the question.

24       Q.    You said that you had problems with

25   Julita's recoveries.

Ex. B, p. 13

Jaime San Miguel * 1/24/2006
Johnson v. Fred Meyer * J04-008 CV (JWS)

Page 152

1    A.    Uh-huh.

2    Q.    My question is, would that have been

3 when she was the PIC for the closing shift?

4    A.    Right.  If she was in charge -- you

5 know, performing the functions of PIC those nights,

6 yes.  There was occasion where the recovery was not

7 to standards.

8    Q.    Okay.  And if she did something that

9 was not to standards, would you have sent her an

10 Office Vision e-mail to that effect?

11    A.    I don't remember if she had Office

12 Vision access -- if she had Office Vision access.

13 No, I don't remember.

14    Q.    Okay.  So Myrna Johnson was gone on

15 vacation.  She returned, and then clearly, when she

16 returned, there were -- she was having some family

17 problems; is that correct?

18    A.    That's what she said, yes.

19    Q.    Okay.  Did you have any reason to

20 disbelieve her?

21    A.    No.

22    Q.    What did she tell you about her family

23 problems?

24    A.    After she got back from vacation, at

25 least three or four days after she got back from

Ex. B, p. 14

Jaime San Miguel * 1/24/2006
Johnson v. Fred Meyer * J04-008 CV (JWS)

Page 153

1   vacation, I -- she -- she called me, and I asked

2   her, "Hey, I notice that you missed work your first

3   day back.  Your second day back, you went to lunch

4   and never came back.  You know, now you are

5   calling, you know.  Is everything okay?"  And then

6   she goes, "Well, I'll be in the store in little

7   bit.  Can I talk to you then?"  I said "Sure.  Come

8   on down."

9            And she came in and told me that

10  when she got back from vacation, when she come

11  home, she find out that her daughter was having

12  some problems, like not staying at home, staying

13  out with friends, that she suspected some substance

14  abuse, and then just different things.  And she was

15  very concerned about her daughter.

16       Q.       And how could you tell that she was

17  concerned?

18       A.       Because you could tell that she was,

19  you know, distraught, upset.

20       Q.       Was she crying?

21       A.       I don't think at that time she broke

22  down, but I could tell that she was upset.  And my

23  observation was that she was upset and distraught

24  and concerned about her daughter.

25            And I told her, "Okay.  Well, what

Ex. B, p. 15

Page 154

1    is it you need?" And she goes, "Well, I really

2    need to find her." And I said, "Okay. Well, why

3    don't you just go ahead and take the day off, look

4    for her, and keep me posted. If there is anything

5    I can do for you, just let me know." And that was

6    the extent of the conversation three or four days

7    after she came back from vacation.

8        Q.    Now, when did you next hear from her

9    then?

10       A.    I don't know if it was the very next

11   day or two days after. I don't know exactly the

12   day, but it was like within two days.

13       Q.    Okay. And what did -- and how did she

14   contact you?

15       A.    She came into the store.

16       Q.    Okay. And what did she tell you?

17       A.    She came into -- when she came into the

18   store, she told me that they found her daughter.

19   And they went over and found her at a friend's

20   house, and there was something going on, and that

21   she took her to Bartlett Memorial for observation.

22   And she wasn't sure what she was going to do, that

23   she was going to try to seek treatment for her

24   daughter, but she wasn't sure exactly here, where.

25   She had possibility to go down to the Philippines,

Ex. B, p. 16

Jaime San Miguel * 1/24/2006
Johnson v. Fred Meyer * J04-008 CV (JWS)

Page 155

1    that she'd have to probably be gone for a period of

2    time.

3                     And she asked me, you know, "what

4    are my" -- you know, "my choices, if I want to take

5    a period of time to take care of my daughter?"

6    Because she informed me she didn't have any

7    vacation -- she didn't have a lot of vacation time

8    left.

9                     And I said, "Well, if you are

10   going to be needing time from Fred Meyer, if you

11   leave for more than three days, you have to request

12   a leave of absence, either personal or as a medical

13   leave."

14        Q.        Okay.

15        A.        And I instructed that she could go --

16   because she had been there more than a year, had

17   worked more than 1,200 hours -- to go to the time

18   and attendance office, talk to the time and

19   attendance person.  They'll give her all the

20   paperwork needed to submit the leave of absence,

21   and just follow up on that and just let me know if

22   there was anything else that we could do for her,

23   like, "I'm leaving tomorrow, leaving in a week,

24   this is when I'm thinking about coming back," and,

25   you know, that kind of thing.

Ex. B, p. 17

Page 159

1  BY MR. CHOATE:

2      Q.    Were you aware that to get family

3  medical leave, you would have to -- an employee

4  would have to have completed this Certification of

5  Healthcare Provider?  Had you ever seen this

6  document before?

7      A.    I've seen this document before.

8      Q.    Okay.  So you were familiar with the

9  fact that, for family medical leave to be approved,

10  would require this document to be sent with the

11  family medical leave application?

