# DECLARATION OF JAMES R. DICKENS
## EXHIBIT C
## (PAGES 1-11)

Page 1

UNITED STATES DISTRICT COURT
DISTRICT OF ALASKA

MYRNA I. JOHNSON,            )
                             )
        Plaintiff,           )
                             )
v.                           )
                             )
FRED MEYER STORES, INC.,     )
a Delaware corporation;      )
and JAIME SAN MIGUEL,        )
                             )
        Defendants.          )
_____)

Case No. J04-008 CV (JKS)

VIDEOTAPED DEPOSITION OF FRED SAYRE
Pages 1 through 105, Inclusive
Taken: Friday, January 27, 2006
Place: Juneau, Alaska

Ex. C, p. 1

Page 38

1  days. I know one day I went in and wrote a pretty
2  big tour.
3      Q.   Okay. And let me see if I can find it
4  here. Let's just talk about that. You came in --
5          MR. DICKENS: Counsel, Exhibit 11?
6          MR. CHOATE: Yes, you're right.
7  BY MR. CHOATE:
8      Q.   Is this the tour that you wrote?
9      A.   No.
10     Q.   Okay. That's not -- is that your
11 handwriting?
12     A.   No.
13     Q.   Okay. Not your handwriting.
14     A.   No. My handwriting is not very good.
15     Q.   Neither is mine. It seems to get worse
16 all the time. One second.
17         MR. DICKENS: Check Exhibit 38.
18         MR. CHOATE: What?
19         MR. DICKENS: Check Exhibit 38.
20 BY MR. CHOATE:
21     Q.   I'm handing you what has been marked
22 Exhibit 38. Is that the tour that you did?
23     A.   Yeah, that's my handwriting.
24     Q.   Okay. And is that the tour you are
25 referencing? Is that where you had concerns?

Fred Sayre * 1/27/2006
Johnson v. Fred Meyer * J04-008 CV (JWS)

Page 54

1  compose yourself, or do you need to come back and
2  meet with us a little -- when you feel better?"
3      A.    No, I didn't. Because if you -- every
4  time you are counseling somebody, they tend to do
5  that or they tend to -- that can happen. That
6  circumstance can happen.
7           So you try to go on with it and
8  try to calm down the situation, and say, "Look,
9  this is just -- we are just talking to you. This
10 is what we are doing. Please calm down. We don't
11 want you to quit."
12          And then I believe at the time I
13 reminded her that, you know, if she did walk out,
14 that that would be a voluntary resignation.
15     Q.    Okay. Was she still crying?
16     A.    I don't believe she was at the time
17 when I told her that. She cried, and then she got
18 upset, and then she stopped, if I remember, and
19 then she kind of got really upset.
20     Q.    Okay. And when she was really upset,
21 how did she demonstrate that?
22     A.    I think she was loud, verbally loud,
23 and said something to Jaime, and then she walked
24 out the door.
25     Q.    What did she say to Jaime?

Page 73

EXAMINATION

BY MR. DICKENS:

Q. Mr. Sayre, I have some questions. Who, at the Fred Meyer Juneau store, had the authority to terminate an employee?

A. The only person who would terminate an employee would be myself.

Q. And you were the store director at that time?

A. Store director, yes.

Q. Did Jaime San Miguel, just to be clear, have the authority to terminate an employee?

A. No, he did not.

Q. Okay. During the time that Myrna Johnson was on her personal leave to go back to the Philippines in February and early March of 2002, did Jaime San Miguel ever talk to you about replacing her?

A. No.

Q. Did he ever talk to you about hiring someone young and beautiful to replace her?

A. No.

Q. Did you ever hear Jaime San Miguel say

Page 85

1  A.  She got upset when he started -- I
2 don't know if he was reading this or started
3 talking to her more about it. She got more upset
4 and said, "Well, I ought to just quit." And that's
5 when I reminded her, "No, we are here talking about
6 this. We don't want you to do that. That's
7 definitely not what we want. You are a long-term
8 employee, and we want you -- if you do walk out,
9 then that's your -- you know, if you walk out, it
10 is a voluntary resignation. I just want to remind
11 you of that."
12  Q.  Did she respond to that comment?
13  A.  She calmed down. She didn't really
14 respond. She just kind of looked at me, if I
15 remember right, and calmed down. And then she got
16 upset again, once Jaime was going more into this,
17 and then she ended up walking out the door.
18  Q.  Did you make any other comments to her
19 about not walking out?
20  A.  I believe Jaime did and myself. "No,
21 we don't -- we are here talking to you. We don't
22 want you to leave."
23  Q.  Okay. What did you expect would be the
24 result of that conference with Ms. Johnson?
25  A.  That she would understand where Jaime

Page 86

1  was coming from, what the expectations of the store
2  were, and for her, the outcome of her to succeed.
3  That's what you want your employees to do.
4      Q.   Now, was the Employee Warning Notice a
5  termination of Ms. Johnson?
6      A.   No.
7      Q.   And Mr. San Miguel had no authority to
8  terminate her, did he?
9      A.   No.
10     Q.   What was your reaction when she got up
11 and walked out the door?
12     A.   I was -- well, shocked and saddened. I
13 mean, I didn't have any kind of -- you just look at
14 somebody walk out the door, and you don't know what
15 you did to -- to prompt that.
16     Q.   Did you think that either you or
17 Mr. San Miguel took any action or made any comments
18 that reasonably would result in the employee
19 getting up and leaving?
20     A.   No.
21     Q.   Did you and Mr. San Miguel talk to each
22 other, then, after she left, about your reaction?
23     A.   About our reaction?
24     Q.   Yes.
25     A.   Yeah.

