James R. Dickens
MILLER NASH LLP
4400 Two Union Square
601 Union Street
Seattle WA 98101-2352
Telephone: (206) 622-8484

Peter Gruenstein
GRUENSTEIN & HICKEY
Resolution Plaza
1029 W. 3rd Avenue, Suite 510
Anchorage AK 99501
Telephone: (907) 258-4338

    Attorneys for Defendants

Hon. Ralph R. Beistline

MILLER NASH LLP
ATTORNEYS AT LAW
4400 TWO UNION SQUARE
601 UNION STREET, SEATTLE WA 98101-2352
TELEPHONE (206) 622-8484

UNITED STATES DISTRICT COURT
DISTRICT OF ALASKA

| | |
|---|---|
| MYRNA I. JOHNSON,<br><br>    Plaintiff,<br><br>v.<br><br>FRED MEYER STORES, INC., a Delaware corporation; and JAIME SAN MIGUEL,<br><br>    Defendants. | Case No. 1J-04-008-CV (RRB) |

## DECLARATION OF JAMES R. DICKENS IN SUPPORT OF DEFENDANTS' OMNIBUS MOTIONS IN LIMINE

I, James R. Dickens, declare under oath as follows:

1.    I am an attorney with Miller Nash LLP, one of the attorneys for the defendants in the above-referenced matter. I make this declaration based on my personal knowledge and the records and files herein.

2.    Attached hereto as **Exhibit 1** is a true and correct copy of the Affidavit of Paz Carrillo submitted to the Alaska State Commission for Human Rights.

3.    Attached hereto as **Exhibit 2** is a true and correct copy of the Affidavit of Sarah Dexter submitted to the Alaska State Commission for Human Rights.

DECLARATION OF JAMES R. DICKENS IN SUPPORT
OF DEFENDANTS' OMNIBUS MOTIONS IN LIMINE
Johnson v. Fred Meyer
Case No. 1J-04-008-CV
Page 1 of 2

SEADOCS:239716.1

MILLER NASH LLP
ATTORNEYS AT LAW
4400 TWO UNION SQUARE
601 UNION STREET, SEATTLE WA 98101-2352
TELEPHONE (206) 622-8484

4.    Attached hereto as **Exhibit 3** is a true and correct copy of the Affidavit of Mary Droddy submitted to the Alaska State Commission for Human Rights.

5.    Attached hereto as **Exhibit 4** is a true and correct copy of the Affidavit of Jay Epstein submitted to the Alaska State Commission for Human Rights.

6.    Attached as **Exhibit 5** is a true and correct copy of the Affidavit of Charina Fontenot submitted to the Alaska State Commission for Human Rights.

7.    Attached as **Exhibit 6** is a true and correct copy of the Affidavit of Johnna Havard submitted to the Alaska State Commission for Human Rights.

8.    Attached as **Exhibit 7** is a true and correct copy of the Affidavit of Mathew Laney submitted to the Alaska State Commission for Human Rights.

9.    Attached as **Exhibit 8** is a true and correct copy of the Affidavit of Sallie Tenwolde submitted to the Alaska State Commission for Human Rights.

10.    Attached as **Exhibit 9** is a true and correct copy of the Affidavit of Maranda Wilburn submitted to the Alaska State Commission for Human Rights.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

SIGNED at Seattle, Washington, on July 31, 2006.

s/ James R. Dickens _____

Certificate of Service

I hereby certify that on July 31, ,2006,
A copy of the foregoing was served
electronically on:

Mark Choate
lawyers@choatelawfirm.com

s/ James R. Dickens _____

DECLARATION OF JAMES R. DICKENS IN SUPPORT
OF DEFENDANTS' OMNIBUS MOTIONS IN LIMINE
Johnson v. Fred Meyer
Case No. 1J-04-008-CV
Page 2 of 2

SEADOCS:239716.1

BEFORE THE ALASKA STATE COMMISSION OF HUMAN RIGHTS

MYRNA I. JOHNSON,                    )
                                     )
        Plaintiff                    )
                                     )
                                     )
vs.                                  )
                                     )
FRED MEYER STORES, INC.              )
                                     )
        Defendants                   )
                                     )
                                     )
_____)    ASCHR No. C-02-132

## AFFIDAVIT OF PAZ CARRILLO

I, Paz Carrillo, being first duly sworn upon oath, depose and state as follows:

1.      I am more than 19 years of age, and competent to testify regarding these matters, based on personal knowledge and belief.

2.      My mailing address is P.O. Box 33394,  Juneau, AK  99803.

3.      I first began working at the Juneau store of Fred Meyer, Inc. ("Juneau Store") in 1995, as a part-time sales clerk in the apparel department.

4.      I got acquainted with Myrna Johnson when I first began working at the Juneau Store because, during the time we both worked at the Juneau Store, she was one of my supervisors.

5.      I saw Myrna Johnson on a regular basis at work – and I typically worked two or three times a week at the Juneau Store.

6.      I worked in the apparel department until May of 2003, when I began working in the jewelry department.

7.      I currently am employed by the Juneau Store and continue to work in the

*Johnson v. Fred Meyer Stores, Inc.,*
Affidavit of Paz Carrillo

Exhibit H
page 10 of 18

100094
ASCHR No. C-02-132
Page 1 of 3

Ex. 1,
P. 1

jewelry department there.

8.  During the years that I worked with Ms. Johnson at the Juneau Store, she was a very hard worker, a good supervisor, a kind person, and had very good communication skills.

9.  In or about mid-March of 2002, Ms. Johnson returned from a medical leave that involved taking care of her daughter.

10. Shortly after she returned from that leave, she informed me and other members of the evening staff that Jaime San Miguel had criticized our recovery the previous evening.

11. The term "recovery" at the Juneau Store means that the store merchandise was in order at the end of the evening when the Juneau Store closed.

12. I had been through my area at the close of business on the preceding evening, and everything was in order.

13. Ms. Johnson showed me a photograph of the displays in my area that she had been given, which had supposedly been taken first thing in the morning by San Miguel and Fred Sayre.

