Mark Clayton Choate, Esq., AK #8011070
Jessica L. Srader, Esq., AK #0412105
CHOATE LAW FIRM LLC
424 N. Franklin Street
Telephone: (907) 586-4490
Facsimile:  (907) 586-6633

Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA AT JUNEAU

| | | |
|---|---|---|
| MYRNA I. JOHNSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| FRED MEYER STORES, INC., and | ) | |
| JAIME SAN MIGUEL, | ) | |
| | ) | |
| Defendants | ) | Case No. J-04-008 CV (RRB) |
| | ) | |

## OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

**TABLE ON CONTENTS & TABLE OF AUTHORITIES**

I.      Introduction………………………………………………………… 1
II.     Summary of Dispute………………………………………………… 4
III.    A Description of Parties …………………………………………… 5
        A.  Myrna Johnson………………………………………………… 5
        B.  Fred Meyer Stores, Inc……………………………………… 6
        C.  Jamie San Miguel ……………………………………………6
IV.     Undisputed Facts……………………………………………………7
        A.  December 1992 to March 11, 2002 – Johnson's Work History with
            Fred Meyer…………………………………………………………7
        B.  Fred Meyer's Employment Agreement with Myrna Johnson – Oral
            and Written
        C.  Six Days That Ended A Career:  March 12, 2002 to March 18, 2002….15
        D.  Jaime San Miguel – Relevant History………………………… 23
        E.  Havard Replaces Johnson Only To Experience A Similar Campaign….25
V.      Applicable Law………………………………………………………29
VI.     Argument………………………………………………………………29
            1.  A genuine issue of fact exists as to whether the oral representations and
                personnel manuals of Fred Meyer were included in the employment
                contract such that Ms. Johnson could only be discharged "for
                cause"…………………………..29

            2.  Whether a system of progressive discipline existed and
                should have applied to any discipline Fred Meyer instituted as
                to Ms. Johnson's performance as a Lead Assistant Manager (First
                Assistant) in the Apparel Department at the Juneau Fred Meyer
                Store?............................................................33

            3.  Whether Fred Meyer followed its own disciplinary policies
                and procedures in the week leading up to Ms. Johnson's
                termination?............................................................34

            4.  Whether Ms. Johnson failed to perform her job duties as
                Lead Assistant Manager in the Apparel Division between
                March 12 and March, 17, 2002………………………………37

                a.  Whether she performed recoveries in accordance
                    with Fred Meyer's own standards and training?.............38

                b.  Whether she assembled a planogram correctly in accordance with
                    Fred Meyer's standards and training....39

CHOATE LAW FIRM LLC
424 North Franklin Street
Juneau, Alaska  99801
(907) 586-4490

*Johnson, Myrna  v Fred Meyers (03/18/2002) [23003].*
OPPOSITION TO MOTION FOR SUMMARY JUDGMENT
J-04-008 CV (RHB)

1

c.  Whether she performed the remainder of her duties in accordance with Fred Meyer's standards and training?..40

5.  If there were any deficiencies in Ms. Johnson's work performance between March 12 and March 17, 2002, whether such deficiencies merited any discipline, much less threat of loss of her position as Lead Assistant on March 18, 2002……………………………………………………… 41

6.  What progressive discipline if any was given to Ms. Johnson prior to the meeting of March 18, 2002………………………41

7.  What stage of progressive discipline was given to Ms. Johnson at the meeting on March 18, 2002?..........................42

8.  Did Fred Meyer fail to follow its own policies, procedures and promises in its discipline of Ms. Johnson during the week of March 12 to March 18, 2002…………………………………42

9.  Whether Ms. Johnson acted reasonably under the circumstances in leaving the Store Manager's office on March 18, 2002 to continue crying downstairs in the Apparel stock room?..........43

10. Whether Ms. Johnson while sobbing uncontrollably, heard Fred Sayre threaten her with termination if "she left the room"?.... 44

11. Whether Ms. Johnson "walked off" the job on March 18, 2002 when she left the Store Manager's office "sobbing uncontrollably"?....................................................................44

12. Whether Jaime San Miguel replaced Ms. Johnson with Johnna Havard because Havard was younger and single?.................. 45

VII.    Conclusion…………………………………………………………50

**CHOATE LAW FIRM LLC**
424 North Franklin Street
Juneau, Alaska  99801
(907) 586-4490

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**TABLE OF AUTHORITIES**

*Alms v. Advance PSC, Slip Copy,* 2006 WL 2032746, D. Ariz., 2006……………… 48

*Celotex Corp. V. Catrett,* 477 U.S. 317, 323, 324 (1986)…………………………… 29

*Jones v. Central Peninsula General Hospital,* 779, P.2d 783 (Alaska, 1989)……… 31, 33

*Lindsey v. SLT Los Angles, LLC,* 447 F.3d 1138 C.A.9 (Cal) 2006………………… 47

*Raad v. Alaska State Commission for Human Right,* 86 P.3d 899,
186 Ed. Law Rep. 551, 84 Empl. Prac. Dec. P. 41, 629, 93 Fair Empl.
Prac. Cas. (BNA) 178, (Alaska, 2004)……………………………………………………..46

*Schnidrig v. Columbia Machine, Inc.,* 80 F3d 1406, 1410 (9th Cir)………………… 29

*State, Dept of Fish and Game, Sport Fish Div. v. Meyer,* 906 P.2d 1365,
68 Empl. Prac. Dec. P 44, 164 (Alaska, 1995)…………………………………………..47

*Toussaint v. Blue Cross & Blue Shield of Michigan,* 408 Mich. 579,
292 N.W.2d 880 at 885 (1980)………………………………………………………… 31

*T.W. Elec. Serv., Inc. V Pacific Elec. Contractors Ass'n,* 809 F.2d 626, 630
(9th Cir. 1987)………………………………………………………………………………  29

**CHOATE LAW FIRM LLC**
424 North Franklin Street
Juneau, Alaska 99801
(907) 586-4490

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

3

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF**
**OPPOSITION TO MOTION FOR SUMMARY JUDGMENT**

I.

Introduction

The defendants' request for summary judgment in this matter must be denied because genuine issues of fact exist as to whether the end of Myrna Johnson's ten year career with Fred Meyer on March 18, 2002 was the result of her voluntarily quitting her job as opposed to a wrongful termination.

This brief will establish that at a minimum, genuine issues of fact exist as to whether Jaime San Miguel, her immediate supervisor, orchestrated a concerted campaign over a six day period to remove Mrs. Johnson (a fifty year old woman with parental responsibilities) from her position as Lead Assistant manager in the Apparel Department at the Juneau Fred Meyer Store in order to replace her with a pretty 23 year old single woman with no children.  Genuine issues of fact exist as to whether Mr. San Miguel and Fred Meyer discriminated against Mrs. Johnson because of her age and parentage.

Defendants' Motion for Summary Judgment is largely conclusory and fatally myopic, avoiding discussion of the long and rich relationship between the defendants and Myrna Johnson.  For example, with no basis whatsoever, defendants assert that the employment relationship was "at will".  A cursory examination of all of the documents describing employment with Fred Meyer confirms that not once is the phrase "at will" used or a description of the employment relationship being solely dependent to the employer's whim.

Instead, "career" is the operative word at Fred Meyer.  It is used continually throughout all documents describing Myrna Johnson's employment relationship.  In addition, progressive discipline is promised to employees – something not expected in an "at will" relationship.

It can be anticipated that defendants will argue that whether the employment was "for cause" or "at will", that ultimately it didn't matter, because with the same level of conclusory reasoning as that which characterizes the rest of their brief, they assert Ms. Johnson "walked-off" her job and as such "voluntarily quit" her 10 year career with Fred Meyer.

**CHOATE LAW FIRM LLC**
424 North Franklin Street
Juneau, Alaska 99801
(907) 586-4490

CHOATE LAW FIRM LLC
424 North Franklin Street
Juneau, Alaska 99801
(907) 586-4490

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

First, genuine issues of fact exist as to whether the employment was relationship was "for cause" as opposed to "at will". Fred Meyer's deliberate omission from any employment document or discussion of the term "at will" or inclusion of something resembling the definition of "at will" employment demonstrates that the employment was "for cause". Genuine issues of fact exist as to what representations Fred Meyer made to Ms. Johnson and other employees as to the "for cause" nature of their employment relationship. The jury can conclude in this matter based upon Fred Meyer's own writings and representations that Ms. Johnson was employed "for cause" and that "cause" did not exist for her termination.

Second and alternatively, if the jury concludes that Ms. Johnson had an "at will" employment contract with Fred Meyer, there are genuine issues of fact which if found in her favor would support the conclusion that the defendants breached the covenant of good faith and fair dealing.

Ms. Johnson did not "walk-off" her job. She left a room sobbing uncontrollably after suddenly discovering that her career was ending, that she was at an end stage of discipline with no prior warnings and that despite knowing how to do her job and doing it well, nothing would satisfy Mr. San Miguel. Plaintiff submits that a reasonable person could easily conclude that Ms. Johnson was set up, that Mr. San Miguel orchestrated the meeting on March 18, 2002 for no other purpose than to replace Ms. Johnson with Ms. Havard.

The jury can easily find based upon the extensive and largely undisputed record that the defendants made a decision while Ms. Johnson was on emergency leave that (1) she was no longer reliable because she had to take time off for a family crisis; and (2) that she would be replaced by Ms. Havard, a young, pretty and single woman who had told Mr. San Miguel she was interested in Myrna Johnson's job.

Given the extensive record in this matter, genuine issues of fact exist as to whether Myrna Johnson's termination for "walking-off" the job on March 18, 2002 was in breach of her employment agreement; was in breach of the covenant of good faith and fair dealing and was done for reasons that were in violation of both federal and state protections against discrimination because of age and parentage.

Genuine issues of fact exist which support this conclusion including Ms. Havard advised others before Ms. Johnson's return on March 12, 2002 that Mr. San Miguel had offered her Ms. Johnson's job.  In addition, Mr. San Miguel's subsequent treatment of Ms. Havard after she became engaged and no longer "available" to him, demonstrate that he is a master at utilizing the internal paperwork processes of Fred Meyer to remove subordinates when it suits his desires or needs.

These genuine issues of fact preclude summary judgment on Ms. Johnson's claims for (1) violation of the Age Discrimination in Employment Act ("ADEA"); (2) harassment and wrongful discharge in violation of the Alaska Human Rights Act on the basis of age and parental status; and (3) state common law claims for wrongful discharge under either a "for cause" employment contract; or alternatively, for "at will" breach of the covenant of good faith and fair dealings.[1]

II.
<u>Summary of Dispute</u>

In 1992, Fred Meyer and Myrna Johnson entered into an employment contract with defendant Fred Meyer.  Fred Meyer promised to provide Ms. Johnson with a career, promising her job security and ever increasing pay raises and promotions if Ms. Johnson performed her job well and met all requirements for advancement within the Fred Meyer organization. Throughout that employment, to induce her to spend the enormous amounts of time required to be promoted to management and work as a manager, Fred Meyer made numerous representations to her, both orally and in writing, that she would be treated fairly and consistently with its internal disciplinary processes.

Based on those promises, for a period of almost a decade, Ms. Johnson absolutely committed herself to her job at Fred Meyer.  From her start as a part-time shoe sales associate, she ultimately advanced to a salaried management position as Lead Assistant Manager in the Apparel Department at the Fred Meyer Store in Juneau, Alaska.  Her work as a manager almost always entailed 55 or more hours a week with 60 and 70 hour weeks common during the holiday seasons.

---

[1] As noted earlier, Ms. Johnson withdraws her claims of gender discrimination under Federal and State law, violation of the federal Family and Medical Leave Act ("FMLA") and tortuous interference with business relations.

**CHOATE LAW FIRM LLC**
424 North Franklin Street
Juneau, Alaska  99801
(907) 586-4490

CHOATE LAW FIRM LLC
424 North Franklin Street
Juneau, Alaska 99801
(907) 586-4490

1    In March of 2002, over a period of just six days, her career was terminated by the actions of
2    defendant Jaime San Miguel, her immediate supervisor with the knowledge and consent of Fred Meyer
3    upper-level management.  The defendants wanted to replace Ms. Johnson for two improper reasons.
4    First, Mr. San Miguel wanted to replace Ms. Johnson, an older, married woman over the age of 40, with
5    a younger (age 23), pretty and single woman, Johnna Havard.  Second, because Ms. Johnson had taken
6    time off to take care of her teenaged daughter and told Mr. San Miguel she might have to do so again
7    the following Fall, the defendants decided her parental status made her unreliable and as such, in need
8    of replacement.  Ms. Havard, who had earlier expressed interest in Ms. Johnson's job if it came open,
9    was single and had no children to distract her from the job.

10   In order to remove Ms. Johnson from her position as Lead Assistant, Mr. San Miguel needed to
11   have her either terminated or demoted.  To accomplish this, he orchestrated a campaign of daily and
12   unceasing oral and written complaints and harassment which terminated in less than one week in an
13   emotional confrontation with Ms. Johnson trapped in a small, confined space with San Miguel and Fred
14   Sayre, both large men.

15   Ms. Johnson began sobbing uncontrollably as Mr. San Miguel demanded she sign a Written
16   "Employee Warning Notice", an advanced form of discipline which threatened her removal from her
17   position as Lead Assistant.  This form of discipline normally only occurs after other progressive
18   discipline is accomplished.  Since there had been none and Ms. Johnson had worked unceasingly and
19   unsuccessfully for the prior six straight days to respond to San Miguel's escalating complaints, she
20   knew that he was going to have her fired or demoted.

21   Overwhelmed with the loss of her career and the series of events over less than a week's time
22   which had allowed Mr. San Miguel to accomplish this, Ms. Johnson began sobbing uncontrollably.
23   Deeply embarrassed and humiliated, she told the men she had to leave the room and did so in an effort
24   to collect herself emotionally.  She did not hear Mr. Sayre state that if she left the room that it would be
25   considered a voluntary "walk off" from the job.

While Ms. Johnson went downstairs to continue crying in the Apparel stock room, Mr. San
Miguel and Mr. Sayre called the Portland headquarters for Fred Meyer, where the decision was made to
describe Ms. Johnson's tearful exodus from the room as a "walk-off" from the job and "voluntary
termination".  When Ms. Johnson, after collecting herself emotionally, prepared to return to work the
following morning she learned to her surprise, that she had been terminated.

III.<br>A Description of the Parties

*Johnson, Myrna v Fred Meyers (03/18/2002) [23003].*    7
OPPOSITION TO MOTION FOR SUMMARY JUDGMENT
J-04-008 CV (RHB)

A. <u>Myrna Johnson</u>

Myrna Inductivo Johnson is a 53 year old woman (dob: 09/23/52) of Philippine national origin. Like many immigrants from the Philippines, she is well educated having both a high school degree and a Batchelor's of Arts in English from Manual Luiz Quezon University in Manilla.  Prior to coming to the United States, she was the production manager for Cristobal Manufacturing, a successful family business in the Philippines.

