Mark Clayton Choate, Esq., AK #8011070
Jessica L. Srader, Esq., AK #0412105
CHOATE LAW FIRM LLC
424 N. Franklin Street
Telephone: (907) 586-4490
Facsimile: (907) 586-6633

Attorneys for Plaintiff

# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ALASKA AT JUNEAU

| | |
|---|---|
| MYRNA I. JOHNSON,<br><br>               Plaintiff,<br><br>vs.<br><br>FRED MEYER STORES, INC., and<br>JAIME SAN MIGUEL,<br><br>               Defendants | Case No. J-04-008 CV (RRB) |

## AFFIDAVIT OF MYRNA JOHNSON

STATE OF ALASKA         )
                                   ) ss.
FIRST JUDICIAL DISTRICT  )

MYRNA JOHNSON, being duly sworn upon oath, deposes and states:

1. I am the plaintiff in this matter and make this Affidavit in support of the Opposition to Motion for Summary Judgment.

2. I was abandoned by my first husband right after giving birth to our third daughter, Melissa, in 1984. In 1987, I obtained a tourist visa to visit the United States, eventually staying with a cousin in South Carolina where I met Russell Johnson in October 1987. When I showed him the pictures of my three daughters, Melinda (dob: 12/19/69); Mayet (dob: 2/26/71) and Melissa (dob:

1 of 13

CHOATE LAW FIRM LLC
424 North Franklin Street
Juneau, Alaska 99801
(907) 586-4490

7/17/84), and he promised to love them as his own children, he captured my heart. We married in February 1988. I subsequently was able to immigrate to the United States on a Resident Visa and in the Fall of 1992 we moved to Juneau, Alaska.

3. <u>Employment Contract</u>: In late November 1992, I interviewed with Fred Meyer in Juneau. From the outset of my employment with Fred Meyer I always made it clear that I was looking for secure, long-term employment with opportunity to grow and be promoted.

4. At no time during my employment at Fred Meyer, from December of 1992 to March of 2002 did I ever hear the term "at will" employment used.

5. At no time during my employment at Fred Meyer, from December of 1992 to March of 2002, was I ever informed orally or in writing that my employment could be terminated for any reason, for no reason or for a bad reason.

6. I was assured from the outset, through conversations with Dennis Afflect, Matthew Laney, Jaime San Miguel, Fred Sayre and Mary Lucas, if I worked hard and followed the rules, that I was secure in my career with Fred Meyer.

7. In addition, I was told by those individuals and throughout Fred Meyer training and the training materials that I would be treated fairly and subject to a progressive "positive" discipline process.

8. In particular, I am familiar with the Employee Handbook, the Corporate Policy Manual, the Employee Performance Evaluations and Fred Meyer training materials referenced in this litigation. I have always understood those

CHOATE LAW FIRM LLC
424 North Franklin Street
Juneau, Alaska 99801
(907) 586-4490

documents as describing both my responsibilities under the employment agreement and the corollary obligation that Fred Meyer would treat me fairly and provide me with long-term, secure job position if I did my best for the company.

9. I have never heard the term "at will" used in any context in Fred Meyer and have always believed and communicated to the individuals that I supervised that good work would be rewarded with job security and advancement.

10. My counsel has shown me the "Disclaimer" contained above the copyright in the Corporate Policy Manual. I never saw that. No one at Fred Meyer ever advised me that the Disclaimer existed, brought it to my attention or in any fashion should cause me not to rely upon and follow the Corporate Policy Manual. It is not in a location that I would have considered it important or conspicuous.

11. In that Disclaimer, I do not read or understand it to say that I could be fired for any reason, no reason or a bad reason. Rather, I read that Disclaimer to indicate that my position can be subject to "immediate discharge when, in (Fred Meyer's) opinion, such action is necessary to protect the well-being of the company or its employees." I read and interpret that provision as being a safety issue of some sort and that continued employment could place the company or other employees at risk of injury or harm. I do not read that or understand to be a description of "at will" employment.

CHOATE LAW FIRM LLC
424 North Franklin Street
Juneau, Alaska 99801
(907) 586-4490

3 of 13

*Johnson, Myrna v Fred Meyers (03/18/2002) [23003].*
AFFIDAVIT OF MYRNA JOHNSON
J-04-008 CV (RHB)

MJ Exhibit 1    Page 3 of 13

12. Based on the representations made to me by Fred Meyer, I worked generally at least 55 to 60 hours a week or more at all times I was the Lead Assistant. I made that sacrifice, working roughly fifty-percent more than hourly employees because of the promise made to me throughout my employment that I would have secure, long-term employment in exchange for those efforts.

