Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF ALASKA

MYRNA I. JOHNSON,            )
                             )
        Plaintiff,           )
                             )
v.                           )
                             )
FRED MEYER STORES, INC.,     )
a Delaware corporation;      )
and JAIME SAN MIGUEL,        )
                             )
        Defendants.          )
_____)

Case No. J04-008 CV (JKS)


VIDEOTAPED DEPOSITION OF JAIME SAN MIGUEL

Pages 1 through 270, Inclusive

Taken: Tuesday, January 24, 2006

Place: Juneau, Alaska

Page 30

1   A.   About a year and six months, year and a
2   half.
3   Q.   Was that a civil service position?
4   Were you hired by the city itself?  Were you like a
5   city employee, or were you like a personal
6   employee?
7   A.   Personal employee, right.
8   Q.   Okay.  And what did you do after that
9   job?
10  A.   At the same time I was also working in
11  a shoe store, in Puerto Rico, in the same town,
12  Bayamon.  Let's see.
13  Q.   Was that like in the evenings or
14  weekends, or --
15  A.   That was mostly evenings and weekends.
16  And then also sold encyclopedias, also, just by
17  appointment.
18  Q.   Okay.
19  A.   And then when Mr. O'Neill was elected
20  to be a senator of that district, I worked in his
21  office for six months.
22  Q.   Okay.  And what did you do in his
23  office?
24  A.   Same thing, clerical work.
25  Q.   Okay.  And did you continue your

Page 31

1   part-time jobs while you did that?
2   A.   Only selling encyclopedias, because it
3   was by appointment.
4   Q.   Okay.
5   A.   So . . .
6   Q.   So would it be safe to say that through
7   most of your career, you worked multiple jobs?
8   A.   I'd say at the beginning of my career.
9   Q.   At the beginning of your career.
10  Certainly not now?
11  A.   No.
12  Q.   You worked for the senator for about
13  six months, and then what did you do?
14  A.   Then that's when I moved to Alaska.
15  Q.   Okay.  What brought you to Alaska?
16  A.   I got married, and my sister-in-law
17  lived in Fairbanks, Alaska.  And my wife and I
18  decided just to come and visit.
19  Q.   Okay.
20  A.   And never went back.
21  Q.   Okay.  And your wife's name?
22  A.   At the time was Marilyn.
23  Q.   Okay.  And maiden name?
24  A.   Maiden name was Medina.
25  Q.   Medina?

Page 32

1   A.   Yeah.
2   Q.   Like the city, M-E-D-I-N-A?
3   A.   That would be correct.
4   Q.   Okay.  What was her sister's name?
5   A.   Her sister was Rosa Reyes.
6   Q.   I know that.  How would I spell that?
7   A.   R-E-Y-E-S.
8   Q.   R-E-Y-E-S.  In Fairbanks?
9   A.   Correct.
10  Q.   I think I have represented the Reyes
11  family sometime in the past in Fairbanks.
12       So when did you come and visit
13  Fairbanks?  It couldn't have been in January.
14  A.   No.
15  Q.   I would say, from Puerto Rico --
16  A.   It was early August of 1991.
17  Q.   Okay.  And you made the trip.  You
18  liked Alaska.  So what did you do?
19  A.   The plan was to stay just for a couple
20  of months because her sister had a baby.  And so
21  just a couple of months.  She was out of college.
22  But after a week there I got bored, so I went to
23  get a job at McDonald's next to where we were
24  staying, because it was within walking distance and
25  I didn't have a car.  And I started working, I

Page 33

1   would say, like towards the end of August, middle
2   of August.  I was there two weeks and I got a job.
3   Q.   And what did you start doing for
4   McDonald's?
5   A.   Cooking crew.
6   Q.   Okay.  And which McDonald's was that in
7   Fairbanks?  Do you remember where it was located?
8   A.   Yeah.  I'm trying to remember the name
9   of the road.  College Road.
10  Q.   College Road?  Okay.  And how long did
11  you do that?
12  A.   About six, seven months.
13  Q.   So into the winter?
14  A.   Sounds about right.
15  Q.   Okay.  And were you only working the
16  one job at McDonald's at the time?
17  A.   No.
18  Q.   Okay.  Where else did you work?
19  A.   In September -- September of 1991,
20  September 16 of 1991, I got hired on with Fred
21  Meyer.
22  Q.   In Fairbanks?
23  A.   In Fairbanks.
24  Q.   And what were you hired as?
25  A.   A shoes associate.

### Page 34

1  Q.  And there are multiple stores in
2  Fairbanks, aren't there?
3  A.  It was the one on Airport Way.
4  Q.  Airport Way.
5  A.  Yes.
6  Q.  Okay. Was that a full-time or
7  part-time position?
8  A.  It was part-time because they were
9  still building the store.
10 Q.  Now, at that time, to your knowledge,
11 did Fred Meyer have a policy of only hiring people
12 on a part-time basis for that type of job and then
13 subsequently changing them to full-time if they
14 worked out?
15 A.  I don't know that's their policy.
16 Q.  You don't know?
17 A.  No.
18 Q.  Okay. So you were working at
19 McDonald's throughout the early winter, and you
20 were working part-time -- was that full-time at
21 McDonald's?
22 A.  No.
23 Q.  How many hours a week at McDonald's?
24 A.  Five days a week, from 6:00 to 11:00 in
25 the morning. So --

### Page 35

1  Q.  So about 25 hours?
2  A.  25, 30 hours.
3  Q.  And then how many hours at Fred Meyer?
4  A.  In the beginning it was about 24.
5  Q.  Okay. So you were doing 50-hour weeks?
6  A.  (Nods head).
7  Q.  Okay. And -- that's a yes?
8  A.  Yeah. Yes.
9  Q.  All right. And was your wife working
10 at the time?
11 A.  She was.
12 Q.  Okay. Where was she working?
13 A.  She worked at Westmark Hotel in
14 Fairbanks.
15 Q.  Okay. What was she doing there?
16 A.  I think she was, like, doing
17 housekeeping.
18 Q.  Okay. Is that over by the airport?
19 A.  I think it was the one downtown.
20 Q.  Downtown? Okay.
21 A.  Downtown.
22 Q.  You stopped working for McDonald's
23 probably January, February; is that right?
24 A.  Before Christmas.
25 Q.  Before Christmas? Okay. And what did

### Page 36

1  you do then after you stopped your McDonald's work?
2  A.  I was just working at Fred Meyer.
3  Q.  Okay. So full-time?
4  A.  I was working 40 hours a week, correct.
5  Q.  Okay. And what was your -- were you
6  still working as a shoes associate?
7  A.  Yes.
8  Q.  Okay. And how long did you work as a
9  shoes associate full-time at Fred Meyer in
10 Fairbanks? You started full-time in December of
11 '91?
12 A.  Correct. '91 until 1993.
13 Q.  Okay.
14 A.  I think, if I remember, it was around
15 summertime.
16 Q.  All right. And did you work any other
17 jobs during that time period?
18 A.  No, I didn't.
19 Q.  Okay. And did your wife continue to
20 work at Westmark?
21 A.  No.
22 Q.  Okay. Where did she -- what did she
23 do?
24 A.  She also got hired on at Fred Meyer in
25 September of 1991.

