Page 262

1  whatever it took thereafter for her to get the
2  store closed; is that right?
3      A.    Yes.
4      Q.    Okay. And you know from your e-mails
5  and the Office Visions that were sent to her that
6  she was working some nights until 11:30, maybe even
7  until midnight or after; isn't that correct?
8      A.    That seemed to be the case.
9      Q.    Okay. So in the six days preceding
10 your decision to give her a verbal warning, she had worked
11 probably in excess of 60 hours for Fred Meyer doing
12 her job; is that right?
13     A.    There is two different weeks.
14     Q.    I understand it. But they were six
15 days in a row. I understand it was two different
16 weeks, but she had worked the 12th, the 13th, the
17 14th -- Tuesday, Wednesday, Thursday -- Friday the
18 15th, and the 16th -- right, five days? Then a new
19 week started on the 17th, and she worked the 17th,
20 the sixth day, and she was in for her seventh
21 straight day when you had this meeting with her,
22 right?
23     A.    That would be correct.
24     Q.    Did you receive a report from anybody
25 that she had not worked her full shifts during that

Page 263

1  week?
2      A.    No, I didn't.
3      Q.    Did you receive a report from anybody
4  that she had not worked consistently and, you know,
5  with good intention throughout that entire time
6  period? Did anyone tell you she was hanging out in
7  the break room, goofing off, staring at the
8  ceiling, sitting in the corner crying. Did anyone
9  say that?
10     A.    Not that I remember, no. Not that --
11     Q.    You didn't have any indication -- you
12 didn't have any concerns that she wasn't working
13 hard, did you, during that week?
14     A.    I have no concern that she was working
15 hard. No.
16     Q.    Okay. Now, in the month prior to when
17 she was gone on the leave to the Philippines, had
18 Fred Sayre ever said to you, "I'm so concerned
19 about the recoveries in the store that I think we
20 need to give somebody a verbal warning"? Did he
21 ever say that --
22     A.    No.
23     Q.    -- in that month?
24     A.    No.
25     Q.    But you said that during that month,

Page 264

1  you had inconsistent recoveries the entire month;
2  isn't that right?
3      A.    Yes. And Mr. Sayre addressed those
4  with me.
5      Q.    Okay. Did he give you a verbal warning
6  for them?
7      A.    He talked to me several times.
8      Q.    I'm sorry. That wasn't my question.
9            Did he give you a verbal warning
10 for those -- for those inconsistent recoveries?
11           MR. DICKENS: Objection. Asked
12 and answered. Go ahead.
13     Q.    Yes or no?
14           MR. DICKENS: It's not a yes or
15 no. He's already answered the question.
16           Go ahead and answer it again.
17 BY MR. CHOATE:
18     Q.    Did he give you a warning, such as the
19 document there in front of you, saying, "This is a
20 verbal warning for these inconsistent recoveries"?
21     A.    This one? No, he didn't.
22     Q.    Okay. Now, when Ms. Johnson started
23 crying, did Mr. Sayre say, "Do you need some time
24 to compose yourself?
25     A.    He stopped talking, and to see if she

Page 265

1  will ask for any time. No, he didn't.
2      Q.    Did he say, "Do you need some time? Do
3  you need to take a break?"
4      A.    No, I don't remember. I don't remember
5  that -- him saying that, no.
6      Q.    He said, "If you leave the room" --
7  this is what your testimony is -- "If you leave
8  this room while you are crying and we are giving
9  you this discipline, that's walking off the job."
10 Isn't that what he said?
11     A.    That's not what I said.
12     Q.    That's what he said, right?
13     A.    That's not what I said he said.
14     Q.    Did he say, "If you leave this room, we
15 are going to consider that walking off the job, and
16 that's the end of your employment with Fred Meyer?"
17     A.    That would be more along the lines of
18 what he said, yes.
19     Q.    What time did -- do you know what time
20 Mr. Sayre did his tour?
21     A.    It was probably around 8:00 in the
22 morning.
23     Q.    Okay. So about an hour after the
24 department opened? *Defendant's Exhibit 4*   *Page 15 of 38*
25     A.    Yes.

