Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF ALASKA

MYRNA I. JOHNSON,            )
                             )
         Plaintiff,          )
                             )
v.                           )
                             )
FRED MEYER STORES, INC.,     )
a Delaware corporation;      )
and JAIME SAN MIGUEL,        )
                             )
         Defendants.         )
_____)

Case No. J04-008 CV

DEPOSITION OF MYRNA JOHNSON

Pages 1 through 264, Inclusive

Taken: Monday, January 23, 2006

Place: Juneau, Alaska

Page 122

1   A.   Yes.  We were standing in there, and he
2   said, "Come on in here."
3   Q.   All right.  So you went into Fred
4   Sayre's office, and he's got a separate office as
5   the store director?
6   A.   Yes, sir.
7   Q.   Did you sit down?
8   A.   He make a gesture for me to sit down.
9   I sit down.
10  Q.   And was Mr. San Miguel standing or
11  sitting?
12  A.   Standing.
13  Q.   And where was Mr. Sayre?
14  A.   Sitting at his desk.
15  Q.   All right.  What happened at that
16  point?
17  A.   He put out a written warning notice and
18  start to read it to me.
19  Q.   Well, which "he"?
20  A.   Mr. San Miguel.
21  Q.   All right.  Are you saying he stood
22  there, or he sat down and read it to you?
23  A.   He stood blocking the door.
24  Q.   Well, the door was closed, wasn't it?
25  A.   Yes, he close it.  So I was sitting,

Page 123

1   and then he stood right close to me with his back
2   behind the door.
3   Q.   All right.  So you came in the room.
4   There is a doorway.  There is Mr. Sayre's desk.
5   You sit down at the chair in front of the desk, and
6   there is no -- actually, there was not a second
7   chair there, either, was there?
8   A.   There was a second chair.
9   Q.   All right.  Besides the one Mr. Sayre
10  was in?
11  A.   No, in front of Mr. Sayre.
12  Q.   Oh, all right.  So Mr. San Miguel stood
13  up there, and you said that he read something to
14  you?
15  A.   Yes.  He read the warning notice.
16  Q.   Okay.  Without having it in front of
17  you -- and we'll look at it a little bit later --
18  but what do you recall it said, in effect?
19  A.   He said that my job performance -- he
20  talk about my recovery, and he said that if my job
21  performance will not improve, I am -- I have to --
22  I will lose, basically, my job as assistant
23  manager.
24  Q.   Was there a time frame mentioned in the
25  warning?

Page 124

1   A.   In 30 days.
2   Q.   All right.  But you weren't being
3   suspended, were you?
4   A.   No.
5   Q.   You weren't being fired?
6   A.   No.
7   Q.   All right.  And that's consistent with
8   the normal procedure to give, first of all, a
9   verbal warning with a written documentation, if you
10  want an employee to improve, was it not?
11  A.   He didn't give me a verbal warning.
12  Q.   Well, he read you -- that's a verbal
13  warning, because he didn't ask you to sign it, did
14  he?
15  A.   He wants me to sign it.
16  Q.   Now, wait a minute.  At the time he
17  first read it to you, isn't it true he never asked
18  you to sign it?
19  A.   No, sir.  He asked me to sign it.
20  Q.   At the beginning?
21  A.   He have a pen, and he was reading it,
22  and he was telling me to sign it.  He have a pen in
23  his hand.
24  Q.   Well, having a pen in his hand -- are
25  you testifying that it is your recollection

Page 125

1   Mr. San Miguel asked you to sign that at the time?
2   A.   Yes, sir.
3   Q.   And what did you say?
4   A.   I said, "I cannot sign this.  This is
5   not true."
6   Q.   Why is it not true?
7   A.   Because I know I did a good recovery.
8   I know that my job performance is still the same
9   thing from the first day that I took that job.
10  Q.   Have you had employees ever disagree
11  with your evaluation of their job performance and
12  walk off the job?
13  A.   No, sir.
14  Q.   So all the time you worked at Fred
15  Meyer, no one who worked when you were supervising
16  them at the time ever disagreed with your
17  evaluation of their performance?
18  A.   They walk out of the job, but not with
19  job performance, with evaluation.  I do not do the
20  evaluation, sir.
21  Q.   All right.  Let's go back.  So your
22  testimony is that Mr. San Miguel reads you this
23  warning and then asks you to sign it, and you say
24  you won't sign it. MJ Exhibit 33    Page 2 of 11
25  A.   Yes, sir.  I start to -- I was crying

32 (Pages 122 to 125)

