BEFORE THE ALASKA STATE COMMISSION OF HUMAN RIGHTS

MYRNA I. JOHNSON,        )
                         )
    Plaintiff            )
                         )
                         )
vs.                      )
                         )
FRED MEYER STORES, INC.  )
                         )
    Defendants           )
                         )
_____)  ASCHR No. C-02-132

### AFFIDAVIT OF MATHEW LANEY

I, Mathew Laney, being first duly sworn upon oath, depose and state as follows:

1. I am more than 19 years of age, and competent to testify regarding these matters, based on personal knowledge and belief.

2. My mailing address is 821 9th Ave., # 202, Seattle, WA 98104.

3. I first began working at Fred Meyers, Inc. ("Company") in Oregon on a part-time basis when I was in school.

4. I began working full-time at the Company in 1989 as a sales clerk and shortly thereafter entered the Company's management training program.

5. From 1989 until 1994, I worked in five different Company stores in Oregon and was an Assistant Manager.

6. In 1994, I was transferred to the Apparel and Leisure Department of the Company's store in Juneau, Alaska ("Juneau Store").

7. When I began managing the Apparel and Leisure Department at the Juneau Store in 1995, Ms. Johnson was working in the shoe department, which was

MJ Exhibit 34  Page 1 of 4

Exhibit 32  Date 1/24/06
Witness Jaime San Miguel
Lynda Batchelor Barker, RDR
4 pages

Johnson v. Fred Meyer Stores, Inc.,
Affidavit of Matthew Laney

ASCHR No. C-02-132
Page 1 of 4

under my supervision, and I had contact with her on a daily basis.

8. Ms. Johnson later took a job with the State of Alaska for a brief period of time, but she continued to work part-time at the Juneau Store until 1996, so I still saw her at work from time to time even while she worked for the State.

9. In 1996, I was involved in a project to strengthen the management team at the Juneau Store and I immediately recruited Ms. Johnson to be part of the management team.

10. When Ms. Johnson returned to the Juneau Store on a full-time basis in 1996 as part of management, I saw her on a daily basis and was her supervisor.

11. Ms. Johnson, throughout my association with her at the Juneau Store, was very professional in appearance, was extremely hardworking, had an exemplary work ethic, was an excellent supervisor who had outstanding people skills, and was an employee who needed little supervision.

12. I found Ms. Johnson to be an excellent employee who was exceptional on a number of different levels: she led by example, was devoted to her job, was well-balanced, inspired employees, and was well-respected by co-workers and management.

13. Myrna Johnson also completed her work in a timely manner and there was no need to supervise her or follow up with her as she always outworked her project list.

14. I also supervised Jaime San Miguel during much of this same time period.

15. By contrast, I viewed San Miguel as a bit of a problem, since he caused more work than he produced, needed substantial improvement in his people skills, and was the source of a number of complaints from co-workers and subordinates who worked under him.

16. Among the complaints I received about him were complaints from at least

*MJ Exhibit 34    Page 2 of 4*

two older female employees who related to me that he had said to them: "if I could, I'd get rid of you and just hire cute ones."

17. Jaime San Miguel also remarked on a number of occasions that he was interested in dating Kaylana Haase, a female co-worker of his at the Juneau Store, and I did notice that good-looking young women at the Juneau Store captured his attention.

18. While San Miguel worked for me, he had a number of family and personal problems and I gave him time off from work because of these problems, including a month's leave in one instance.

19. From time to time, San Miguel left before his shift was over because he was upset or didn't feel well and, on occasions, Ms. Johnson also left a few times before her shift was finished due to extenuating circumstances.

20. I resigned from the Juneau Store in 2000, and then began focusing my attention on an interior decorating business that I had started while employed at the Juneau Store.

21. San Miguel was promoted into my position after I resigned.

22. I received a phone call from Ms. Johnson shortly after her termination from the Company in March of 2002, which is how I learned that she was no longer at the Juneau Store.

23. During this phone call, Ms. Johnson told me that upon her return from leave, San Miguel had given her pages and pages of things that needed to get done in one night on a "Tour of Duty" list. Such lists were normally one-page in length or two pages at the most.

24. When I heard Ms. Johnson's account of the events, it sounded as though San Miguel was demanding that Ms. Johnson perform an unreasonable number of tasks in a totally unreasonable time frame.

25. Knowing San Miguel, I suspect he was very resentful that Ms. Johnson had

taken a leave of absence to deal with the health issues of her daughter.

26. I asked Ms. Johnson whether she had spoken to Fred Sayre about what had happened and she said that she did, but he had done nothing.

27. I was not surprised at Sayre's conduct since when he was faced with a problem, he tended to ignore it.

28. Since the Juneau Store was the only large retailer in town after K-Mart closed, I was not surprised to learn that Ms. Johnson had been forced to leave Juneau, Alaska after she was terminated by the Juneau Store.

DATED this 9th day of June, 2004.

_____
Mathew Laney

SUBSCRIBED and SWORN TO before me this 9th day of June, 2004.

_____
Notary Public, State of Washington
My commission expires: 9/4/07

*Johnson v. Fred Meyer Stores, Inc.,*
Affidavit of Matthew Laney

ASCHR No. C-02-132
Page 4 of 4

MJ Exhibit 34   Page 4 of 4