UNITED STATES DISTRICT COURT

DISTRICT OF ALASKA

MYRNA I. JOHNSON,             )
                              )
        Plaintiff,            )
                              )
v.                            )
                              )
FRED MEYER STORES, INC.,      )
a Delaware corporation;       )
and JAIME SAN MIGUEL,         )
                              )
        Defendants.           )
_____)

Case No. J04-008 CV (JKS)

VIDEOTAPED DEPOSITION OF FRED SAYRE

Pages 1 through 105, Inclusive

Taken:  Friday, January 27, 2006

Place:  Juneau, Alaska

Page 38

```
 1  days. I know one day I went in and wrote a pretty
 2  big tour.
 3      Q.   Okay. And let me see if I can find it
 4  here. Let's just talk about that. You came in --
 5           MR. DICKENS: Counsel, Exhibit 11?
 6           MR. CHOATE: Yes, you're right.
 7  BY MR. CHOATE:
 8      Q.   Is this the tour that you wrote?
 9      A.   No.
10      Q.   Okay. That's not -- is that your
11  handwriting?
12      A.   No.
13      Q.   Okay. Not your handwriting.
14      A.   No. My handwriting is not very good.
15      Q.   Neither is mine. It seems to get worse
16  all the time. One second.
17           MR. DICKENS: Check Exhibit 38.
18           MR. CHOATE: What?
19           MR. DICKENS: Check Exhibit 38.
20  BY MR. CHOATE:
21      Q.   I'm handing you what has been marked
22  Exhibit 38. Is that the tour that you did?
23      A.   Yeah, that's my handwriting.
24      Q.   Okay. And is that the tour you are
25  referencing? Is that where you had concerns?
```

Page 39

```
 1      A.   Correct.
 2      Q.   Okay. What day was that tour done, if
 3  you know?
 4      A.   It says 3-13-02.
 5      Q.   So on the 13th?
 6      A.   Yeah.
 7      Q.   And you went through apparel, you had
 8  concerns regarding the recovery, and did you give
 9  this sheet to Mr. San Miguel?
10      A.   Yeah. Talked to him.
11      Q.   Okay. And what did you say, if you
12  recall?
13      A.   I don't recall what I said. It
14  probably wasn't good, just things needed fixed.
15      Q.   Okay. And do you -- so, you did that
16  tour on the 13th. You had these concerns. Did you
17  have any other concerns that week regarding
18  recoveries?
19      A.   I might have.
20      Q.   Do you recall?
21      A.   Not that I recall.
22      Q.   Okay. Subsequently, did you and
23  Mr. San Miguel, at some point in time that week,
24  talk about having a conference with Myrna Johnson?
25      A.   That was not -- not that I remember.
```

Page 40

```
 1      Q.   Okay. Do you recall having a meeting
 2  with Myrna Johnson on March 18th?
 3      A.   Yes.
 4      Q.   Okay. How did that come about?
 5      A.   From what I remember is, OVs were going
 6  back and forth between her and Jaime, and he said,
 7  "Well, we need to sit down and chat with her." And
 8  I said, "Okay. Since it's not getting done, let's
 9  go ahead and sit down and chat with her."
10      Q.   Okay. And would that have been your
11  normal practice to, if you have a problem with work
12  not getting done, that you'd sit down and talk with
13  the manager or assistant manager about it?
14      A.   Normally the manager and assistant
15  manager try to take care of it. If not, then yes,
16  I'd be involved.
17      Q.   Well you know that Ms. -- strike that.
18           So did you call -- ask for a
19  meeting because you saw the OVs going back and
20  forth?
21      A.   No.
22      Q.   Okay. Did you ask for the meeting, or
23  did Mr. San Miguel ask for it?
24      A.   If I recall right, Jaime asked if I
25  could talk with him and Myrna about her
```

