MYRNA L. JOHNSON v. FRED MEYER STORES, INC.

ASCHR No. C-O2-132

AFFIDAVIT OF JOHNNA HAVARD

I, Johnna Havard, being first duly sworn upon oath, depose and state as follows:

1. I am twenty-five (25) years of age, and competent to testify regarding these matters, based on personal knowledge and belief.

2. My mailing address is 3330 Nowell Ave., # 5, Juneau, Alaska 99801.

3. I first began working for Fred Meyer, Inc. ("Company") in its Fairbanks, Alaska store on September 2, 1999, as the "Fourth-in-Charge," a management position.

4. During the five years I have been employed by the Company, I have also worked at the Company's stores in Wasilla, Alaska ("Wasilla Store") and in Juneau, Alaska ("Juneau Store").

5. I received several promotions at the Company and, in January of 2002, was working as the Second Assistant in the Wasilla Store. This position is sometimes also called the "Relief Assistant."

6. In February of 2002, I learned from Dennis Afflect, the District Manager for the Company, that there was a temporary First Assistant position open at the Juneau Store.

MJ Exhibit 51    Page 1 of 8

Affidavit of Johnna Havard    Page 1 of 8

7. Dennis Afflect recommended that I take the temporary First Assistant position at the Juneau Store in order to get more managerial experience and I agreed to do that.

8. I began working at the Juneau Store on March 1, 2002, as the temporary First Assistant. After I began working at the Juneau Store, I learned that I was replacing Myrna Johnson, who was on a leave of absence.

9. Throughout my time as a temporary First Assistant at the Juneau Store, I was supervised by Jaime San Miguel ("San Miguel"), a Hispanic male who appears to be in his thirties.

10. I enjoyed living and working in Juneau, Alaska and during the month that I was in this temporary position, I mentioned to San Miguel that I would be willing to move to Juneau if the First Assistant position ever became available.

11. Myrna Johnson returned from her leave of absence in mid-March of 2002. Upon her return, we were both working at the Juneau Store for approximately one week prior to my scheduled return to the Wasilla Store. During that time, I was working the day shift while Myrna was on the evening shift.

12. On or about March 18, 2002, San Miguel informed me that Myrna Johnson was no longer working at the Juneau Store and told me that her job was being posted. Both San Miguel and Fred Sayre, the Juneau Store Manager, encouraged me to apply for her position.

*MJ Exhibit 51    Page 2 of 8*

13. I returned to the Wasilla Store in late March as had previously been scheduled, but did apply for the First Assistant opening at the Juneau Store.

14. I was offered the First Assistant position at the Juneau Store, relocated to Juneau, and began my new job there on April 17, 2002.

15. While I was working as the temporary First Assistant at the Juneau Store, it was obvious from my conversations with other employees that Myrna was well-liked by her co-workers, that her subordinates thought highly of her, and that she was a hard worker.

16. Several employees told me that Myrna Johnson had been pushed out of the job so that San Miguel could hire me and I was told that San Miguel had written her up shortly before her job was posted as being vacant.

17. I was also told by two female employees that San Miguel had said that he wanted to replace Myrna Johnson with a younger and more beautiful employee. I was not surprised by this comment as I had personally observed that San Miguel favored younger female employees in comparison to his treatment of older women who worked at the Juneau Store.

18. I subsequently learned that one of the things that Myrna was being written up for was the completion of a plan-o-gram (also called a schematic) in the baby furniture department. I was very surprised to hear this, since Minerva Cortez – not Myrna Johnson – was responsible for that task. In fact, the plan-o-gram remained unfinished long after

Ms. Johnson was no longer employed by the Store and, to the best of my knowledge, Ms. Cortez was never reprimanded for her failure to complete this task.

19. After I returned to the Juneau Store to be the First Assistant, San Miguel on one occasion invited me to come over to his house and do some Latin dancing with him. I considered this invitation to be inappropriate.

20. I also noticed that San Miguel behaved in a very flirtatious manner – and in my view, an inappropriate manner – with Felicia Kohnen, who was a "KSP" in the Juneau Store. A KSP is employed in a human resources function. I also could not help but notice that San Miguel would eye attractive women who walked by him in the Juneau Store.

21. It also became obvious to me that San Miguel preferred Hispanic employees over Asian employees. For example, complaints about Minerva Cortez abounded in the Juneau Store, yet San Miguel did nothing to address those complaints.

22. On Myrna's last day in the Juneau Store, I saw her crying in the stock room and observed that she was very upset.

23. After Myrna's last day at work, San Miguel remarked that Myrna "was not doing her job." However, he did not elaborate on that statement.