12      A.    Yes.

13      Q.    Do you know if Ms. Johnson was ever

14  given a copy of Exhibit 27?  Do you have any

15  independent knowledge of that?

16      A.    No, I don't.

17      Q.    Okay.  Do you know if -- whether either

18  Ms. Harmon or Mr. Boley sent what was an incomplete

19  application for family medical leave to the head

20  office in Portland?

21      A.    Do I have knowledge?

22      Q.    Yes.  Do you have knowledge one way or

23  the other?

24      A.    I don't --

25      Q.    Okay.

Ex. B, p. 18

Jaime San Miguel * 1/24/2006
Johnson v. Fred Meyer * J04-008 CV (JWS)

Page 160

1   A.    -- have knowledge of that.

2   Q.    You sent her to time and attendance,

3   and then did you hear from Ms. Johnson again that

4   week?

5   A.    I think she called me one more time

6   before -- before she left or was getting ready to

7   leave.  I don't know exactly what the day or the

8   time frame after I talked to her the first time.

9   It was before she left.

10   Q.    Did Ms. Johnson ever have to take an

11   emergency leave, in your experience, prior to this

12   time in February of 2002, while you worked with

13   her?

14   A.    Not that I'm aware, no.

15   Q.    Okay.  So except for her annual

16   vacations, she was a consistent, steady worker who

17   showed up for her shifts and did her job; is that

18   correct?

19   A.    Sure.  Yes.

20   Q.    Now, did you know when she left how

21   long she intended to be gone?

22   A.    She just mentioned about, you know,

23   about a month, but no specific dates.  More like be

24   back about a month, or "I'll be gone about a

25   month," she said.

Ex. B, p. 19

Page 208

1    Q.    Okay.  Well, you are meeting with her,

2    and your purpose was to give her this verbal

3    warning with the written notice that will go in her

4    discipline file -- her personnel file, right?

5    A.    This one?

6    Q.    Yes.

7    A.    It would go into -- at the -- at the

8    store level, yes.

9    Q.    It would go in the store file.  And

10   then she begins to cry, right?

11   A.    At one point, yes, she begins to cry.

12   Q.    And she cries until after she -- she

13   starts to cry, and she doesn't stop, and she's

14   crying when she leaves the room, right?

15   A.    When she left the room, yes.

16   Q.    Okay.  And when she started to cry,

17   what did you say?

18   A.    When she started crying, I think I was

19   saying like -- you know, it was more on the lines,

20   like, "Well, come now.  If there is something

21   wrong" -- and, you know, "What is going on?"  And

22   she just said, no, that there was nothing wrong,

23   that she was fine.

24   Q.    Okay.  But she was still crying?

25   A.    Yes.  She had tears, yeah.

Ex. B, p. 20

Page 210

1  she crying loudly?  Did it sound like she was happy

2  or sound like she was sad?

3      A.    It sounded like she was sad.

4      Q.    Okay.  It sounded like she was

5  distraught, didn't it?

6      A.    She was upset.

7      Q.    Okay.  You are a guy that we have

8  already recognized as someone who also, when

9  emotionally upset, can cry; isn't that right?

10      A.    Right.

11      Q.    Okay.  I'm not saying it's right -- or

12  I'm not saying it's bad, okay?  But when she was in

13  the office and she was crying, did it appear to be

14  that she was upset about this notice given to her?

15      A.    Right.  That's what I said.  She was --

16  she sounded upset.

17      Q.    Okay.  Did you say, "Look, why don't

18  you go and compose yourself, and we'll talk about

19  this when you feel a little better"?

20      A.    Because once she get up and said she

21  was leaving, that is when the store director says

22  to her, "If you get up and leave the office and

23  walk out of here, you are walking out of your job.

24  Do you understand that?"

25                 Now, I'm completely out.  Now it

Ex. B, p. 21

Page 211

1    is the store director giving her -- you know,

2    talking to her.  Either call it an order or

3    whatever it is.  I mean, he's telling her, "If you

4    do this, this is what it means.  Do you understand

5    that?"  And she said, "Yes."  He told her again,

6    twice.  She goes, "I'm leaving."  Third time he ask

7    her, "If you leave your job -- if you leave the

8    office, you are walking off the job.  Do you

9    understand that?"  And she just got up and left.

10        Q.      So in your experience as a manager, in

11   training and working with people, if someone is

12   crying and they are emotionally upset, do you

13   believe it is the best time to have a conversation

14   with them regarding their job performance?

15                   MR. DICKENS:  Objection.  Calls

16   for speculation.  Go ahead.

17                   MR. CHOATE:  I'm asking him about

18   his experience.

19                   MR. DICKENS:  I understand.  I

20   object to the question.  Calls for speculation.  Go

21   ahead.

22        A.      I'm sorry.  Do I --

23                   MR. CHOATE:  Do you want to repeat

24   the -- read back that one, please?

25                   THE REPORTER:  "Question:  So in

Ex. B, p. 22