1   Q.   What did you discuss?
2   A.   We both kind of looked at each other
3   and just went, "Wow. That's -- what do we do now?"
4   We were shocked. I mean, we couldn't believe that
5   happened.
6   Q.   Did Mr. San Miguel make any comment
7   about whether or not he wanted Ms. Johnson to get
8   up and walk out?
9   A.   He said he didn't want -- that's not
10  what he wanted, if I remember correctly.
11  Q.   All right. And with her getting up and
12  leaving, who was left to manage the apparel
13  department?
14  A.   Just him, by himself.
15  Q.   Going to be a long few days, isn't it?
16  A.   A long, long time, because the pool for
17  employees is really tough.
18  Q.   All right.
19  A.   Especially a knowledgeable employee.
20  Q.   Well, then, why didn't you get up and
21  run down the stairs and say, "Oh, please, Myrna,
22  come back. Come back"?
23  A.   Because I have dealt with employees in
24  the store since 2000, and when people walk out the
25  door, they do that on their own free will, and I

Page 88

1    don't go pursue that. Because if I did that every
2    time, then I would have no consistency. I
3    couldn't -- I couldn't manage the store doing that.
4        Q.   Okay. Other than what you have told
5    us, any other discussion between you and
6    Mr. San Miguel before the two of you broke up the
7    meeting and he left your office?
8        A.   I can't recall.
9        Q.   Well, let me ask you this. Did you --
10   you mentioned something about talking to corporate.
11   Did you talk to anyone at corporate at that time?
12       A.   Oh, yes. Mary Lucas.
13       Q.   And, just for the record, who was Mary
14   Lucas?
15       A.   Mary Lucas was the HR supervisor for
16   the region.
17       Q.   Okay. And why did you call her?
18       A.   Because anytime there was an employee
19   who is being terminated or walked off the job, you
20   need to call her and tell her the circumstances,
21   what's going on, and if they -- they actually make
22   the call back saying the employee is terminated
23   because of that ground. You go ahead -- and you
24   can go ahead with termination.
25       Q.   And did you tell Ms. Lucas pretty much

Page 89

```
1    what you told us here today?
2         A.    Correct.
3         Q.    And then what response or comment did
4    she make?
5         A.    She said, "It sounds like that she
6    voluntarily resigned her position."
7         Q.    And did she tell you to take any other
8    action?
9         A.    No.
10        Q.    Did she say she was going to take any
11   action regarding paperwork?
12        A.    I believe she was going to put in the
13   resignation, yes.
14        Q.    All right.  Now, did you play any role
15   in the decision, when an employee like Ms. Johnson
16   leaves, as to whether or not she's eligible for
17   rehire?
18        A.    I don't play in that role.  That's
19   something corporate does.
20        Q.    Well, did you make any recommendation
21   to Ms. Lucas that Myrna Johnson not be eligible for
22   rehire?
23        A.    No, I did not.
24        Q.    Would you have been happy to have her
25   come back, if she'd come back and sought
```

Page 90

1   reemployment?
2   A.   Yes.
3   Q.   Did she do that?
4   A.   No.
5   Q.   Did she ever get in touch with you?
6   A.   No.
7   Q.   Never even called and said, "I'm sorry,
8   I lost it. I really don't want to leave Fred
9   Meyer. I'd like to continue my career at Fred
10  Meyer"?
11  A.   Not that I'm aware of, no.
12  Q.   Do you have any information that she
13  got in touch with anyone else at Fred Meyer about
14  returning?
15  A.   Not that I'm aware of.
16  Q.   Was the first you heard of any
17  complaint on behalf of Ms. Johnson, when you
18  received the letter from the attorney that was
19  previously marked?
20  A.   Yes.
21  Q.   Okay. And did you have any other
22  involvement in responding until the lawsuit, and
23  you started being interviewed?
24  A.   No.
25  Q.   All right. Mr. Sayre, did you play any

Page 93

1   regarded by Fred Meyer as a voluntary resignation?
2       A.      Correct.
3       Q.      And has that been throughout the
4   history of your employment with Fred Meyer?
5       A.      Throughout the history of my employment
6   with Fred Meyer, yes.
7       Q.      Now, looking again at Exhibit 9, on
8   page 1, did you sign that?
9       A.      Yes, I did.
10      Q.      And why did you sign the request for
11  personal leave, which is page 1 of Exhibit 9?
12      A.      Because there was a question that she
13  had something going on, and she wanted to have
14  her -- that she would have a job when she got back.
15      Q.      So, from your perspective, there was no
16  objection to her taking time for this personal
17  family matter?
18      A.      No.
19      Q.      All right. And is that within the
20  scope of your authority to approve the personal
21  leave?
22      A.      Yes.
23      Q.      All right. But family leave is a
24  separate issue?
25      A.      Family leave is not in my authority.