14. The photograph from San Miguel showed displays in my area that had signs on the merchandise displays which were slightly askew.

15. After we had been told about the signs being askew, I walked through my area to straighten the signs.

16. I thought then, and still think this now, that San Miguel's photograph must have taken around 9 a.m. – in other words, after the Juneau Store had been open to customers for two hours – since several areas in the Apparel Section looked as if they either had been poorly recovered, or early customers had been through them already.

17. This is the only time in my career at the Juneau Store that I can recall photographs being taken of a work area.

Johnson v. Fred Meyer Stores, Inc.,
Affidavit of Paz Carrillo

Exhibit H
page 11 of 18

100095    Ex 1, p 2

ASCHR No. C-02-132
Page 2 of 3

18. My reaction when I saw the photograph was that San Miguel was giving Ms. Johnson a hard time and that he was nitpicking.

19. The next day, San Miguel told her that the Levi's, Lee Jeans, and Dockers slacks should have been arranged by size, and thus felt our recovery had been unsatisfactory.

20. I was surprised to hear this criticism because I had been doing recovery in the apparel department since 1995, the area involving women's slacks and jeans was my area, and at no time had anybody ever criticized our recovery for that reason.

21. A day or two later, San Miguel told the night crew that Ms. Johnson was no longer working at the Juneau Store.

DATED this 7th day of June, 2004.

Paz Carrillo

SUBSCRIBED and SWORN TO before me this 7th day of June, 2004.



Notary Public, State of Alaska
My commission expires: 07/04/07

Exhibit H
page 12 of 18

100096   Ex 1, p 3

Johnson v. Fred Meyer Stores, Inc.,
Affidavit of Paz Carrillo

ASCHR No. C-02-132
Page 3 of 3

MYRNA L. JOHNSON v. FRED MEYER STORES, INC.

ASCHR No. C-O2-132

<u>AFFIDAVIT OF SARAH DEXTER</u>

I, Sarah Dexter, being first duly sworn upon oath, depose and state as follows:

1.    I am more than 19 years of age, and competent to testify regarding these matters, based on personal knowledge and belief.

2.    My mailing address is P.O. Box 33004, Juneau, AK 99803.

3.    I first joined the Juneau store of Fred Meyer, Inc. ("Juneau Store") in July of 1995 as a shoe clerk, which was a part-time (twenty-four hour a week) position.

4.    Since commencing my employment with the Juneau Store, I have served as the Children's Section Head and the Accessories Section Head.

5.    Ms. Johnson became my supervisor when she was promoted to the Third Assistant at the Juneau Store.

6.    I interacted with Ms. Johnson on almost a daily basis until she was terminated from the Juneau Store.

7.    Ms. Johnson was an excellent manager.  She was pleasant, dressed professionally, was hardworking and had very good people skills – in fact, she was excellent at motivating the employees that she supervised.

8.    Ms. Johnson was loyal to the Juneau Store, her supervisors, and was a valued employee.

9.    When Mr. San Miguel, her supervisor, was going through a divorce a year or two ago, he would cry at work and sometimes be absent from work.  Myrna was very helpful to him during this time and picked up his duties when he was too distraught to work.

10.    After San Miguel went through his divorce, he started asking employees to find him dates.  He asked me to get him dates and I know Julita Lim, another employee,

BAXTER BRUCE BRAND P.C.
P.O. BOX 32819
JUNEAU, ALASKA 99803-2819
Telephone (907) 789-3196
Facsimile (907) 789-1516

1  fixed him up on some dates.

2       11.   On one occasion, San Miguel saw a good-looking girl outside the stockroom

3  talking to an employee and I heard him say that "if she wants a job, I will give it to her

4  now."

5       12.   San Miguel also hired a good-looking young Hispanic woman -- named

6  Angela or Angelica -- and I observed him flirting with her on a number of occasions.

7       13.   San Miguel cut the hours of other employees so he could give

8  Angela/Angelica a job. In fact, Angela/Angelica was given forty hours a week to work

9  but he did not put her on the schedule as a full-time employee, probably since she was

10  working hours that had been taken away from other employees.

11       14.   In January of 2002, Myrna had some problems with her daughter. I did not

12  notice any change in the quality of her work, her loyalty to the Juneau Store, or her

13  interactions with others during this time. In fact, I did not even know Myrna was having

14  serious problems with her daughter until I learned she was taking family medical leave to

15  deal with those issues, because she really managed to keep her personal problems out of

16  the workplace.

17  15.   When Ms. Johnson went on leave in January, I was there when San Miguel learned

18  that Fred Meyer, Inc. was sending an employee from another store to fill-in during

19  Myrna's absence. San Miguel said, "if it is a woman, send somebody young and

20  beautiful" and "not a hag."

21       16.   Johnna Havard, a young and attractive female who is about twenty-two

22  years old, was sent from another Fred Meyer store in Alaska to the Juneau Store while

23  Myrna was on leave to assist San Miguel.

24       17.   Shortly before Ms. Johnson returned from leave, Johnna Havard remarked to

25  me that she thought she would take the Assistant's job and I was under the impression

26  that San Miguel had offered her that job.

27       18.   I had heard from others that Johnna and San Miguel were socializing outside

28  of the office, although I have no personal knowledge of this.

BAXTER BRAND & DOUGLA
P.O. BOX 32819
JUNEAU, ALASKA 99803-2810
Telephone (907) 780-3300
Facsimile (907) 780-3315

Exhibit H
page 15 of 18

Ex. 21
Q-2

2

19. On March 12, 2002, Myrna returned from her leave of absence, and I was present when San Miguel first saw her. He was with Johnna Havard; he spoke to Myrna but did not introduce her to Johnna. In fact, I thought it very odd that he was so unfriendly towards Myrna.

20. When I learned that Myrna had been given the night schedule on her return, I also found that unusual. Myrna previously had the daytime shift and normally, the Second Assistant (Myrna's job) would not have been given the closing shift. Instead, Ms. Havard would have been assigned to that shift

21. I also found it unusual that San Miguel gave Johnna the PIC phone ("person-in-charge" phone) rather than Myrna, as normally the second in command would be given the PIC phone.