Ms. Johnson was abandoned by her first husband in the Philippines in 1984 and was solely responsible for providing for their three daughters.  She met Russell Johnson while visiting relatives in the United States.  His promise to love her daughters like they were his own was the key to her heart. They married in April 1988 and she immigrated to the United States, moving to Juneau in the Fall of 1992.[2]

Soon thereafter, she applied for work at the Juneau Fred Meyer Store, starting part-time as a shoe sales associate.  In the following decade, she rose steadily within the Apparel Department, with the stated purpose from the outset of being "promoted" and having a career with the company.  By March of 2002 she had received extensive training and had a demonstrated history of being able to successfully do her job as the Lead Assistant Manager.

B.    <u>Fred Meyer Stores, Inc.</u>

Defendant Fred Meyer Stores, Inc. is a part of The Kroger Co., one of the largest grocery chains in the country with more than sixty billion in annual sales.  There are a 128 Fred Meyer Stores, called "multi-department stores" by Kroger, averaging 150,000 square feet and offering 225,000 food and non-food products.  They require an average investment of $24.5 million.[3]  Fred Meyer operates stores throughout Alaska, Washington, Idaho and Oregon with corporate headquarters in Portland.  In the Portland area alone, Fred Meyer employs more than 30,000 people.[4]

Employment with Fred Meyer normally begins with part-time employment.  Full-time employment is usually not available to starting employees but rather is a reward once a part-time employee demonstrates satisfactory performance.  Fred Meyer hires "from within" and there are

---

[2] Exh. 1 – Myrna Johnson Affidavit
[3] Exh. 2 – Kroger Co. Description of Fred Meyer Store – from World Wide Web
[4] Exh 3 – http://www.workforcepartners.org/display_one.cfm?ID=147

*Johnson, Myrna  v Fred Meyers (03/18/2002) [23003].*    8
OPPOSITION TO MOTION FOR SUMMARY JUDGMENT
J-04-008 CV (RHB)

CHOATE LAW FIRM LLC
424 North Franklin Street
Juneau, Alaska  99801
(907) 586-4490

numerous manuals and training materials that employees must read and be tested upon in order to be eligible for promotions.

   C.   Jaime San Miguel

   In September, 1991, Mr. San Miguel took a part-time job at the Airport Way Fred Meyer as a shoe sales associate.[5] In less than five years, March of 1996, he had been promoted to the Lead Assistant Manager for Apparel in the Juneau Store.[6] He was subsequently promoted to Manager in 2001.

   Mr. San Miguel went through a turbulent and emotionally exhausting divorce in the Spring and Summer of 2001.  His attendance was erratic.  He would come late and leave early.[7] He would break down crying at times.[8]   During that time period, less than a year prior to Myrna Johnson's termination, it was Mr. San Miguel who relied upon to do his job.[9] A review of Mr. San Miguel's personnel file confirms that there were no disciplinary consequences to his erratic performance and attendance during that time period even though Fred Meyer management were aware that he was having problems.

   Mr. San Miguel always made it clear that preferred younger women, both as employees and as potential dating partners.  Once divorced, Mr. San Miguel became even more explicit in discussing his sexual interests with subordinates, asking female employees to set him up with someone who was *"hot"*.  His discussions centered on sports and *"girls"*.  Because he was a baseball buddy of the Store Manager, Fred Sayre, he was seen to be part of a "good old boys network" that was inaccessible to his largely female staff.[10]

   When Ms. Johnson had to return to the Philippines in early February 2002 with her daughter Melissa on emergency leave, Mr. San Miguel, in describing the replacement he wanted, said *"if it is a woman, send somebody young and beautiful...and not a hag."*[11]

IV.
Undisputed Facts

   A.   December 1992 to March 11, 2002 - Johnson's Work History With Fred Meyer

   In December 1992, Myrna Johnson interviewed at Fred Meyer Store in Juneau, Alaska and was hired as a part-time salesperson in the shoe department.  Her Employment Application describes her

---

[5] Exh. 4 – Jaime San Miguel Depo Transcript [JSM Tr]. 33/19-25.
[6] Exh. 4 – [JSM Tr. 74/17-22].
[7] Exh. 4 – [JSM Tr. 108/24 – 110/2].
[8] Exh. 4 – [JSM Tr. 110/3 – 9].
[9] Exh. 4 – [JSM Tr. 110/18 – 111/11].
[10] Exh. 5 - Sallie Tenwolde Affidavit;  Exh. 59 – Droddy Letter.
[11] Exh. 6 - Sarah Dexter Affidavit - p. 2.

*Johnson, Myrna  v Fred Meyers (03/18/2002) [23003].*                    9
OPPOSITION TO MOTION FOR SUMMARY JUDGMENT
J-04-008 CV (RHB)

CHOATE LAW FIRM LLC
424 North Franklin Street
Juneau, Alaska  99801
(907) 586-4490

CHOATE LAW FIRM LLC
424 North Franklin Street
Juneau, Alaska 99801
(907) 586-4490

Scheduling Preferences as "available for work – *anytime – can work anytime.*  She was paid $8.50/hour.[12] While she sought full-time work, it was not available.  She was told she would have to perform satisfactorily in order to earn the right to work full-time.

   She was dedicated and unusually hard working.  She was promoted to full-time as Manager of the Shoe Department in May of 1993 (less than six months since starting part-time) receiving a 30% pay increase.  She maintained that position till 1994 when she took a full-time job with the State of Alaska while continuing to work part-time for Fred Meyer as a closing supervisor of the shoe department at the same hourly rate she had received as a full-time employee.[13]

   In September 1996, Matthew Laney, manager of the Apparel Department at the Juneau Store, told her that he would train her for the position as Relief (2nd) Assistant Manager for the Apparel Department. It was a career position (management),[14] offering more potential for responsibility, promotion and better income than she could obtain from the State.  Ms. Johnson left her job with the State to begin full-time as a management trainee at the Fred Meyer Store in Juneau. She went through the training program for Relief Assistant Manager including on-the-job training and completion of a written training manual under the direct supervision of Mr. Laney.  She received approximately a twenty percent (20%) raise when promoted to that position.[15]

   For the next four and a half years, Ms. Johnson worked as the Relief Assistant Manager, The Lead Assistant, or First Assistant Manager, was Jaime San Miguel.  The Apparel Manager was Matthew Laney.  As the Relief Assistant, she received the least desirable shift, the closing shift, from 2:00 p.m. till closing.  For the entire time she held that position, four and one-half years, she closed the Apparel Department at Fred Meyer, successfully performing those job duties which included completing "recovery", (preparing and straightening the store shelves and racks so that the store would be ready the next morning), assembling planograms, (product specific displays that appear the same in all stores), and otherwise being responsible for the successful closing of the Apparel Department.  Not only did she never receive any discipline, her customer service was recognized as being exceptional.[16]

   Fred Meyer Store hours are long.  In the summers, the store opens from 7:00 a.m. to midnight. In the winters, the Store is open from 7:00 a.m. to 11:00 p.m.  Management employees are expected to

---

[12] Exh. 7 – Employment Application  [200001]
[13] Exh. 8 [200135]
[14] Exh. 14 – Store Management Career Paths – [200315]
[15] Exh. 1 – Myrna Johnson Affidavit
[16] Exh. 1 – Myrna Johnson Affidavit

*Johnson, Myrna  v Fred Meyers (03/18/2002) [23003].*                    10
OPPOSITION TO MOTION FOR SUMMARY JUDGMENT
J-04-008 CV (RHB)

work at least ten hour shifts during normal times and during the holiday seasons, twelve hour shifts, seven days a week are not uncommon.  Fundamentally, managers are expected to do whatever it takes to make the store work, irrespective of their personal needs or schedules.  The closing manager leaves when the job is done, often requiring work till midnight or later.[17]

In her May 12, 1997 Performance Appraisal, her Manager, Matthew Laney described the progress she had made towards "continuing self-development" as:  "Myrna exhibits a strong desire to learn and perform well, she handles short-comings in a non-defeating, self-improving manner."[18]  In her self-appraisal, Ms. Johnson described her career goals and aspirations as: "To stay on top of my job, and be ready for promotion & future challenges." [19]

In her June 2, 1998 Performance Appraisal, her supervisor, Matthew Laney, wrote "Myrna has a strong desire to learn, grow, and get promoted.  Myrna has improved in meeting the needs of the ALE Dept and providing support."[20]  On the same evaluation, when asked for her career goals and aspirations, she wrote "My career goals are to stay & be promoted on my job.  To learn 100% and be very effective in the execution of all the job responsibilities required.  Will try very hard this year to meet more than expectations next year." [21]

In her May 1999 Appraisal, which again showed her as "Meets Expectations" with "Very Good – An Example to the Store" in the area of Customer Service, Ms. Johnson wrote that she wanted to "gain more training and experience to be very confident in my job.  I am committing myself to meet all the expectations."[22]

Her May 10, 2000 Appraisal, again by Matthew Laney, demonstrated her continued efforts at improving her managerial skills:

- "Myrna supported the team efforts on the day to day working end of the goals and expectations.  Her consistent performance was key in achieving these goals."
- "Myrna expanded and increased her understanding of hiring and training skills for new employees."
- "Myrna has an exceptional talent in developing a team effort and work level amongst the employees she directs."[23]

---

[17] Exh. 1 – Myrna Johnson Affidavit
[18] Exh 9 - [201179]
[19] Exh 9 - [201182]
[20] Exh. 10 - [200033]
[21] Exh. 10 - [200036]
[22] Exh 11 - [201190]
[23] Exh. 12 - [200046]

*Johnson, Myrna  v Fred Meyers (03/18/2002) [23003].*     11
OPPOSITION TO MOTION FOR SUMMARY JUDGMENT
J-04-008 CV (RHB)

CHOATE LAW FIRM LLC
424 North Franklin Street
Juneau, Alaska  99801
(907) 586-4490

CHOATE LAW FIRM LLC
424 North Franklin Street
Juneau, Alaska 99801
(907) 586-4490

Her excellent Customer Service abilities were again given a "Very Good."   In this evaluation, her last as a Relief Assistant Manager, she wrote: "I want to stay focused in this job, get promoted someday and gain more respect from co employees and achieve more goals and responsibility."[24]

In February 2001, Matthew Laney left Fred Meyer and Jaime San Miguel was promoted from within to replace him. Ms. Johnson was thereafter promoted from within to take over Mr. San Miguel's position.  In her June 12, 2001 Performance Appraisal, prepared by Mr. San Miguel, her writes in regards to her Customer Service "Myrna always leads by example."  Under Commitment to Excellence, he wrote: "Myrna is learning her new job. Mgr is confident of her skills. Seek info if needed."  Under Teamwork, he wrote: "Great team player! Asset to my team."[25]

In the small section set aside for the employee's job aspirations, Johnson wrote: "I want to learn more and (be) trained more for future promotions.  I am very happy with how my career is heading."[26]

Similarly, in her Performance Self-Appraisal Form dated 06/20/01, she described her greatest strengths as: "My dedication to the job no matter what it takes.  My ability (to) perform multiple tasks (in a) limited period of time.  My ability to make quick decisions if needed.  The friendship that I gained from the employees and that they are willing to help at all times."[27]

In response to the question – In what areas do you need assistance?  She responded "I need more training to prepare myself for future promotions."[28] In response to the question, "Are you satisfied with the direction you see your career taking with the company?"  Her response was "Yes".  This was eight months before her termination.

She continued to work from June of 2001 to January of 2002.  Her work continued to be exemplary.  There were no complaints or concerns about her ability to do her job or to perform routine tasks such as "recovery" or the set up of "planograms".  In January 2002, she took her annual vacation to the Philippines to be with her extended family there.

Soon after her return from the Philippines in early February, her daughter ran away.  For three days, she and her husband searched Juneau finally finding their daughter in an apartment downtown mixed up with a very bad crowd.  There were concerns with substance abuse.  Her teenaged daughter, Melissa, threatened suicide.  The doctor advised Ms. Johnson and her husband that their daughter would

---

[24] Exh. 12 - [200049]
[25] Exh. 13 - [200058]
[26] Exh. 13 - [200059]
[27] Exh. 13 - [200054]
[28] Exh. 13 - [200393]

have to be supervised 24 hours a day. Anything less would result in her either running away or harming herself. The decision was made to take her to the Philippines where the large extended family could provide 24 hour supervision. Ms. Johnson flew back with her daughter spending the better part of a month watching her, helping her and the family transition to this new and urgent situation.[29]

She returned to Juneau on Sunday, March 10, 2002 and was immediately put on the closing schedule to start working on Tuesday, March 12, 2002. Six days later, on March 18, 2002 she was terminated from her job.

B.    Fred Meyer's Employment Agreement With Myrna Johnson - Oral & Written Representations

When Myrna Johnson first interviewed for a job with Fred Meyer, she completed an Employment Application. No where in that document is there any statement that her employment was to be "at will."[30]

At the time of her initial employment application (11/30/92) she was also given the PSI Test. It appears to be designed to target whether the prospective employee has the right attitudes for the job in regards to drug and alcohol usage, theft, dishonesty, etc.[31] In that document, Ms. Johnson was asked why she was seeking employment with the company. Her answer was succinct: "I want to work in a company that has room for promotion and has job security."[32]

Annually subject to Salaried Employee Performance Appraisals, those forms do not contain one mention that the employment is "at will." Instead, the documents necessarily look prospectively towards how the employee can do a better job for the company and how they can improve as a manager. Each Appraisal ends with a request for the employee to describe their "career goals and aspirations."

In Ms. Johnson's 1997 Performance Appraisal, a series of questions were asked.[33] Three questions specifically address the employee's perspective of his or her long-term relationship with the company. Question 10 asks for general comments regarding "current promotion, career path and future accomplishments. Question 13 asks if the salaried employee is willing to "relocate for promotional opportunities and for increased duties and responsibilities". Question 14 asks if the employee is

---

[29] Exh. 1 – Myrna Johnson Affidavit.
[30] Exh. 7 - [200001]
[31] Exh. 15 - [201262-201269]
[32] Exh. 15 - [201270]
[33] Exh. 9 - [201183-201184]

*Johnson, Myrna v Fred Meyers (03/18/2002) [23003].*    13
OPPOSITION TO MOTION FOR SUMMARY JUDGMENT
J-04-008 CV (RHB)

CHOATE LAW FIRM LLC
424 North Franklin Street
Juneau, Alaska 99801
(907) 586-4490

"satisfied with the direction you see your career taking with the company?"  Ms. Johnson's answers in 1997 all reflect an intention and plan to have a career with Fred Meyer.[34]

Fred Meyer relies upon two primary manuals to describe the employment relationship with its employees; the Employee Handbook and the Fred Meyer Corporate Policy Handbook.  The Employee Handbook[35] does not contain one mention of either the phrase "at will" employment or otherwise, in a clear and concise manner, advise Fred Meyer employees that they are "at will".  In contrast, it mentions "career" repeatedly and is clearly designed to provide new employees with the belief that if they work successfully at Fred Meyer, that they will be treated fairly. Fred Meyer explicitly recognizes that *"skilled, capable and dedicated employees are essential, for the overall success of our business is determined by the combined ideas, work and effort of all Fred Meyer employees."*[36] For example, under the heading "Career Opportunities", the following description is found:

"You'll find we support promoting from within the Company whenever possible at Fred Meyer. During your time with the Company, there will be opportunities for advancement and many career options available. You may decide that you would like to work for another part of the Company.  With a company as large and diverse as Fred Meyer, your career options aren't limited to just one division.  We frequently promote people from the store to regional and corporate positions.  *Your advancement will be based on your performance and willingness to learn and grow.  Ultimately, you are in charge of your career at Fred Meyer.*  You are encouraged to meet with your supervisor to discuss your career goals and aspirations."[37] (emphasis added)

The second manual describing the employment relationship and mutual expectations and responsibilities is the "Fred Meyer Corporate Policy Handbook".[38]  This manual, consisting of hundreds of pages of information, describes in detail employee responsibilities and consequences.  In no place does it describe employment with Fred Meyer as being "at will" or that an employee can be discharged *without cause.*  In fact, discharge is always described as a consequence of either a violation of some policy or when "necessary to protect the well-being of the company or its employees."