13. <u>Discipline</u>: I learned about Fred Meyer's progressive disciplinary process through my ten years of experience and training with the company, including specific training by Matthew Laney and Jaime San Miguel.

14. As a manager, I used the progressive disciplinary process and certainly believed prior to March 18, 2002 that I understood it. I understand the disciplinary process to basically involve four stages: (1) counseling; (2) verbal warning; (3) written verbal warning; (4) written warning.

15. The nature of the job as a manager is to point out problems and areas for correction. It happens every day and every shift. That is not discipline. When a performance issue reaches the need to start the disciplinary process, the employee is clearly told that.

16. Informal discipline starts with "counseling". A meeting normally occurs when the employee is specifically advised that their performance is substandard and if it does not improve, they will be given a verbal warning. Counseling is easily distinguished from normal day to day instruction or correction because the employee is specifically told they are being "counseled" and if they do not

CHOATE LAW FIRM LLC
424 North Franklin Street
Juneau, Alaska 99801
(907) 586-4490

improve within a certain period of time, they will be subject to a "verbal warning".

17. If there is not improvement over a reasonable period of time, then the employee is given a "verbal warning". They are specifically told that they are being "verbally warned" to improve or else they will be subject to formal discipline.

18. Formal discipline differs from informal in that it always involves the use of Fred Meyer's Employee Warning Notice. This is the only form Fred Meyer gives its managers. Since there are two forms of formal discipline that can occur using this form, "written verbal warnings" and "written warnings", they are distinguished by the word "VERBAL" being written prominently at the top of the page for "written verbal warnings."

19. As a manager, I have given employees "Written verbal warnings". I always read the document to them taking care write the word "Verbal" at the top of the page prior to the meeting and to make sure they understand that this is a "Verbal" warning as opposed to a "Written" warning. Verbal warnings do not go in the employee's file.

20. If the "written verbal warning" does not work, then the next stage and last before suspension, demotion or termination is a "Written warning." To reach this stage generally means that repeated efforts have been made over a sustained period of time to improve performance. The employee has been given notice at all three lower levels, (1) counseling; (2) verbal warning; and (3) written verbal warning, that they are in the disciplinary process.

CHOATE LAW FIRM LLC
424 North Franklin Street
Juneau, Alaska 99801
(907) 586-4490

21. I was taught when giving discipline, to follow the "Steps for Positive Discipline". [202650] Whenever I disciplined an employee, I followed that process, getting the employee to identify ways in which performance could be improved and developing a plan that included the employee. This has two benefits. First, the employee participates – it is not someone else's solution. Second, the employee understands what has to be done to improve because they have helped identify the solution.

22. In my own situation, I was provided none of the progressive discipline guaranteed by Fred Meyer for performance issues. During the week of March 12, 2002 to March 17, 2002, I was never told I had been subject to even the lowest stages of discipline. During the week of March 12, 2002 to March 17, 2002, I was never warned that I would receive a verbal or written verbal warning if my performance did not improve. The first time I became aware that there was any discipline in process was at the meeting of March 18, 2002. At that time, I was read the Employee Warning Notice. It did not contain the description "Verbal Warning Notice". I understood it to be the last stage of discipline. In addition, it stated that I had already been "verbally warned" though this had not occurred.

23. At no time did Mr. San Miguel meet with me and go through the "Steps for Positive Discipline." There was no discussion as to how I could improve the problem or what the solution would be.

CHOATE LAW FIRM LLC
424 North Franklin Street
Juneau, Alaska 99801
(907) 586-4490

24. In my experience at Fred Meyer, no one was ever threatened with demotion or termination without staged discipline unless it was for a clear violation of company policy; for example, theft or dishonesty.

25. <u>Departure from Meeting with Mr. San Miguel and Mr. Sayre</u>: On March 18, 2002, I was taken totally by surprise when shown the written Employee Warning Notice. I had not been advised that any discipline was in process before that so I was confronted with the final stage of discipline. The word "Verbal" was not written on the form nor did Mr. San Miguel or Mr. Sayre describe the warning as being "Verbal".