### Page 37

1  Q.  And what was her position there?
2  A.  She was the head cashier.
3  Q.  In what department?
4  A.  CCK.
5  Q.  I don't know what that is.
6  A.  Operations.
7  Q.  Okay. You are educating me as we are
8  going here on some of these things.
9      And was that full-time for her as
10 well?
11 A.  That's correct.
12 Q.  Okay. So by September of '92, you were
13 full-time at Fred Meyer in shoes, and your wife was
14 full-time in operations as the head cashier?
15 A.  That's correct.
16 Q.  Okay. And you continued until the
17 summer of, what, '93?
18 A.  That's correct.
19 Q.  What happened then?
20 A.  I moved to -- got transferred to the
21 other Fred Meyer across town, the one on College
22 Road, to be the men's department section head.
23 Q.  Was that a promotion?
24 A.  It was.    MI Exhibit 4    Page 3 of 38
25 Q.  More hours or same, still -- was it

Page 38

1  still an hourly job?
2     A.   Hourly job.
3     Q.   Okay. So it was still 40 hours per
4  week?
5     A.   That's correct.
6     Q.   Okay. And did your wife continue
7  working in operations?
8     A.   Yes.
9     Q.   Okay. And how long did you work as the
10 men's department section head at the College Road
11 Fred Meyer in Fairbanks?
12    A.   For September, October of 1994.
13    Q.   All right. What did you do next?
14    A.   I went back to the -- got transferred
15 to the store across town again on College Road, and
16 I was working as an apparel PIC.
17    Q.   Was that a promotion?
18    A.   Yes.
19    Q.   Okay. And was that still hourly?
20    A.   Yes.
21    Q.   Okay. Now, what are the
22 responsibilities of a section head?
23    A.   You are responsible for a particular
24 section. In my case, it was the men's department.
25 You were responsible to make sure that you get the

Page 39

1  freight processed, put out on the floor, fill the
2  shelves, follow up on customer requests, ensure
3  that the department is merchandised to Fred Meyer
4  standards, and that's about it.
5     Q.   Okay. Did you receive any kind of
6  classroom training for that position, or was it all
7  on the job?
8     A.   It was on-the-job training.
9     Q.   Okay. What about when you became the
10 apparel PIC? Did you receive any kind of classroom
11 training for that, or was it all on the job?
12    A.   Apparel was on the job.
13    Q.   What are the responsibilities of the
14 apparel PIC?
15    A.   To ensure that the whole apparel
16 department gets properly recovered at night, that
17 they were meeting the Fred Meyer standards of
18 recovery. Get the department ready for the next
19 day's business -- for business for the next day.
20    Q.   Okay. Now, is the apparel PIC -- is
21 that always a night job, or, I mean, there are
22 different shifts -- strike that.
23         There are different shifts at Fred
24 Meyer?
25    A.   Uh-huh.

Page 40

1     Q.   What do you call those shifts?
2         MR. DICKENS: Just a minute. You
3  have got to answer audibly when he asks a question
4  so it's clear. So like that would have been a yes
5  to his question.
6         THE WITNESS: I haven't answered.
7         MR. DICKENS: Well, you went
8  "uh-huh." So I just want to make it -- I'm just
9  making sure we are as clear as we can.
10        THE WITNESS: Oh, okay.
11        MR. DICKENS: So if he asks a
12 question, you say yes or no, as opposed to nodding.
13        THE WITNESS: I guess I do have to
14 -- I was understanding what he's saying then.
15        MR. DICKENS: All right. That's
16 fine.
17        THE WITNESS: But I'll try not to
18 do that.
19        MR. DICKENS: That's okay.
20 BY MR. CHOATE:
21    Q.   What do you call the different shifts
22 at Fred Meyer? What are they called?
23    A.   I don't understand.
24    Q.   Let me rephrase that. When do Fred
25 Meyers open? Do they all open at the same time?

Page 41

1     A.   No.
2     Q.   Okay. When did the Fred Meyer's in
3  Fairbanks open? What time?
4     A.   In the summer -- in the wintertime it
5  was 7:00. In the summertime, I think it was 6:00.
6     Q.   Okay. And when did they close in the
7  wintertime?
8     A.   At 11:00 at night.
9     Q.   And when did it close in the
10 summertime?
11    A.   Midnight.
12    Q.   Okay. Now, in the wintertime, that
13 means it's basically 15 hours a day that the store
14 is open, and in the summertime, the store would
15 open 17 hours, right?
16        MR. DICKENS: I think that's 18,
17 6:00 to midnight.
18        MR. CHOATE: You're right.
19        MR. DICKENS: It's two hours. But
20 let's just do one thing too --
21        MR. CHOATE: 16 and 18.
22        MR. DICKENS: The name of the
23 store is Fred Meyer. There is no S on it. It's a
24 common thing I have employees hear talk
25 about Fred Meyer's. It's just Fred Meyer,

MJ Exhibit 4 Page 4 of 28

Page 42

1  singular.
2        MR. CHOATE: We call it Fred
3  Meyer's here.
4        MR. DICKENS: Well, it is not Fred
5  Meyer's.
6        MR. CHOATE: It is Fred Meyer?
7        MR. DICKENS: It is Fred Meyer.
8        MR. CHOATE: Okay. Excuse me.
9        MR. DICKENS: That's okay. I
10 don't want to go into a lot of discussion. We
11 would just like to have the name right.
12       MR. CHOATE: Me, too.
13       MR. DICKENS: Okay.
14 BY MR. CHOATE:
15   Q.   At Fred Meyer, during the winter, it
16 would be 16 hours a day the store is open, and
17 during the summer, it would be open for 18 hours a
18 day; is that correct?
19   A.   Correct.
20   Q.   Okay. Now, in the apparel area -- and
21 I assume that that's basically where you have
22 always worked while working at the Fred Meyer?
23   A.   That's correct.
24   Q.   Okay. How were those work days staffed
25 in terms of groups of people coming in to cover

Page 43

1  opening, cover the middle of the day, cover
2  closing? How did you call those? I call them
3  shifts, but maybe that's not what you guys call
4  them.
5    A.   Shift.
6    Q.   Shift? Okay. You do call them shifts.
7         Do the shifts have a name, in
8  terms of is there morning shift or opening shift,
9  or afternoon shift, or closing shift? How is it --
10 what are they called?
11   A.   If it's during the opening of the
12 store, it would be an opening shift.
13   Q.   Okay.
14   A.   If you were going to close the store,
15 it would be a closing shift.
16   Q.   Were there any other shifts in the
17 middle?
18   A.   Yes.
19   Q.   Okay. What would that be called?
20   A.   That would be called the swing shift.
21   Q.   Okay. So what was the opening shift in
22 Fairbanks? When did it -- from store opening, how
23 long -- how many hours would that go for hourly
24 employees?
25   A.   If they came in at 7:00 in the morning?