1    would say, like towards the end of August, middle

2    of August.  I was there two weeks and I got a job.

3        Q.    And what did you start doing for

4    McDonald's?

5        A.    Cooking crew.

6        Q.    Okay.  And which McDonald's was that in

7    Fairbanks?  Do you remember where it was located?

8        A.    Yeah.  I'm trying to remember the name

9    of the road.  College Road.

10       Q.    College Road?  Okay.  And how long did

11   you do that?

12       A.    About six, seven months.

13       Q.    So into the winter?

14       A.    Sounds about right.

15       Q.    Okay.  And were you only working the

16   one job at McDonald's at the time?

17       A.    No.

18       Q.    Okay.  Where else did you work?

19       A.    In September -- September of 1991,

20   September 16 of 1991, I got hired on with Fred

21   Meyer.

22       Q.    In Fairbanks?

23       A.    In Fairbanks.

24       Q.    And what were you hired as?

25       A.    A shoes associate.

*MJ Exhibit  4*      *Page 16 of 38*

1    you do then after you stopped your McDonald's work?

2        A.    I was just working at Fred Meyer.

3        Q.    Okay.  So full-time?

4        A.    I was working 40 hours a week, correct.

5        Q.    Okay.  And what was your -- were you

6    still working as a shoes associate?

7        A.    Yes.

8        Q.    Okay.  And how long did you work as a

9    shoes associate full-time at Fred Meyer in

10   Fairbanks?  You started full-time in December of

11   '91?

12       A.    Correct.  '91 until 1993.

13       Q.    Okay.

14       A.    I think, if I remember, it was around

15   summertime.

16       Q.    All right.  And did you work any other

17   jobs during that time period?

18       A.    No, I didn't.

19       Q.    Okay.  And did your wife continue to

20   work at Westmark?

21       A.    No.

22       Q.    Okay.  Where did she -- what did she

23   do?

24       A.    She also got hired on at Fred Meyer in

25   September of 1991.

*MJ Exhibit  4     Page 17 of 38*

Page 37

1    Q.    And what was her position there?

2    A.    She was the head cashier.

3    Q.    In what department?

4    A.    CCK.

5    Q.    I don't know what that is.

6    A.    Operations.

7    Q.    Okay.  You are educating me as we are

8  going here on some of these things.

9              And was that full-time for her as

10  well?

11   A.    That's correct.

12   Q.    Okay.  So by September of '92, you were

13  full-time at Fred Meyer in shoes, and your wife was

14  full-time in operations as the head cashier?

15   A.    That's correct.

16   Q.    Okay.  And you continued until the

17  summer of, what, '93?

18   A.    That's correct.

19   Q.    What happened then?

20   A.    I moved to -- got transferred to the

21  other Fred Meyer across town, the one on College

22  Road, to be the men's department section head.

23   Q.    Was that a promotion?

24   A.    It was.

25   Q.    More hours or same, still -- was it

*MJ Exhibit 4*    *Page 18 of 38*

1    still an hourly job?

2         A.    Hourly job.

3         Q.    Okay.  So it was still 40 hours per

4    week?

5         A.    That's correct.

6         Q.    Okay.  And did your wife continue

7    working in operations?

8         A.    Yes.

9         Q.    Okay.  And how long did you work as the

10   men's department section head at the College Road

11   Fred Meyer in Fairbanks?

12        A.    For September, October of 1994.

13        Q.    All right.  What did you do next?

14        A.    I went back to the -- got transferred

15   to the store across town again on College Road, and

16   I was working as an apparel PIC.

17        Q.    Was that a promotion?

18        A.    Yes.

19        Q.    Okay.  And was that still hourly?

20        A.    Yes.

21        Q.    Okay.  Now, what are the

22   responsibilities of a section head?

23        A.    You are responsible for a particular

24   section.  In my case, it was the men's department.