Page 126

1  already by the time he finish reading it. I was
2  already crying.
3     Q.  Did you expect this?
4     A.  No.
5     Q.  You just told me earlier that you had
6  received several OVs that week from Mr. San Miguel
7  which were critical of your job performance, had
8  you not?
9     A.  In the course of the job, sir, we
10 always receive OVs a lot of time, and also because
11 I know that I am doing a good job.
12    Q.  Well, you just told me a few minutes
13 ago that Mr. San Miguel told you the very first
14 thing that standards are going to be higher when
15 you returned. Didn't he tell you that?
16    A.  He tell that to me because he was
17 showing me all those that has not been done.
18    Q.  All right. Let's go back to the
19 meeting on March the 18th, 2002. You start to cry.
20 Do you say anything else to Mr. Sayre or
21 Mr. San Miguel at that time?
22    A.  I was crying so hard, sir, and I said,
23 "I need to go. I need to go."
24    Q.  Go where?
25    A.  Downstairs, where I have more space and

Page 127

1  where I can get something -- a glass of water or
2  something.
3     Q.  Did Mr. Sayre say anything?
4     A.  He said that "We know that your job
5  performance is affected by what happened to your
6  daughter."
7     Q.  And did you respond to that?
8     A.  Yes. I cry more.
9     Q.  Did you respond to --
10    A.  I said, "Please don't say that." I
11 said, "I have never left this store from the day I
12 come in here -- from the moment I come in here
13 until the moment that we close the store. I do not
14 leave this store. Please, do not say that, because
15 I am working harder when I was -- before what
16 happened to my daughter."
17    Q.  All right. You come back from having
18 taking your daughter in a difficult family
19 situation, and upon your return, for several days
20 the department manager concludes that you are not
21 performing as -- in a satisfactory manner. Do you
22 think it unusual that he and the store director
23 would attribute that to a family situation?
24    A.  No --
25    Q.  Well then --

Page 128

1     A.  I don't understand the question, sir.
2  I get a little bit confused on that.
3     Q.  Let me ask you this. What else did
4  Mr. Sayre say?
5     A.  Nothing. He look at me there, while I
6  was crying, and I stood up.
7     Q.  Did he say anything to you about,
8  "Don't leave. If you do, it will be considered a
9  quit"?
10    A.  No, sir.
11    Q.  Are you sure?
12    A.  Yes.
13    Q.  As a first assistant under Fred Meyer
14 policy in effect in March 2002, who at the store,
15 if anyone, had authority to terminate an employee
16 at your level?
17    A.  Mr. San Miguel and Mr. Sayre.
18    Q.  Do you know if Mr. San Miguel actually
19 had authority, or if it only could be Mr. Sayre?
20    A.  Mr. San Miguel.
21    Q.  And on what do you base that
22 conclusion?
23    A.  Because he is our immediate boss.
24    Q.  Have you ever known a situation where
25 the department manager had the authority to fire a

Page 129

1  first assistant without the actual approval and
2  firing done by the store director?
3     A.  No, sir, I don't.
4     Q.  Okay. Do you recall anything else that
5  was said by Mr. San Miguel or Mr. Sayre at that
6  point in time before you left the room?
7     A.  No.
8     Q.  Okay. You have no recollection of any
9  comments by Mr. Sayre as to what he would conclude
10 would be your situation if you got up and walked
11 out of the room before the discussion ended?
12    A.  No, sir. I was crying very, very hard,
13 sir. I was saying something, and I don't even know
14 if they understand. I was saying, "I know you have
15 somebody in your mind" --
16    Q.  Did you say that to them, or do you
17 know if they understood that?
18    A.  I said, "You must have somebody in mind
19 to replace me."
20    Q.  Now, why would you say that?
21    A.  Because prior to that, I notice some
22 changes in the store -- in the department.
23    Q.  What changes?
24    A.  Mr. San Miguel had put me at the
25 schedule that is supposed to be for the second

*MJ Exhibit 33, Page 3 of 11*

33 (Pages 126 to 129)

Page 150

1  2002?
2  A.  I know he was working daytime, because
3  his schedule, sir, is different.
4  Q.  What do you mean, it's different?
5  A.  He could write himself there, the
6  schedule.  For example, is 7:00 to 5:00 every day
7  in the schedule, but it does not necessarily mean
8  he was there.
9  Q.  Okay.  Do you know how many days the
10 week of March 10, 2002, he was on the schedule to
11 be working?
12 A.  I saw him when I walk in there on --
13 when I work on Tuesday.  On the 12th, the 13th -- I
14 saw him on those days.
15 Q.  Well, actually, if you think back, did
16 you see the schedule for that week when you started
17 on March 12?
18 A.  I don't remember, sir.
19 Q.  All right.  Okay.  You say your
20 schedule changed.  Well, as we have already talked,
21 when you came back, the schedule had already been
22 set for the week of March 10 before you even
23 arrived back in town.  Correct?
24 A.  Yes, sir.
25 Q.  Okay.  And are you telling me that in