Page 41

```
 1  performance.
 2      Q.   Okay. Did he tell you at that time
 3  that he had given her a verbal warning regarding
 4  her performance?
 5      A.   I believe he just said, "We'd been
 6  talking about this, and these are the OVs I sent to
 7  her."
 8      Q.   Okay. And so that meeting was at
 9  Mr. San Miguel's request, not -- it wasn't
10  initiated by yourself?
11      A.   No.
12      Q.   Okay.
13      A.   Not that I recall.
14      Q.   Okay. And prior to that meeting, did
15  you meet with -- did you discuss with
16  Mr. San Miguel what was the purpose -- what the
17  purpose of the meeting was for?
18      A.   I believe we discussed it right before
19  the meeting, that we wanted to talk -- he wanted to
20  talk with Myrna and find out what was going on and
21  find out why her recoveries were not getting done.
22      Q.   Okay. When you -- when he said that,
23  did you look at what her schedule had been for the
24  prior week --
25      A.   No.
```

Page 42

1   Q.   Were you aware when you -- right before
2   you had your meeting with Myrna Johnson on
3   March 18, that she'd worked the six prior days, you
4   know, roughly 11, 12 hours a day?
5   A.   I didn't know how long she worked, no.
6   Q.   Okay.  Now, when this meeting was --
7   occurred, it occurred up in your office?
8   A.   It was in my office.
9   Q.   Okay.  And were you aware, before that
10  meeting began, that Mr. San Miguel had prepared a
11  written -- let me make sure I use the right
12  language here.
13           MR. DICKENS:  It is Exhibit 18.
14           MR. CHOATE:  18?
15           MR. DICKENS:  Yes.
16  BY MR. CHOATE:
17  Q.   An employee -- written Employee Warning
18  Notice that he was intending to give to
19  Ms. Johnson?
20  A.   This is -- yeah.
21  Q.   Okay.  When did you first learn that he
22  was going -- that he had prepared that notice?
23  A.   The day of the meeting.
24  Q.   How soon before the meeting?
25  A.   I don't know the time before the

Page 43

1   meeting.  Before he brought her in.
2   Q.   Okay.  Was it a common practice at Fred
3   Meyer to give written notices like that to
4   management employees?
5   A.   The written -- actually, you want to
6   counsel -- this is more of a counseling document.
7   A written notice would be -- this would be a
8   written notice, if they ever sign it, yeah.
9   Q.   Okay.  So if the expectation -- if the
10  person is expected to sign it, then it would be
11  considered a written notice?
12  A.   Correct.  You have counseling, and then
13  a written, verbal written notice.  Yeah.
14  Q.   Okay.  Let me -- maybe we'll step off
15  the track here and talk about that procedure.
16  A.   Okay.
17  Q.   What are the steps in discipline at
18  Fred Meyer?
19  A.   Generally, you have counseling.
20  Q.   Okay.  And what is counseling?
21  A.   Counseling is the manager, whoever,
22  chatting with the person.
23  Q.   Okay.
24  A.   Then you normally have a verbal written
25  warning.

Page 44

1   Q.   A verbal written warning.  That
2   sounds -- only lawyers could think of something
3   like that.  What does that mean?
4   A.   It means that it's a warning that --
5   "Look, this is what could happen if things don't
6   change around. "
7   Q.   Okay.
8   A.   "We are verbally talking to you about
9   it now.  Do you acknowledge that?"
10  Q.   Okay.
11  A.   And generally most people say, "Well,
12  okay," and turn around.
13  Q.   Okay.  And a verbal written warning, is
14  that memorialized by a document like this?
15  A.   Generally.
16  Q.   Okay.  And what is the next step?
17  A.   Then a written Employee Warning Notice.
18  Q.   Okay.  And how does -- is this document
19  in front of you, Exhibit 18, is that a verbal
20  written warning or is that a written warning?
21  A.   This would be a verbal written warning,
22  if -- if it was ever given out.  I mean --
23  Q.   Okay.  If it was given out, it would
24  have been -- and how would you tell the difference
25  between a verbal written warning and a --