24. San Miguel repeatedly asked me to fix him up with dates or with "hot women," a request that I found to be inappropriate.

25. Sometime in the spring of 2002, after I had assumed the position of First Assistant for the Juneau Store, Myrna was in the Juneau Store working on servicing the

Foster Grant exhibit since she was a vendor for them. San Miguel instructed me to inform Myrna that she was not to service the account unless he was present in the Juneau Store.

26. I had previously been a vendor for an outside account that sold merchandise in one of the Company's stores so I knew that there was no such requirement. Thus, I found it very odd that San Miguel would impose this unusual requirement on Ms. Johnson but I delivered his message to Ms. Johnson since he had instructed me to do so.

27. I do not recall seeing Ms. Johnson servicing that account after that time.

28. San Miguel remained my supervisor until April of 2003. However, our working relationship began to deteriorate seriously after I got engaged to a co-worker in the summer of 2002.

29. San Miguel began to criticize my work after I got engaged. I felt San Miguel's criticism of my work after my engagement was utterly unfounded as the quality and quantity of my work had not changed. I personally believe that jealousy – not my work performance – prompted his actions.

30. After my engagement, San Miguel also scheduled me on the less favorable evening shift and would give me a long list of things that needed to be done which could not possibly be completed during my shift.

31. San Miguel would then criticize me for not completing all the items on his long list. On one occasion he told me that I needed to work until 2 a.m. to finish the tasks assigned to me. I would note that even when San Miguel placed me on the less desirable evening shift, my working hours were supposed to be over at 11 p.m.

MJ Exhibit "51" Page 5 of 8

32. By late fall of 2002, I was sure that San Miguel was trying to push me out of my job. He even blamed me for incidents that happened on my days off from work.

33. I complained about San Miguel's conduct to Dennis Afflect, the District Manager for the Company, in or about November of 2002 but my complaints were ignored.

34. In December of 2002, San Miguel and Fred Sayre gave me a written warning for "leaving when the job was not completed" when I left work at approximately 6:00 a.m. on Thanksgiving Day. I refused to sign that written warning because I felt that it was not warranted.

35. Although I complained about the change in San Miguel's treatment of me to Fred Sayre, these two men socialize outside of the office and my complaints were "swept under the rug."

36. When I mentioned to another Fred Meyer, Inc. employee in early 2003 that I would like to work in the corporate office for the Company, San Miguel overheard my statement and said that I "was not going anywhere."

37. After I complained about San Miguel's conduct, he placed me on the graveyard shift which ran from 10 p.m. to 7:30 a.m., although the First Assistant is normally not scheduled for this shift.

38. San Miguel's harassment and retaliation of me began to take a toll on my health and I was rushed to the hospital with chest pains in December of 2002.

39. I eventually contacted Jim Hill (Operations Manager for the Company in the Company's corporate office), Ken Haverkost (Fred Sayre's supervisor), and Mary Lucas,

MJ Exhibit 51   Page 6 of 8

who was in charge of Human Resources at the corporate offices of the Company, through e-mail in order to complain about the treatment I had been experiencing since my engagement.

40. Neither Jim Hill nor Ken Haverkost responded to my e-mail. Instead, Haverkost forwarded my e-mail to Fred Sayre.

41. After Sayre received this forwarded e-mail, he informed me that he did not appreciate my going over his head with my complaints. However, the reason why I felt forced to go above Fred Sayre with my concerns was because he had ignored my previous complaints about San Miguel.

42. Ms. Lucas, however, did respond to my e-mail and I informed Ms. Lucas that San Miguel had issues with women and that I felt there was a pattern in his treatment of various women – including myself and Ms. Johnson.

43. Clearly, the Company did not take my complaints seriously since San Miguel has since been promoted to be second-in-command of the entire Juneau Store.

44. Eventually, in April of 2003, I took a position at the Juneau Store that paid approximately $5.00 less an hour than the First Assistant position so that I would no longer be under San Miguel's direct supervision.

45. I feel San Miguel's actions towards me after my engagement forced me out of my management job and that his conduct has harmed my chances for further promotion within the Company.

FURTHER your affiant sayeth naught.

DATED this ___ day of February 2004.

_Johnna C. Havard  2-12-04_
Johnna Havard

SUBSCRIBED and SWORN TO before me this 12th day of February 2004.

_Heather A Hildebrand_
Notary Public, State of Alaska
My commission expires: 7/4/07

[Notary Seal: HEATHER A. HILDEBRAND, NOTARY PUBLIC, STATE OF ALASKA]