22. Each of these actions contributed to my impression that San Miguel was trying to replace Myrna with Ms. Havard.

23. Shortly after Ms. Johnson returned to work from her leave of absence, I told her that Johnna was after her job, based upon what I had heard from Johnna and had observed.

24. On Sunday, March 17, 2002, Minerva Cortez – another employee – informed me that I was to write up anything wrong I had noticed about the previous evening's "recovery." The term "recovery" at the Juneau Store means that the store merchandise was in order when the store closed.

25. Ms. Cortez gave me a different Office Vision address (like an e-mail address) for San Miguel that only he could view in connection with this instruction. This was not the normal procedure, as typically a message would be sent to San Miguel and all other managers. I learned from other employees that they too had received a similar message.

26. I had never received a similar instruction emanating from San Miguel, although recovery is frequently an issue at the Juneau Store.

27. I responded to San Miguel's instruction by telling him that I felt the department I was responsible for in the Juneau Store had looked good when I had arrived

1  for the daytime shift.

2      28.    After Myrna was terminated, a co-worker of mine sent several e-mails to San

3  Miguel complaining about recovery at the Juneau Store after Myrna's departure but San

4  Miguel never did anything about the recovery issues despite those e-mails.

5      29.    I am aware that there were recovery issues concerning an employee named

6  Julita Lim, but she told me that she was never written up or reprimanded for doing an

7  inadequate "recovery."

8      30.    I was present when Ms. Johnson returned from the meeting on March 18,

9  2002 with Fred Sayre and San Miguel in which she was written up; Ms. Johnson was

10  crying and finally went home because she was so upset.

11      31.    When a co-worker learned that Myrna had been written up, she remarked

12  that San Miguel "got what he wanted" – a veiled reference to replacing Myrna with

13  Johnna.

14      32.    Johnna was offered Myrna's job that same day (March 18, 2002) or the very

15  next day.

16      33.    In a meeting San Miguel held with Sixta Catli and myself shortly after Myrna

17  was terminated, I questioned San Miguel about his treatment of Myrna.  He claimed she

18  had "quit" and he "had no control over this" and "it was not his fault".

19      34.    During my employment at the Juneau Store, I have observed that it is useless

20  to complain to Fred Sayre, the Juneau Store manager, since nothing ever happens.  An

21  employee will go to Fred Sayre with a complaint, and then never hear anything more.

22      35.    Since San Miguel has been the Apparel Manager, the individuals he has

23

24

25

26

27

28

BAXTER BRUCE BRAND & DOUGLA
P.O. BOX 30910
JUNEAU, ALASKA 99803-2010
Telephone (907) 789-3196
Facsimile (907) 789-1463

Exhibit H
page 17 of 18

EX.2, p.4

1    hired to work for him have, in all but one instance, been young women considerably

2    younger than forty (40) years of age.

3              FURTHER your affiant sayeth naught.

4              DATED this 24 day of October, 2002.

5                                        _Sarah Dexter_

6                                        Sarah Dexter

7              SUBSCRIBED and SWORN TO before me this 24th day of Oct, 2002.

8

9                                        Notary Public, State of Alaska
                                         My commission expires: May 9, 2002

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26                                        Exhibit H
                                          page 18 of 18
27

28

BAXTER BRUCE BRAND & DOUGLA
P.O. BOX 32019
JUNEAU, ALASKA 99803-2019
Telephone (907) 789-3100
Facsimile (907) 789-1409

5

Ex. 2, p. 5

100102

BEFORE THE ALASKA STATE COMMISSION OF HUMAN RIGHTS

MYRNA I. JOHNSON,                    )
                                     )
            Plaintiff                )
                                     )
                                     )
vs.                                  )
                                     )
FRED MEYER STORES, INC.              )
                                     )
            Defendants               )
                                     )
                                     )    ASCHR No. C-02-132

## AFFIDAVIT OF MARY DRODDY

I, Mary Droddy, being first duly sworn upon oath, depose and state as follows:

1.    I am more than 19 years of age, and competent to testify regarding these matters, based on personal knowledge and belief.

2.    My mailing address is 4050 Delta Drive, Juneau, AK. 99801.

3.    I first began working at the Juneau store of Fred Meyer, Inc. ("Juneau Store") in 1984 and have worked at the Juneau Store from time to time over the past twenty (20) years.

4.    I initially worked in the groceries section of the Juneau Store, but in 1996 began to work in the apparel department, which is how I met Myrna Johnson.

5.    When I worked in the apparel department, I saw Myrna Johnson on a regular basis.

6.    I found Ms. Johnson to be one of the hardest working people I had ever met, considered her a good boss, and felt she had excellent interpersonal

Exhibit *H*
page 30 4 of 18

RECEIVED
HUMAN RIGHTS COMMISSION

*Johnson v. Fred Meyer Stores, Inc.,*
Affidavit of Mary Droddy

ASCHR No. C-02-132
Page 1 of 2

*Ex 3 10-1*

skills.

7.    I had surgery in the 2000-2001 time period, and thus was not working at the Juneau Store at the time of Myrna's termination.

8.    What I heard about the circumstances surrounding Myrna's termination from the Juneau Store in March of 2002 came from second-hand sources other than Ms. Johnson.

9.    I was appalled to hear that the Juneau Store had terminated Ms. Johnson since she was the best employee I had seen during my long tenure there.

10.   When I heard about Myrna's termination, I was so outraged and upset that on my own initiative, I wrote a letter to Mary Lucas, who was in charge of Human Resources, in the Portland headquarters of Fred Meyers, Inc.

11.   In my letter to Ms. Lucas, I told her what a fine worker Myrna was, what a loss it was to the Juneau Store not to have her there.

12.   I gave Ms. Lucas my phone number and even told her she could call me collect for more information about Myrna.

13.   Ms. Lucas never acknowledged my letter and she never called me.

DATED this 16 day of June, 2004.