---

[34] Exh. 9 - [201184]
[35] Exh. 16
[36] Exh. 16 - [201427]
[37] Exh. 16 - [201433]

[38] Exh. 17 - [200557-200971]

*Johnson, Myrna  v Fred Meyers (03/18/2002) [23003].*        14
OPPOSITION TO MOTION FOR SUMMARY JUDGMENT
J-04-008 CV (RHB)

CHOATE LAW FIRM LLC
424 North Franklin Street
Juneau, Alaska  99801
(907) 586-4490

CHOATE LAW FIRM LLC
424 North Franklin Street
Juneau, Alaska 99801
(907) 586-4490

1    Violation of a Fred Meyer policy almost always can have a disciplinary consequence, up to

2 termination.[39] There simply is no need for such consequences if employees cannot expect the corollary;

3 if they follow the policies, they will not be subject to discipline including possible termination.

One of the reasons why Fred Meyer goes to such extraordinary efforts to describe both its

4 policies and the consequences of their violation is because of the extensive amount of training and

5 investment necessary to develop skilled employees.  This is especially the case for managers.  Many

6 managers start "at the bottom", working their way up through ascending levels of expertise and

7 responsibility, all requiring extensive amounts of on the job training as well as the study of written

materials and the passing of tests or evaluations by supervisors.

8    Fred Meyer created an extensive training program with written materials in order to train its

9 employees so that they could be promoted from within the company.  In the Apparel division (ALE),

10 there were 4 levels of managers; Fourth-in-Charge/PIC; Relief Assistant (also called 2nd Assistant); Lead

Assistant Manager (also called First Assistant) and Manager.[40]

11    In order to maintain consistency and quality throughout its chain of stores, Fred Meyer created

12 its own system of in-house professional training for these positions with extensive job descriptions and

13 training materials.

14    In order to be hired or promoted to a Relief Assistant Manager, one must complete the ALE

15 (Apparel) Relief Assistant Training Program.[41]  While the program has 220 pages of written materials,

16 the two page Performance Requirements Chart provides one with a good idea of the broad variety of

tasks which must be mastered in order to be the Relief Assistant Manager (2nd Assistant).[42]

17

18

19

20

21    [39] Exh. 17 - Violation of the Job Posting Program's "Promotion from Within the Company" policy; [200577]

22 Violation of the Equal Employment Opportunity policy; [ 200583 & 200633] Violation of the Conflicts of Interest
policy (employment or relatives); [200601] Violation of the Hiring People with Disabilities policy; [200603]

23 Violation of the Hiring Minors policy; [200607] Violation of the Hiring Independent Contractors policy; [200617]
Violation of the Hiring School to Work policy; [200629] Violation of the Rehiring Former Employees policy;

24 [200637] Violation of the Transfer, Interview and Selection Process policy; [200639] are examples of this.
[40] Exh. 14 - Fred Meyer Store Management Career Paths – [200315]

25

26    [41] Exh. 18 – ALE (Apparel) Relief Assistant Training Program.
[42] Exh. 18 - [201576-201577]

27    *Johnson, Myrna  v Fred Meyers (03/18/2002) [23003].*    15
OPPOSITION TO MOTION FOR SUMMARY JUDGMENT

28 J-04-008 CV (RHB)

CHOATE LAW FIRM LLC
424 North Franklin Street
Juneau, Alaska 99801
(907) 586-4490

There is also an ALE Assistant Manager Training Program.[43]  A prerequisite to starting it is completion of the Relief Assistant Training Program.[44] A review of that manual confirms the extensive amount of training required *before* someone can become the Assistant Apparel Manager.

There is also a job description for the ALE Assistant Manager.  It describes the primary purpose of the position as:

- *Assist in the management of the department, maximize all financial opportunities and assume the management responsibilities in the absence of the manager.*

The job description then has a long list of the essential duties and responsibilities of the position:

- Provides Customer service
- Reacts with urgency to changing sales opportunities
- Ensures compliance with the divisional signing standards
- Ensures compliance with divisional recovery standards
- Coordinates and organizes merchandising of the department floor
- Implements and audits ads
- Ensures compliance with divisional recovery standards
- Coordinates and organizes merchandising of the department floor
- Implements and audits ads
- Ensures compliance with planograms
- Coordinates the implementation of weekly Merchandise Specialists Notes, Off-Shelf Merchandising Notes, and Period Planners to complete merchandising assignments
- Assists in preparing the seasonal critiques
- Identifies current market trends
- Maintains an awareness of the competitors activities in the specific market area
- Ensures implementation of visual merchandising standards
- Ensures compliance with the divisional folding/hanging standards
- Ensures compliance with the standards for fixtures usage and maintenance
- Ensures compliance to the stockroom standards
- Ensures the accuracy and follows up on price changes
- Maintains and audits the in-store Price Change Control Log
- Ensures compliance with the ticketing standards
- Authorizes any manager discretion markdowns
- Audits and takes appropriate action on scan audits
- Audits and takes appropriate action on alpha code documents and in-store Price Change Recap
- Audits and takes appropriate action on Report Code 10, Report Code 20, and the ECR Override Report

---

[43] Exh. 19 - [201680 – 201825].
[44] Exh. 19 - [201736]

*Johnson, Myrna  v Fred Meyers (03/18/2002) [23003].*    16
OPPOSITION TO MOTION FOR SUMMARY JUDGMENT
J-04-008 CV (RHB)

- Audits and takes appropriate action on missing markdown and markdown exception reports
- Audits and takes appropriate action on file maintenance exceptions
- Demonstrates, recognize, and ensures compliance with the Q and SAM actions
- Ensures compliance with the corporate dress code policy
- Sells products to Customers; teaches/demonstrates selling skills
- Performs cashier functions, when required
- Participates in mandatory training programs
- Audits cashier proficiency and related reports
- Ensures compliance with labor agreements, when applicable
- Maintains an awareness of overstock/understock conditions to ensure ordering system integrity
- Ensures compliance with freight receiving and freight stocking standards
- Completes daily tours
- Adjusts the schedule/15 minute charts
- Records daily sales
- Orders department supplies
- Responds to verbal Customer comments/complaints/requests
- Ensures daily and weekly time and attendance functions are completed
- Identifies and takes appropriate action on maintenance/repair needs
- Completes Customer incident and employee incident/accident report forms, when necessary
- Ensures compliance to all safety guidelines and standards
- Ensures compliance to the quality ordering functions/RMS updates
- Audits salvage procedures
- Audits and follows up on written distribution center returns, weekly WDCR recaps, and Returns to Suppliers
- Reviews on-line sales information and takes appropriate action
- Assists in the inventory process
- Audits the vendor logs
- Ensures compliance to shipping/receiving procedures, including auditing the Shipping/Receiving Log)
- Approves Intersection Transfers
- Ensures compliance with the shrink control guidelines
- Promotes employee participation in the Fred Meyer Incentive Award Program[45]

One cannot be promoted to this position until demonstrating competence in all of the above areas.

C.    Six Days That Ended A Career: March 12, 2002 to March 18, 2002

---

[45] Exh. 20 – [200089 – 200094]

*Johnson, Myrna  v Fred Meyers (03/18/2002) [23003].*    17
OPPOSITION TO MOTION FOR SUMMARY JUDGMENT
J-04-008 CV (RHB)

CHOATE LAW FIRM LLC
424 North Franklin Street
Juneau, Alaska  99801
(907) 586-4490

March 12, 2002 (Monday):    On March 12, 2000, Myrna Johnson clocked in for work at 1:11 p.m.[46]  She was in charge of closing the store that evening so would work until at least midnight. When she arrived, she learned from Mr. San Miguel that they were very short-handed in terms of experienced personnel.  Charlene Fontenot, the Relief (2nd) Assistant, had injured her back and would not be back until March 15th at the earliest.  Jeff Furber, a full-time PIC had been terminated.  Johnna Havard, a Relief (2nd) Assistant from the Wasilla Store was going to help out at the Spring Reset.   In that same conversation, Ms. Johnson mentioned that if her daughter had to stay in the Philippines for a long period of time, she might have to take a six month family leave, but that this wouldn't be happening soon and she would give him at least one month's notice.  She told him she might decide this before the end of the calendar year.[47]

On that same day, he gave her a Tour (a "to do" worksheet) dated March 13, 2002.[48]  Ms. Johnson assumed that was because he expected it to be turned in the same day.  He also asked her to finish 3 carts of transfer Docker™ pants to the Fairbanks store.

At 10:48 p.m. that same evening she advised Mr. San Miguel that she had finished the transfer of the Docker pants, submitted check cashing violations and that "read and signs (were) in progress."[49]

That same evening, Ms. Johnson was advised by Julita Lim, a part-time PIC, that she was having problems with completing a baby furniture planogram.  A planogram is a display system which includes a complete description of how a product or product line is to be displayed, all of the assorted materials necessary for the display and normally includes all of the UPL (Universal Product Label) codes.  Ms. Lim told Ms. Johnson that Mr. San Miguel had told her to finish the Planogram because Minerva Cortez, who had originally been assigned to do it, didn't want to do it.[50]

Though a long-term employee, Ms. Lim had little experience with setting up planograms and Ms. Johnson immediately saw that the planogram materials were missing UPL codes which are necessary for the planogram to be completed. The UPLs can be typed manually but the simpler and more efficient method is to order them from Portland.  She ordered them from Portland and advised Mr.

[46] Exh. 21 - [201176-201177]
[47] Exh. 22 – [300514]
[48] Exh. 23 – Tour - [200421-200422]
[49] Exh. 24 - [300513]
[50] Exh. 22 – [300514]

*Johnson, Myrna  v Fred Meyers (03/18/2002) [23003].*        18
OPPOSITION TO MOTION FOR SUMMARY JUDGMENT
J-04-008 CV (RHB)

CHOATE LAW FIRM LLC
424 North Franklin Street
Juneau, Alaska  99801
(907) 586-4490

CHOATE LAW FIRM LLC
424 North Franklin Street
Juneau, Alaska 99801
(907) 586-4490

San Miguel by an Office Vision at 11:39 p.m.[51] Ms. Johnson left the store after midnight her first evening back.

March 13, 2002 (Wednesday): On March 13, 2002, Ms. Johnson again clocked into work early, at 1:17 p.m.[52] Mr. San Miguel, who apparently was not on the floor, sent her an Office Vision just 17 minutes later at 1:34 p.m. stating:

> "Have Minerva or Julita complete this planogram TONIGHT. It's been a week, can't wait any longer. I want this done tonight, have them make the upl a store level. All displays need to be sensor tag, with a scanning upl on the back bottom left, top bar worked. I'm going to scan zeroes in the am." (emphasis in original)[53]

Eight minutes later, at 1:42 p.m., while he and she were both in the store, he sent her a second Office Vision complaining (in writing) about the quality of the recovery the prior evening:

> "Please see me about recovery last night. Lots of areas were not recovered to standard (mens dockers table/acs backpacks). Recovery was coming along nicely the last couple weeks. Last night we took a step backwards. This morning Fred called me to the men's section to walk the ale dpt, I was embarassed by the conditions in some areas. This is not acceptable any longer, expectations are a lot higher now, especially when the lead asst is closing.
>
> You need to walk all areas with the closing crew to ensure that recovery gets done every night. Also make sure everybody crosses out the tour as they get it done. AS part of your closing duties leave a detail ov about who work each area and what they work on throughout the night."[54]

Ms. Johnson went to him to apologize if her recovery "(was) not excellent." She explained that they were busy, it was her first day back and there were "so much things to do."[55]

She also received the Office Vision about the planogram. He wanted it done on the evening of March 13 even though he had given "another long tour" to Minerva Cortez. Because Cortez was obviously going to be too busy to complete the planogram, Ms. Johnson started it.[56]

March 14, 2002 (Thursday): Ms. Johnson worked past midnight to complete the planogram, sending an Office Vision to Mr. San Miguel at 12:38 a.m. on March 14 that she had completed it but because of the time, would have to take care of some cleaning and straightening the following day:

---

[51] Exh. 25 - [201174 (Bottom of Page)]
[52] Exh. 21 - [201177]
[53] Exh. 25 - [201174 (Top of Page)]
[54] Exh. 24 - [300513 (Top of Page)]
[55] Exh. 22 – [300514]
[56] Exh. 22 - [300514]

*Johnson, Myrna  v Fred Meyers (03/18/2002) [23003].*    19
OPPOSITION TO MOTION FOR SUMMARY JUDGMENT
J-04-008 CV (RHB)

CHOATE LAW FIRM LLC
424 North Franklin Street
Juneau, Alaska 99801
(907) 586-4490

1

2

3

4

> "I finished the planogram for the baby furniture deck. I will check for back stock tomorrow.
> …will straighten the other side tomorrow (shelf)
>
> I hope that my recovery is up to standard this time.
>
> Most of the tour for the night was done.  Thanks, Myrna"[57]

5

Later that morning, at 11:17 on March 14, 2002, Mr. San Miguel forwarded an earlier Office Vision originally dated March 6, 2002 to Myrna Johnson.  The subject was "Excellence in Execution":

6

7

8

9

10

11

12

> "We have a huge opportunity to drive sales and improve our profitability by (indiscipherable) EXECUTION of the plan directed by management.  There are several items in ALE that I have personally discussed with all of you on previous meetings and we still struggle to get it done to standard in a timely manner.  We can't continue to operate like this, I need all of you to hug and embrace your dpts and all changes.
>
> I know there is a lot going on, but we need to be focused on sales planning, execution and follow up.  Taking a week to get something done, is not in the schedules lined out by DXA on previous communications.  Enough said; If you are executing the plan/tours/bulletins/s&mnotes/ thank you; If not DIG IN ….. only two kinds of employees survive in retail.. The Fast and the Furious."[58]

13

14

15

16

After working almost twelve hours the previous day (having left after midnight), she clocked back into work at 1:20 p.m.[59] Johnna Havard, who was scheduled to work the early morning shift, called in sick.  Ms. Johnson had to straighten out the CHL section because of Ms. Havard's absence.  The store was very busy again.[60]

17

18

19

20

That afternoon she was called into Mr. San Miguel's office where he told her that a lot of spots were missed the night before.  He showed her a long list of the spots and then inexplicably showed her photos of bad recoveries that occurred while she was gone.  He said her recovery was better than those that occurred while she was gone but that she had still missed "spots".[61] He gave her a three (3) page Tour with work to be done on that day.[62] [200423-200425]

21

22

23

24

25

------

[57] Exh. 26 - [201248 (Bottom of Page)]
[58] Exh. 27 - [201251]
[59] Exh. 21 - [201177]
[60] Exh. 22 - [300514]
[61] Exh. 22 - [300514]
[62] Exh. 23A – Tour (03/14/02) - [200423-200425]

26

27

28

*Johnson, Myrna  v Fred Meyers (03/18/2002) [23003].*    20
OPPOSITION TO MOTION FOR SUMMARY JUDGMENT
J-04-008 CV (RHB)

CHOATE LAW FIRM LLC
424 North Franklin Street
Juneau, Alaska 99801
(907) 586-4490

Ms. Johnson explained that they had been very busy the night before. Mr. San Miguel reiterated that they must follow standards and if someone was going to lose their job, it would not be him. He then mentioned that he knew she was having some family problems. Ms. Johnson asked that he please not involve her family situation – that she had been in the store the preceding day from 1:30 p.m. (actually 1:20 p.m.) to almost midnight (actually to 12:48 a.m.), hadn't even taken a lunch, so didn't feel that her work performance had been affected by her daughter's situation.[63]

Mr. San Miguel then said he didn't like the way she had set up the baby furniture deck planogram even though Ms. Johnson had set it up "by the book" as taught and previously instructed by Mr. San Miguel. This time he wanted something different. Because he changed the requirements and wanted something different than what was specifically called for in the planogram instructions, she spent the whole evening making new UPL(s) and adjusting the planogram.