26. When Mr. San Miguel read aloud to me that I had been given a prior "verbal warning" I was also just overwhelmed. It hadn't happened and I felt like the world was falling in around me. Then, Mr. San Miguel said that my work performance had been affected by my daughter Melissa's issues. This made me even more upset as I had worked extremely hard to insulate my personal problems from the work environment.

27. In the prior six days I had worked an average of more than eleven (11) hours per day. I worked hard, diligently and effectively even though I had to pick up work not completed by Johnna Havard because she was ill, had to deal with being short-staffed on a number of shifts and was given Tours and a planogram to complete which required work during time set for recoveries.

28. Despite this, I did my job and stand by the quality of the work that was done during that time period. To blame my daughter was just totally offensive to me

CHOATE LAW FIRM LLC
424 North Franklin Street
Juneau, Alaska 99801
(907) 586-4490

and in combination with finding myself at the last stage of discipline, threatened with the loss of my job, I started crying. It was a terrible feeling because I was doing my job consistent with my training and the Visual Merchandising Standards Manual. Mr. San Miguel had decided to replace me as the Lead Assistant Manager and nothing I was going to do would please him.

29. I left the room with Mr. San Miguel and Mr. Sayre because I was deeply embarrassed and humiliated. First, they are two very large men, in excess of 200 pounds each, and the room was small and crowded. I felt trapped and set-up. I needed to clear my head and get my bearings. At no time while I cried did either of them offer me tissues or suggest that we take a break and resume the discussion later when tears weren't streaming down my face and I wasn't sobbing uncontrollably.

30. If Mr. Sayre said that leaving his office would be considered a "walk-off" or voluntary termination, I certainly never heard that. Also, in my training as a manager, you are trained to never give ultimatums to someone who is crying. We are taught that all employees are valuable, are to be respected and are diverse. I know what a "walk off" is. It happens at Fred Meyer. My leaving the room was not a "walk off". I needed to compose myself emotionally. I didn't leave the store. I went to the Apparel Stock Room and continued crying there.

31. Subsequently, while still very emotionally shaken up, I was advised by fellow employees to get a copy of the "Employee Warning Notice" read to me by Mr. San Miguel. I returned upstairs and obtained a copy. I returned to the Apparel

CHOATE LAW FIRM LLC
424 North Franklin Street
Juneau, Alaska 99801
(907) 586-4490

Stock Room and tried to stop crying. Unable to do so, I went home for the day taking sick leave. I called in the next morning to report the sick time to Time and Attendance. At that time I learned that my career had been terminated by Fred Meyer.

32. <u>Recoveries & Planogram:</u>    By March of 2002, I had been building planograms and completing recoveries for almost a decade. From 1996 to 2001, I was the Relief Assistant Manager and primarily responsible for closing the store. At no time during that time period was I criticized for the quality of recoveries or as to my ability to understand and put together a planogram.

33. Because the closing shift's primary responsibility is to prepare the store for the following day, the rule is that no Tours or related tasks will be assigned to occur after 6:00 p.m. From 6:00 p.m. till closing, the only work that is to be done, beyond customer service, is recovery.

34. During the week of March 12, 2002, Mr. San Miguel was highly critical of our recovery even though it was done as I had been taught and was instructed by Fred Meyer management over a ten year period, including Mr. San Miguel.

35. It was a busy week but I worked every night past midnight to insure that the recovery was done correctly. Unfortunately, the store opens early in the morning, generally earlier than when Mr. Sayre or Mr. San Miguel arrived. It is possible for displays to be disordered or gone through by customers in the couple hours before the day managers arrive. If this is the case, it can result in

what appears to be a sloppy recovery. Both Mr. San Miguel and Mr. Sayre know this.

36. It was unusual for Mr. San Miguel to give me such long Tours to accomplish given the business of the store and the time necessary for recoveries. Because I was assigned to complete the planogram, and could never accomplish that to Mr. San Miguel's satisfaction, and because of the very long Tours, they invariably ate into the time available to do recoveries. My response was to simply work longer and harder. In retrospect, I should have suspected that Mr. San Miguel was creating a situation to allow him to replace me with Ms. Havard. At the time, I just assumed he was being moody and did not think he was trying to get me demoted or fired.

37. <u>Work Hours</u>: The Juneau Fred Meyer Store is open from 7:00 a.m. to midnight (12:00 a.m.) in the summers and from 7:00 a.m. to 11:00 p.m. in the winter. If a manager is assigned to the closing shift, as I was during the week of March 12 to March 18, 2002, they are also the PIC (Person in Charge). They are required to stay after all of the hourly employees have left. During that week, I routinely worked till after midnight each evening because of the extensive amount of work that needed to be done.