Page 44

1    Q.   Yes.
2    A.   Until 4:00.
3    Q.   Until 4:00. Would there be one hour
4  off for lunch a day, or how would the breaks be
5  calculated?
6    A.   Some managers will schedule half hour
7  lunches for their employees. Some will have an
8  hour lunch.
9    Q.   Okay. And if there is a half hour
10 lunch, would there be like 15 minute breaks other
11 parts of the day?
12   A.   That's correct.
13   Q.   Okay. So the employee is there for a
14 total of nine hours, but they are working actually
15 eight; is that right?
16   A.   No.
17   Q.   Okay. Tell me how it works.
18   A.   If your starting time was 7:00, and you
19 come in at 7:00 in the morning, and you are taking
20 a half hour lunch, then you'd be scheduled to 3:30.
21   Q.   All right. So you'd leave at 3:30?
22   A.   Right.
23   Q.   So there is an opening shift, a swing
24 shift, and a closing shift; is that correct?
25   A.   That's correct.

Page 45

1    Q.   When is the swing shift? When did it
2  start? When did it start in Fairbanks?
3    A.   Some would be at 10:00 in the morning,
4  some would be at 11:00 in the morning, and some
5  would be noon.
6    Q.   And how would that be determined in
7  terms of when you would have to schedule people for
8  the swing shift?
9    A.   Depending on the need of the business.
10   Q.   All right. Now, you described your job
11 as the apparel PIC at the -- in Fairbanks as being
12 responsible for recovery. Is that because the
13 apparel PIC worked the closing shift?
14   A.   Most of the times.
15   Q.   Most of the time? Okay. Would there
16 also be an apparel PIC on the opening shift, as a
17 general rule?
18   A.   Yes.
19   Q.   Okay. What would be the duties of the
20 apparel PIC on the opening shift?
21   A.   Probably would be processing the time
22 and attendance records, write a tour for the day,
23 direct employees as they are coming in, look up
24 e-mails, office vision, look up merchandising notes
25 that we got from the main office, and pretty much

MJ Exhibit 4, Page 5 of 38

Page 70

1  Office Vision e-mail from 2002 right now?  Can you
2  do that?
3     A.   No.
4     Q.   Okay.  If you wanted to find an e-mail
5  that was sent in 2002 on Office Vision, how would
6  you go about doing that?
7     A.   I don't know.
8     Q.   Would you contact somebody at the
9  company headquarters?
10    A.   Yes.
11    Q.   Okay.  Now, in 2002, what were the
12 purposes -- what would you use Office Vision for?
13    A.   Just communicate to the employees, the
14 projects to get done, pass down logs.  I mean,
15 we'll communicate things that happen during the
16 day, communicate some instructions on what they
17 need to get done, forward communications sent by
18 the regional office, from the buyers to the rest of
19 the employees.
20    Q.   Did the Office Vision have a way to
21 create to-dos, a way to task things to people and
22 then get confirmation that they had been completed?
23    A.   You could create a list in your Office
24 Vision, typing, you know, like an e-mail, a to-do
25 list.  I don't remember if you can get confirmation

Page 71

1  if the person received it or not.
2     Q.   Okay.  Could you get confirmation as to
3  whether -- if you said, "I want you to do X," was
4  there a way that the Office Vision would remind
5  you, "We haven't got a completion on this task
6  yet?"  Was the system sophisticated enough to do
7  that?
8     A.   I think there was -- that you could tag
9  your Office Vision in a way that will confirm if
10 the person received and open the note.
11    Q.   Okay.  So you could get a confirmation
12 receipt that they had opened it?
13    A.   Yes.
14    Q.   That's it; is that correct?
15    A.   Yes.
16    Q.   Okay.  Now, you worked -- how long did
17 you work in Fairbanks as the men's apparel section
18 head?
19    A.   Until 1995, February of 1995.
20    Q.   And what happened then?
21    A.   When I was filling in in the West
22 Fairbanks store in 1994, I entered apparel
23 management training.
24    Q.   And what was apparel management
25 training?

Page 72

1     A.   That's when you receive your first
2  book, and you train with your training manager.
3  And they go over different chapters and sections in
4  the book.  They show you all the standards related
5  to merchandising, the operation of the department,
6  from processing freight, recovery, what to follow
7  for employees, and so forth like that.  It is a
8  four-week training.
9     Q.   Is it on-the-job training, or is it --
10 do you actually take four weeks off from the job to
11 do the training?
12    A.   No.  It is on-the-job training.
13    Q.   And that was with the assistant relief
14 manager book?
15    A.   Well, back then, when I went to
16 training in 1994, there was -- I think the books
17 were a little bit different.  I think the first
18 step was called apparel management training book.
19    Q.   Okay.  And how long, do you know, that
20 that book was used?
21    A.   Through the years, it changed.  I don't
22 remember exactly when they changed it to the way it
23 is set up now to where we have the three different
24 books.
25    Q.   All right.  Do you know when those

Page 73

1  three different books came into existence in terms
2  of when they started being used?
3     A.   It was around 2001 -- 2000, 2001.  I
4  don't remember.
5     Q.   So before 2000-2001, with the training
6  book that would have been used to learn to -- to
7  learn Fred Meyer standards for recovery, would it
8  be the apparel management training book, or the
9  visual display standards book?
10    A.   I think all they changed was the name
11 of the book.  It was still set up in like almost a
12 three-tier, you know, difficult levels.  But the
13 names changed a little bit.
14    Q.   Okay.  So you went through apparel
15 management training in '94?
16    A.   Towards the end of 1994, getting into
17 1995.
18    Q.   Okay.  And then what happened?
19    A.   Then I was promoted to relief assistant
20 manager and transferred to the Soldotna store.
21    Q.   And is a relief assistant manager now
22 known as the second assistant manager?
23    A.   Yes.
24    Q.   Okay.  How is a relief assistant
25 manager different than a PIC?