*MJ Exhibit  4     Page 19 of 38*

25   You were responsible to make sure that you get the

1  opening, cover the middle of the day, cover

2  closing?  How did you call those?  I call them

3  shifts, but maybe that's not what you guys call

4  them.

5      A.    Shift.

6      Q.    Shift?  Okay.  You do call them shifts.

7              Do the shifts have a name, in

8  terms of is there morning shift or opening shift,

9  or afternoon shift, or closing shift?  How is it --

10  what are they called?

11      A.    If it's during the opening of the

12  store, it would be an opening shift.

13      Q.    Okay.

14      A.    If you were going to close the store,

15  it would be a closing shift.

16      Q.    Were there any other shifts in the

17  middle?

18      A.    Yes.

19      Q.    Okay.  What would that be called?

20      A.    That would be called the swing shift.

21      Q.    Okay.  So what was the opening shift in

22  Fairbanks?  When did it -- from store opening, how

23  long -- how many hours would that go for hourly

24  employees?

*MJ Exhibit  4     Page 20 of 38*

25      A.    If they came in at 7:00 in the morning?

1   if the person received it or not.

2        Q.    Okay.  Could you get confirmation as to

3   whether -- if you said, "I want you to do X," was

4   there a way that the Office Vision would remind

5   you, "We haven't got a completion on this task

6   yet?"  Was the system sophisticated enough to do

7   that?

8        A.    I think there was -- that you could tag

9   your Office Vision in a way that will confirm if

10  the person received and open the note.

11       Q.    Okay.  So you could get a confirmation

12  receipt that they had opened it?

13       A.    Yes.

14       Q.    That's it; is that correct?

15       A.    Yes.

16       Q.    Okay.  Now, you worked -- how long did

17  you work in Fairbanks as the men's apparel section

18  head?

19       A.    Until 1995, February of 1995.

20       Q.    And what happened then?

21       A.    When I was filling in in the West

22  Fairbanks store in 1994, I entered apparel

23  management training.

24       Q.    And what was apparel management

*MJ Exhibit  4*      *Page 21 of 38*

25  training?

1  three different books came into existence in terms

2  of when they started being used?

3      A.    It was around 2001 -- 2000, 2001.  I

4  don't remember.

5      Q.    So before 2000-2001, with the training

6  book that would have been used to learn to -- to

7  learn Fred Meyer standards for recovery, would it

8  be the apparel management training book, or the

9  visual display standards book?

10      A.    I think all they changed was the name

11  of the book.  It was still set up in like almost a

12  three-tier, you know, difficult levels.  But the

13  names changed a little bit.

14      Q.    Okay.  So you went through apparel

15  management training in '94?

16      A.    Towards the end of 1994, getting into

17  1995.

18      Q.    Okay.  And then what happened?

19      A.    Then I was promoted to relief assistant

20  manager and transferred to the Soldotna store.

21      Q.    And is a relief assistant manager now

22  known as the second assistant manager?

23      A.    Yes.

24      Q.    Okay.  How is a relief assistant

25  manager different than a PIC?

*MJ Exhibit  4*     *Page 22 of 38*

1    A.    Well, PIC is not a position.  PIC is a

2  function.

3    Q.    Okay.  So can a relief assistant

4  manager be a PIC?

5    A.    Yes.

6    Q.    Okay.  Can a manager be a PIC?

7    A.    Yes.

8    Q.    Okay.  So "PIC" just means someone who

9  has the function of being in charge at a certain

10  time; is that correct?

11    A.    Person in charge, yes.

12    Q.    Okay.  And how long did you work at the

13  Soldotna store as a relief assistant manager?

14    A.    Until January of 1996.

15    Q.    All right.  And what did you do next

16  then?

17    A.    Then I was asked by my regional

18  supervisor to come to Juneau, to come down to the

19  Juneau store.

20    Q.    Okay.  Were you still going to be a

21  relief assistant manager?

22    A.    No.  It was going to be a promotion.

23  There was an opening at this location for an

24  apparel manager.  The apparel manager was getting

*MJ Exhibit  4     Page 23 of 38*

25  transferred to the Tillamook store.  And then -- so

1  go to personnel, HR, at Fred Meyer?