Page 151

1  the nine years you had worked at Fred Meyer, no one
2  in the apparel department had ever been given a
3  verbal reprimand of any type?
4  A.  There was a lot, sir, that was given a
5  verbal warning.
6  Q.  So then giving you a verbal warning
7  wasn't really unusual, was it?
8  A.  He was not giving me a verbal warning,
9  sir.  It was a warning notice already.
10 Q.  Again, I think there is a difference of
11 opinion on that, but I understand what you are
12 saying.
13     In the nine years that you worked
14 for Fred Meyer, are you telling me that no one in
15 the apparel department had been given a written
16 warning for poor performance?
17 A.  There are some, sir.
18 Q.  All right.  So, again, that's not
19 unusual, either, was it?
20 A.  It was unusual when you are giving a
21 warning in front of the director.
22 Q.  But you are a first-level assistant,
23 right?
24 A.  Yes, sir.
25 Q.  Do you know of any employee that

Page 152

1  Mr. San Miguel saw socially outside of Fred Meyer
2  during 2000, 2001, 2002?
3  A.  Yes, I know some.
4  Q.  Who?
5  A.  He was going out with Kaylonna Haase at
6  the time.
7  Q.  Anyone else he dated that you know of?
8  A.  He was -- I know he was going out with
9  Minerva.  Not -- like as friends, with wives and
10 everything.  You said socially, so --
11 Q.  All right.  Let me rephrase it then.
12     How about anyone Mr. San Miguel
13 dated who worked at Fred Meyer besides Kaylonna?
14 A.  I don't know, sir.
15     MR. DICKENS:  Let's mark this,
16 please.
17     (Exhibit 1 duly marked)
18 BY MR. DICKENS:
19 Q.  Ms. Johnson, you have been handed what
20 has been marked as Exhibit 1 to your deposition.
21 For the record, would you please identify that?
22 A.  Yes, sir.
23 Q.  What is that?
24 A.  This is the application.
25 Q.  Is that in your handwriting, the space

Page 153

1  above "To be completed by manager"?
2  A.  Yes, sir.
3  Q.  And is the information on page 1 that
4  you filled in true and accurate?
5  A.  Yes, sir.
6  Q.  Would you turn to page 2, please?
7  There is education listed there.  There are some
8  places filled in.  There is some information -- was
9  it correct at the time?
10 A.  Yes, sir.
11 Q.  And under your prior employment,
12 starting with Famous Footwear in Charlotte, North
13 Carolina, was that information correct at the time?
14 A.  Yes, sir.
15 Q.  So did you move from Charlotte, North
16 Carolina, to Juneau?
17 A.  Yes, sir.
18     MR. DICKENS:  Mark that, please.
19     (Exhibit 2 duly marked)
20 BY MR. DICKENS:
21 Q.  Ms. Johnson, you have been handed what
22 has been marked as Exhibit 2 to your deposition.
23 Would you take a minute, please, and look at that?
24 A.  (Reading).
25 Q.  Are you familiar with that document?

1    A.    Yes. We were standing in there, and he
2  said, "Come on in here."
3    Q.    All right. So you went into Fred
4  Sayre's office, and he's got a separate office as
5  the store director?
6    A.    Yes, sir.
7    Q.    Did you sit down?
8    A.    He make a gesture for me to sit down.
9  I sit down.
10   Q.    And was Mr. San Miguel standing or
11 sitting?
12   A.    Standing.
13   Q.    And where was Mr. Sayre?
14   A.    Sitting at his desk.
15   Q.    All right. What happened at that
16 point?
17   A.    He put out a written warning notice and
18 start to read it to me.
19   Q.    Well, which "he"?
20   A.    Mr. San Miguel.
21   Q.    All right. Are you saying he stood
22 there, or he sat down and read it to you?
23   A.    He stood blocking the door.
24   Q.    Well, the door was closed, wasn't it?
25   A.    Yes, he close it. So I was sitting,

1    A.    In 30 days.

2    Q.    All right.  But you weren't being
3 suspended, were you?

4    A.    No.

5    Q.    You weren't being fired?

6    A.    No.

7    Q.    All right.  And that's consistent with
8 the normal procedure to give, first of all, a
9 verbal warning with a written documentation, if you
10 want an employee to improve, was it not?