Page 45

1   A.   You normally write a "verbal" up on
2   here. (indicating).
3   Q.   So if it had been a verbal written
4   warning, the word "verbal" would be written at the
5   top?
6   A.   You normally write "verbal," or you
7   write something on there after you talk to the
8   employee about it and discuss it.
9   Q.   Okay.  And on a verbal written warning,
10  you are saying that the word "verbal" would
11  normally be written above "Employee Warning
12  Notice"?
13  A.   Normally that's what I do, yeah.
14  Q.   Okay.
15  A.   Or -- yeah.
16  Q.   Okay.  Now, if you see here, on the
17  first paragraph, it says "Prior verbal warning,"
18  and there is a check mark, "Yes"?
19  A.   Uh-huh.
20  Q.   Did you check that off, or did
21  Mr. San Miguel check that off?
22  A.   I didn't check that off.
23  Q.   Okay.  Do you know what prior verbal
24  warning was given to Ms. Johnson?

MJ Exhibit 47 Page 3 of 6

25  A.   I believe it would be the OVs and the

1    Q.    Okay.  Do you recall having a meeting
2  with Myrna Johnson on March 18th?
3    A.    Yes.
4    Q.    Okay.  How did that come about?
5    A.    From what I remember is, OVs were going
6  back and forth between her and Jaime, and he said,
7  "Well, we need to sit down and chat with her."  And
8  I said, "Okay.  Since it's not getting done, let's
9  go ahead and sit down and chat with her."
10    Q.    Okay.  And would that have been your
11 normal practice to, if you have a problem with work
12 not getting done, that you'd sit down and talk with
13 the manager or assistant manager about it?
14    A.    Normally the manager and assistant
15 manager try to take care of it.  If not, then yes,
16 I'd be involved.
17    Q.    Well you know that Ms. -- strike that.
18         So did you call -- ask for a
19 meeting because you saw the OVs going back and
20 forth?
21    A.    No.
22    Q.    Okay.  Did you ask for the meeting, or
23 did Mr. San Miguel ask for it?
24    A.    If I recall right, Jaime asked if I
25 could talk with him and Myrna about her

```
 1      Q.      A verbal written warning.  That
 2 sounds -- only lawyers could think of something
 3 like that.  What does that mean?
 4      A.      It means that it's a warning that --
 5 "Look, this is what could happen if things don't
 6 change around. "
 7      Q.      Okay.
 8      A.      "We are verbally talking to you about
 9 it now.  Do you acknowledge that?"
10      Q.      Okay.
11      A.      And generally most people say, "Well,
12 okay," and turn around.
13      Q.      Okay.  And a verbal written warning, is
14 that memorialized by a document like this?
15      A.      Generally.
16      Q.      Okay.  And what is the next step?
17      A.      Then a written Employee Warning Notice.
18      Q.      Okay.  And how does -- is this document
19 in front of you, Exhibit 18, is that a verbal
20 written warning or is that a written warning?
21      A.      This would be a verbal written warning,
22 if -- if it was ever given out.  I mean --
23      Q.      Okay.  If it was given out, it would
24 have been -- and how would you tell the difference
25 between a verbal written warning and a --
```

```
 1      A.      You normally write a "verbal" up on
 2 here.  (indicating).
 3      Q.      So if it had been a verbal written
 4 warning, the word "verbal" would be written at the
 5 top?
 6      A.      You normally write "verbal," or you
 7 write something on there after you talk to the
 8 employee about it and discuss it.
 9      Q.      Okay.  And on a verbal written warning,
10 you are saying that the word "verbal" would
11 normally be written above "Employee Warning
12 Notice"?
13      A.      Normally that's what I do, yeah.
14      Q.      Okay.
15      A.      Or -- yeah.
16      Q.      Okay.  Now, if you see here, on the
17 first paragraph, it says "Prior verbal warning,"
18 and there is a check mark, "Yes"?
19      A.      Uh-huh.
20      Q.      Did you check that off, or did
21 Mr. San Miguel check that off?
22      A.      I didn't check that off.
23      Q.      Okay.  Do you know what prior verbal
24 warning was given to Ms. Johnson?
25      A.      I believe it would be the OVs and the
```