Mary Droddy
_____
Mary Droddy

SUBSCRIBED and SWORN TO before me this 16th day of ~~May~~ June, 2004.



Heather A Hildebrand
_____
Notary Public, State of Alaska
My commission expires: 07/04/07

Exhibit ___H___
page ___5___ of ___18___

**100089**    Ex 3, p. 2

_Johnson v. Fred Meyer Stores, Inc.,_
_Affidavit of Mary Droddy_

ASCHR No. C-02-132
Page 2 of 2

BEFORE THE ALASKA STATE COMMISSION OF HUMAN RIGHTS

MYRNA I. JOHNSON,           )
                           )
        Plaintiff          )
                           )
                           )
vs.                        )
                           )
FRED MEYER STORES, INC.    )
                           )
        Defendants         )
                           )    ASCHR No. C-02-132
_____)

```
          RECEIVED
  HUMAN RIGHTS COMMISSION

       MAR 2 4 2004

       DOCKET OFFICE
```

### AFFIDAVIT OF JAY EPSTEIN

I, Jay Epstein, being first duly sworn upon oath, depose and state as follows:

1. I am older than nineteen (19) years of age, and competent to testify regarding these matters, based on personal knowledge and belief.

2. My mailing address is 4436 Glacier Highway, Juneau, AK 99801.

3. I first began working for Fred Meyer Stores, Inc. in the Seattle, Washington area in 1998 as a Loss Prevention Specialist.

4. I moved to Juneau, Alaska in March of 1990 and at that time assumed the position of Loss Prevention Specialist in the Juneau, Alaska store of Fred Meyer Stores, Inc. ("Juneau Store").

5. In or about early 1991, I was promoted to the position of Loss Prevention Manager in the Juneau Store. I was assigned to the Aurora Store (a Fred Meyer Stores, Inc. store in North Seattle, Washington) in 1992. I returned to Juneau

Exhibit __H__
page __1__ of __18__

Ex. 4, p. 1

BAXTER BRUCE & SULLIVAN P.C
P.O. Box 32819, Juneau Alaska 99803
Ph: (907) 789-3166
Fax: (907) 789-1913

Store as the Loss Prevention Manager in March of 1993 and held that position until January of 2003.

6. I currently am employed by the State of Alaska in Juneau, Alaska.

7. During 2002, several female employees at the Juneau Store came to me and complained that Jaime San Miguel was showing favoritism towards young, attractive female employees who worked in the Juneau Store.

8. I had the opportunity to observe Myrna Johnson on a regular basis during the years I worked in the Juneau Store and noted that she was a hard worker.

9. Around the time of Ms. Johnson's termination, I learned that she had been asked to go to Fred Sayre's office and that Sayre and San Miguel had met with her there.

10. Both Sayre and San Miguel are large, burly men and Ms. Johnson is a petite, soft spoken woman. The office she was taken into had a locked door.

11. I had serious concerns over how the meeting with Ms. Johnson was handled because I felt that Ms. Johnson would have been very intimidated being in that office with two large men and that she would have felt threatened in that situation.

12. When I had held similar meetings with a female employee, I had always been very careful to have another female employee present so that I would not be accused of intimidation.

BAXTER BRUCE & SULLIVAN P.C.
P.O. Box 32819, Juneau Alaska 99803
Ph: (907) 789-3166
Fax: (907) 789-1913

13. I learned from others at the Juneau Store that Ms. Johnson had emerged from that meeting crying; shortly afterwards, I heard that she had been terminated from her position at the Juneau Store.

FURTHER your affiant sayeth naught.

DATED this _17_ day of March, 2004.



Jay Epstein

SUBSCRIBED and SWORN TO before me this _17th_ day of March, 2004.

Notary Public, State of Alaska
My commission expires:

**100087**



Exhibit _H_
page _3_ of _18_

Ex 4.10.3

BAXTER BRUCE & SULLIVAN P.
P.O. Box 32819, Juneau Alaska 99803
Ph: (907) 789-3166
Fax: (907) 789-1913

BEFORE THE ALASKA STATE COMMISSION OF HUMAN RIGHTS

MYRNA I. JOHNSON,                      )
                                       )
            Plaintiff                  )
                                       )
                                       )
vs.                                    )
                                       )
FRED MEYER STORES, INC.                )
                                       )
            Defendants                 )
                                       )
_____)    ASCHR No. C-02-132

## AFFIDAVIT OF CHARINA FONTENOT

I, Charina Fontenot, being first duly sworn upon oath, depose and state as
follows:

1.    I am more than 19 years of age, and competent to testify regarding these
matters, based on personal knowledge and belief.

2.    My mailing address is 4450 Julep Street, Juneau, AK  99801.

3.    I first began working at the Juneau store of Fred Meyer, Inc. ("Juneau
Store") in 1998 as a sales clerk in the cosmetics department.

4.    I got acquainted with Myrna Johnson in 1998, when I first began working
in at the Juneau Store and she was one of my bosses during the time we
both worked at the Juneau Store.

5.    I saw Myrna Johnson at work on a regular basis from 1998 until February
of 2002, when Ms. Johnson went on leave due to some problems with her
daughter.

6.    Sometime in the fall of 2001, Jaime San Miguel announced that I would be

**300036**    Ex. 5, p. 1

a relief Assistant (sometimes called the "Second Assistant") and Myrna began training me for that job.

7.  I was out of work for several weeks in March of 2002 due to a back injury and I did not return to the Juneau Store until March 19, 2002.

8.  When I returned to work on March 19, 2002, I learned that Ms. Johnson was no longer working at the Juneau Store.

9.  At the time I returned to work, there was a display of baby furniture on a platform, or deck, in the Juneau Store.

10.  Jaime San Miguel, on March 19, 2002, told me to mark down the furniture that had been assembled for that display and I was also told to remove the rest of the items into a store room, which I did.

11.  I later learned that Ms. Johnson had been instructed by San Miguel earlier that same week to assemble the furniture and to put together that display.