Ms. Johnson left Mr. San Miguel's office "very sad". That evening she explained to the night crew Mr. San Miguel's complaints about the recovery. Those employees were unhappy because like Ms. Johnson, they had felt they had done a good job the night before.[64] Despite the confusion created by Mr. San Miguel's sudden disapproval of everything she was doing, she continued to do her job, working late again that evening.[65]

At 10:07 p.m. she sent an Office Vision to Mr. San Miguel giving him an update on her progress:

> "I fixed the baby furniture deck as much as I can. Those items on the top were supposed to be for display. I ran out of time to vaccum (sic) and built the display. I will finished them tomorrow.
>
> I tried to type UPL for the end cap printer not working. I had been very busy tonight. Minerba and I were both back ups at SG20.
>
> I talk to all the night crew tonight and we are committing to our goal of excellence. We will work on perfection every night. Give us a little time to straighten everything and we will get there.
>
> Thank You,
> Myrna" [66]

---

[63] Exh. 22 - [300514]
[64] Exh. 28 – [Paz Carillo Affidavit for ASHRC]
[65] Exh. 22 - [300515]
[66] Exh. 29 - [201216]

CHOATE LAW FIRM LLC
424 North Franklin Street
Juneau, Alaska 99801
(907) 586-4490

1        March 15, 2002 (Friday):    Ms. Johnson returned to work on Friday, clocking in at 1:15

2    p.m. Ms. Havard got sick on the job and had to go home.  Ms. Havard had been working on rearranging

3    the children's section leaving a quick layout for Sita Catli and Sara Dexter on what to do.  They were

4    both lost when Johnson arrived so she helped them following Ms. Havard's layout.  Once again, the

5    store was very busy and Ms. Johnson worked till around midnight.[67]

    March 16, 2002 (Saturday):    Ms. Johnson clocked into work at 1:33 p.m., starting her shift

6    as the store was crowded with out of town shoppers and was having a 50% off clearance event.  Ms.

7    Havard told her when she arrived that the apparel (ALE) closing cashier, Jennifer Kipple, had called in

8    sick.  The only person with experience to replace Ms. Kipple on the closing shift was Julita Lim.[68]

    At 3:03 p.m., while Ms. Johnson worked clearance minus one cashier, Mr. San Miguel sent the

9    following Office Vision to her:

10   > "As of today 03/16/02, the Bfn planogram still not done 100% as outlined on the tour dated
11   > 03/13/02.  This is unaceptable (sic)!!!!!!!  The front endcap still notsigned, backstock not
12   > worked, snugride callback not completed, kick & play / 1st bouncer still out of place and no
13   > display set on top of the deck…….
     >
     > You have till MONDAY 7:00am to complete this project.  I will not accept anymore excuses on
14   > why isn't done.
15   >
     > Bfn: Tour:  Planograms gondola/deck/deck end/ done all upl up.  All backstock worked
16   > including boards on container/top bars/ stockroom.  All displays set on the deck as per pogo.
     > No bfn product left on ale stockroom/all have to go in to the container.  Thanks Jaime"[69]

17       Forty minutes later, at 3:43 p.m. Ms. San Miguel sent another Office Vision, with more work

18   for Ms. Johnson:

19   > "All these items have to be completed on sunday 03/17/07.
     >
20   > Ads in all depts. Set by 7:00 a.m. including outpost areas. All signing to standard.
21   > Ads scan 100% by 9:00 am/Ad audit turn in to Fred
     > Top ten executed/Signed copy left on my desk
22   > Stockroom clean and organized at closing time/All salvage done.
     > Checkstand ends set as per period planner.
23   > Merchandising notes executed in all dpts. Copy to section heads/Sign master copy filed in the
     > book.

24

25   ───────────────────────

26   [67] Exh. 22 - [300515]
     [68] Exh. 22 - [300515-300516]
     [69] Exh. 30 - [201309 (Top of Page)]

27   *Johnson, Myrna  v Fred Meyers (03/18/2002) [23003].*    22
     OPPOSITION TO MOTION FOR SUMMARY JUDGMENT
28   J-04-008 CV (RHB)

> Clearance execution/All racks to the back of dpts or aligned on a row from front to back.  All clearance racks sized with rings and price pointed. Execute RTW clearance pricing (ov sent separately).
>
> All rms tables and sets recovered to planogram.
>
> Don't forget to ov me every night with a passdown log. I want detail.
>
> Thanks.
> Jaime
>
> PS – You forgot to ov the quest items to Steve and Joe Nichols…..Not good….. [70]

Ms. Johnson, received two demanding Office Visions from Mr. San Miguel, while in the middle of a major clearance sale and short her normal closing cashier.  At 6:00 p.m. that evening, Julita Lim, took her dinner break (normally one-half hour).  She didn't return for almost two and one half hours. Ms. Johnson was forced to work as back-up cashier, PIC and still try to finish all of the Tours and work assigned by Mr. San Miguel.  She worked till past midnight on Saturday evening.

Ms. Johnson subsequently was told by Ms. Lim that she had spent the extended dinner break with Mr. San Miguel and Ms. Havard at a going away dinner for Ms. Havard.  Mr. San Miguel was aware that the shift was already one cashier short and that Ms. Lim's prolonged absence would require that Ms. Johnson take care of Ms. Lim's duties plus Ms. Kipple's duties (the sick cashier), complete her normal duties and comply with the two Office Visions received earlier that day.[71]

March 17, 2002 (Sunday):        Ms. Johnson started work at approximately 1:30 p.m.  Upon arriving, she was met by Sara Dexter who told her that Mr. San Miguel had asked the day staff to report to him about the quality of Ms. Johnson's recovery.  Ms. Dexter warned Ms. Johnson that she should "watch her back" because Mr. San Miguel was planning something against her.  She told Ms. Johnson that Johnna Havard had been very vocal about wanting to move to Juneau to be the Lead Assistant and had started dating another Fred Meyer employee, Jeff Smith.

Rhonda Cox was interviewed by the Alaska State Commission for Human Rights on January 15, 2003.  She confirmed that Mr. San Miguel had asked her to secretly send an Office Vision to him to complain about the recovery.  She stated that Mr. San Miguel would give "projects" to Ms. Johnson to do at night when in fact, recovery was supposed to be the sole task.[72]

---

[70] Exh. 31 - [201310]
[71] Exh. 22 – [300515]
[72] Exh. 32 - [Rhonda Cox ASHRC Interview 1/15/03 p. 1 pp8].

*Johnson, Myrna  v Fred Meyers (03/18/2002) [23003].*        23
OPPOSITION TO MOTION FOR SUMMARY JUDGMENT
J-04-008 CV (RHB)

CHOATE LAW FIRM LLC
424 North Franklin Street
Juneau, Alaska  99801
(907) 586-4490

CHOATE LAW FIRM LLC
424 North Franklin Street
Juneau, Alaska 99801
(907) 586-4490

        Having received the warnings from Ms. Dexter, Ms. Johnson continued to do her work, doing her best to respond to the Office Visions sent by Mr. San Miguel on the 14th.  In addition, on Sunday, all of the week's store specials have to be prepared for opening on Monday.  This means that prices have to be changed and any special sale displays set up.  The store places the advertisement in the Sunday paper for the week's sales.  She was responsible for all of this plus cleaned the stock room and did all other things that needed to be done.  Once again, she worked till almost midnight.  In six days she had worked approximately 66 hours.

        <u>March 18, 2002 (Monday):</u>        On March 18, 2002, Ms. Johnson clocked into work at 1:17 p.m.  She met with Mr. San Miguel briefly to update him on what had happened the day before.  She updated him on all projects that had been assigned including finishing a shoe audit because it had not been completed by Jeff Smith.  Smith had attended the dinner party with Mr. San Miguel the evening before, cleaning up the stock room and various odds and ends.[73]

        Mr. San Miguel had no comments about her progress or activities.  Ms. Johnson took the store cell phone and went downstairs where she was met by Sita Catli who asked for assistance in completing a Levi's petite planogram.  She was interrupted about half-way through the project by Mr. San Miguel asking her to come upstairs.  He then sent her back down because he needed to take care of something and she returned to help Catli.  She was then called back by Mr. San Miguel, passing Ms. Havard descending on the stairway as she went up.[74]

        Mr. San Miguel said that he wanted to meet with her in Fred Sayre's office (the store director).  The office was small and cramped.  Mr. Sayre sat at his desk with Mr. San Miguel hovering over Ms. Johnson's shoulder, between her and the door. With no preamble or discussion, he showed her a Written Employee Warning Notice and began reading the text of it to her.  When he finished, he told her to sign it.  The Written Employee Warning Notice was an advanced form of discipline, which only occurs after the employee has previously been through a series of less formal discipline including counseling, verbal warnings, and "written" verbal warnings.  None of this had occurred.  The notice stated that Ms. Johnson, who had worked till midnight or later for the last six days was unable to perform recovery and closing correctly and that she would be "removed from her position" as ALE Lead Assistant Manager if her work didn't improve in 30 days.[75]

---

[73] Exh. 22 - [300516-300517]
[74] Exh. 22 - [300516-300517]
[75] Exh. 22 - [300516-300517]; Exh. 1 – Myrna Johnson Affidavit; Exh. 49- Employee Warning Notice. – [20217]

CHOATE LAW FIRM LLC
424 North Franklin Street
Juneau, Alaska 99801
(907) 586-4490

Ms. Johnson began crying,[76] intimidated by the circumstances and the small room with two large men. Mr. San Miguel stood blocking the door.[77] She had never had any form of discipline in the past[78] and could not understand how with no prior discipline taking place, she could suddenly be at a stage of discipline that was going to result in her termination or demotion. She began sobbing uncontrollably. It was clear to her that no matter what she did, no matter how long or diligently she worked, Mr. San Miguel was going to find reason to remove her from her position so that she could be replaced by Ms. Havard.

She continued crying, deeply embarrassed and humiliated to be trapped in the small room with Mr. San Miguel demanding she sign the written Employee Warning Notice. (In fact, signature is not required by the employee) Unable to collect herself emotionally, overwhelmed with the thought that she was going to lose her job and intimidated, she left the room to go to the Apparel Stock room where she continued to cry.

No effort was made by Mr. San Miguel or Mr. Sayre to talk with Ms. Johnson. No effort was made to see how she was doing.[79] In fact, no effort was made to advise her that the meeting could continue when she had some time to compose herself. Despite her ten years of work for Fred Meyer and her outstanding contributions and efforts, within minutes, Mr. San Miguel and Mr. Sayre had called Human Resources in Portland to report that Ms. Johnson had "walked off" the job when she left the room to cry in the break room downstairs.[80]

Immediate steps were made to post Ms. Johnson's hard earned job on the company's internal system. Within days, Ms. Havard, 23 years old, young, pretty and single, had replaced Ms. Johnson. Ms. Johnson only learned that her position was in fact terminated when she called Time and Attendance the following morning to make sure that the time she missed from work on Monday afternoon and evening would be logged to her personal leave account.[81]

Since Mr. Sayre and Mr. San Miguel were bowling buddies and had participated in her termination, Ms. Johnson attempted to bring her wrongful termination to upper management as she had not "walked off" the job and had been mistreated by Mr. San Miguel. Her calls to both Dennis Affleck, the Regional Apparel Supervisor and Mary Lucas, at Human Resources, were initially unreturned. Mr.

---

[76] Exh. 33 – Myrna Johnson Transcript [MJ Tr] 125/25 to 128/6.
[77] Exh. 33 – [MJ Tr. 122/1-23].
[78] Exh. 4 – [JSM Tr. 100/19 to 101/1].
[79] Exh 4 – [JSM Tr 264/22 to 265/5].
[80] Exh. 4 – [JSM Tr. 257/1-18].
[81] Exh. 22 - [300516-300517]

*Johnson, Myrna v Fred Meyers (03/18/2002) [23003].*        25
OPPOSITION TO MOTION FOR SUMMARY JUDGMENT
J-04-008 CV (RHB)

CHOATE LAW FIRM LLC
424 North Franklin Street
Juneau, Alaska  99801
(907) 586-4490

Affleck did eventually leave a voice message stating that he would not intervene and any concerns she had would have to be raised with Fred Sayre.[82]

Subsequently, Ms. Johnson did meet Ms. Lucas on an airplane.  She asked to speak with Ms. Lucas when she was in Juneau and did so.  At that meeting, she requested that Ms. Lucas investigate what occurred as she wanted to return to her job.  Ms. Lucas said she would speak with Mr. San Miguel.  Ms. Johnson heard nothing further thereafter from Ms. Lucas or anyone else at Fred Meyer.

D.    Jaime San Miguel – Relevant History

Mr. San Miguel began working in Alaska in August 1991 at the College Road McDonalds.  In September, 1991 he took a part-time job at the Airport Way Fred Meyer as a shoe sales associate.[83] That job became full-time in December 1991.[84] In the summer of 2003, he was transferred to the College Road Fred Meyer were he became section head of the men's apparel department.[85] He became the apparel PIC (Person In Charge – also known as 4th Assistant] in the Fall of 2004.[86] In February 1995 he entered apparel management training.[87] He was promoted to Relief Assistant Manager at the Soldotna store and held that position until January 1996[88] when he was then transferred to Juneau where he was promoted to be the Assistant Manager in March 1996.[89] He was subsequently promoted to Manager in 2001 when Matthew Laney left.