38. <u>Age Discrimination</u>: I do believe that I was terminated through Mr. San Miguel's efforts because of my age. As the Lead Assistant Manager, I normally worked the day shift along with Mr. San Miguel. The Relief Assistant normally works closing as I had done from 1996 to 2001. I believe that one of the reasons

CHOATE LAW FIRM LLC
424 North Franklin Street
Juneau, Alaska 99801
(907) 586-4490

Mr. San Miguel wanted to replace me with Ms. Havard was because he saw her as being young, pretty and single and more desirable to work with during that day shift.

39. In retrospect, the day shift that Mr. San Miguel worked was largely populated with full-time employees who were young women. They included Miranda Willburn (age 22); Charina Fontenot (age 25); Angelica (?) (age 25 and Spanish speaking); Soka Chan (age 25); Minerva Cortez (age 27 and Spanish speaking).

40. In contrast, the closing shift, the one Mr. San Miguel did not work, was filled with older women, many who worked part-time. They included Julita Lim (age 55), Paz Carillo (age 55); Delores Doogan (age 65); Rhonda Cox (age 55); Sarah Dexter (age 60); Vivian Siangco (age 45).

41. Mr. San Miguel would utilize the distribution of work hours to benefit young women he was attracted to. Work hours are very important to Fred Meyer employees. Senior employees are normally given first choice for any additional work hours that come available in a week. Hourly employees always look at the weekly roster to see who is working what number of hours. Seniority is jealously guarded because it means you are given priority to earn more money. Mr. San Miguel was able to provide more time to young women he liked, such as Angelica, by simply assigning her more work after the schedule came out. Where the schedule might only show her working three (3) six (6) hour days for a total of 18 hours a week, he would after the fact tell her that she could work

CHOATE LAW FIRM LLC
424 North Franklin Street
Juneau, Alaska 99801
(907) 586-4490

more hours – effectively giving her full-time employment. This was a sore spot for many hourly employees with greater seniority.

42. I never thought much about this while working for Fred Meyer. I just didn't make the connection.

43. <u>Parentage Discrimination:</u> I believe the second reason I was terminated was because of my parental status. I had to leave on an emergency basis because of my daughter Melissa's problems. Since I did much of the work in the Apparel Department, I think this did increase Mr. San Miguel's workload. When I returned from that emergency leave on March 12, 2002, I advised Mr. San Miguel that I might have to leave again. I told him that if Melissa didn't get better, I might have to return to the Philippines in the late Fall to spend more time with her. I believe that when I told him this, Mr. San Miguel made the decision that because of my parental responsibilities, I was no longer reliable and dependable and as such, needed to be replaced.

44. Prior to this time, I had never taken any emergency leave with the exception of going to the Philippines in 1996 for a month when my father had a heart attack. Throughout my career in management at the Fred Meyer Store in Juneau I was always the person the Apparel Department could depend upon to get things done, cover a shift, complete the work of another manager who was ill or unable to get their tasks done.

45. For example, when Mr. San Miguel went through a very emotional divorce in 2001, I made sure that his work was completed when he would be late, have to

CHOATE LAW FIRM LLC
424 North Franklin Street
Juneau, Alaska 99801
(907) 586-4490

leave early, not show up or be so emotionally incapacitated that he would have to leave work. There never was a question that any of those events was a "walk-off" from work. I knew that and he knew that. I didn't walk off work on March 18, 2002. I didn't end my career, Fred Meyer did.

46. In April of 2002, I prepared a chronology describing the events from March 12, 2002 to March 18, 2002. (Bates 300514 to 300518) It consists of five pages and was at the time, my best recollection of the events of that time period. I submitted it in support of my Complaint to the Alaska State Human Rights Commission. I have reread it and adopt it by reference as my sworn testimony in this matter.

FURTHER, AFFIANT SAYETH NAUGHT.

SUBSCRIBED AND SWORN TO before me this 2nd day of September, 2006 at Juneau, Alaska.

_____
Myrna Johnson

DATED this 2nd day of September, 2006 at Juneau, Alaska.



_____
Notary Public in and for the State of Alaska.

Johnson, Myrna v Fred Meyers (03/18/2002) [23003].
AFFIDAVIT OF MYRNA JOHNSON
J-04-008 CV (RHB)

13 of 13

MJ Exhibit 1    Page 13 of 13