Page 74

1  A.  Well, PIC is not a position. PIC is a
2  function.
3  Q.  Okay. So can a relief assistant
4  manager be a PIC?
5  A.  Yes.
6  Q.  Okay. Can a manager be a PIC?
7  A.  Yes.
8  Q.  Okay. So "PIC" just means someone who
9  has the function of being in charge at a certain
10 time; is that correct?
11 A.  Person in charge, yes.
12 Q.  Okay. And how long did you work at the
13 Soldotna store as a relief assistant manager?
14 A.  Until January of 1996.
15 Q.  All right. And what did you do next
16 then?
17 A.  Then I was asked by my regional
18 supervisor to come to Juneau, to come down to the
19 Juneau store.
20 Q.  Okay. Were you still going to be a
21 relief assistant manager?
22 A.  No. It was going to be a promotion.
23 There was an opening at this location for an
24 apparel manager. The apparel manager was getting
25 transferred to the Tillamook store. And then -- so

Page 75

1  I was going to come down here, and eventually there
2  was going to be an opening for a lead assistant
3  manager.
4  Q.  Okay. So I'm a little bit confused.
5  You said there was going be an opening for an
6  apparel manager, but let me make sure I understand
7  it. Is the organization in terms of the apparel
8  department manager, first assistant or lead
9  assistant, relief or second assistant; is that
10 correct?
11 A.  That is correct.
12 Q.  Okay. Was that the case in '95?
13 A.  That's correct.
14 Q.  Okay. And is that the case at present?
15 A.  That is correct.
16 Q.  Okay. Is first -- do you guys use --
17 strike that.
18     Is "first assistant" the same as
19 "lead assistant," or which term is used by Fred
20 Meyer?
21 A.  Now is used "assistant manager."
22 Q.  Now it's "assistant manager." And what
23 is -- we have heard discussion of "second
24 assistant." Is that now the "relief assistant"?
25 A.  Yes.

Page 76

1  Q.  Okay. When did that -- at some time in
2  the past, were those terms used differently? In
3  the past, was there a first assistant and a second
4  assistant?
5  A.  I think, over the years, they were
6  referred to as first and second. And I think Fred
7  Meyer, at one point, just kind of -- they were
8  changing also the books. There was apparel
9  manager, apparel assistant manager, apparel relief
10 assistant manager.
11 Q.  Okay. When did that happen, if you
12 recall?
13 A.  Around 2000, 2001.
14 Q.  Okay. So when you transferred from
15 Soldotna to Juneau, what was your job here then?
16 A.  I first came down as a relief assistant
17 manager.
18 Q.  All right. So it was a promotion, but
19 it was still -- it was the same job that you had in
20 Soldotna?
21 A.  It was the same job that I had in
22 Soldotna.
23 Q.  Okay. Did you get more money when you
24 came down here?
25 A.  I did.

Page 77

1  Q.  Okay. But the title for the job was
2  the same; is that right?
3  A.  Yes.
4  Q.  Okay. And when did you come to Juneau?
5  A.  When?
6  Q.  Yes.
7  A.  Last week of January of 1996.
8  Q.  And how long did you work as a relief
9  assistant manager?
10 A.  Two months.
11 Q.  And at that time, who was the
12 assistant -- the lead assistant manager or first
13 assistant?
14 A.  Mr. Laney.
15 Q.  And who was the manager?
16 A.  There was no manager at the store when
17 I came down.
18 Q.  At the time that you came in January of
19 '96, was Myrna Johnson working for Fred Meyer as a
20 full-time employee?
21 A.  No.
22 Q.  Was she working as a part-time
23 employee?
24 A.  She was.    MJ Exhibit 4    Page 7 of 38
25 Q.  And what was her job at that time; do

20 (Pages 74 to 77)

Page 98

1  memorialized, meaning is there a writing anywhere
2  that indicates that someone has been given a verbal
3  warning?
4      A.  Sometimes there is, yes.
5      Q.  And how do you determine when you write
6  it down?
7      A.  Once we have talked to the employee on
8  several occasions about the same problem, and then
9  we want to make sure that the employee understand
10 that that particular behavior has to improve, we'll
11 put it in a document.  Even though it's verbal, it
12 is documented in a form, that we did talk about
13 this, and we have talked about it in the past,
14 about this same issue, and now we expect an
15 improvement of that particular thing.
16     Q.  Okay.  And isn't there a specific form
17 that is used for verbal warnings, where it has a
18 check box where you can say, "This is a verbal
19 warning"?
20     A.  There is not just a form for verbal
21 warning.  We use the same form.
22     Q.  For verbal warnings as opposed to
23 written warnings?
24     A.  It is the same form.
25     Q.  Okay.  So when do you -- does it

Page 99

1  require like multiple verbal warnings to end up
2  actually get a written memo or written document
3  saying "You have been given a verbal warning"?  How
4  do you decide when -- how does the employee know
5  that they have got a verbal warning in terms of
6  their file or record?
7      A.  That will be communicated to them right
8  there at the meeting with the manager.
9      Q.  And they'll say, "I'm giving you a
10 verbal warning"?
11     A.  We'll say, "This is a verbal warning.
12 We have talked about this particular incident, you
13 know, on several occasions.  So here is a document.
14 This is a verbal warning."
15         And then we tell them what the
16 expectations are, what we expect, and more often
17 than not, especially at that level, it is more like
18 a training, you know.  It's like this: "We need
19 you to improve and find out what is preventing you
20 from achieving this."  And then we'll let the
21 employee know that it is a verbal warning.  And if
22 it doesn't improve, then we'll move forward to the
23 next step.
24     Q.  Move forward to the next step, right.
25 All right.  Now, are verbal warnings something that

Page 100

1  go to personnel, HR, at Fred Meyer?
2      A.  I think it's kept at the store.
3      Q.  Okay.  And where are they kept at the
4  store?
5      A.  They'll be on the HR -- HRC office.
6      Q.  Okay.  And where is the HRC office?
7      A.  In our store?
8      Q.  Uh-huh.
9      A.  It is located right by the manager's
10 office or director's office, in back of the
11 stockroom flight of stairs, by the training room.
12     Q.  And were copies of verbal warnings
13 placed in employees' personnel files?
14     A.  If -- the ones that is like actually
15 written?
16     Q.  Yes.
17     A.  There will be -- a copy will be put in
18 the personnel file.
19     Q.  Do you ever recall giving Myrna Johnson
20 a verbal warning that was written between 1996,
21 fall of '96, and February of 2001?
22     A.  No.
23     Q.  Okay.  Do you recall ever hearing
24 anyone else gave her any form of discipline during
25 that time period?

Page 101

1      A.  No.
2      Q.  Okay.
3          MR. CHOATE:  Why don't we take
4  another break?
5          THE REPORTER:  All right.  This
6  will be the end of videotape No. 1.  It is now
7  11:09 a.m.  We'll go off record.
8  11:09 AM
9          (Off record)
10 11:28 AM
11         THE REPORTER:  We're back on
12 record after a brief break.  This is the beginning
13 of videotape No. 2.  It is 11:28 a.m.  You may
14 proceed.
15 BY MR. CHOATE:
16     Q.  Mr. San Miguel, if I wanted to find out
17 Fred Meyer's disciplinary policies, could I look in
18 the policy manual for that information?
19     A.  I think so, yes.
20     Q.  How about the employee handbook?
21     A.  I don't know to what extent they
22 explain it in the handbook.
23     Q.  Is there any other place for
24 information regarding disciplinary policies, other
25 than the policy manual, that you are aware of?