2      A.     I think it's kept at the store.

3      Q.     Okay.  And where are they kept at the

4  store?

5      A.     They'll be on the HR -- HRC office.

6      Q.     Okay.  And where is the HRC office?

7      A.     In our store?

8      Q.     Uh-huh.

9      A.     It is located right by the manager's

10  office or director's office, in back of the

11  stockroom flight of stairs, by the training room.

12      Q.     And were copies of verbal warnings

13  placed in employees' personnel files?

14      A.     If -- the ones that is like actually

15  written?

16      Q.     Yes.

17      A.     There will be -- a copy will be put in

18  the personnel file.

19      Q.     Do you ever recall giving Myrna Johnson

20  a verbal warning that was written between 1996,

21  fall of '96, and February of 2001?

22      A.     No.

23      Q.     Okay.  Do you recall ever hearing

24  anyone else gave her any form of discipline during

25  that time period?

*MJ Exhibit  4*    *Page 24 of 38*

Page 101

1    A.    No.

2    Q.    Okay.

3              MR. CHOATE:  Why don't we take

4  another break?

5              THE REPORTER:  All right.  This

6  will be the end of videotape No. 1.  It is now

7  11:09 a.m.  We'll go off record.

8 11:09 AM

9              (Off record)

10  11:28 AM

11             THE REPORTER:  We're back on

12  record after a brief break.  This is the beginning

13  of videotape No. 2.  It is 11:28 a.m.  You may

14  proceed.

15 BY MR. CHOATE:

16    Q.    Mr. San Miguel, if I wanted to find out

17  Fred Meyer's disciplinary policies, could I look in

18  the policy manual for that information?

19    A.    I think so, yes.

20    Q.    How about the employee handbook?

21    A.    I don't know to what extent they

22  explain it in the handbook.

23    Q.    Is there any other place for

24  information regarding disciplinary policies, other

*MJ Exhibit  4     Page 25 of 38*

25  than the policy manual, that you are aware of?

Page 108

1    the separation was not something you initially

2    wanted?

3         A.    That's correct.

4         Q.    Okay.  Isn't it correct that your wife

5    had, unknown to you, developed a relationship with

6    an older man and wanted to be involved with him

7    rather than you?  Isn't that right?

8         A.    I wasn't able to prove it.  So I don't

9    know.  I --

10        Q.    Was that your suspicion?  Was that what

11   you told other people?

12        A.    Yes.

13        Q.    Okay.  And, in fact, that was pretty

14   emotionally devastating for you as a husband and as

15   a man, wasn't it?

16        A.    Yes.

17        Q.    Okay.  And you are a big guy.

18   Physically, you are a good-sized guy, but, in fact,

19   I think in that time period you had a pretty tender

20   heart.  Isn't that right?

21        A.    You can say that.

22        Q.    And I'm not saying that in a bad way at

23   all, okay?

24                   When you separated from your wife,

*MJ Exhibit  4*    *Page 26 of 38*

25   there was a time period when you were having a

1    tough time dealing with losing your marriage; isn't

2    that right?

3         A.    Yes.

4         Q.    Okay.  And did that -- was that

5    reflected in -- did you have trouble at work

6    because of that in terms of concentrating and

7    paying attention?

8         A.    Yes.

9         Q.    Okay.  And you guys have children,

10   right?

11        A.    Yes, we do.

12        Q.    Okay.  And there are two kids?

13        A.    One.

14        Q.    One child?  And is that a boy?

15        A.    It's a boy.

16        Q.    Okay.  And he's a -- you're a baseball

17   player, right?

18        A.    I play baseball, yes.

19        Q.    And you were doing everything you could

20   to keep your relationship with your son while

21   dealing with the stuff with your wife, right?

22        A.    That's correct.

23        Q.    Okay.  So did you find that you'd

24   leave work at times, either because you were

*MJ Exhibit  4     Page 27 of 38*

25   emotionally upset or to take care of your son,

1  during the spring of 2001?