11   A.    He didn't give me a verbal warning.

12   Q.    Well, he read you -- that's a verbal
13 warning, because he didn't ask you to sign it, did
14 he?

15   A.    He wants me to sign it.

16   Q.    Now, wait a minute.  At the time he
17 first read it to you, isn't it true he never asked
18 you to sign it?

19   A.    No, sir.  He asked me to sign it.

20   Q.    At the beginning?

21   A.    He have a pen, and he was reading it,
22 and he was telling me to sign it.  He have a pen in
23 his hand.

24   Q.    Well, having a pen in his hand -- are
25 you testifying that it is your recollection

Page 125

```
 1  Mr. San Miguel asked you to sign that at the time?
 2       A.    Yes, sir.
 3       Q.    And what did you say?
 4       A.    I said, "I cannot sign this.  This is
 5  not true."
 6       Q.    Why is it not true?
 7       A.    Because I know I did a good recovery.
 8  I know that my job performance is still the same
 9  thing from the first day that I took that job.
10       Q.    Have you had employees ever disagree
11  with your evaluation of their job performance and
12  walk off the job?
13       A.    No, sir.
14       Q.    So all the time you worked at Fred
15  Meyer, no one who worked when you were supervising
16  them at the time ever disagreed with your
17  evaluation of their performance?
18       A.    They walk out of the job, but not with
19  job performance, with evaluation.  I do not do the
20  evaluation, sir.
21       Q.    All right.  Let's go back.  So your
22  testimony is that Mr. San Miguel reads you this
23  warning and then asks you to sign it, and you say
24  you won't sign it.
25       A.    Yes, sir.  I start to -- I was crying
```

1  already by the time he finish reading it.  I was
2  already crying.
3     Q.    Did you expect this?
4     A.    No.
5     Q.    You just told me earlier that you had
6  received several OVs that week from Mr. San Miguel
7  which were critical of your job performance, had
8  you not?
9     A.    In the course of the job, sir, we
10 always receive OVs a lot of time, and also because
11 I know that I am doing a good job.
12    Q.    Well, you just told me a few minutes
13 ago that Mr. San Miguel told you the very first
14 thing that standards are going to be higher when
15 you returned.  Didn't he tell you that?
16    A.    He tell that to me because he was
17 showing me all those that has not been done.
18    Q.    All right.  Let's go back to the
19 meeting on March the 18th, 2002.  You start to cry.
20 Do you say anything else to Mr. Sayre or
21 Mr. San Miguel at that time?
22    A.    I was crying so hard, sir, and I said,
23 "I need to go.  I need to go."
24    Q.    Go where?
25    A.    Downstairs, where I have more space and

1  where I can get something -- a glass of water or
2  something.
3      Q.    Did Mr. Sayre say anything?
4      A.    He said that "We know that your job
5  performance is affected by what happened to your
6  daughter."
7      Q.    And did you respond to that?
8      A.    Yes.  I cry more.
9      Q.    Did you respond to --
10     A.    I said, "Please don't say that."  I
11 said, "I have never left this store from the day I
12 come in here -- from the moment I come in here
13 until the moment that we close the store.  I do not
14 leave this store.  Please, do not say that, because
15 I am working harder when I was -- before what
16 happened to my daughter."
17     Q.    All right.  You come back from having
18 taking your daughter in a difficult family
19 situation, and upon your return, for several days
20 the department manager concludes that you are not
21 performing as -- in a satisfactory manner.  Do you
22 think it unusual that he and the store director
23 would attribute that to a family situation?
24     A.    No --
25     Q.    Well then --

1      A.      I don't understand the question, sir.
2  I get a little bit confused on that.
3      Q.      Let me ask you this.  What else did
4  Mr. Sayre say?
5      A.      Nothing.  He look at me there, while I
6  was crying, and I stood up.
7      Q.      Did he say anything to you about,
8  "Don't leave.  If you do, it will be considered a
9  quit"?
10     A.      No, sir.
11     Q.      Are you sure?
12     A.      Yes.
13     Q.      As a first assistant under Fred Meyer
14 policy in effect in March 2002, who at the store,
15 if anyone, had authority to terminate an employee
16 at your level?
17     A.      Mr. San Miguel and Mr. Sayre.
18     Q.      Do you know if Mr. San Miguel actually
19 had authority, or if it only could be Mr. Sayre?
20     A.      Mr. San Miguel.
21     Q.      And on what do you base that
22 conclusion?
23     A.      Because he is our immediate boss.
24     Q.      Have you ever known a situation where
25 the department manager had the authority to fire a

1  the nine years you had worked at Fred Meyer, no one
2  in the apparel department had ever been given a
3  verbal reprimand of any type?
4       A.    There was a lot, sir, that was given a
5  verbal warning.
6       Q.    So then giving you a verbal warning
7  wasn't really unusual, was it?
8       A.    He was not giving me a verbal warning,
9  sir.  It was a warning notice already.
10      Q.    Again, I think there is a difference of
11 opinion on that, but I understand what you are
12 saying.
13            In the nine years that you worked
14 for Fred Meyer, are you telling me that no one in
15 the apparel department had been given a written
16 warning for poor performance?
17      A.    There are some, sir.
18      Q.    All right.  So, again, that's not
19 unusual, either, was it?
20      A.    It was unusual when you are giving a
21 warning in front of the director.
22      Q.    But you are a first-level assistant,
23 right?
24      A.    Yes, sir.
25      Q.    Do you know of any employee that