12.  This was a time-consuming task that normally would not have been assigned to Ms. Johnson as it would have been very difficult for Ms. Johnson to complete this Baby Furniture display while still fulfilling her other managerial responsibilities.

13.  It made no sense to me that San Miguel had asked Johnson to assemble this display only several days before he told me to remove this same display and to mark down and sell off the furniture that had been assembled by Ms. Johnson.

14.  Ms. Johnson was a hard worker, a good boss, and she was respected by other employees in the Juneau Store.

15.  During the entire time that I worked with Myrna, she always behaved in a

**300037**  Ex. 5, p-2

professional manner.

DATED this ___ day of June, 2004.



Charina Fontenot

SUBSCRIBED and SWORN TO before me this 8th day of June, 2004.



Notary Public, State of Alaska
My commission expires: 07/04/07

*Ex.5, p. 3*

**300038**

MYRNA L. JOHNSON v. FRED MEYER STORES, INC.

ASCHR No. C-O2-132

AFFIDAVIT OF JOHNNA HAVARD

I, Johnna Havard, being first duly sworn upon oath, depose and state as follows:

1.    I am twenty-five (25) years of age, and competent to testify regarding these matters, based on personal knowledge and belief.

2.    My mailing address is 3330 Nowell Ave., # 5, Juneau, Alaska 99801.

3.    I first began working for Fred Meyer, Inc. ("Company") in its Fairbanks, Alaska store on September 2, 1999, as the "Fourth-in-Charge," a management position.

4.    During the five years I have been employed by the Company, I have also worked at the Company's stores in Wasilla, Alaska ("Wasilla Store") and in Juneau, Alaska ("Juneau Store").

5.    I received several promotions at the Company and, in January of 2002, was working as the Second Assistant in the Wasilla Store.  This position is sometimes also called the "Relief Assistant."

6.    In February of 2002, I learned from Dennis Affect, the District Manager for the Company, that there was a temporary First Assistant position open at the Juneau Store.

Ex.6, p.1

7.    Dennis Afflect recommended that I take the temporary First Assistant position at the Juneau Store in order to get more managerial experience and I agreed to do that.

8.    I began working at the Juneau Store on March 1, 2002, as the temporary First Assistant. After I began working at the Juneau Store, I learned that I was replacing Myrna Johnson, who was on a leave of absence.

9.    Throughout my time as a temporary First Assistant at the Juneau Store, I was supervised by Jaime San Miguel ("San Miguel"), a Hispanic male who appears to be in his thirties.

10.    I enjoyed living and working in Juneau, Alaska and during the month that I was in this temporary position, I mentioned to San Miguel that I would be willing to move to Juneau if the First Assistant position ever became available.

11.    Myrna Johnson returned from her leave of absence in mid-March of 2002. Upon her return, we were both working at the Juneau Store for approximately one week prior to my scheduled return to the Wasilla Store. During that time, I was working the day shift while Myrna was on the evening shift.

12.    On or about March 18, 2002, San Miguel informed me that Myrna Johnson was no longer working at the Juneau Store and told me that her job was being posted. Both San Miguel and Fred Sayre, the Juneau Store Manager, encouraged me to apply for her position.

Ex. 6, p. 2

13. I returned to the Wasilla Store in late March as had previously been scheduled, but did apply for the First Assistant opening at the Juneau Store.

14. I was offered the First Assistant position at the Juneau Store, relocated to Juneau, and began my new job there on April 17, 2002.

15. While I was working as the temporary First Assistant at the Juneau Store, it was obvious from my conversations with other employees that Myrna was well-liked by her co-workers, that her subordinates thought highly of her, and that she was a hard worker.

16. Several employees told me that Myrna Johnson had been pushed out of the job so that San Miguel could hire me and I was told that San Miguel had written her up shortly before her job was posted as being vacant.

17. I was also told by two female employees that San Miguel had said that he wanted to replace Myrna Johnson with a younger and more beautiful employee. I was not surprised by this comment as I had personally observed that San Miguel favored younger female employees in comparison to his treatment of older women who worked at the Juneau Store.

18. I subsequently learned that one of the things that Myrna was being written up for was the completion of a plan-o-gram (also called a schematic) in the baby furniture department. I was very surprised to hear this, since Minerva Cortez – not Myrna Johnson – was responsible for that task. In fact, the plan-o-gram remained unfinished long after

*Ex. 6, P. 3*

Ms. Johnson was no longer employed by the Store and, to the best of my knowledge, Ms. Cortez was never reprimanded for her failure to complete this task.

19.    After I returned to the Juneau Store to be the First Assistant, San Miguel on one occasion invited me to come over to his house and do some Latin dancing with him. I considered this invitation to be inappropriate.

20.    I also noticed that San Miguel behaved in a very flirtatious manner – and in my view, an inappropriate manner – with Felicia Kohnen, who was a "KSP" in the Juneau Store. A KSP is employed in a human resources function. I also could not help but notice that San Miguel would eye attractive women who walked by him in the Juneau Store.

21.    It also became obvious to me that San Miguel preferred Hispanic employees over Asian employees. For example, complaints about Minerva Cortez abounded in the Juneau Store, yet San Miguel did nothing to address those complaints.

22.    On Myrna's last day in the Juneau Store, I saw her crying in the stock room and observed that she was very upset.

23.    After Myrna's last day at work, San Miguel remarked that Myrna "was not doing her job." However, he did not elaborate on that statement.

24.    San Miguel repeatedly asked me to fix him up with dates or with "hot women," a request that I found to be inappropriate.

25.    Sometime in the spring of 2002, after I had assumed the position of First Assistant for the Juneau Store, Myrna was in the Juneau Store working on servicing the

Ex. 6, p. 4

Foster Grant exhibit since she was a vendor for them. San Miguel instructed me to inform Myrna that she was not to service the account unless he was present in the Juneau Store.

26.    I had previously been a vendor for an outside account that sold merchandise in one of the Company's stores so I knew that there was no such requirement. Thus, I found it very odd that San Miguel would impose this unusual requirement on Ms. Johnson but I delivered his message to Ms. Johnson since he had instructed me to do so.