Mr. San Miguel went through a turbulent and emotionally exhausting divorce in the Spring and Summer of 2001.  His attendance was erratic.  He would come late and leave early.  He would break down crying at times.  He couldn't do his job.  Notwithstanding this, his job was completed and no word ever reached management that he was incapacitated.  This was because Mrs. Johnson did his work for him.  She "covered" for his absences, worked extra to insure that his inability to work would not result in any adverse job action towards him.  She was a true friend and loyal co-employee.

There were no disciplinary consequences to his erratic performance and attendance during that time period.  Ms. Johnson and his other co-workers successfully protected him until her was emotionally able to do his job again.  His erratic performance, attendance and emotional outbreaks were

---

[82] Exh. 21 - [300517]
[83] Exh. 4 - [JSM Tr. 33/19-25]
[84] Exh. 4 - [JSM Tr. 36/2-7]
[85] Exh. 4 - [JSM Tr. 37/20-22]
[86] Exh. 4 - [JSM Tr. 38/14-18]
[87] Exh. 4 - [JSM Tr. 71/19-23]
[88] Exh. 4 - [JSM Tr. 73/18-74/14]
[89] Exh. 4 - [JSM Tr. 74/17-22]

*Johnson, Myrna  v Fred Meyers (03/18/2002) [23003].*    26
OPPOSITION TO MOTION FOR SUMMARY JUDGMENT
J-04-008 CV (RHB)

tolerated by Fred Meyer and Ms. Johnson stepped in to "hold the fort" and keep things going while he was unable to do so.

Mr. San Miguel always made it clear that preferred younger women, both as employees and as potential dating partners. In a sworn Affidavit presented to the EEOC, Matthew Laney, his previous supervisor, stated in this regard:

- Two older female employees related to him that San Miguel told them *"if I could, I'd get rid of you and just hire cute ones."*
- San Miguel remarked on a number of occasions that he was interested in dating Kaylana Haase, a female co-worker. Good-looking young women captured his attention.[90]

Another female employee, Maranda Willburn, in her sworn Affidavit also commented that San Miguel showed favoritism to young, attractive female employees.[91] Other employees commented about San Miguel's "laziness" and "poor work habits." When seeing a pretty, young female customer, he would make comments such as *"I'd give her a job anytime."*[92]

Once divorced, San Miguel became even more explicit in discussing his sexual interests with subordinates, asking female employees to set him up with someone who was *"hot"*. His discussions centered on sports and *"girls"*. Because he was a bowling buddy of the Store Manager, Fred Sayre, he was seen to be part of a "good old boys network" that his largely female staff had no way of accessing.

When Ms. Johnson left to the Philippines in early February with her daughter on emergency leave, San Miguel, in describing the replacement he wanted, said *"Don't send me an old hag, send me someone young and beautiful."*[93]

E.    Havard Replaces Johnson Only To Experience A Similar Campaign

In six days, Mr. San Miguel had accomplished his goal of replacing Johnson with Johnna Havard. Ms. Havard was young, pretty and single and had no children. Unsurprisingly, Mr. San Miguel kept Ms. Havard on the day shift (the same one he worked) and subsequently asked her out. His attitude towards her abruptly changed when he learned that she had become engaged to Jeff Smith.

Interestingly, Ms. Havard, who worked days during the week of March 11 to March 18, 2002, saw no problems with the recoveries done by Ms. Johnson. After confirming that Mr. San Miguel had complained to her about the quality of Ms. Johnson's recoveries, Ms. Havard testified that "it wasn't

---

[90] Exh. 34 – [Affidavit of Matthew Laney]
[91] Exh. 35 – [Affidavit of Maranda Wilburn]
[92] Exh. 5 – [Affidavit of Sallie Tenwolde]
[93] Exh. 6 - [Sarah Dexter Affidavit at p. 2]

*Johnson, Myrna v Fred Meyers (03/18/2002) [23003].*    27
OPPOSITION TO MOTION FOR SUMMARY JUDGMENT
J-04-008 CV (RHB)

CHOATE LAW FIRM LLC
424 North Franklin Street
Juneau, Alaska 99801
(907) 586-4490

major stuff … it was minor … it wasn't really an issue"[94] and stated that there was no difference in the recoveries done by Ms. Johnson than those done while Ms. Johnson was on vacation.[95]

Ms. Havard stayed in Juneau for another week or two after Ms. Johnson's termination before returning north to move her belongings to Juneau. During that time, there was no difference in the recoveries after Ms. Johnson left than when Ms. Johnson was doing them.[96] She learned of the opening of the Lead Assistant position by way of a call from Mr. San Miguel.[97] He asked her if she wanted to come down to (the Juneau) store and work as a (Lead) assistant.[98] There was no formal interview. She was basically "handed the job."[99]

After announcing her engagement to Jeff Smith in the summer of 2002, there was a change in the way Mr. San Miguel treated her.[100] Suddenly, "anything she did wasn't done right or wasn't done good enough or up to (San Miguel's) expectations."[101] Mr. San Miguel's criticisms were both oral and in emails.[102] There was no difference in the quality of her work which would cause Mr. San Miguel to become more critical of her.[103] She felt that she was treated differently because she had become engaged.[104]

Where before Mr. San Miguel had communicated primarily with her orally in meetings, after her engagement "she constantly got Office Visions saying that things were don't right."[105] Her motivation and job performance had not changed and she continued to do the best job she could do.[106]

Because of the way Mr. San Miguel started treating her, she'd go home crying because she felt she wasn't good enough for the job. Her complaints to Dennis Affleck or Fred Sayre were "swept under the rug."[107] She ended up transferring out of apparel to Fred Meyer Jewelers because of Jaime San Miguel and his treatment of her.[108] She called crying to Dennis Affleck because Mr. San Miguel either

---

[94] Exh. 36 - Johanna Havard Depo Transcript [JH Tr] 15/14-21
[95] Exh. 36 - [JH Tr 15/22-25]
[96] Exh. 36 - [JH Tr 19/8-12]
[97] Exh. 36 - [JH Tr 19/13-18]
[98] Exh. 36 - [JH Tr 19/19-25]
[99] Exh. 36 - [JH Tr  20/14-21]
[100] Exh. 36 - [JH Tr 26/18-22]
[101] Exh. 36 - [JH Tr 26/23 to 27/1]
[102] Exh. 36 - [JH Tr 27/5-8]
[103] Exh. 36 - [JH Tr 27/15-20]
[104] Exh. 36 - [JH Tr 28/9 to 29/2]
[105] Exh. 36 - [JH Tr 29/10-17]
[106] Exh. 36 - [JH Tr 29/18-22]
[107] Exh. 36 - [JH Tr 29/23 to 30/12]
[108] Exh. 36 - [JH Tr 31/4-8]

*Johnson, Myrna  v Fred Meyers (03/18/2002) [23003].*     28
OPPOSITION TO MOTION FOR SUMMARY JUDGMENT
J-04-008 CV (RHB)

CHOATE LAW FIRM LLC
424 North Franklin Street
Juneau, Alaska 99801
(907) 586-4490

CHOATE LAW FIRM LLC
424 North Franklin Street
Juneau, Alaska  99801
(907) 586-4490

didn't appreciate her work, would take credit personally for the work she did when corporate people were visiting or blamed others."[109] She transferred even though it meant a $5/hour pay cut and an inability to pay her bills.[110]

Before she became engaged to Jeff Smith, Mr. San Miguel asked her to come over to his home to do some Latin dancing. She rejected the invitation feeling it inappropriate and not professional.[111]

Mr. San Miguel spent so much time "flirting" and acting in an "inappropriate manner" with Felicia Kohnen, another store employee.[112] He would "eye" attractive women who walked by him in the store.[113] Hispanic workers were treated more favorably than Asians by Mr. San Miguel.[114]

On at least two separate occasions Mr. San Miguel asked Ms. Havard to "fix him up with dates or with hot women."  This was while he was dating Kaylonna Haase, another store employee.[115] After Ms. Havard became engaged, she was given less favorable shifts (closing & graves) than she had before her engagement (days).[116]

After her engagement, Mr. San Miguel would give her long tours which could not possibly be completed during a shift.  Where he would accept the fact that sometimes because of staffing shortages, work simply couldn't be completed within a shift, after her engagement, this was no longer acceptable.[117]

By late 2002, Ms. Havard was sure that San Miguel was trying to push her out of the job.[118] No matter what she did, it wasn't going to be good enough to satisfy Mr. San Miguel.[119] By December 2002, Ms. Havard, a previously healthy 23 year old woman, was rushed to the hospital with stress-related chest pains.[120]

Unlike Ms. Johnson who culturally simply worked harder when criticized by Mr. San Miguel, Ms. Havard, a native-born American, was more vocal in terms of her concerns regarding her treatment. In an email to Mary Lucas and Jim Hill, dated October 6, 2002, she complains of being "treated

---

[109] Exh. 36 - [JH Tr 32/22 to 33/6]
[110] Exh. 36 - [JH Tr 34/15-22]
[111] Exh. 36 - [JH Tr 44/22 to 45/21]
[112] [Exh. 36 - JH Tr 45/22 to 46/24]
[113] Exh. 36 - [JH Tr 47/2 to 47/7]
[114] Exh. 36 - [JH Tr 47/8 to 48/1]
[115] Exh. 36 - [JH Tr 49/2-22]
[116] Exh. 36 - [JH Tr 52/21 to 53/1]
[117] Exh. 36 - [JH Tr 54/16 to 55/20]
[118] Exh. 36 - [JH Tr 56/3 to 57/3]
[119] Exh. 36 - [JH Tr 57/4-13]
[120] Exh. 36 - [JH Tr 63/16 to 64/3]

*Johnson, Myrna  v Fred Meyers (03/18/2002) [23003].*     29
OPPOSITION TO MOTION FOR SUMMARY JUDGMENT
J-04-008 CV (RHB)

unfairly". She describes being put on opening shift (6 am to 4 pm) then having to work graveyard that same day starting at 11:00 p.m. and being "set up to fail." [121] In the response, she was told she had to speak about this with Fred Sayre.[122]

She responded to that email on October 10, 2002 stating that she had already gone to the store director twice and nothing had changed.[123]

On December 12, 2002 she recorded another of times throughout the Fall that Mr. San Miguel simply didn't show up or showed up late for work.[124]

Subsequently, she complained of Mr. San Miguel's repeated unexplained absences and failure to come in when scheduled. On December 29, 2002 she wrote an email subsequently forwarded to Mary Lucas on January 11, 2003 that Mr. San Miguel was a "no show/no call".[125]

On January 11, 2003 she made a note and then forwarded it to Mary Lucas confirming a "no show" by an employee, Tonia Avila. Despite having told Mr. San Miguel about his, nothing happened to Avila.[126]

On January 15, 2003, she sent an Office Vision to Mary Lucas succinctly summarizing her experiences with Mr. San Miguel:

> "May, I did talk with Dennis when he came and I still feel like my voice is not heard. I don't want to "burn my bridges" with Dennis but I still feel like there will be no justice brought upon Mr. San Miguel. When I was explaining to Dennis that Jaime no shows and is always late, he said that I was keeping tabs on my Manager. In a way I am but I also feel that he is not leading by example of an apparel manager. His employees see this and this is how they get away with it. For example (and this did happen), our relief assistant (Tonia Avila) called in on Jan 1. Now from working with some other managers in the past, if you call-in on the 1st of January, you are automatically termed. Also from talking with Dennis, I also feel by him not caring about the situations that I have come across, that he doesn't care to lose another dedicated employee. Mr. San Miguel may be a good manager in some other aspects but from what I have observed and the situations I have been in with him, I feel like he knows that he can and will get away with anything his heart desires, even if it's against policy."[127]

CHOATE LAW FIRM LLC
424 North Franklin Street
Juneau, Alaska 99801
(907) 586-4490

---

[121] Exh. 37 - [202438]
[122] Exh. 38 - [202435 (Top of the Page)]
[123] Exh. 39 - [202437]
[124] Exh. 40 - [202438F & G]
[125] Exh. 41 - [202438B]
[126] Exh. 42 - [202438C]
[127] Exh. 43 - [202416]

*Johnson, Myrna v Fred Meyers (03/18/2002) [23003].*    30
OPPOSITION TO MOTION FOR SUMMARY JUDGMENT
J-04-008 CV (RHB)

On February 9, 2003, she again noted Mr. San Miguel's "excessive tardiness."[128]  None of Ms. Havard's complaints appear to have ever been acted upon by management at Fred Meyer.  Ms. Havard left her job.  Mr. San Miguel retained his position as Apparel Manager.  His personnel file reflects none of the complaints by Ms. Havard or the investigation into them by Mary Lucas.

Mr. San Miguel's change of heart in regards to Ms. Havard is important because once she became engaged he ultimately utilized many of the same methods and techniques against her that he had successfully used with Johnson.

## V.
### Applicable Law

FRCP 56(c) authorizes summary judgment if no genuine issue exists regarding any material fact and the moving party is entitled to judgment as a matter of law. The moving party must show an absence of an issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party shows the absence of an issue of material fact, the non-moving party must go beyond the pleadings and designate specific facts showing a genuine issue for trial. *Id* at 324.

The substantive law governing a claim or defense determines whether a fact is material. *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir1987). The court must view the inferences drawn from the facts in the light most favorable to the non-moving party. Thus, reasonable doubts about the existence of a factual issue should be resolved against the moving party. *Id* at 630-31.

The Ninth Circuit has set a high standard for granting summary judgment in employment discrimination cases. "[W]e require very little evidence to survive summary judgment in a discrimination case, because the ultimate question is one that can only be resolved through a searching inquiry-one that is most appropriately conducted by the fact-finder, upon a full record." *Schnidrig v. Columbia Machine, Inc.*, 80 F3d 1406, 1410 (9th Cir) (citations omitted), *cert denied*.

## VI.
### Argument

---

[128] Exh. 44 - [202414 – 202415]

CHOATE LAW FIRM LLC
424 North Franklin Street
Juneau, Alaska  99801
(907) 586-4490

1.    <u>A genuine issue of fact exists as to whether the oral representations and personnel manuals of Fred Meyer were included in the employment contract such that Ms. Johnson could only be discharged "for cause".</u>

Myrna Johnson had every reason to believe, based upon the oral and written representations of Fred Meyer, that her "career" with the company came with certain protections, including that she would only be disciplined, including demotion or termination "for cause".

Fred Meyer as a sophisticated employer, certainly understands the concept of "for cause" versus "at will" employment.  It would of course like to have its cake and eat it to.  In the context of salaried employees such as Ms. Johnson this meant, promise a career, expect and exact enormous efforts with the "career carrot" but if inconvenient, or for no good reason at all, demote or terminate that employee without consideration for whether there was "just cause."