Page 106

```
 1  stocking during your off hours or when you had free
 2  time?
 3     A.   Yes.
 4     Q.   Okay.  And is that something that was
 5  relatively commonly done by Fred Meyer employees in
 6  terms of people in management positions, you know,
 7  lead assistant, second assistant, relief assistant?
 8  Did they do those kinds of jobs?
 9          MR. DICKENS:  Objection.  That's
10  vague.
11          Go ahead and answer.
12     A.   To do --
13     Q.   To your knowledge, was that
14  something -- had Mathew Laney done that kind of
15  work, to your knowledge?
16     A.   I don't remember.
17     Q.   Okay.  Did you know if Myrna Johnson
18  did it?
19     A.   She was doing some vendor jobs.  Yes.
20     Q.   Is Burton a vendor job?
21     A.   It is an outside company.
22     Q.   So it would be a vendor job, right?
23     A.   Yes.
24     Q.   So it's the same as Myrna Johnson,
25  right?
```

Page 107

```
 1     A.   Yes.
 2     Q.   Okay.  Now, at some time in this time
 3  period -- help me -- you began to have some marital
 4  difficulties.  Is that right?
 5     A.   That's correct.
 6     Q.   Do you recall when those first began?
 7     A.   I separated from my wife on January 1st
 8  of 2001.
 9     Q.   And so you separated from your wife
10  right before getting the job as manager of the
11  apparel department; is that right?
12     A.   That's correct.
13     Q.   Okay.  And I'm going to ask you some
14  questions about this time period, and I know it was
15  a hard time period for you, okay, so I'm not trying
16  to embarrass you.
17     A.   Sure.
18     Q.   But the questions are relevant to some
19  of the things that Ms. Johnson was doing while you
20  were dealing with your divorce.  Okay?
21     A.   Okay.
22     Q.   Okay.  Why did you separate from your
23  wife?
24     A.   It was irreconcilable differences.
25     Q.   And it wasn't -- isn't it correct that
```

Page 108

```
 1  the separation was not something you initially
 2  wanted?
 3     A.   That's correct.
 4     Q.   Okay.  Isn't it correct that your wife
 5  had, unknown to you, developed a relationship with
 6  an older man and wanted to be involved with him
 7  rather than you?  Isn't that right?
 8     A.   I wasn't able to prove it.  So I don't
 9  know.  I --
10     Q.   Was that your suspicion?  Was that what
11  you told other people?
12     A.   Yes.
13     Q.   Okay.  And, in fact, that was pretty
14  emotionally devastating for you as a husband and as
15  a man, wasn't it?
16     A.   Yes.
17     Q.   Okay.  And you are a big guy.
18  Physically, you are a good-sized guy, but, in fact,
19  I think in that time period you had a pretty tender
20  heart.  Isn't that right?
21     A.   You can say that.
22     Q.   And I'm not saying that in a bad way at
23  all, okay?
24          When you separated from your wife,
25  there was a time period when you were having a
```

Page 109

```
 1  tough time dealing with losing your marriage; isn't
 2  that right?
 3     A.   Yes.
 4     Q.   Okay.  And did that -- was that
 5  reflected in -- did you have trouble at work
 6  because of that in terms of concentrating and
 7  paying attention?
 8     A.   Yes.
 9     Q.   Okay.  And you guys have children,
10  right?
11     A.   Yes, we do.
12     Q.   Okay.  And there are two kids?
13     A.   One.
14     Q.   One child?  And is that a boy?
15     A.   It's a boy.
16     Q.   Okay.  And he's a -- you're a baseball
17  player, right?
18     A.   I play baseball, yes.
19     Q.   And you were doing everything you could
20  to keep your relationship with your son while
21  dealing with the stuff with your wife, right?
22     A.   That's correct.
23     Q.   Okay.  So did you find that you'd
24  leave work early, either because
25  emotionally upset or to take care of your son,
```

Page 110

1  during the spring of 2001?
2  A.  On occasions.
3  Q.  And when you were -- and did you have
4  occasions at work when you really would break down
5  and cry because you felt so bad about what
6  happened?
7  A.  I'm sure I became very upset.
8  Q.  And you cried, right?
9  A.  Sure.
10 Q.  Okay.  And when you were having
11 something which is clearly very important to you,
12 your marriage, having -- losing it, was there
13 somebody -- were you able to look to Myrna Johnson
14 at work to keep the fort, you know, to keep
15 everything going while you were dealing with your
16 emotional problems?
17 A.  Is there a question?
18 Q.  My question is, were you able to --
19 when you were emotionally upset and having
20 difficulties concentrating and focusing and having
21 to leave work early or go out and do things, were
22 you able to depend on Myrna Johnson to keep things
23 going while you were doing that?
24 A.  Yes.
25 Q.  And do you recall her saying to you

Page 111

1  many times, "Don't worry, Jaime, I'll keep the
2  fort.  I'll keep everything going here.  You take
3  care of these things"?
4  A.  Yes.
5  Q.  Okay.  And could you depend upon her to
6  do that?
7  A.  Yes.
8  Q.  Okay.  And was she not only a good
9  employee, but a good friend during that really hard
10 time you went through?
11 A.  She was.
12 Q.  Okay.  And about how long did that kind
13 of period of emotional turbulence go on for you
14 where it was just -- it was really -- it was tough?
15 How long did that happen?  How long did that go on?
16 A.  I would say the first six weeks.  You
17 know, first it was pretty emotional and then I
18 started getting -- after six weeks, I was able to
19 concentrate on work and do other things and be
20 clear on what needs to be done, kind of get the
21 emotional part out of it.
22 Q.  So if you guys separated on
23 January 1st -- that's when you left the house?
24 A.  Shortly after that.
25 Q.  Shortly after that.  Okay.  And then do

Page 112

1  you recall when the divorce papers got filed?
2  A.  I don't remember when the -- the last
3  of the paperwork got filed.
4  Q.  How old was your son when you
5  separated?
6  A.  He was -- he's 12 now, so he was eight
7  years old.
8  Q.  And his name?
9  A.  James Ryan.
10 Q.  James Brian?
11 A.  Ryan.
12 Q.  James Ryan.  And you moved out of the
13 family home in early January, and then the
14 paperwork started going through.  Was it a
15 dissolution or an actual divorce?
16 A.  It was a dissolution of marriage.
17 Q.  So there was -- basically, you were
18 able to agree on everything?
19 A.  After a while.
20 Q.  After a while.  It took a while.  Okay.
21 And did you use a lawyer for that?
22 A.  Yes, I did.
23 Q.  Who was your lawyer?
24 A.  I don't remember her name.
25 Q.  You want to forget about it, I'm sure.