2      A.    On occasions.

3      Q.    And when you were -- and did you have

4  occasions at work when you really would break down

5  and cry because you felt so bad about what

6  happened?

7      A.    I'm sure I became very upset.

8      Q.    And you cried, right?

9      A.    Sure.

10     Q.    Okay.  And when you were having

11  something which is clearly very important to you,

12  your marriage, having -- losing it, was there

13  somebody -- were you able to look to Myrna Johnson

14  at work to keep the fort, you know, to keep

15  everything going while you were dealing with your

16  emotional problems?

17     A.    Is there a question?

18     Q.    My question is, were you able to --

19  when you were emotionally upset and having

20  difficulties concentrating and focusing and having

21  to leave work early or go out and do things, were

22  you able to depend on Myrna Johnson to keep things

23  going while you were doing that?

24     A.    Yes.

*MJ Exhibit 4*      *Page 28 of 38*

25     Q.    And do you recall her saying to you

1   many times, "Don't worry, Jaime, I'll keep the

2   fort.  I'll keep everything going here.  You take

3   care of these things"?

4         A.     Yes.

5         Q.     Okay.  And could you depend upon her to

6   do that?

7         A.     Yes.

8         Q.     Okay.  And was she not only a good

9   employee, but a good friend during that really hard

10  time you went through?

11        A.     She was.

12        Q.     Okay.  And about how long did that kind

13  of period of emotional turbulence go on for you

14  where it was just -- it was really -- it was tough?

15  How long did that happen?  How long did that go on?

16        A.     I would say the first six weeks.  You

17  know, first it was pretty emotional and then I

18  started getting -- after six weeks, I was able to

19  concentrate on work and do other things and be

20  clear on what needs to be done, kind of get the

21  emotional part out of it.

22        Q.     So if you guys separated on

23  January 1st -- that's when you left the house?

24        A.     Shortly after that.

*MJ Exhibit  4     Page 29 of 38*

25        Q.     Shortly after that.  Okay.  And then do

Page 140

1                    (Off record)

2                    (Ms. Johnson is not present)

3 1:20 PM

4                    THE REPORTER:  We're back on

5  record following a lunch break.  It is 1:20 p.m.

6  You may proceed.

7 BY MR. CHOATE:

8      Q.      Mr. San Miguel, during the fall of

9  2001, did you ever give any verbal warnings to

10  Ms. Johnson?

11      A.      I don't recall if I did or not.

12      Q.      Okay.  Could you explain to me under

13  what situations a verbal warning stays verbal, and

14  in what situations it actually gets recorded in a

15  written form as a verbal warning?

16      A.      For verbal warning, it would be if we

17  are talking about the same issue over, say, three

18  or four days' time period, like a particular task

19  is not completed.  And the first time, you know,

20  we'll go, "Okay.  How come this wasn't done?"  And

21  then I will listen to the reason why it wasn't

22  done.  And then we'll say, "Okay.  Well, today it

23  needs to be completed."

24                    And if it happens again, I think

25  like the third time will be a verbal warning, where

*MJ Exhibit  4    Page 30 of 38*

Page 141

1    it's just like, "Okay.  This need to get done

2    today."

3                        And if it continues to be a

4    serious offense, that's when I -- then we'll sit

5    down and have it in a written form -- it is still

6    verbal -- but in a written form so they will

7    understand that that particular behavior -- or that

8    particular project has to be completed in a timely

9    manner.

10        Q.    And do you use a form that's produced

11   by Fred Meyer for that written notice of a verbal

12   warning?  Is that the same form that's used for the

13   written reprimand or written warning?

14        A.    It would be the same form.

15        Q.    Same form?

16        A.    Yes.

17        Q.    It is just something different is

18   checked?  Is the little square not checked for

19   prior verbal warning?  How is the form different?

20        A.    No, it is the same form.  Now, on the

21   meeting with the employee, we'll state if it is a

22   verbal warning, or this is an actual write-up, or

23   if it is a three-day suspension at the meeting with

24   the employee.