27.    I do not recall seeing Ms. Johnson servicing that account after that time.

28.    San Miguel remained my supervisor until April of 2003. However, our working relationship began to deteriorate seriously after I got engaged to a co-worker in the summer of 2002.

29.    San Miguel began to criticize my work after I got engaged. I felt San Miguel's criticism of my work after my engagement was utterly unfounded as the quality and quantity of my work had not changed. I personally believe that jealousy – not my work performance – prompted his actions.

30.    After my engagement, San Miguel also scheduled me on the less favorable evening shift and would give me a long list of things that needed to be done which could not possibly be completed during my shift.

31.    San Miguel would then criticize me for not completing all the items on his long list. On one occasion he told me that I needed to work until 2 a.m. to finish the tasks assigned to me. I would note that even when San Miguel placed me on the less desirable evening shift, my working hours were supposed to be over at 11 p.m.

Ex. 4, p. 5

32.     By late fall of 2002, I was sure that San Miguel was trying to push me out of my job. He even blamed me for incidents that happened on my days off from work.

33.     I complained about San Miguel's conduct to Dennis Afflect, the District Manager for the Company, in or about November of 2002 but my complaints were ignored.

34.     In December of 2002, San Miguel and Fred Sayre gave me a written warning for "leaving when the job was not completed" when I left work at approximately 6:00 a.m. on Thanksgiving Day.  I refused to sign that written warning because I felt that it was not warranted.

35.     Although I complained about the change in San Miguel's treatment of me to Fred Sayre, these two men socialize outside of the office and my complaints were "swept under the rug."

36.     When I mentioned to another Fred Meyer, Inc. employee in early 2003 that I would like to work in the corporate office for the Company, San Miguel overheard my statement and said that I "was not going anywhere."

37. .   After I complained about San Miguel's conduct, he placed me on the graveyard shift which ran from 10 a.m. to 7:30 p.m., although the First Assistant is normally not scheduled for this shift.

38.     San Miguel's harassment and retaliation of me began to take a toll on my health and I was rushed to the hospital with chest pains in December of 2002.

39.     I eventually contacted Jim Hill (Operations Manager for the Company in the Company's corporate office), Ken Haverkost (Fred Sayre's supervisor), and Mary Lucas,

Ex. 6, p. 6

Affidavit of Johnna Havard

who was in charge of Human Resources at the corporate offices of the Company, through e-mail in order to complain about the treatment I had been experiencing since my engagement.

40.    Neither Jim Hill nor Ken Haverkost responded to my e-mail.  Instead, Haverkost forwarded my e-mail to Fred Sayre.

41.    After Sayre received this forwarded e-mail, he informed me that he did not appreciate my going over his head with my complaints.  However, the reason why I felt forced to go above Fred Sayre with my concerns was because he had ignored my previous complaints about San Miguel.

42.    Ms. Lucas, however, did respond to my e-mail and I informed Ms. Lucas that San Miguel had issues with women and that I felt there was a pattern in his treatment of various women -- including myself and Ms. Johnson.

43.    Clearly, the Company did not take my complaints seriously since San Miguel has since been promoted to be second-in-command of the entire Juneau Store.

44.    Eventually, in April of 2003, I took a position at the Juneau Store that paid approximately $5.00 less an hour than the First Assistant position so that I would no longer be under San Miguel's direct supervision.

45.    I feel San Miguel's actions towards me after my engagement forced me out of my management job and that his conduct has harmed my chances for further promotion within the Company.

Ex. 4, p. 7

FURTHER your affiant sayeth naught.

DATED this ___ day of February 2004.

_Johnna C. Havard_ 2-12-04
Johnna Havard

SUBSCRIBED and SWORN TO before me this 12ᵗʰ day of February 2004.

_Heather A Hildebrand_
Notary Public, State of Alaska
My commission expires: 7/4/07

Ex. 4, p. 8

BEFORE THE ALASKA STATE COMMISSION OF HUMAN RIGHTS

MYRNA I. JOHNSON,                          )
                                           )
        Plaintiff                       )
                                           )
                                           )
vs.                                        )
                                           )
FRED MEYER STORES, INC.                    )
                                           )
        Defendants                      )
                                           )
_____   )    ASCHR No. C-02-132

### AFFIDAVIT OF MATHEW LANEY

I, Mathew Laney, being first duly sworn upon oath, depose and state as follows:

1. I am more than 19 years of age, and competent to testify regarding these matters, based on personal knowledge and belief.

2. My mailing address is 821 9th Ave., # 202, Seattle, WA 98104.

3. I first began working at Fred Meyers, Inc. ("Company") in Oregon on a part-time basis when I was in school.

4. I began working full-time at the Company in 1989 as a sales clerk and shortly thereafter entered the Company's management training program.

5. From 1989 until 1994, I worked in five different Company stores in Oregon and was an Assistant Manager.

6. In 1994, I was transferred to the Apparel and Leisure Department of the Company's store in Juneau, Alaska ("Juneau Store").

7. When I began managing the Apparel and Leisure Department at the Juneau Store in 1995, Ms. Johnson was working in the shoe department, which was

RECEIVED

Ex. 7, p. 1

**100110**

under my supervision, and I had contact with her on a daily basis.

8.  Ms. Johnson later took a job with the State of Alaska for a brief period of time, but she continued to work part-time at the Juneau Store until 1996, so I still saw her at work from time to time even while she worked for the State.

9.  In 1996, I was involved in a project to strengthen the management team at the Juneau Store and I immediately recruited Ms. Johnson to be part of the management team.

10. When Ms. Johnson returned to the Juneau Store on a full-time basis in 1996 as part of management, I saw her on a daily basis and was her supervisor.

11. Ms. Johnson, throughout my association with her at the Juneau Store, was very professional in appearance, was extremely hardworking, had an exemplary work ethic, was an excellent supervisor who had outstanding people skills, and was an employee who needed little supervision.