A review of all of the employment documents including initial interview forms, Performance Evaluations, Employee Manual and Corporate Policy Manual confirm that in not one place is employment described as being "at will."  While this is clearly an intentional omission on the part of Fred Meyer, an evaluation of those documents also demonstrates that in not one place is an employee advised that their employment can be terminated for any reason, good, bad or simply at whim.  In contrast, the employment materials consistently talk about a "career" with Fred Meyer.  "Career" is defined as "doing what one does as a permanent occupation or lifework or for which one trains and which is undertaken as a permanent  calling  (Webster's Online Dictionary)  It necessarily is "long-term" as opposed to "short-term".

Companies, such as Fred Meyer, with the need to create a dedicated and skilled work force must offer something to their workers than the promise that they can be terminated at any time for any reason, including a bad one.  In fact, it specifically and intentionally avoids advising employees, especially salaried employees, that their employment is "at will".  Instead, they make every effort to sell to employees the prospect of long-term employment through oral representations and writings.  They do this in order to obtain the kind of work product and

CHOATE LAW FIRM LLC
424 North Franklin Street
Juneau, Alaska  99801
(907) 586-4490

effort exhibited by Ms. Johnson.  Ten or twelve hour shifts are common.  The job comes first.  Salaried employees don't work like that if they think they can be fired at any time on a whim.

In this instant matter, from the outset of her first job application, Ms. Johnson stated her desire for long-term employment with the possibility for promotion.  That desire is expressed in every annual evaluation when she is asked about her "career" goals.  In no instance is she advised that it is unrealistic to spend sixty hour weeks working for the company with the expectation that she will have long-term employment or will only be discharged "for cause".  In fact, exactly the opposite is consistently represented to her by the company.

The leading case in Alaska on the application of personnel manuals to employment contracts is *Jones v. Central Peninsula General Hosp*., 779 P.2d 783 (Alaska,1989).  In *Jones*, the Alaska Supreme Court specifically found that personnel manuals could be made part of an employment contract and could create expectations that would change "at will" employment into "for cause" employment.

> "While an employer need not establish personnel policies or practices, where an employer chooses to establish such policies and practices and makes them known to its employees, the employment relationship is presumably enhanced. The employer secures an orderly, cooperative and loyal work force, and the employee the peace of mind associated with job security and the conviction that he will be treated fairly. No pre-employment negotiations need take place and the parties' minds need not meet on the subject; nor does it matter that the employee knows nothing of the particulars of the employer's policies and practices or that the employer may change them unilaterally. It is enough that the employer chooses, presumably in its own interest, to create an environment in which the employee believes that, whatever the personnel policies and practices, they are established and official at any given time, purport to be fair, and are applied consistently and uniformly to each employee. The employer has then created a situation "instinct with an obligation." *Citing  Toussaint v. Blue Cross & Blue Shield of Michigan,* 408 Mich. 579, 292 N.W.2d 880 at 885 (1980).

The *Jones* Court also found that if an employer wanted to keep employees from relying upon the personnel manual as modifying their employment contract, the employer would have to *"clearly and conspicuously tells their employees that the manual is not part of the employment contract and that their jobs are terminable at the will of the employer with or without reason."* (779 P.2d at 787)

CHOATE LAW FIRM LLC
424 North Franklin Street
Juneau, Alaska  99801
(907) 586-4490

CHOATE LAW FIRM LLC
424 North Franklin Street
Juneau, Alaska 99801
(907) 586-4490

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

No such disclaimer is found in the Employee Manual.  Above the copyright information on a back page in the "Corporate Policy Manual", with searching, the following disclaimer can be found:

> "This handbook is not intended to, and indeed does not bestow any additional rights to employment or employment benefits to Fred Meyer Stores employees.  In addition, Fred Meyer reserves the right to depart from these guidelines and to take action up to and including immediate discharge when, in its opinion, such action is necessary to protect the well-being of the company or its employees."[129]

This disclaimer is neither "conspicuous" nor "clear".  The manual sets out in exacting detail Fred Meyer's policies and that a deviation from them can result in discipline up to discharge.  The disclaimer is easily overlooked because most employees do not look to the copyright page for information about their employment.

Second, the disclaimer does not advise how the manual's exacting description of expected conduct and policies is not part of the employment agreement between the parties.  When the manual says you must follow these policies or face discipline, is it reasonable for the employee to expect that adherence to those policies will not subject him or her to discipline?

In addition, the disclaimer fails to state in any fashion that employment can be terminable *with or without reason*, the classic description of "at will" employment.  Rather, it states that the manual will only be departed from when the action is necessary to "protect the well-being of the company or its employees."  This statement does not accord with "at will" employment and is purposefully vague and ambiguous.  An employee, if they found it, could read it and still conclude that their job was protected unless their activities created a risk to the "well-being" of the company or its employees.

Myrna Johnson, Mary Droddy and Rhonda Cox, all state in sworn affidavits that they were never told or explained that their employment was "at will" or described in any fashion which would indicate that they could be terminated for a good reason, no reason or even a bad reason.  Instead, they describe the representations made to them, which cause them to work

---

[129] Exh. 16 - [200566]

*Johnson, Myrna  v Fred Meyers (03/18/2002) [23003].*      34
OPPOSITION TO MOTION FOR SUMMARY JUDGMENT
J-04-008 CV (RHB)

long and hard hours for their employer, as being one "for cause". If they perform their jobs and follow company policy and rules, they can expect long-term employment – careers.[130]

Minimally, this is a fact question which cannot be resolved by summary judgment. As the *Jones* Court stated:

> "These courts have stated that whether an employee handbook was incorporated into an agreement between an employer and an employee is a question of fact to be determined in each case. *(citation omitted)* In particular, the facts must show that the employer has somehow indicated to the employee, at least in general, that employment policies favorable to the latter have been established." (779 P.2d at 785)

Given the lack on conspicuity and clarity of the one disclaimer in the multitude of materials provided to employees and in contrast, the repeated references to long-term employment with the company as the product of hard work and adherence to policies and procedures, a genuine issue of fact exists as to whether the combination of writings and oral representations to Ms. Johnson by Fred Meyer created a "for cause" employment contract?

> 2. Whether a system of progressive discipline existed and should have applied to any discipline Fred Meyer instituted as to Ms. Johnson's performance as a Lead Assistant Manager (First Assistant) in the Apparel Department at the Juneau Fred Meyer Store?

A genuine issue of fact exists as whether a system of progressive discipline existed at Fred Meyer and should have applied to any discipline instituted against Ms. Johnson. While a disciplinary process is not described in either the Employee Handbook or Corporate Policy Manual, all three managers deposed in this matter, Fred Sayre, Jaime San Miguel and Myrna Johnson, described the existence of one. It consisted of four distinct stages:

Stage One:    Counseling: The manager chats with the person.[131]

Stage Two:    Verbal warning: If the same issue is talked about three or four days in a row and it's not done, then there's a Verbal Warning.[132]

Stage Three:  Written Verbal Warning: "If it continues to be a serious offense …then we'll sit down and have it in a written form – it is still verbal – in a

---

[130] Exh. 1 – Myrna Johnson Affidavit; Exh. 45 – Mary Droddy Affidavit; Exh. 46 – Rhonda Cox Affidavit.
[131] Exh. 47 – [Fred Sayre Depo Transcript (FS Tr). 43/19-22]
[132] Exh. 4 – [SM Tr 140/16 to 141/3]

*Johnson, Myrna v Fred Meyers (03/18/2002) [23003].*    35
OPPOSITION TO MOTION FOR SUMMARY JUDGMENT
J-04-008 CV (RHB)

CHOATE LAW FIRM LLC
424 North Franklin Street
Juneau, Alaska 99801
(907) 586-4490

written form so they will understand that the particular behavior – or that particular project has to be completed in a timely manner."[133]

(Also described as) Verbal Written Warning:  "It's a warning that --- 'Look, this is what could happen if things don't change around." (Sayre 43/24 to 44/6)  The Written Warning Notice is modified by writing "Verbal" at the top of the page.[134]

Stage Four:    <u>Written Employee Warning:</u>[135]"At the meeting with the employee, we'll state if it is a verbal warning, or this is an actual write-up, or if it's a three-day suspension…"[136]

The disciplinary process then can be summarized as informal counseling, followed by a verbal warning if the behavior doesn't change, followed by a "verbal written" warning with the word "verbal" written at the top of the Written Warning Notice and finally a Written Warning Notice.

While this process can certainly result in some confusion, it is agreed by all three managers that it was in place at Fred Meyer on March 18, 2002.  Minimally, a genuine issue of fact exists as to whether such a staged disciplinary process existed and whether Myrna Johnson could expect that process to be utilized in any disciplinary proceedings.

3.    <u>Whether Fred Meyer followed its own disciplinary policies and procedures in the week leading up to Ms. Johnson's termination?</u>

A genuine issue of fact exists as to whether Fred Meyer followed its own disciplinary process in this matter.  For example, Myrna Johnson was unaware that she had been subject to any stage of discipline prior to the meeting of March 18, 2002.  She did not understand or realize that the Office Visions sent by Mr. San Miguel were actually the first stage or even second stage of the disciplinary process.[137]

---

[133] Exh. 4 – [SM Tr 141/3-10]
[134] Exh. 47 – [FS Tr 45/1-13]
[135] Exh. 47 – [FS Tr 44/16-17]
[136] Exh. 4 – [SM Tr 141/14-24]
[137] Exh. 1 – Myrna Johnson Affidavit.

CHOATE LAW FIRM LLC
424 North Franklin Street
Juneau, Alaska  99801
(907) 586-4490

Fred Meyer teaches its managers that discipline is to be "positive" and multi-staged. For example, "training and counseling" are to be used before "starting a progressive discipline program."[138]

Managers learn from Fred Meyer instructional materials that "discipline on the job is about directing an individual's behavior to increase performance."[139] "The goal of discipline is to change workplace performance in a positive, constructive ay or prevent further rule violations."[140]

Fred Meyer encourages the use of "positive" discipline as opposed to "negative" discipline. This is because "delivering any message in a negative way, regardless of the reason, will be received with defensiveness and opposition. Negative discipline is one of the biggest de-motivators in the working world."[141]

Fred Meyer trains its managers to use "Progressive Discipline" to give the employee the opportunity to correct performance problems. "Fred Meyer has a progressive disciplinary policy that should be followed by all management personnel."[142]

Progressive Discipline at Fred Meyer involves two separate components: Informal Progressive Disciplinary Steps and Formal Progressive Disciplinary Steps. Informal Steps are described as:

- Training and counseling
- Consequence line

The "Consequence line" is described as "The employee has not chosen to correct the performance issue."[143]

Formal Progressive Discipline is defined as comprising the following actions:

- Talk with the employee
- Document information about your conversation

---

[138] Exh. 48 - [202640]
[139] Exh. 48 - [202641]
[140] Exh. 48 - [202641]
[141] Exh. 48 - [202641]
[142] Exh. 48 - [202644]
[143] Exh. 48 - [202644]

**CHOATE LAW FIRM LLC**
424 North Franklin Street
Juneau, Alaska 99801
(907) 586-4490

- Complete the Employee Warning Notice (M-1650) and have the employee sign the Employee Responsibility Form (M-1398)
- Tell the employee that his or her job is in jeopardy and that copies of write ups will be put in their employee file
- Talk with your regional human resources supervisor to discuss how you will proceed with these steps[144]

Fred Meyer's own materials for management training describe the "Steps for Positive Discipline" as:

- Identify the performance problem
- Get the employee's view of the performance problem
- Ask the employee for a solution to the performance problem
- Agree on a plan to address the performance problem
- Give the employee a verbal or written warning
- Set up a follow-up session.[145]

A genuine issue fact exists as to whether the defendants followed their own policy of progressive discipline in this matter. As Myrna Johnson has stated in her sworn affidavit, she was unaware that any of the communications between March 12 and March 16 were intended to be discipline of any form as opposed to be standard communications between managers.[146] In fact, Ms. Johnson had only worked four days when she received the Office Visions which Mr. San Miguel describes as being "verbal warnings". It should be noted that none of those Office Visions utilize any of the language followed by the disciplinary process, whether it is described as "counseling" or "warnings".

She was never asked to give her view of the performance problem or to propose a solution. This was of course because she was doing her job as she has always done in the manner that she was trained. All work is of course subject to reasonable limitations based upon hours available for the tasks, number of tasks, individuals available to work, etc. As demonstrated earlier, the week of March 12, 2002 was very busy. There were critical absences by Ms. Havard and other employees. A major store event occurred on Saturday, March 16

---

[144] Exh. 48 - [202645]
[145] Exh. 48 - [202650]
[146] Exh. 1 – Myrna Johnson Affidavit.

*Johnson, Myrna v Fred Meyers (03/18/2002) [23003].*      38
OPPOSITION TO MOTION FOR SUMMARY JUDGMENT
J-04-008 CV (RHB)

CHOATE LAW FIRM LLC
424 North Franklin Street
Juneau, Alaska 99801
(907) 586-4490

(50% clearance sale). Ms. Johnson, doing the very best that she could do, worked to midnight or later every day.[147]

Notwithstanding this, because Mr. San Miguel's complaints were never identified as being the initiation of a disciplinary process, a genuine issue of fact exists as to what stage of discipline was being imposed on March 18, 2002. For example, both Mr. San Miguel and Mr. Sayre describe the meeting in various ways. Mr. Sayre says it was to "chat with her" because OVs were not getting done.[148]

Mr. Sayre describes the Employee Warning Notice[149] as being a "verbal written warning" even though the word "verbal" is not on the page and was not on the page when shown to Myrna Johnson.[150] Mr. San Miguel described the purpose of the meeting was to talk with Ms. Johnson …and to issue a "verbal warning".[151] The document they showed to Ms. Johnson "was not going to be put in her personnel file."[152]

Ms. Johnson did not understand that she was being given a "verbal" written warning. She thought because the document did not have the word "verbal" on it, and threatened her with removal from her position in 30 days if her work did not improve, that she was receiving a "Written Employee Warning Notice."[153] In fact, since she didn't realize or understand that Mr. San Miguel was treating the Office Visions as Stage One: Counseling discipline and Stage Two: Verbal Warning discipline, she was shocked to find that she was at a Stage Four "Written Employee Warning Notice" on March 18, 2002.[154]

Minimally, a genuine issue of fact exists as to whether Fred Meyer followed its own disciplinary process in the week leading up to Ms. Johnson's termination.