Page 113

1  A.  Elizabeth Ziegler.
2  Q.  Okay.  And who was your wife's
3  attorney?
4  A.  She didn't have an attorney.
5  Q.  She didn't have an attorney?  Okay.  So
6  do you recall when you eventually got to the point
7  to where you were actually divorced, how long it
8  took?
9  A.  I think the divorce was final July of
10 2001.
11 Q.  Okay.  And at some point in time,
12 either before the divorce was final, or -- before
13 it was final, did you, I guess in your own mind,
14 sort of say, "Well, I guess that really is done,
15 and I now can get involved maybe in a new
16 relationship, to look for someone else to be
17 involved with"?  Do you recall when that was, kind
18 of in your own head?
19 A.  I know it was final when I left the
20 house.
21 Q.  Okay.  So you --
22 A.  Then it was final.
23 Q.  All right.  So at some point in time,
24 did you begin to get interested in dating
25 somebody new, after leaving the house in January of

Page 138

1   A.   That's correct.
2   Q.   Okay. By "depends," could you get out
3   in as little as half an hour, 11:30?
4   A.   At times.
5   Q.   Okay. Would that be typical or early?
6   A.   I'd say 11:30 would be the rule.
7   Q.   Sort of an average would be 11:30?
8   A.   I would say so.
9   Q.   Okay. And if -- events could cause you
10  to have to stay later than 11:30?
11  A.   Absolutely.
12  Q.   Okay. Did managers or -- did you or
13  Ms. Johnson have to clock in and clock out when you
14  were both -- when she was working as a lead
15  assistant and you were working as manager?
16  A.   No, we are not required to clock in or
17  clock out.
18  Q.   Okay. Do you clock in at all, or no?
19  A.   No.
20  Q.   Okay. So if Ms. Johnson was closing
21  the store, what would be the best way to tell how
22  late she worked?
23  A.   I wouldn't know.
24  Q.   Would you look to the hourly employees
25  who were clocking out, to the one who clocked out

Page 139

1   last? Because doesn't the manager or whoever is in
2   charge of closing stay -- don't they leave with the
3   last hourly employee?
4   A.   That would give an indication --
5   Q.   Okay.
6   A.   -- as to when the last hourly employee
7   left the store, not necessarily what time the
8   assistant manager or manager left.
9   Q.   Would the assistant manager -- if they
10  were the person in charge of closing, would they
11  leave before the last hourly employee left?
12  A.   No.
13  Q.   Okay. So we can assume that they are
14  there at least as long as the last hourly employee,
15  whoever the manager is?
16  A.   That would give a pretty good
17  indication.
18  Q.   Okay.
19       MR. CHOATE: It is about 12:07.
20  Do you want to take a lunch break?
21       MR. DICKENS: Certainly.
22       MR. CHOATE: Okay.
23       THE REPORTER: We'll go off
24  record.
25  12:11 AM

Page 140

1        (Off record)
2        (Ms. Johnson is not present)
3   1:20 PM
4        THE REPORTER: We're back on
5   record following a lunch break. It is 1:20 p.m.
6   You may proceed.
7   BY MR. CHOATE:
8   Q.   Mr. San Miguel, during the fall of
9   2001, did you ever give any verbal warnings to
10  Ms. Johnson?
11  A.   I don't recall if I did or not.
12  Q.   Okay. Could you explain to me under
13  what situations a verbal warning stays verbal, and
14  in what situations it actually gets recorded in a
15  written form as a verbal warning?
16  A.   For verbal warning, it would be if we
17  are talking about the same issue over, say, three
18  or four days' time period, like a particular task
19  is not completed. And the first time, you know,
20  we'll go, "Okay. How come this wasn't done?" And
21  then I will listen to the reason why it wasn't
22  done. And then we'll say, "Okay. Well, today it
23  needs to be completed."
24       And if it happens again, I think
25  like the third time will be a verbal warning, where

Page 141

1   it's just like, "Okay. This need to get done
2   today."
3        And if it continues to be a
4   serious offense, that's when I -- then we'll sit
5   down and have it in a written form -- it is still
6   verbal -- but in a written form so they will
7   understand that that particular behavior -- or that
8   particular project has to be completed in a timely
9   manner.
10  Q.   And do you use a form that's produced
11  by Fred Meyer for that written notice of a verbal
12  warning? Is that the same form that's used for the
13  written reprimand or written warning?
14  A.   It would be the same form.
15  Q.   Same form?
16  A.   Yes.
17  Q.   It is just something different is
18  checked? Is the little square not checked for
19  prior verbal warning? How is the form different?
20  A.   No, it is the same form. Now, on the
21  meeting with the employee, we'll state if it is a
22  verbal warning, or this is an actual write-up, or
23  if it is a three-day suspension at the meeting with
24  the employee.
25  Q.   Okay. Now, in January 2002, did

MJ Exhibit 4    Page 11 of 38

Page 194

1  do a plan-o-gram correctly?
2      A.   No. I didn't know why she was not able
3  to do that.
4      Q.   Did any employees, during the time
5  period from March 12 to March 17, at the store, did
6  they ever come to you and say, "Myrna seems to be
7  out of it. She's not concentrating on work. She's
8  sitting in a corner and crying. She seems to be
9  distracted"? Did anyone tell you that?
10     A.   Not that I can remember.
11     Q.   Okay. And would that be the sort of
12 thing that people normally would tell you if they
13 were concerned about her?
14     A.   If they were concerned. My
15 observations coming in one of those nights and
16 walking in and not finding my employees in the
17 floor -- they were all in the stockroom. They were
18 all talking. So, you know, I notice there was not
19 a lot of work being completed. That concerned me.
20     Q.   So what was wrong with the plan-o-gram
21 that she had done on the 14th?
22     A.   Well, according to this e-mail, the
23 front end cap was still not signed.
24     Q.   Now, what does that mean?
25     A.   I don't know if you are familiar with

Page 195

1  what a gondola is. It is a set of shelves where we
2  merchandise our product. And then facing the aisle
3  would be what we call an end cap, a smaller shelf
4  facing the end cap.
5      Q.   Okay.
6      A.   Okay. That's --
7      Q.   Okay. And so when the end cap is not
8  signed, what does that mean?
9      A.   It means it is missing the sign.
10     Q.   Meaning the UPL?
11     A.   The UPL and the actual sign. The item
12 that is on sale would be required to have a sale
13 sign on it.
14     Q.   Okay. And did you understand that she
15 had already ordered UPLs from the main -- from
16 headquarters for the plan-o-gram when you wrote
17 this?
18     A.   She said that she ordered some --
19     Q.   Right.
20     A.   -- UPLs.
21     Q.   And when it says "back stock not
22 worked," do you see below here on 3-14, she said,
23 "I'll check for back stock tomorrow"?
24     A.   That's correct.
25     Q.   Okay.