*MJ Exhibit  4*      *Page 31 of 38*

25        Q.    Okay.  Now, in January 2002, did

1   was through e-mail.  And she'll come in, and we'll

2   talk -- you know, we'll take a time, or set a time

3   aside to talk about this.  So, yes, this is part of

4   what we are calling a verbal warning.  We are

5   talking about things that not being completed, and

6   they need to be addressed.

7        Q.    Okay.  But a verbal warning is a

8   discipline issue, isn't it?  A verbal warning is a

9   beginning of discipline of an employee who is not

10  doing their job correctly; isn't that right?

11       A.    That would be a way for us to address,

12  yeah, if something is not being completed

13  correctly.

14       Q.    Okay.  And so within 48 -- well,

15  actually, within one day of her arriving from her

16  family -- or her personal and family leave in the

17  Philippines, you have given her, is that my

18  understanding, a verbal warning, beginning of

19  discipline that she's not doing her job correctly?

20       A.    We were addressing the fact that, yeah,

21  some of these tasks were not being completed.

22       Q.    Well, not that they just weren't being

23  completed, but that they -- that you thought it was

24  of a disciplinary consequence.  It was initiation

*MJ Exhibit 4     Page 32 of 38*

25  of a disciplinary procedure; is that right?

1      A.      Yes.

2      Q.      Okay.  Now, and that began -- was this

3    e-mail, Exhibit No. 12, is this a verbal warning

4    that is dated the 13th from you to her?

5      A.      No.  I think this was just

6    addressing -- on the 12, like I said, I don't know

7    if we are missing another e-mail here, or what we

8    talked about that day.  Was more addressing things

9    that -- "Hey, this is some of the things that

10   needed to get done last night.  It didn't get done.

11   We need to get it done tonight."

12     Q.      Okay.  And was the -- well, was the

13   e-mail that is in reference in Exhibit No. 10, the

14   Office Vision, No. 10, was that a verbal warning,

15   or did that reflect a verbal warning that was given

16   to her?

17     A.      I think that by this that would

18   start -- you know, in this e-mail we are addressing

19   still all the areas that didn't get done.

20     Q.      My question is, is this a verbal

21   warning or referencing a verbal warning that was

22   given to her orally in the day regarding the

23   recovery on the 12th?

24     A.      No, I don't think so.

25     Q.      Okay.  Why don't you tell me, then,

*MJ Exhibit 4*          *Page 33 of 38*

Page 200

1     A.      The purpose of the meeting was to talk

2  to Ms. Johnson about some of this situation that we

3  were already addressing in the e-mails, and then to

4  issue a verbal warning, that she understood what

5  the expectations were, what it was that we were

6  looking for, and try to find out if there was a

7  reason why she was not being able to complete these

8  things.  Because to that point, she hasn't said

9  anything about -- to me about being shorthanded.

10  She said she could handle everything and whatnot,

11  but still some of the things were not getting done.

12                  So the first step was to find out

13  if there was a reason or a problem as to why it

14  wasn't getting done.  And then after, we'll discuss

15  what we are going to set for the standard, what is

16  it that we're looking for the next day.

17                  So that was going to be a verbal

18  warning that we were going to -- I don't know.  I

19  used the word before -- in the written form.

20     Q.      Now, is it a practice to issue verbal

21  warnings with the director?

22     A.      For a salaried -- for salaried

23  employees, yes.

24     Q.      Well, then, on the 16th, when you sent

25  this e-mail, was that a verbal warning?  Did

1   Mr. Sayre participate in that?

2       A.    Well, because that one, again, like I

3   said, it was not going to be -- it was a

4   conversation.  It was not going to be put in her

5   personnel file.

6       Q.    So are there two different kinds of

7   verbal warnings then?

8       A.    I'll talk to an employee out on the

9   floor, let them know, again, whatever the situation

10  is.  And I said, "Look, if this doesn't get done,

11  then we are going to have go upstairs and then

12  we'll talk about it."