12. I found Ms. Johnson to be an excellent employee who was exceptional on a number of different levels:  she led by example, was devoted to her job, was well-balanced, inspired employees, and was well-respected by co-workers and management.

13. Myrna Johnson also completed her work in a timely manner and there was no need to supervise her or follow up with her as she always outworked her project list.

14. I also supervised Jaime San Miguel during much of this same time period.

15. By contrast, I viewed San Miguel as a bit of a problem, since he caused more work than he produced, needed substantial improvement in his people skills, and was the source of a number of complaints from co-workers and subordinates who worked under him.

16. Among the complaints I received about him were complaints from at least

Ex 7,
P 2

two older female employees who related to me that he had said to them: "if I could, I'd get rid of you and just hire cute ones."

17. Jaime San Miguel also remarked on a number of occasions that he was interested in dating Kaylana Haase, a female co-worker of his at the Juneau Store, and I did notice that good-looking young women at the Juneau Store captured his attention.

18. While San Miguel worked for me, he had a number of family and personal problems and I gave him time off from work because of these problems, including a month's leave in one instance.

19. From time to time, San Miguel left before his shift was over because he was upset or didn't feel well and, on occasions, Ms. Johnson also left a few times before her shift was finished due to extenuating circumstances.

20. I resigned from the Juneau Store in 2000, and then began focusing my attention on an interior decorating business that I had started while employed at the Juneau Store.

21. San Miguel was promoted into my position after I resigned.

22. I received a phone call from Ms. Johnson shortly after her termination from the Company in March of 2002, which is how I learned that she was no longer at the Juneau Store.

23. During this phone call, Ms. Johnson told me that upon her return from leave, San Miguel had given her pages and pages of things that needed to get done in one night on a "Tour of Duty" list. Such lists were normally one-page in length or two pages at the most.

24. When I heard Ms. Johnson's account of the events, it sounded as though San Miguel was demanding that Ms. Johnson perform an unreasonable number of tasks in a totally unreasonable time frame.

25. Knowing San Miguel, I suspect he was very resentful that Ms. Johnson had

Ex 7,
p-3

taken a leave of absence to deal with the health issues of her daughter.

26. I asked Ms. Johnson whether she had spoken to Fred Sayre about what had happened and she said that she did, but he had done nothing.

27. I was not surprised at Sayre's conduct since when he was faced with a problem, he tended to ignore it.

28. Since the Juneau Store was the only large retailer in town after K-Mart closed, I was not surprised to learn that Ms. Johnson had been forced to leave Juneau, Alaska after she was terminated by the Juneau Store.

DATED this 9th day of June, 2004.

Mathew Laney

SUBSCRIBED and SWORN TO before me this 9th day of June, 2004.

Notary Public, State of Washington
My commission expires: 9/4/07

EX 7,
p. 4

BEFORE THE ALASKA STATE COMMISSION OF HUMAN RIGHTS

MYRNA I. JOHNSON,               )
                               )
          Plaintiff            )
                               )
                               )
vs.                            )
                               )
FRED MEYER STORES, INC.        )
                               )
          Defendants           )
                               )
_____)    ASCHR No. C-02-132

### AFFIDAVIT OF SALLIE TENWOLDE

I, Sallie Tenwolde, being first duly sworn upon oath, depose and state as follows:

1. I am more than 19 years of age, and competent to testify regarding these matters, based on personal knowledge and belief.

2. My mailing address is 28890 Lilac Road (# 147), Valley Center, California.

3. I first began working at the Juneau store of Fred Meyer, Inc. ("Juneau Store") in 1984 as part of the opening crew for that store but left that job when I moved later that year to California.

4. I returned to Juneau and began working as a salesperson in the apparel department of the Juneau Store in April of 1996 and held that position until I returned to California in December of 1996.

5. While I worked in the apparel department, Myrna Johnson was my supervisor as she was the closing PIC (person-in-charge) at the Juneau Store.

Exhibit H
page 6 of 18

Ex. 6, p. 1

**100090**

6.    I returned to Juneau, Alaska in 1997 and again worked at the Juneau Store. However, this time I was employed as a Visual Display Specialist and was supervised by Matthew Laney.

7.    Mr. Laney also supervised Ms. Johnson at that time.

8.    In January of 1998, I returned to California but came back to Juneau in April of 1998 and worked at the Juneau Store again as a Visual Display Specialist under Mr. Laney's supervision.

9.    In September of 1998, I left Juneau and returned to California and did not return to Juneau until May of 2000.

10.    After I returned to Juneau in May of 2000, I went back to work at the Juneau Store as a Visual Display Specialist until I returned to California in August of 2000.

11.    When I returned to Juneau in 2002, I subsequently took a job at the Juneau Store again but this time I worked in the mail order department under the supervision of Drew Norman.

12.    Jaime San Miguel had replaced Mr. Laney by the time I returned to Juneau in 2002 and I did not want to work under Mr. San Miguel.

13.    I had had ample opportunity to observe San Miguel's work habits and conduct when I worked at the Juneau Store in previous years.  I had complained about his poor work ethic to Matthew Laney on one occasion and I personally viewed San Miguel as lazy and unreliable.

14.    In my dealings with San Miguel, I had noticed that he often left work early to play baseball or to pick up his son and had observed that he failed to follow through on things and then blamed others if the work was not completed.

15.    I felt San Miguel "played favorites" and did not treat all the employees working for him fairly or even-handedly.

Ex. F. p. 2

16. I quit my job at the Juneau Store when I returned to California two months later and have not been back to Juneau, Alaska since September of 2002.

17. I saw Ms. Johnson at work on a regular basis during the times when we were both employed by the Juneau Store.

18. Throughout my dealings with her, I was very impressed by her professionalism and work ethic.

19. Myrna Johnson was an incredibly hard worker and sometimes even covered for San Miguel by doing his job when he left work early to play baseball or to attend to other personal matters.

20. I considered Ms. Johnson to be a role model for me and other workers at the Juneau Store because of her work ethic and loyalty to the Juneau Store and its management.