    4.    <u>Whether Ms. Johnson failed to perform her job duties as Lead Assistant Manager in the Apparel Division between March 12 and March 17, 2002:</u>

---

[147] Exh. 1 – Myrna Johnson Affidavit
[148] Exh. 47 – [FS Tr 40/5-16]
[149] Exh. 49 - [201217]
[150] Exh. 47 – [FS Tr 44/18-22]
[151] Exh. 4 – [SM Tr 200/1-19]
[152] Exh. 4 – [SM Tr 201/2-5]
[153] Exh. 51 - [MJ Tr.151/8-12]; Exh. 1 – Myrna Johnson Affidavit.
[154] Exh. 1 – Myrna Johnson Affidavit

CHOATE LAW FIRM LLC
424 North Franklin Street
Juneau, Alaska 99801
(907) 586-4490

Genuine issues of fact exist as to whether Ms. Johnson was in fact satisfactorily performing her job duties in the six days preceding her termination. As the record reflects, she certainly was spending an enormous amount of time at work, clocking in usually before 1:30 p.m. for a 2:00 p.m. shift and leaving around midnight or later.

We also know that during that week, the store was frequently short-handed. Ms. Havard's absences on two days resulted in Ms. Johnson picking up the manager's work that wasn't done on the day shift. In addition, Ms. Johnson also undertook to complete a planogram that had not been completed in the prior two weeks by Minerva Cortez and Julita Lim and struggled to keep the Apparel Department going during a 50% off clearance sale in which her lead cashier (Ms. Kipple) was sick and Julita Lim left for more than two hours for a prolonged dinner break with Mr. San Miguel and Ms. Havard.

Finally, we know from sworn testimony that Ms. Johnson did not let any of the emotional sequellae surrounding taking her daughter to the Philippines interfere with her work. For example, in the Affidavit of Sarah Dexter dated October 24, 2002, she states that Ms. Johnson was able to keep her personal problems "out of the workplace."[155]

      a.  <u>Whether she performed recoveries in accordance with Fred Meyer's own standards and training?</u>

The ostensible reason for Mr. San Miguel's chief criticisms were the recoveries from March 12 to March 17, 2002. As has been demonstrated, there's no question that Ms. Johnson was capable of performing quality recoveries. She had done so for years as the closing Relief Assistant Manager from 1996 to 2001. Her previous Manager, Matthew Laney, described Ms. Johnson was someone who was an "excellent employee...led by example...was devoted to her job...completed her work in a timely manner...and always outworked her project list."[156]

Her fellow employees also have testified that her recoveries did not suddenly deteriorate or become sub-par that week. Johnna Havard testified that at the same time Mr. San Miguel was complaining about Myrna Johnson's recoveries, that anything she saw was "minor", "not

---

[155] Exh. 6 – [Sarah Dexter Affidavit, p. 2].
[156] Exh. 34 – [Matthew Laney Affidavit, p. 2].

*Johnson, Myrna v Fred Meyers (03/18/2002) [23003].*    40
OPPOSITION TO MOTION FOR SUMMARY JUDGMENT
J-04-008 CV (RHB)

CHOATE LAW FIRM LLC
424 North Franklin Street
Juneau, Alaska 99801
(907) 586-4490

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

an issue."[157]  There was no difference between the recoveries after Ms. Johnson returned from vacation as compared with the recoveries while she was on vacation.[158] She observed Ms. Johnson doing her daily assigned tasks because she would see the daily tour highlighted and signed off by Ms. Johnson.[159]

Paz Carillo has stated under oath that everything "was in order" at the close of business the previous day.[160]  Rhonda Cox was asked by Mr. San Miguel to report "secretly" to him about Ms. Johnson's recoveries.  Ms. Cox stated in an EEOC interview that recovery was always a product of how much time was available, that Mr. San Miguel would task Ms. Johnson with projects when she should have only had to work on recovery, and that the recovery in January 2003 (9 months after Ms. Johnson's termination, was "awful…worse that it has ever been before.."[161]

Similarly, Sarah Dexter stated that she was asked indirectly by Mr. San Miguel through Minerva Cortez to advise him if there were any problems with the recovery Mrs. Johnson supervised on Saturday, March 16, 2002.  Her sworn testimony is that she told him that the Apparel department she was responsible for "looked good" when she had arrived for the day shift on March 17, 2002.[162]

        b.  Whether she assembled a planogram correctly in accordance with Fred Meyer's standards and training?

A genuine issue of fact exists as to whether Ms. Johnson assembled a planogram correctly.  As noted earlier, Ms. Johnson knew how to assemble planograms and had been doing so for years.

She was trained by her supervisors, including Mr. San Miguel, to assemble planograms exactly according to instructions.  There was to be no deviation.  This is because planograms

---

[157] Exh. 36 - [JH Tr 15/10-21]
[158] Exh. 36 - [JH Tr 15/22-25]
[159] Exh. 36 - [JH Tr 41/1-5]
[160] Exh. 28 - [Paz Carillo Affidavit for ASHRC]
[161] Exh. 32 - [Rhonda Cox ASCHR Interv 1/15/03]; Exh. 46 – Rhonda Cox Affidavit.
[162] Exh. 6 - [Sarah Dexter Aff, p. 3]

CHOATE LAW FIRM LLC
424 North Franklin Street
Juneau, Alaska 99801
(907) 586-4490

CHOATE LAW FIRM LLC
424 North Franklin Street
Juneau, Alaska 99801
(907) 586-4490

are designed to insure that the customer has the same visual experience in any Fred Meyer store.

Planograms and the display of merchandise in Fred Meyer stores is not something which is dependent upon an individual manager's subjective opinions. Such reliance would create chaos, with every store being different, and each manager having different ideas as to the best way to display and merchandise apparel. In fact, Fred Meyer has a highly detailed instruction manual in this regard titled the "Visual Merchandising Standards Manual." (VMSM)

The VMSM contains hundreds of pages of detailed instruction as to every section with the Apparel Department. Chapter 7 – Children's: Baby describes how the Baby section is to be visually presented to the customers.[163]

Ms. Johnson was taught to follow the VMSM. In fact, the Job Description for Lead Assistant Manager for the ALE (Apparel Department) requires as a skill set:

- Ensures compliance with planograms
- Ensures implementation of visual merchandising standards

A genuine issue of fact exists as to whether she complied with the planogram. Mr. San Miguel stated he wanted it done "differently" than what was called for in the planogram. She did her best to meet his deviation from standards but since she was only trained in following the VMSM and planogram instructions, she was never able to satisfy him despite repeated efforts.

In this regard, it should be noted that not only was the planogram unable to be completed, though already tasked out, for the two weeks prior to March 12 when Ms. Johnson returned to work, in fact, it was never completed to Mr. San Miguel's satisfaction, ultimately being disassembled and never used.[164]

       c.   Whether she performed the remainder of her duties in accordance with Fred Meyer's standards and training?

---

[163] Exh. 50 - [202351-202368]
[164] Exh. 51 - [Johnna Havard Affidavit to ASCHR, p. 3 at pp.18]; Exh. 52 – [Charina Fontenot Affidavit to ASCHR, p. 2, pp.8-13]

*Johnson, Myrna v Fred Meyers (03/18/2002) [23003].*    42
OPPOSITION TO MOTION FOR SUMMARY JUDGMENT
J-04-008 CV (RHB)

A genuine issue of fact exists as to whether Ms. Johnson performed her other duties as the Lead Assistant Manager for the Apparel Department according to Fred Meyer's standards and training.

Fred Meyer appears to argue that whether Ms. Johnson was successfully performing her job duties can only be decided by Mr. San Miguel.  That it is his "subjective" decision to be made and no one else can challenge that.  This argument flies in the face of the extraordinary training, procedures and manuals in place which determine how work is to be performed.  It is challenged not only by co-workers who observed her work at that time and will comment that she was motivated, worked hard, did her job and that there was no decrease in quality of work during her shifts.  It is also challenged by her long work hours and own record of responding to Mr. San Miguel's Office Visions, making every effort to comply with his escalating demands.

Finally, the deviation from the established disciplinary procedures and Ms. Johnson's immediate replacement with Johnna Havard, all raise a genuine issue of fact as to whether she was in fact failing to do her job as trained and capable of doing so, or if instead, it didn't matter what she did, Mr. San Miguel had decided to replace her with Johnna Havard.

> 5.    If there were any deficiencies in Ms. Johnson's work performance between March 12 and March 17, 2002,  whether such deficiencies merited any discipline, much less threat of loss of her position as Lead Assistant on March 18, 2002?

Genuine issues of fact exist as to whether any deficiencies or problems with Ms. Johnson's work performance merited in six days the threatened loss of her management position.  Under either a "for cause" analysis or "at will" – breach of the covenant of good faith and fair dealing, a fact finder could reasonably conclude that the accelerated and confused application of discipline by Mr. San Miguel and Mr. Sayre was "without cause" and in breach of the covenant of good faith and fair dealing.

> 6.    What progressive discipline if any was given to Ms. Johnson prior to the meeting of March 18, 2002?

A genuine issue of fact exists as to what, if any, progressive discipline was given to Ms. Johnson prior to the meeting of March 18, 2002.  As her Affidavit confirms, she was unaware

CHOATE LAW FIRM LLC
424 North Franklin Street
Juneau, Alaska  99801
(907) 586-4490

that she had been subject to any discipline prior to the meeting – including "informal" stage discipline. For this reason, when she was presented with a Written "Employee Warning Notice" on March 18, 2002, and was advised that she had received a "Prior Verbal Warning" [checkbox is checked], she was caught completely unawares. Not only was she receiving the final stage of discipline prior to suspension or termination, she had apparently already gone through the earlier stages of discipline without ever being aware that they had occurred.

It was only at Mr. San Miguel's deposition on January 24, 2006 that Ms. Johnson learned that he in fact had started the informal disciplinary process by giving her a "verbal warning" within one (1) day of her return from emergency leave.[165]

7.   What stage of progressive discipline was given to Ms. Johnson at the meeting on March 18, 2002?

A genuine issue of fact exists as to what stage of progressive discipline was given to Ms. Johnson at the meeting of March 18, 2002. She was presented with a Written "Employee Warning Notice".[166] Her training and experience with Fred Meyer caused her to believe that was the final stage of discipline before suspension or termination.[167] In contrast, Fred Sayre described the meeting as one for "counseling" to be followed by a "written verbal warning".[168] He acknowledged that normally the word "Verbal" is hand-written at the top of the Employee Warning Notice.[169] A review of the document prepared for the meeting confirms that it did not have "Verbal" written on it.[170]

For all of the foregoing reasons, a genuine issue of fact exists as to what stage of progressive discipline was given at the meeting on March 18, 2002.

8.   Did Fred Meyer fail to follow its own policies, procedures and promises in its discipline of Ms. Johnson during the week of March 12 to March 18, 2002?

---

[165] Exh. 4 – [JSM Tr 197/7 to 198/1]
[166] Exh. 49 - Employee Warning Notice [201217]
[167] Exh. 1 – Myrna Johnson Affidavit.
[168] Exh. 47 - [FS Tr 45/1-13]
[169] Exh. 47 - [FS Tr 45/1-13]
[170] Exh. 49 - Employee Warning Notice [201217]

*Johnson, Myrna v Fred Meyers (03/18/2002) [23003].*    44
OPPOSITION TO MOTION FOR SUMMARY JUDGMENT
J-04-008 CV (RHB)

CHOATE LAW FIRM LLC
424 North Franklin Street
Juneau, Alaska 99801
(907) 586-4490

Genuine issues of fact exist as to whether Fred Meyer followed its own policies, producers and promises in its discipline of Ms. Johnson. There is no evidence that Ms. Johnson was subject to any form of discipline prior to March 18, 2002 unless one assumes that the Office Visions by Mr. San Miguel were suddenly transformed into "discipline". Ms. Johnson has testified under oath and in her Affidavit that the first time she realized that any disciplinary process was ongoing was at the meeting of March 18th.

The descriptions by Mr. Sayre and Mr. San Miguel of their intentions and the purpose of the March 18 meeting are also subject to differing factual findings. Was it for counseling? Was the Employee Warning Notice in fact a "verbal written warning" not be included in Ms. Johnson's file or an end stage "written warning"? Genuine issues of fact exist as to what was actually occurring at that meeting. Were the Fred Meyer employment policies and procedures followed and did Ms. Johnson understand as defendants' assert, that this was really something other than end stage discipline – a written warning threatening job action in 30 days?

As demonstrated in this brief, employees were advised and promised that their employment was subject to certain protections. They were taught that if they were not performing their duties, that they would be subject to progressive discipline.

Fred Meyer's own documents describe the purposes for "positive" discipline, how it is to be undertaken and the two way communication process that is required to insure that the employee understands the problem, participates in identifying a solution and then understands and is involved in implementing that solution. A genuine issue of fact exists as to whether Mr. San Miguel followed those procedures.

9.    Whether Ms. Johnson acted reasonably under the circumstances in leaving the Store Manager's office on March 18, 2002 to continue crying downstairs in the Apparel stock room?

A genuine issue of fact exists as to whether Ms. Johnson acted reasonably under the circumstances when she left the meeting. Given the long relationship between Fred Meyer and Ms. Johnson, the fact finder could find that Ms. Johnson, confronted with end stage discipline and unable reconcile her years of training and hard work with Mr. San Miguel's six day campaign to end her career, was emotionally overwhelmed.

**CHOATE LAW FIRM LLC**
424 North Franklin Street
Juneau, Alaska 99801
(907) 586-4490

Given Fred Meyer's own statements about the value of employees and Ms. Johnson's unceasing dedication to her employer's interest for the prior decade, the fact finder could conclude that under the circumstances, her departure was reasonable. A mature adult woman would be embarrassed by her uncontrolled sobbing in that small room with those two large men to where she would need to escape to regroup emotionally. Quite simply, genuine issues of fact exist on this issue as well.

    10.   Whether Ms. Johnson while sobbing uncontrollably, heard Fred Sayre threaten her with termination if "she left the room"?

A genuine issue of fact exists as to whether Ms. Johnson heard Mr. Sayre's alleged threat that if she left the room, it would be considered a "voluntary termination". The defendants' own brief indicates that it is unknown whether she heard and understood what Mr. Sayre said while she sobbed uncontrollably.

Ms. Johnson has stated at deposition and in Affidavit that she did not hear any statement to that effect. A fact finder, in looking at that meeting and Ms. Johnson's very justified emotional reaction to seeing her career coming to an end, could conclude that she never heard Mr. Sayre's threats.

    11.   Whether Ms. Johnson "walked off" the job on March 18, 2002 when she left the Store Manager's office "sobbing uncontrollably"?

A genuine issue of fact exists as to whether Ms. Johnson "walked off" the job on March 18 when she left Mr. Sayre's office sobbing uncontrollably. First, there is no evidence that she ever even heard Mr. Sayre's threats in this regard.

Second, she has testified under oath that she did not hear any statements by Mr. Sayre to that effect. Even if they occurred, the fact finder could conclude that she may not have heard him because she was crying so hard and so emotionally bereft.

Third, her actions after leaving the room are inconsistent with someone knowingly "walking off" the job. For instance, when Ms. Johnson left the office, if she was in fact "walking off" the job, one would have expected her to leave Fred Meyer. Instead, she went downstairs to the Apparel stock room, used exclusively be Apparel personnel with a small

CHOATE LAW FIRM LLC
424 North Franklin Street
Juneau, Alaska 99801
(907) 586-4490

work area.  She continued to cry there and eventually was advised by fellow employees to return upstairs to actually get a copy of the document read to her by Mr. San Miguel.