Page 196

1      A.   I see this. Yeah.
2      Q.   But you were unhappy that she hadn't
3  taken care of it -- taken care of this by the 14th;
4  is that right?
5      A.   Right. Because that means that the
6  plan-o-gram is not completed. That's part of the
7  process.
8      Q.   I understand. And it's part of the
9  process, and she said, "This is what I have done."
10     A.   Okay.
11     Q.   "But I have not got everything done,"
12 right? She said, "I'll check for back stock
13 tomorrow. Will straighten the other side
14 tomorrow."
15     A.   Okay.
16     Q.   Did you talk to her at all about this
17 to see how late she was working, not only doing
18 recovery, but also doing the plan-o-gram which
19 hadn't been done in the ten days before?
20     A.   I don't remember talking to her, no.
21     Q.   Okay. Now, at some point in time,
22 between 3-12 and 3-17, you gave -- it is my
23 understanding you believe you gave Myrna Johnson a
24 verbal warning; is that correct?
25     A.   Well, all -- all of this communication

Page 197

1  was through e-mail. And she'll come in, and we'll
2  talk -- you know, we'll take a time, or set a time
3  aside to talk about this. So, yes, this is part of
4  what we are calling a verbal warning. We are
5  talking about things that not being completed, and
6  they need to be addressed.
7      Q.   Okay. But a verbal warning is a
8  discipline issue, isn't it? A verbal warning is a
9  beginning of discipline of an employee who is not
10 doing their job correctly; isn't that right?
11     A.   That would be a way for us to address,
12 yeah, if something is not being completed
13 correctly.
14     Q.   Okay. And so within 48 -- well,
15 actually, within one day of her arriving from her
16 family -- or her personal and family leave in the
17 Philippines, you have given her, is that my
18 understanding, a verbal warning, beginning of
19 discipline that she's not doing her job correctly?
20     A.   We were addressing the fact that, yeah,
21 some of these tasks were not being completed.
22     Q.   Well, not that they just weren't being
23 completed, but that they -- that you thought it was
24 of a disciplinary consequence. Part of --
25 of a disciplinary procedure; is that right?

Page 198

1  A.  Yes.
2  Q.  Okay. Now, and that began -- was this
3  e-mail, Exhibit No. 12, is this a verbal warning
4  that is dated the 13th from you to her?
5  A.  No. I think this was just
6  addressing -- on the 12, like I said, I don't know
7  if we are missing another e-mail here, or what we
8  talked about that day. Was more addressing things
9  that -- "Hey, this is some of the things that
10 needed to get done last night. It didn't get done.
11 We need to get it done tonight."
12 Q.  Okay. And was the -- well, was the
13 e-mail that is in reference in Exhibit No. 10, the
14 Office Vision, No. 10, was that a verbal warning,
15 or did that reflect a verbal warning that was given
16 to her?
17 A.  I think that by this that would
18 start -- you know, in this e-mail we are addressing
19 still all the areas that didn't get done.
20 Q.  My question is, is this a verbal
21 warning or referencing a verbal warning that was
22 given to her orally in the day regarding the
23 recovery on the 12th?
24 A.  No, I don't think so.
25 Q.  Okay. Why don't you tell me, then,

Page 199

1  when is the first -- when was the first verbal
2  warning you gave her?
3       MR. DICKENS: Well, I'm going to
4  object as vague as to time frame.
5  Q.  In March, after she returned from her
6  family medical leave, personal leave, when was
7  the -- what day did you give her her first verbal
8  warning?
9  A.  That would be on the 16th. That would
10 be like the first time --
11 Q.  That would be Saturday the 16th?
12 A.  Yes, either -- once this e-mail --
13 that's when -- I think that's when I finally said,
14 "Look, it really needs to get done. You know, it
15 is not getting done. There is no reason or rhyme
16 why it is not done. Have to complete these
17 things."
18 Q.  Okay. And this would be Exhibit No.
19 15?
20 A.  That's correct, sir.
21 Q.  Now, you met with Myrna Johnson and
22 Fred Sayre on March the 18th at roughly 3:00 in the
23 afternoon; is that correct?
24 A.  That is correct.
25 Q.  What was the purpose for that meeting?

Page 200

1  A.  The purpose of the meeting was to talk
2  to Ms. Johnson about some of this situation that we
3  were already addressing in the e-mails, and then to
4  issue a verbal warning, that she understood what
5  the expectations were, what it was that we were
6  looking for, and try to find out if there was a
7  reason why she was not being able to complete these
8  things. Because to that point, she hasn't said
9  anything about -- to me about being shorthanded.
10 She said she could handle everything and whatnot,
11 but still some of the things were not getting done.
12      So the first step was to find out
13 if there was a reason or a problem as to why it
14 wasn't getting done. And then after, we'll discuss
15 what we are going to set for the standard, what is
16 it that we're looking for the next day.
17      So that was going to be a verbal
18 warning that we were going to -- I don't know. I
19 used the word before -- in the written form.
20 Q.  Now, is it a practice to issue verbal
21 warnings with the director?
22 A.  For a salaried -- for salaried
23 employees, yes.
24 Q.  Well, then, on the 16th, when you sent
25 this e-mail, was that a verbal warning? Did

Page 201

1  Mr. Sayre participate in that?
2  A.  Well, because that one, again, like I
3  said, it was not going to be -- it was a
4  conversation. It was not going to be put in her
5  personnel file.
6  Q.  So are there two different kinds of
7  verbal warnings then?
8  A.  I'll talk to an employee out on the
9  floor, let them know, again, whatever the situation
10 is. And I said, "Look, if this doesn't get done,
11 then we are going to have go upstairs and then
12 we'll talk about it."
13      And then you have the option,
14 depending on what the infraction is, to either give
15 her a verbal warning, which we'll document. There
16 are some infractions where we have a three-day
17 suspension. Some are a straight write-up. Some
18 are termination of employment.
19 Q.  Is this -- is the Exhibit No. 18, which
20 is a copy called "Employee Warning Notice," is this
21 a verbal warning or a written warning?
22 A.  This was going to be a verbal warning,
23 that we were going to document that we did, in
24 fact, talk to her that day about the patterns
25 Q.  So is there something -- is there

Page 254

1  unfortunately, that's the way that -- I feel bad
2  she didn't agree with me, but, that, in fact, some
3  of these things were not -- still not completed,
4  and that recovery was not up to standards.
5       And I said, "So what we are going
6  to do is, I have prepared this form," and that's
7  when I grabbed the form and put it on the desk to
8  read. I said, "So this is going to be a formal
9  verbal warning, but it's still -- I mean, we want
10 you to understand that what we want you to do is to
11 improve on these items."
12      Then when I started reading the
13 form, what I wrote on the form, that's when she --
14 halfway through when I was reading, that she
15 started, you know, crying, said that wasn't fair,
16 that it wasn't true, you know. And I kept telling
17 her, I said, "Unfortunately, this is what we -- my
18 supervisor seen this morning, and this is what I
19 have seen the last couple of days, and it is not
20 getting any better."
21      Q.   Did you, at any time, ask Ms. Johnson
22 to sign Exhibit 18?
23      A.   No.
24      Q.   Did you sign Exhibit 18 at any time
25 before you talked to her?