13              And then you have the option,

14  depending on what the infraction is, to either give

15  her a verbal warning, which we'll document.  There

16  are some infractions where we have a three-day

17  suspension.  Some are a straight write-up.  Some

18  are termination of employment.

19      Q.    Is this -- is the Exhibit No. 18, which

20  is a copy called "Employee Warning Notice," is this

21  a verbal warning or a written warning?

22      A.    This was going to be a verbal warning,

23  that we were going to document that we did, in

24  fact, talk to her that day about these items.

*MJ Exhibit  4*     *Page 35 of 38*

25      Q.    So is there something -- is there

Page 257

1     A.     Well, once she walked off the job, I

2  would say, you know, a few minutes elapsed.  I

3  can't remember exactly, maybe five, seven minutes.

4  Mr. Sayre placed a call -- I'm almost certain it

5  was to the regional office to inform regional staff

6  what happened.  I was not in the office when --

7  when he placed the call, I was there.  Then I left

8  because I got a phone call to go on the -- on the

9  floor, which I did.

10                And by the time I came back, I was

11  in the office not even a minute or two, and we

12  still kind of -- as I said earlier, were kind of

13  shocked at -- you know.  So -- I wanted just to

14  have my assistant manager improve her performance.

15  Now, all of a sudden, I don't have an assistant

16  manager.  And it started coming down to me.  It's

17  like, "Oh, wow, now I don't have an assistant

18  manager."  And she came into the office and asked

19  for a copy of the form.

20     Q.     And what happened then?

21     A.     At that point, Mr. Sayre and I tried to

22  like talk to her, and she just said she didn't want

23  to talk to us.  And she just wanted a copy and

24  wanted to leave, and she left.

*MJ Exhibit  4     Page 36 of 38*

25     Q.     Did Mr. Sayre make any other comment

Page 264

1  you had inconsistent recoveries the entire month;

2  isn't that right?

3      A.    Yes.  And Mr. Sayre addressed those

4  with me.

5      Q.    Okay.  Did he give you a verbal warning

6  for them?

7      A.    He talked to me several times.

8      Q.    I'm sorry.  That wasn't my question.

9            Did he give you a verbal warning

10  for those -- for those inconsistent recoveries?

11           MR. DICKENS:  Objection.  Asked

12  and answered.  Go ahead.

13     Q.    Yes or no?

14           MR. DICKENS:  It's not a yes or

15  no.  He's already answered the question.

16           Go ahead and answer it again.

17 BY MR. CHOATE:

18     Q.    Did he give you a warning, such as the

19  document there in front of you, saying, "This is a

20  verbal warning for these inconsistent recoveries"?

21     A.    This one?  No, he didn't.

22     Q.    Okay.  Now, when Ms. Johnson started

23  crying, did Mr. Sayre say, "Do you need some time

24  to compose yourself?

*MJ Exhibit 4    Page 37 of 38*

25     A.    He stopped talking, and to see if she

Page 265

1   will ask for any time.  No, he didn't.

2       Q.    Did he say, "Do you need some time?  Do

3   you need to take a break?"

4       A.    No, I don't remember.  I don't remember

5   that -- him saying that, no.

6       Q.    He said, "If you leave the room" --

7   this is what your testimony is -- "If you leave

8   this room while you are crying and we are giving

9   you this discipline, that's walking off the job."

10  Isn't that what he said?

11      A.    That's not what I said.

12      Q.    That's what he said, right?

13      A.    That's not what I said he said.

14      Q.    Did he say, "If you leave this room, we

15  are going to consider that walking off the job, and

16  that's the end of your employment with Fred Meyer?"

17      A.    That would be more along the lines of

18  what he said, yes.

19      Q.    What time did -- do you know what time

20  Mr. Sayre did his tour?

21      A.    It was probably around 8:00 in the

22  morning.

23      Q.    Okay.  So about an hour after the

24  department opened?

*MJ Exhibit  4*        *Page 38 of 38*

25      A.    Yes.