21. I felt that San Miguel was part of the "boys' network" as he was a drinking buddy and played baseball with Fred Sayre's predecessor and there was a "macho" tone to his dealings and those of other males in management at the Juneau Store.

22. After I returned to Juneau in 2002, I ran into Ms. Johnson and she was sobbing when she told me that she had been terminated. I had previously heard that Ms. Johnson was no longer working at the Juneau Store.

23. I was shocked that the Juneau Store would terminate such a hardworking, competent, and professional employee like Ms. Johnson while the poor work ethic of San Miguel was overlooked.

24. In fact, I was so appalled by Ms. Johnson's termination that I wrote a letter to Mary Lucas – the head of human resources at the Portland, Oregon headquarters of Fred Meyer Stores, Inc. – telling her how wonderful an employee Myrna was.

25. In my letter to Ms. Lucas, I told her to contact me about Myrna Johnson. I

Ex. 8,
P-3



100092

*Johnson v. Fred Meyer Stores, Inc.,*      Exhibit H page 8 of 18      ASCHR No. C-02-132

1  never heard back from Ms. Lucas even though I gave her a fax and phone
2  number where I could be reached.

4
5  FURTHER your affiant sayeth naught.
6  DATED this 13 day of April, 2004.

8  **State of California**  }
9  **County of San Diego** } SS.        _Sallie Tenwolde_
                                        Sallie Tenwolde

11  SUBSCRIBED and SWORN TO before me this 13 day of April, 2004.

14                                      _[signature]_
15                                      Notary Public, State of California
16                                      My commission expires:

17  [stamp: DANIEL W. SUNDQUIST
18  Commission # 1357744
19  Notary Public - California
    San Diego County
    My Comm. Expires Jun 19, 2008]

Ex. 8, p. 4

MYRNA L. JOHNSON v. FRED MEYER STORES, INC.

ASCHR No. C-O2-132

## AFFIDAVIT OF MARANDA WILBURN

I, Maranda Wilburn, being first duly sworn upon oath, depose and state as follows:

1.  I am more than 19 years of age, and competent to testify regarding these matters, based on personal knowledge and belief.

2.  My mailing address is 5370 Commercial Boulevard, Juneau, AK 99801.

3.  I first joined the Juneau store of Fred Meyer, Inc. ("Juneau Store") in 1998 as a part-time Garden Center cashier. Several months later, I was promoted to the Ready-to-Wear section head, which was a full-time position, and continued to be employed in this position until 2000.

4.  In 2001, I returned to the Apparel Department of the Juneau Store as a part-time clerk. Within a few months, my duties were changed to that of a "Merchandising and Display Specialist" in Apparel Department and I continued to work on a part-time schedule. After returning to the Juneau Store, I typically worked two to three days each week.

5.  In May of 2003, I resigned from Fred Meyer, Inc., after San Miguel falsely accused me of not completing my work. That false accusation arose because I had complained to him about his conduct towards me in front of Fred Sayre the preceding day.

6.  I first became acquainted with Ms. Johnson when I joined the Juneau Store and she was one of my supervisors at the Juneau Store, both when I was a full-time employee and after I became a part-time employee.

7.  I continued to have contact with Ms. Johnson on a regular basis until the time that her employment was terminated.

Ex. 9, p. 1

8.  Throughout my professional association with Ms. Johnson, I found her to be hardworking and very professional. Myrna had good relations with her co-workers and subordinates and was excellent at training the employees who worked under her supervision.

9.  I first learned that Ms. Johnson had been terminated from the Juneau Store when Mr. San Miguel, her supervisor, called a meeting on or about March 18, 2002, and stated that Myrna was not going to be working at the Juneau Store anymore because she had "acted unprofessionally."

10. Mr. San Miguel's explanation for Myrna's termination was that she had not done a "good recovery" one night and was not doing her job as a manager.

11. A "good recovery" in short means that everything was put away in the proper spot when the Juneau Store closed. Quite frankly, I considered this reason for Myrna's termination to be laughable since no other Assistant Manager or Person in Charge before or since, to the best of my knowledge, has ever been terminated for this reason

12. Myrna had been at the Juneau Store for years and was a hard-working and respected employee. In addition, when Mr. San Miguel was going through a divorce a year or so earlier, Ms. Johnson had picked up many of the duties of his job since he would leave work early or go in the back of the Store and cry.

13. At no time had I ever heard anybody complain about the recovery when Myrna was in charge. Consequently, San Miguel's reason for Myrna's termination just made no sense to those of us who had worked at the Store or who had worked with Myrna.

14. After I heard Mr. San Miguel's explanation for terminating Myrna, I recalled various things that I had heard or seen that ultimately led me to conclude that San Miguel had pushed Myrna out of her job in order to replace her with a

*Ex. 9, p. 2*

100108

younger and attractive female employee.

15. Ms. Havard, who is in her twenties, had been brought to the Juneau Store from another Fred Myers, Inc. store in Alaska while Myrna Johnson was on leave attending to some medical problems related to her teen-age daughter.

16. While Ms. Johnson was still on her leave, I got the distinct impression that Johnna wanted to transfer to the Juneau Store from my dealings with her.

17. Shortly before Ms. Johnson returned from her leave of absence, Ms. Havard remarked to me that Mr. San Miguel was offering her an Assistant's position.

18. After San Miguel terminated Myrna, Johnna Havard was hired almost immediately.

19. Havard's comments to me about being offered the Assistant's job while Myrna was on leave coupled with the flimsy reason San Miguel gave for terminating Myrna and Myrna's excellent performance and dependability during the years I worked with her made it obvious to me and other employees at the Juneau Store that San Miguel fired Myrna so he could give Ms. Havard her job.

20. I have also noticed that San Miguel tends to show favoritism to young, attractive female employees.

FURTHER your affiant sayeth naught.

DATED this 20 day of February, 2004.

Maranda Wilburn

SUBSCRIBED and SWORN TO before me this 20th day of February, 2004.

Heather A Hildebrand
Notary Public, State of Alaska
My commission expires: 7/4/07

Ex. 9, p. 3

3

100109