Fourth, she did take sick leave that afternoon because she couldn't stop crying.  The fact finder could conclude that this was both permitted and reasonable under the circumstances.  The record is replete with other managers coming and going.  One of the perks of management is that if you work 60 plus hour weeks, you are also not tied to a time clock.  The fact finder in this matter could conclude that under the circumstances, it was reasonable for her to go home as she was unable to stop crying at work.

Fifth, the following morning, she called to advise Time and Attendance to debit her Sick Leave Account with the hours missing from the prior afternoon.  Notwithstanding the fact that Ms. Johnson had no difficulty in working 11 hour shifts on a routine basis for her employee, if she missed some portion of a shift, she had it debited from her Sick Leave.  The fact finder could find that this is inconsistent with Fred Meyer's claim that Ms. Johnson knowingly walked off the job on March 18, 2002.  Of course, in reality, it was on March 19, 2002 when talking with Time and Attendance, that Ms. Johnson first learned that her position had been terminated.

12.    Whether Jaime San Miguel replaced Ms. Johnson with Johnna Havard because Havard was younger and single?

Genuine issues of fact exist as to whether Mr. San Miguel's conduct was designed and intended to accomplish the removal of Myrna Johnson, an over 40 year old married woman, in order to replace her with a younger, pretty and single woman, Johnna Havard.

In Alaska, under state and federal law, a three part test is applied in deciding whether there has been discriminatory treatment.  First, the employee must "introduce evidence raising an inference of employer discriminatory intent."   Second, once a prima facie case of disparate treatment has been set forth, the burden shifts to the employer to "articulate a legitimate, non-discriminatory reason" for the treatment.  Third, if a legitimate reason is established, then the burden shifts to the employee to demonstrate that "discriminatory reasons most likely motivated the employer."   The employee normally accomplishes this by showing that the employer's explanation is "pretextual." *Thomas v. Anchorage Telephone Utility*, 741 P.2d 618,

CHOATE LAW FIRM LLC
424 North Franklin Street
Juneau, Alaska  99801
(907) 586-4490

622 (Alaska 1987).

Defendants acknowledge that Ms. Johnson can establish a *prima facie* case for age discrimination. They claim that she was replaced because she walked off the job. Ms. Havard just happened to be the person who applied for the position. The fact that she was younger (23), pretty and single have no bearing because within a year, she had quit her job with Mr. San Miguel.

The fact finder in this matter could easily find that Fred Meyer's assertion that Ms. Johnson "walked off" the job is simply wrong, factually and legally. The fact finder could also conclude that Ms. Havard's statements to other employees prior to Ms. Johnson's return from the Philippines that she would take Ms. Johnson's job if offered, and the immediate replacement by Ms. Johnson with Ms. Harvard, all demonstrate discriminatory intent.

Mr. San Miguel's subsequent mistreatment of Ms. Havard does not in some way insulate the defendants from their wrongful conduct towards Ms. Johnson. In fact, the parallels between Mr. San Miguel's treatment of these two women, one older and one younger, demonstrate not only a course of improper conduct, in violation of the law, but also a method or *modus operandi* which Mr. San Miguel used with anyone he wanted to remove from that position.

The fact finder in this case could easily conclude that Ms. Johnson was forced out of her job because Mr. San Miguel wanted to replace her with Ms. Havard. Ms. Johnson was simply not young and single. While she is attractive, it's as a mature woman of 50 rather than a young woman of 23.

The fact finder could easily conclude that the replacement of a ten year proven employee with a young woman who worked less than a month, was motivated by an unlawful motive, to replace the older worker with a younger one who may be "more available" to Mr. San Miguel. In this regard, there is extensive testimony by Ms. Havard and other employees of Mr. San Miguel's overt and unprofessional comments and actions towards young women.

The Alaska Supreme Court has held that for purposes of getting to hearing or trial, an employee does not need to prove "pretext". Rather, she must simply establish sufficient facts demonstrating that the employer's explanation was "pretextual" and thereafter, a hearing or

CHOATE LAW FIRM LLC
424 North Franklin Street
Juneau, Alaska  99801
(907) 586-4490

trial is warranted.

The mere "inference" of pretext from the evidence is enough to support a matter going to hearing. *Raad v. Alaska State Commission for Human Right,* 86 P.3d 899, 186 Ed. Law Rep. 551, 84 Empl. Prac. Dec. P 41,629, 93 Fair Empl.Prac.Cas. (BNA) 178, (Alaska,2004). Similarly, the existence of factual disputes as to the evidence when there is an argument about whether an employer's rationale for adverse job activity is pretextual, requires a hearing to resolve those factual issues. *State, Dept. of Fish and Game, Sport Fish Div. v. Meyer,* 906 P.2d 1365, 68 Empl. Prac. Dec. P 44,164, (Alaska, 1995*)*

In the Ninth Circuit, pretext can be demonstrated either "(1) indirectly, by showing that the employer's proffered explanation is 'unworthy of credence' because it is internally inconsistent or otherwise not believable, or (2) directly, by showing that unlawful discrimination more likely motivated the employer." *Lindsey v. SLT Los Angeles, LLC,* 447 F.3d 1138 C.A.9 (Cal.) 2006.

Because all factual inferences are to be made in favor of the non-moving party, it is improper in the summary judgment context to require more than simply refutation of the employer's proffered reasons for the negative employment activity.  Because there is not a complete record, it is essential to "to set before the fact finder the task of analyzing the entire record in order to evaluate the credibility of the reasons proffered, the possibility of other non-discriminatory reasons, and the ultimate likelihood that the main motive was discriminatory." *Lindsey, supra* at 1148.

Defendants' reliance on the "same actor" defense is misplaced in this matter because Ms. Johnson's ten year career was not initiated by Mr. San Miguel.  She was hired by Mr. Laney and Mr. Afflect.  While Mr. San Miguel did participate in the decision to promote her in 2001 from Relief Assistant to Lead Assistant, Fred Meyer's own internal hiring practices support and require hiring from within and at that time, there was not a qualified candidate who was younger and single.

Plaintiff's argument here is not that Ms. Johnson was terminated simply because she was older.  Rather, it is that when given the opportunity to put a younger, pretty and single

CHOATE LAW FIRM LLC
424 North Franklin Street
Juneau, Alaska 99801
(907) 586-4490

worker in Ms. Johnson's job position, Mr. San Miguel orchestrated her termination, effectively discriminating against her because of her age.

In this regard, Mr. San Miguel also did not explicitly terminate Ms. Johnson. He did not recommend termination of Ms. Johnson. It was not "within the scope of his responsibilities." He didn't have authority to terminate her.[171] Rather, he simply set up Ms. Johnson for the emotional meeting on March 18 in which her departure from the room could be considered a "walk-off".

Finally, even if a "same-actor" presumption does exist, it is a rebuttable presumption. Ample evidence exists in this record to demonstrate that Ms. Johnson was more than capable of doing her job and did so. Her termination and replacement by Ms. Havard came about not because Ms. Johnson couldn't do her job – rather, it occurred because Mr. San Miguel decided he could replace her with someone he was more attracted. *Alms v. AdvancePCS*, *Slip Copy*, 2006 WL 2032746, D.Ariz., 2006.

13. <u>Whether Jaime San Miguel replaced Ms. Johnson with Johnna Havard because Johnson's parental responsibilities were believed to interfere with her ability to perform her job for Fred Meyer</u>?

A genuine issue of fact exists as to whether Mr. San Miguel, in his actions from March 12, 2002 to March 18, 2002, were actually "pretextual" and targeted at least in part against Ms. Johnson because of her parental status.

The record demonstrates that Ms. Johnson was a very hard and capable worker. For years, Mr. San Miguel had relied upon Ms. Johnson to work sixty plus hour weeks. The Affidavits from co-workers confirm that Ms. Johnson was primarily responsible for keeping the floor going. Mr. San Miguel was not noted for being a hard or diligent worker. In fact, when Mr. San Miguel was going through a situation quite similar to Ms. Johnson's, his personal divorce, his work attendance was erratic and inconsistent and he would have emotional outbreaks, including one that led to a hospitalization. Throughout that time period, it was Ms. Johnson whom he relied upon. It was her ability and work ethic which kept the Apparel

**CHOATE LAW FIRM LLC**
424 North Franklin Street
Juneau, Alaska 99801
(907) 586-4490

---

[171] Exh. 4 – [SM Tr 258/4-16]

CHOATE LAW FIRM LLC
424 North Franklin Street
Juneau, Alaska 99801
(907) 586-4490

Department going and insured that Mr. San Miguel's work was done when he was unable to do it himself.

Less than eight months later, Ms. Johnson went through similar personal problems requiring that she take an emergency leave. When she returned, she told Mr. San Miguel that she might have to leave again later in the year if her daughter remained in the Philippines and was not doing better. While Mr. San Miguel might have been considering or even moving forward with the idea of replacing Ms. Johnson with Ms. Havard and demoting Ms. Johnson to Relief Assistant again, the fact finder could conclude that this advanced notice of future parenting needs requiring more absence from work may have also motivated Mr. San Miguel.

The fact finder could conclude that Ms. Johnson was important to Fred Meyer so long as she was absolutely reliable, a part in a machine that never broke and never needed maintenance. Unlike Mr. San Miguel, who appears to have constant allowances made for his behavior and conduct by his male supervisors with whom he plays baseball and watches football, women and most importantly, Ms. Johnson as a parent in this situation, seem to have been held to a different standard.

The fact finder could reasonably conclude that Mr. San Miguel's harsh and unrelenting campaign to orchestrate Ms. Johnson's demotion or termination was because she was perceived by him as no longer being reliable or dependable.

As noted in the earlier section, Mr. San Miguel did not hire Ms. Johnson. Her promotion to Lead Assistant, which he participated in, was internal and at the time she applied, Mr. San Miguel was unaware someone younger and more beautiful interested in the position. It was only when Mr. San Miguel, in searching for a temporary replacement, said "*if it is a woman, send somebody young and beautiful…and not a hag*",[172] and received Ms. Havard, that he saw the opportunity to use Ms. Johnson's job position to attract the lovely Ms. Havard to Juneau on a permanent basis.

---

[172] Exh. 6 – [Sarah Dexter Aff, 10/24/02 at p. 2]

1      Mr. San Miguel also did not fire Ms. Johnson.  He simply set up the situation which

2  resulted in her termination.  The "same actor" presumption is simply not applicable under these

3  circumstances.  If it is, it has been amply rebutted by the extensive record in this matter.  A

4  genuine issue of fact exists as to whether Ms. Johnson was discriminated against because of her

5  parental status.

                                  VII.

6                           Conclusion

7      Myrna Johnson's ten year career was not ended because she "walked-off" her job.

8  Rather, in six days, in a carefully orchestrated campaign that Jaime San Miguel also eventually

9  used against Johnna Havard, she was forced out of her job.  The facts in this matter could

10  support a finding that Ms. Johnson was a "for cause" employee and the failure of Fred Meyer to

11  follow its own progressive discipline policies was a breach of that employment agreement.

12  Alternatively, if a jury concludes that Ms. Johnson's employment was "at will", a

13  determination could easily be made on this record that the defendants breached the covenant of

    good faith and fair dealing in the events leading up to and including her termination.

14      The fact finder can also conclude that Ms. Johnson's age and parental status formed the

15  basis for some of Mr. San Miguel's hostile acts.  Quite simply, the fact finder could conclude

16  that he wanted to replace her with a young and pretty single woman and did so.

17      Because there are genuine issues of fact and as a matter of law defendants are not

18  entitled to summary judgment, their motion for summary judgment should be denied.

19      DATED this 5th day of September, 2006 at Juneau, Alaska.

20                         Respectfully submitted,
                            CHOATE LAW FIRM LLC

21

22                         s/*Mark Choate*

23                         _____

24                         MARK CHOATE

25                         424 N. Franklin Street
                       Juneau, AK 99801

26                         Phone: (907) 586-4490
                       Fax: (907) 586-6633

27                  52

28  *Johnson, Myrna  v Fred Meyers (03/18/2002) [23003].*
OPPOSITION TO MOTION FOR SUMMARY JUDGMENT
J-04-008 CV (RHB)

**CHOATE LAW FIRM LLC**
424 North Franklin Street
Juneau, Alaska  99801
(907) 586-4490

EM: lawyers@choatelawfirm.com
AK Bar: 8011070

Attorneys for Plaintiff

**PROOF OF SERVICE**

STATE OF ALASKA, FIRST JUDICIAL DISTRICT AT JUNEAU

I am employed in the City and Borough of Juneau, State of Alaska..  I am over the age of 18 and not a party to the within action.  My business address is 424 N. Franklin Street, Juneau, AK 99801.

On September 5, 2006, I served the foregoing document described as REPLY TO DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION TO REOPEN DISCOVERY, on the interested parties in this action by serving the original true copies, addressed as follows:

James Dickens
Miller Nash LLP
Attorney For: Fred Meyers
4400 Two Union Square
601 Union Street
Seattle, WA  98101-2352
Phone: (206) 622-8484
Fax: (206) 622-7485

Peter Gruenstein
Gruenstein & Hickey
Attorney For: Fred Meyers
500 L Street, Suite 401
Anchorage, AK  99501
Phone: (907) 258-4338
Fax: (907) 258-4350

☐ By mail, I deposited such envelope(s) in the mail at Juneau, Alaska, with postage thereon fully prepaid.

I am readily familiar with the firm's practice of collection and processing correspondence for mailing.  Under that practice it would be deposited with the U.S. postal service on that same day with postage thereon fully prepaid at Juneau, Alaska, in the ordinary course of business.  I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after the date of deposit for mailing in affidavit.

*Johnson, Myrna  v Fred Meyers (03/18/2002) [23003].*
OPPOSITION TO MOTION FOR SUMMARY JUDGMENT
J-04-008 CV (RHB)

CHOATE LAW FIRM LLC
424 North Franklin Street
Juneau, Alaska  99801
(907) 586-4490

1    ☐ By personal service, I delivered such envelope(s) by hand to the ☐ office(s); ☐ the
2    court box of the addressee(s)..

3    ☐ By facsimile, I transmitted such documents from Juneau, Alaska, to the offices of the
     addressee(s).

4    ☐ By email, I transmitted such documents from Juneau, Alaska, to the email address of
5    the addressee(s).

6    ☒ By electronic service through the court of record's electronic service system,.

7
8    ☒ (Federal) I declare that I am employed in the office of a member of the Bar of
     this Court, at whose direction the service was made.

9           Executed on September 5, 2006 at Juneau, Alaska..

10
11           _/s/ Mark C. Choate_____
             CHOATE LAW FIRM, LLC

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CHOATE LAW FIRM LLC
424 North Franklin Street
Juneau, Alaska 99801
(907) 586-4490

54 of 55

*Johnson, Myrna v Fred Meyers (03/18/2002) [23003].*
OPPOSITION TO MOTION FOR SUMMARY JUDGMENT
J-04-008 CV (RHB)