Page 255

1       A.   No, I didn't.
2       Q.   Did you sign it at any time after you
3  talked to her?
4       A.   No, I didn't.
5       Q.   So she began to react when you read
6  Exhibit 18. Did she say anything that you can
7  recall about Exhibit 18, beyond what you've told
8  us?
9       A.   It seemed like I was just almost done
10 with the part No. 1, when she stood up from her
11 chair and said that she was leaving. Then at that
12 point, Mr. Sayre asked her to please sit down, to
13 finish this, just -- to keep it positive. She
14 said, "No, I'm leaving." At that point, Mr. Sayre
15 informed her that if she was to walk out of the
16 office, that would be considered walking off the
17 job.
18      And he asked her, "Do you
19 understand that?" And she said that it didn't
20 matter, didn't care, something to the effect that
21 she thought that I was trying to get somebody else.
22 I started walking towards the door. Mr. Sayre,
23 again, asked her to please sit down, and she
24 said -- she refused. Mr. Sayre again told her, "If
25 you walk out of this office, I'll take this as your

Page 256

1  resignation from Fred Meyer. You are walking off
2  the job. Do you understand that?" And she said,
3  "I don't care." Start opening the door. For the
4  third time, Mr. Sayre again told her, "Please sit
5  down, because if you walk out of the job, that will
6  be your resignation from Fred Meyer." And she
7  walked out of the office.
8       Q.   Now, how much time elapsed before she
9  came back up into the office?
10      A.   Maybe 15, 20 minutes.
11      Q.   Okay. During that time frame, did you
12 talk to Mr. Sayre?
13      A.   I did. I --
14      Q.   Let me stop you. You did?
15      A.   Yes.
16      Q.   First of all, were the two of you
17 surprised at Ms. Johnson's reaction?
18      A.   I was surprised that she has walked out
19 of the job, absolutely.
20      Q.   Were you surprised about her
21 defensiveness to the comments about the poor
22 recoveries?
23      A.   I was surprised.
24      Q.   What else did you and Mr. Sayre discuss
25 after Ms. Johnson left the room?

Page 257

1       A.   Well, once she walked off the job, I
2  would say, you know, a few minutes elapsed. I
3  can't remember exactly, maybe five, seven minutes.
4  Mr. Sayre placed a call -- I'm almost certain it
5  was to the regional office to inform regional staff
6  what happened. I was not in the office when --
7  when he placed the call, I was there. Then I left
8  because I got a phone call to go on the -- on the
9  floor, which I did.
10      And by the time I came back, I was
11 in the office not even a minute or two, and we
12 still kind of -- as I said earlier, were kind of
13 shocked at -- you know. So -- I wanted just to
14 have my assistant manager improve her performance.
15 Now, all of a sudden, I don't have an assistant
16 manager. And it started coming down to me. It's
17 like, "Oh, wow, now I don't have an assistant
18 manager." And she came into the office and asked
19 for a copy of the form.
20      Q.   And what happened then?
21      A.   At that point, Mr. Sayre and I tried to
22 like talk to her, and she just said she didn't want
23 to talk to us. And she just wanted a copy and
24 wanted to leave, and she left.    *MJ Exhibit 4  Page 14 of 38*
25      Q.   Did Mr. Sayre make any other comment

Page 262

```
 1   whatever it took thereafter for her to get the
 2   store closed; is that right?
 3       A.   Yes.
 4       Q.   Okay.  And you know from your e-mails
 5   and the Office Visions that were sent to her that
 6   she was working some nights until 11:30, maybe even
 7   until midnight or after; isn't that correct?
 8       A.   That seemed to be the case.
 9       Q.   Okay.  So in the six days preceding
10   your decision to give her a warning, she had worked
11   probably in excess of 60 hours for Fred Meyer doing
12   her job; is that right?
13       A.   There is two different weeks.
14       Q.   I understand it.  But they were six
15   days in a row.  I understand it was two different
16   weeks, but she had worked the 12th, the 13th, the
17   14th -- Tuesday, Wednesday, Thursday -- Friday the
18   15th, and the 16th -- right, five days?  Then a new
19   week started on the 17th, and she worked the 17th,
20   the sixth day, and she was in for her seventh
21   straight day when you had this meeting with her,
22   right?
23       A.   That would be correct.
24       Q.   Did you receive a report from anybody
25   that she had not worked her full shifts during that
```

Page 263

```
 1   week?
 2       A.   No, I didn't.
 3       Q.   Did you receive a report from anybody
 4   that she had not worked consistently and, you know,
 5   with good intention throughout that entire time
 6   period?  Did anyone tell you she was hanging out in
 7   the break room, goofing off, staring at the
 8   ceiling, sitting in the corner crying.  Did anyone
 9   say that?
10       A.   Not that I remember, no.  Not that --
11       Q.   You didn't have any indication -- you
12   didn't have any concerns that she wasn't working
13   hard, did you, during that week?
14       A.   I have no concern that she was working
15   hard.  No.
16       Q.   Okay.  Now, in the month prior to when
17   she was gone on the leave to the Philippines, had
18   Fred Sayre ever said to you, "I'm so concerned
19   about the recoveries in the store that I think we
20   need to give somebody a verbal warning"?  Did he
21   ever say that --
22       A.   No.
23       Q.   -- in that month?
24       A.   No.
25       Q.   But you said that during that month,
```

Page 264

```
 1   you had inconsistent recoveries the entire month;
 2   isn't that right?
 3       A.   Yes.  And Mr. Sayre addressed those
 4   with me.
 5       Q.   Okay.  Did he give you a verbal warning
 6   for them?
 7       A.   He talked to me several times.
 8       Q.   I'm sorry.  That wasn't my question.
 9            Did he give you a verbal warning
10   for those -- for those inconsistent recoveries?
11            MR. DICKENS:  Objection.  Asked
12   and answered.  Go ahead.
13       Q.   Yes or no?
14            MR. DICKENS:  It's not a yes or
15   no.  He's already answered the question.
16            Go ahead and answer it again.
17   BY MR. CHOATE:
18       Q.   Did he give you a warning, such as the
19   document there in front of you, saying, "This is a
20   verbal warning for these inconsistent recoveries"?
21       A.   This one?  No, he didn't.
22       Q.   Okay.  Now, when Ms. Johnson started
23   crying, did Mr. Sayre say, "Do you need some time
24   to compose yourself?
25       A.   He stopped talking, and to see if she
```

Page 265

```
 1   will ask for any time.  No, he didn't.
 2       Q.   Did he say, "Do you need some time?  Do
 3   you need to take a break?"
 4       A.   No, I don't remember.  I don't remember
 5   that -- him saying that, no.
 6       Q.   He said, "If you leave the room" --
 7   this is what your testimony is -- "If you leave
 8   this room while you are crying and we are giving
 9   you this discipline, that's walking off the job."
10   Isn't that what he said?
11       A.   That's not what I said.
12       Q.   That's what he said, right?
13       A.   That's not what I said he said.
14       Q.   Did he say, "If you leave this room, we
15   are going to consider that walking off the job, and
16   that's the end of your employment with Fred Meyer?"
17       A.   That would be more along the lines of
18   what he said, yes.
19       Q.   What time did -- do you know what time
20   Mr. Sayre did his tour?
21       A.   It was probably around 8:00 in the
22   morning.
23       Q.   Okay.  So about an hour after the
24   department opened?             MI. Exhibit  4    Page 15 of 38
25       A.   Yes.
```