§

Page 55

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA AT JUNEAU

**RECEIVED**

OCT 3 0 2006

MYRNA I. JOHNSON,

      Plaintiff,

    vs.                No. J-04-008-CV (RRB)

FRED MEYER STORES, INC., and

JAIME SAN MIGUEL,

      Defendants.


VIDEOTAPED DEPOSITION OF MARY LUCAS HILL

Volume 2, Pages 55-107

Taken on behalf of Plaintiff


October 25, 2006

\*    \*    \*


ORIGINAL

*Johnson v Fred Meyer*    *Exhibit A 1 of 19*

BEOVICH
WALTER
&
FRIEND
*Certified Court Reporters*

(503) 228-7201
1001 S.W. Fifth Avenue, Suite 1200, Portland, Oregon 97204
1-800-541-4452   Fax: (503) 228-3978

Mary Hill                                      October 25, 2006

Page 62

1           question.

2                Go ahead.

3    Q.    BY MR. CHOATE:  Where the file was located that

4          contained this information?

5    A.    I would -- my guess is it was located out of the

6          region office in Seattle.

7    Q.    And why would it have been at the region office in

8          Seattle as opposed to either in Juneau or in

9          Portland?

10   A.    Because at the time that I conducted this

11         interview, my office was in Seattle.

12   Q.    All right.  Now, at the conclusion of your last

13         deposition, did you direct anybody to the fact that

14         there might be additional materials in regards to

15         your investigation as to Mr. San Miguel in Seattle?

16   A.    No.

17   Q.    Okay.  So when was the first time that you actually

18         saw these documents that -- beyond when you were

19         doing the investigation in 2003, when was the first

20         time you saw these documents that are Exhibit 1?

21   A.    Today.

22   Q.    All right.  So you hadn't seen them before?

23   A.    Right.

24   Q.    All right.  Now, having reviewed them, I assume

25         with your counsel and now as Exhibit 1, do you

*Johnson, Myrna v Fred Meyer    Exhibit A 2 of 19*

Mary Hill                                           October 25, 2006

Page 69

1   Q.   When you got this Office Vision, did you initiate

2        any investigation in October of '02?

3   A.   Yes, I did.

4   Q.   Okay.  What did you start doing?

5   A.   Well, as I recall, one of the things I did ask

6        Johnna to do was to provide me with specifics with

7        regard to her complaint, and also I recall that I

8        was dealing with or talking with the store director

9        on a pretty regular basis with regard to issues in

10       his store and asking him to talk to Mr. San Miguel

11       to find out, you know, if Johnna was in fact being

12       trained and what the issues were with her schedule.

13  Q.   Now, those communications, those would have been in

14       October of 2002?

15  A.   Ongoing.  Yes.

16  Q.   Okay.  And they would have been with the store

17       manager?

18  A.   That's correct.

19  Q.   Was it your normal practice to memorialize, meaning

20       write down, those communications in some fashion?

21  A.   Not every phone call.  No.  And I typically would

22       keep -- would have started a file, and any notes

23       that I would have taken with regard to the issue

24       would have gone into the file, an investigation

25       file.

*Johnson, Myrna v Fred Meyer*      *Exhibit  A  3 of 19*

Beovich Walter Friend

Mary Hill                                          October 25, 2006

Page 70

1    Q.    Okay.  Now, looking at the materials that were

2          provided to us by Fred Meyer, do you see any notes

3          of any communications that you had with Mr. Sayre

4          at any time regarding the investigation into

5          Ms. Havard's complaints about Mr. San Miguel?

6    A.    I don't.

7    Q.    Would you have normally kept or written some formal

8          notes in regard to those conversations?

9    A.    Yes.

10   Q.    Do you know where those are?

11   A.    I don't.

12   Q.    Do you have any recollection today of specifically

13         talking to Mr. Sayre about Mr. San Miguel and

14         Ms. Havard's complaints?

15   A.    Yes.

16   Q.    Okay.  Do you recall how many conversations you had

17         with Mr. Sayre?

18   A.    I don't.

19   Q.    Would it have been more than one?

20   A.    Yes, it would have.

21   Q.    Would it have been more than five?

22   A.    It depends on what time frame you are talking

23         about.

24   Q.    What about from October of 2002 through January or

25         February of 2003?

Beovich Walter Friend

Mary Hill                                          October 25, 2006

Page 75

1            through what your investigation entailed.

2    A.     Well, the conclusions based on my conversations

3           with a number of people in that department were

4           that Jaime was not working like he was scheduled to

5           work, that he was coming in late on a pretty

6           regular basis, and that there was a lot of

7           confusion as to who was supposed to do what with

8           regard to assignment of duties.

9    Q.     Okay.  And what was the -- why was there confusion?

10          What did your investigation determine in that

11          regard?

12   A.     Well, the main complaint from the people that I

13          spoke with that worked for him was that there was

14          either no direction or a change of direction after

15          direction was initially given and that he was

16          missing from work on a pretty regular basis.

17   Q.     Were there complaints about Mr. San Miguel -- any

18          complaints of him kicking objects or kind of

19          physically acting out?

20   A.     My notes show that one of the people that I spoke

21          with said that he -- they knew him to have a temper

22          problem and that they cited a time in I think the

23          warehouse or the freight -- where the freight was

24          that they had witnessed him kick a box of freight.

25   Q.     Now, in regards to these complaints, are they the

Johnson, Myrna v Fred Meyer        Exhibit "A" 5 of 19

Beovich Walter Friend

Mary Hill                                                    October 25, 2006

Page 76

1       normal sort of complaints that would have supposed

2       to have gone to the store director?

3   A.  Yes.

4   Q.  Okay.  And did you in your investigation find that

5       this information had gone to the store director but

6       Mr. Sayre had not acted upon or not responded to

7       the complaints?

8   A.  Either he had not responded to the complaint or had

9       not followed up on addressing the complaints with

10      Jaime.

11  Q.  Okay.  Now, did you ask Mr. Sayre what he had done

12      in regards to these complaints?

13  A.  Yes.

14  Q.  Okay.  And what did he tell you?

15  A.  He indicated that he had addressed some of the

16      issues with Jaime, but clearly from what the

17      investigation showed was that, even if he had

18      talked to him about it, it hadn't done any good.

19      Jaime hadn't improved his attendance at all.

20          So it was a matter of not using the progressive

21      discipline process to address an attendance issue

22      with a manager.

23  Q.  Did you talk to Mr. San Miguel directly about these

24      complaints?

25  A.  Yes.

*Johnson, Myrna v Fred Meyer      Exhibit  A  6 of 19*

Mary Hill                                    October 25, 2006

Page 79

1    Q.    Okay.  What was your conclusion in that regard?

2    A.    I -- there was no -- I had no proof, no witnesses

3          to Mr. San Miguel tearing up tours.

4    Q.    Were there complaints regarding employee --

5          inconsistencies in employee discipline by Mr. San

6          Miguel?

7    A.    You know, that part of it I don't recall as being

8          that big of an issue.

9    Q.    Okay.  If you could turn to 202 -- Bates

10         No. 202417.

11   A.    Okay.

12   Q.    Can you tell me whose handwriting this is?

13   A.    That's mine.

14   Q.    Okay.  Real quickly, if we're looking at 202417,

15         418, 419, and then 420, 421, 422, 423, 424, 425,

16         426, 427, 428, 429, 430, 431, that Bates set, are

17         those all your handwritten notes?

18   A.    Yes.

19   Q.    Are they all part of the investigation you

20         conducted?

21   A.    Yes.

22   Q.    Okay.  Did you meet with Mr. Sayre before these

23         notes were taken or after, if you recall?

24   A.    I don't recall.  I really don't.

25   Q.    Let me just ask, also.  There is a page of

*Johnson, Myrna v Fred Meyer*   *Exhibit A  7 of 19*

Beovich Walter Friend

Mary Hill                                           October 25, 2006

1          MR. CHOATE:  Let me rephrase that question.  I

2      think that's a good objection.

3   Q.  BY MR. CHOATE:  If a salaried employee is scheduled

4      to come to work at seven in the morning and doesn't

5      show and hasn't called in, what is the policy at

6      Fred Meyer for dealing with the fact that the

7      employee did not show and did not call in?

8   A.  Well, the policy is that you attempt to make --

9      whether you are hourly or salaried, you make an

10      attempt to contact the person to find out where

11      they are.  If you are speaking to what the

12      discipline is for --

13   Q.  Yes.  Why don't you tell me, what's the discipline

14      for that?

15   A.  If it's determined that there are no extenuating

16      circumstances and they just plain chose not to come

17      to work, typically you would for what they refer to

18      as a no call/no show, for the first offense, it's a

19      written warning.  If it happens again, that's a

20      termination offense.

21   Q.  Okay.  Now, what if the employee shows up two hours

22      late?  What is the discipline?

23   A.  That's an attendance issue.  You start with

24      counseling, and if it continues, then you move to

25      the next step of discipline, which would typically

*Johnson, Myrna v Fred Meyer     Exhibit 'A' 8 of 19*

Mary Hill                                          October 25, 2006

1    A.    I believe that they are asked to clock in once

2          during the week, and that's for a time and

3          attendance requirement.

4    Q.    Okay.  Otherwise, there would be no way for the

5          store director to know whether a manager is showing

6          up for their shift other than the store director

7          following up on that, observing it?

8    A.    Correct.

9    Q.    If a manager -- managerial employee decides to

10         leave early on the shift, is that also an

11         attendance issue if they leave without giving

12         notice?

13   A.    Yes.

14   Q.    Again, would be responded to by a series of

15         progressive discipline?

16   A.    Correct.

17   Q.    Now, if a managerial employee leaves a job because

18         of a personal issue, whether it's a medical problem

19         or it's a kid daycare issue or some other reason,

20         without explanation, would that normally be

21         something which would be treated as an attendance

22         problem with counseling being the first step in

23         discipline?

24   A.    That's correct.

25   Q.    Did you determine in your investigation whether

Johnson, Myrna v Fred Meyer    Exhibit A 9 of 19

Beovich Walter Friend

Mary Hill                                    October 25, 2006

Page 92

1   A.   As I recall, he was given a last and final warning.

2   Q.   Okay.  In your -- okay.  If you could, then,

3        explain to me where a last and final warning fits

4        within the progressive discipline system you just

5        discussed.

6   A.   It's a written warning that says "last and final"

7        at the top, and that means that we're not -- we

8        won't do any more written warnings, we won't do any

9        other discipline, that when you are given a last

10       and final warning, if you violate the rule again,

11       you can expect to be discharged.

12  Q.   Now, in giving a last and final warning, had you

13       concluded that Mr. San Miguel had already been

14       given the series of progressive discipline steps

15       before then, before that, or did you jump to that

16       step?

17  A.   We jumped to that step based on the fact that he

18       had been counseled by the store director.  But due

19       to the fact he was department manager and we had

20       found that it was a pretty serious attendance

21       issue, we decided that he deserved to receive a

22       last and final warning, and that he understood that

23       he could not continue to miss time as he had

24       previously.

25  Q.   And the form that would have had the last and final

*Johnson, Myrna v Fred Meyer    Exhibit "A" 10 of 19*

Mary Hill                                    October 25, 2006

Page 93

1         warning, it would say "last and final," like

2         handwritten at the top of the written warning form?

3    A.   That's correct.

4    Q.   Okay.  And do you recall issuing that?

5    A.   Yes.

6    Q.   And who would have signed off on that?

7    A.   It would have been the regional vice-president and

8         myself and Mr. San Miguel.  And probably Fred as

9         well.

10   Q.   Now, in that same process or trip, did you reach

11        certain conclusions regarding Mr. Sayre's

12        management practices that resulted in some form of

13        discipline for Mr. Sayre?

14   A.   You know, I don't recall if we disciplined

15        Mr. Sayre that trip.

16   Q.   Did you discipline him at some other point?

17   A.   I believe we did.

18   Q.   And what -- if you recall, what was the discipline

19        for?

20   A.   For failing to address issues in his store.

21   Q.   Including the one with Mr. San Miguel?

22   A.   That's correct.

23   Q.   Okay.  Do you recall -- you've identified all of

24        the handwritten documents as being in your own

25        handwriting that are part of this Exhibit 1.

Johnson, Myrna v Fred Meyer        Exhibit A 11 of 19

Beovich Walter Friend

Mary Hill                                    October 25, 2006

Page 101

1           Ms. Havard?

2      A.   Yes.

3      Q.   And then documents stamped Nos. 202420 through

4           202431, are those simply some of your handwritten

5           notes based on interviews of different people at

6           the Juneau store?

7      A.   Yes.

8      Q.   Can you tell us at this time if those handwritten

9           notes were in person or over the telephone or based

10          on interviews?

11     A.   They were in person.

12     Q.   So you were at the Juneau store?

13     A.   Yes.

14     Q.   Now, during the time that you had responsibility

15          for the Juneau store as a human resources

16          representative for Fred Meyer, that would have

17          covered 2001, 2002 and part of 2003?

18     A.   Correct.

19     Q.   And for the salaried employees in the Juneau store

20          during that time frame, what was their employment

21          status?

22     A.   They were at-will.

23     Q.   And what do you understand employment at-will to

24          be?

25          MR. CHOATE:   I'm going to object to your

*Johnson, Myrna v Fred Meyer      Exhibit A 12 of 19*

Beovich Walter Friend

Mary Hill                                                          October 25, 2006

Page 60

1    you investigated.
2  A.  Yes.
3  Q.  Do you recall that now, saying that?
4  A.  Yes.
5  Q.  Okay.  And at that time had you reviewed any
6      documents before going to your deposition in May of
7      2006?
8  A.  I'm sure I did.
9  Q.  Okay.  Had you reviewed the documents that you
10     discussed today, the ones with the Office Vision?
11     Had you looked at those before your deposition in
12     May of 2006?
13 A.  I don't believe so.  No.
14 Q.  Okay.  Now, some documents were -- apparently you
15     did review some documents, and I'm going to have
16     the court reporter mark the document set that I
17     have sent to her as Exhibit 1 to the second volume
18     of your deposition, and I'm going to ask you,
19     Mrs. Hill, if these are the documents you reviewed
20     before coming to your deposition today?
21 A.  Okay.
22 Q.  Will you look at them real quickly.
23         MR. DICKENS:  Counsel, they've not been handed
24     to her yet.
25         MR. CHOATE:  I'm sorry.  All right.

Page 61

1         (Marked Deposition Exhibit No. 1.)
2  Q.  BY MR. CHOATE:  For the record, Mrs. Hill, I'm
3      going to -- basically these documents are
4      production that we received from Fred Meyer in
5      July -- on July 14, 2006, and they consist of a
6      series of Bates stamped documents with the Bates
7      Nos. 202414 to 202438.G.
8         Do you have those in front of you?
9  A.  I do.
10 Q.  Okay.  Are these the documents that you mentioned
11     earlier today that you had looked at before coming
12     to your deposition?
13 A.  Yes.
14 Q.  Okay.  Now, do you know the source of these
15     documents, where they came from?
16 A.  I would assume they came from a file that had been
17     put together with regard to a complaint received.
18 Q.  Okay.  And can you tell me -- because we had never
19     seen these documents, were never provided them
20     until the middle of July, really actually after the
21     sort of close of formal discovery or the end of
22     formal discovery.
23         Can you tell me, if you know today, where that
24     file was?
25         MR. DICKENS:  I'll object to the form of the

Page 62

1      question.
2         Go ahead.
3  Q.  BY MR. CHOATE:  Where the file was located that
4      contained this information?
5  A.  I would -- my guess is it was located out of the
6      region office in Seattle.
7  Q.  And why would it have been at the region office in
8      Seattle as opposed to either in Juneau or in
9      Portland?
10 A.  Because at the time that I conducted this
11     interview, my office was in Seattle.
12 Q.  All right.  Now, at the conclusion of your last
13     deposition, did you direct anybody to the fact that
14     there might be additional materials in regards to
15     your investigation as to Mr. San Miguel in Seattle?
16 A.  No.
17 Q.  Okay.  So when was the first time that you actually
18     saw these documents that -- beyond when you were
19     doing the investigation in 2003, when was the first
20     time you saw these documents that are Exhibit 1?
21 A.  Today.
22 Q.  All right.  So you hadn't seen them before?
23 A.  Right.
24 Q.  All right.  Now, having reviewed them, I assume
25     with your counsel and now as Exhibit 1, do you

Page 63

1      recognize them?
2  A.  Yes, I do.
3  Q.  Okay.  And what do these documents represent?
4  A.  Copies of SYSM notes sent back and forth between
5      Johnna Havard and myself, and it looks like there
6      are some here that were referred to the store
7      director.  Information that was requested as a
8      result of a complaint received from Johnna Havard.
9  Q.  Now, we'll sort of go through the documents in more
10     detail, but when you refer to the Office Visions
11     that you received from Johnna Havard, do you refer
12     to them collectively, meaning as a group, as being
13     a complaint or were there complaints, plural?
14 A.  I believe I received the initial complaint from
15     Johnna, and then I asked her to provide me with any
16     documentation that she may have, any notes
17     supporting the incidents that were at the heart of
18     her complaint.
19 Q.  And do you recall now when you first received a
20     complaint from Johnna Havard regarding Jaime San
21     Miguel?
22 A.  I don't remember right off the top of my head.  I
23     would have to refer to -- I believe in reviewing
24     these that it was in 2002.
25 Q.  Maybe to assist you, I could -- the first date that

3 (Pages 60 to 63)

Mary Hill                                                October 25, 2006

Page 68

1      the fall of 2002 would have been Dennis Affleck?
2  A.  **Correct.**
3  Q.  And then would you have been the person at HR to
4      deal with issues like this?
5  A.  **Correct.**
6  Q.  Now, Ms. Havard's Office Vision at the bottom of
7      this page 202437 talks about her doing ten- or
8      12-hour shifts but not receiving any training,
9      being yelled at if she comes in and writes a tour,
10     that her manager doesn't show up or shows up late,
11     and she's generally complaining.
12         I take it these are the sorts of complaints
13     that you've probably seen over -- during your
14     career working for Fred Meyer?
15 A.  **That's correct.**
16 Q.  What is the normal practice when you receive
17     something like this?  What would you normally do?
18 A.  **I would investigate it.**
19 Q.  Okay.  Well, when you got a copy of this Office
20     Vision from Mr. Hill, were you guys engaged at that
21     time or dating or did you have a personal
22     relationship or was it all professional in '02?
23 A.  **In '02, we were living together.**
24 Q.  Okay.  So a personal relationship?
25 A.  **Yes.**

Page 69

1  Q.  When you got this Office Vision, did you initiate
2      any investigation in October of '02?
3  A.  **Yes, I did.**
4  Q.  Okay.  What did you start doing?
5  A.  **Well, as I recall, one of the things I did ask**
6      **Johnna to do was to provide me with specifics with**
7      **regard to her complaint, and also I recall that I**
8      **was dealing with or talking with the store director**
9      **on a pretty regular basis with regard to issues in**
10     **his store and asking him to talk to Mr. San Miguel**
11     **to find out, you know, if Johnna was in fact being**
12     **trained and what the issues were with her schedule.**
13 Q.  Now, those communications, those would have been in
14     October of 2002?
15 A.  **Ongoing.  Yes.**
16 Q.  Okay.  And they would have been with the store
17     manager?
18 A.  **That's correct.**
19 Q.  Was it your normal practice to memorialize, meaning
20     write down, those communications in some fashion?
21 A.  **Not every phone call.  No.  And I typically would**
22     **keep -- would have started a file, and any notes**
23     **that I would have taken with regard to the issue**
24     **would have gone into the file, an investigation**
25     **file.**

Page 70

1  Q.  Okay.  Now, looking at the materials that were
2      provided to us by Fred Meyer, do you see any notes
3      of any communications that you had with Mr. Sayre
4      at any time regarding the investigation into
5      Ms. Havard's complaints about Mr. San Miguel?
6  A.  **I don't.**
7  Q.  Would you have normally kept or written some formal
8      notes in regard to those conversations?
9  A.  **Yes.**
10 Q.  Do you know where those are?
11 A.  **I don't.**
12 Q.  Do you have any recollection today of specifically
13     talking to Mr. Sayre about Mr. San Miguel and
14     Ms. Havard's complaints?
15 A.  **Yes.**
16 Q.  Okay.  Do you recall how many conversations you had
17     with Mr. Sayre?
18 A.  **I don't.**
19 Q.  Would it have been more than one?
20 A.  **Yes, it would have.**
21 Q.  Would it have been more than five?
22 A.  **It depends on what time frame you are talking**
23     **about.**
24 Q.  What about from October of 2002 through January or
25     February of 2003?

Page 71

1  A.  **No.  It wouldn't have been as many as five**
2      **probably.**
3  Q.  Okay.  What would have been your purpose in talking
4      to the store director?
5  A.  **To find out if he was aware of the issues in his**
6      **store and what he knew about them and if things**
7      **were being monitored in apparel, if there were**
8      **issues, and that sort of thing.**
9  Q.  Okay.  And based upon the communications -- do you
10     recall if any of those communications with
11     Mr. Sayre would have been through Office Vision?
12 A.  **I recall that at one time we had a conversation, we**
13     **meaning the regional vice-president and myself,**
14     **with Mr. Sayre about handling issues in his store**
15     **and addressing issues in his store, and if I**
16     **recall, part of the counseling that we gave**
17     **Mr. Sayre was that he needed to stay in**
18     **communication with myself regarding how he was**
19     **addressing ongoing issues.**
20 Q.  Okay.  I'm a little confused then in terms of what
21     did you mean by that?  First of all, who was the
22     regional vice-president at that time?
23 A.  **Well, it changed.  It went from John Santos to I**
24     **believe Greg Sandeno and then Ken Haverkost.**
25 Q.  Do you recall who was the regional director when

Mary Hill                                                                October 25, 2006

**Page 72**

1    you had this communication with Mr. Sayre?
2  **A.  I believe it was John Santos initially.**
3  Q.   And was this a face-to-face meeting or something
4       over the telephone?
5  **A.  We had gone up and met with Fred face to face, Fred**
6       **Sayre.**
7  Q.   And what was the -- do you recall approximately
8       when that was, that meeting?
9  **A.  I don't.  I'm sorry.**
10 Q.   Do you recall if it was in the fall of 2002 or
11      after Christmas?
12 **A.  I really don't remember --**
13 Q.   When you --
14 **A.  -- when we made the trip there.**
15 Q.   I'm sorry.  I apologize for talking over you.
16      When you made this trip to visit the Juneau
17      store, what was the purpose for the trip?
18 **A.  Because of problems with Fred not addressing issues**
19      **in his store, we went up to sit down and have a**
20      **conversation with him about that.**
21 Q.   Now, did you -- when you -- had you reached the
22      conclusion that there were problems with Fred not
23      addressing problems in his store, that Fred was not
24      doing his job?
25 **A.  We sat down with him to discuss that part of his**

**Page 73**

1       **job was to address issues as they arose.  And --**
2  Q.   And when you -- you described that as a counseling
3       session?
4  **A.  Yes.**
5  Q.   Okay.  Did you believe at that time that his work
6       performance was deficient in that regard?
7  **A.  Yes.**
8  Q.   And what was the basis for your conclusions or your
9       conclusion that his work performance was deficient?
10 **A.  Because as issues arose in the store, they were not**
11      **addressed by Fred.**
12 Q.   Okay.  And what issues do you mean, to the best of
13      your recollection?
14 **A.  There was -- to the best of my recollection, there**
15      **were issues in a number of different departments of**
16      **the store and that one of them was in apparel.**
17 Q.   Was the issue in apparel solely complaints by
18      Ms. Havard or were there other complaints?
19 **A.  No.  Johnna Havard's complaint was the one that we**
20      **were dealing with in apparel.**
21 Q.   In terms of responding to her complaint, did you
22      treat her complaint as being only about Mr. San
23      Miguel's tardiness or attendance or was it wider or
24      broader than that?
25 **A.  Her complaint was wider and broader than just Jaime**

**Page 74**

1       **San Miguel's attendance.**
2  Q.   And when you met with Mr. Sayre, was it for the
3       purpose of dealing with broader issues than just
4       Mr. San Miguel's attendance and tardiness?
5  **A.  Yes.**
6  Q.   What were the issues that you met with Mr. Sayre
7       about in regards to Mr. San Miguel?
8  **A.  Complaints that he was not present when he said he**
9       **was going to be, that he was scheduled to arrive at**
10      **a certain time -- on the schedule to arrive at a**
11      **certain time and would consistently arrive later**
12      **than that, and then there were complaints about his**
13      **failure to communicate to his people.**
14 Q.   And did you investigate those complaints?
15 **A.  Yes.**
16 Q.   Okay.  And was that investigation one of your job
17      duties at Fred Meyer?
18 **A.  Yes.**
19 Q.   Okay.  And as a result of that investigation, did
20      you reach some conclusions as to whether those
21      complaints were valid?
22 **A.  Yes.**
23 Q.   Okay.  What -- and with as much detail as possible,
24      can you -- let's -- first of all, just in general
25      describe to me your conclusion, and we'll go

**Page 75**

1       through what your investigation entailed.
2  **A.  Well, the conclusions based on my conversations**
3       **with a number of people in that department were**
4       **that Jaime was not working like he was scheduled to**
5       **work, that he was coming in late on a pretty**
6       **regular basis, and that there was a lot of**
7       **confusion as to who was supposed to do what with**
8       **regard to assignment of duties.**
9  Q.   Okay.  And what was the -- why was there confusion?
10      What did your investigation determine in that
11      regard?
12 **A.  Well, the main complaint from the people that I**
13      **spoke with that worked for him was that there was**
14      **either no direction or a change of direction after**
15      **direction was initially given and that he was**
16      **missing from work on a pretty regular basis.**
17 Q.   Were there complaints about Mr. San Miguel -- any
18      complaints of him kicking objects or kind of
19      physically acting out?
20 **A.  My notes show that one of the people that I spoke**
21      **with said that he -- they knew him to have a temper**
22      **problem and that they cited a time in I think the**
23      **warehouse or the freight -- where the freight was**
24      **that they had witnessed him kick a box of freight.**
25 Q.   Now, in regards to these complaints, are they the

6 (Pages 72 to 75)

Mary Hill                                                    October 25, 2006

Page 76

1   normal sort of complaints that would have supposed
2   to have gone to the store director?
3   A.  Yes.
4   Q.  Okay.  And did you in your investigation find that
5   this information had gone to the store director but
6   Mr. Sayre had not acted upon or not responded to
7   the complaints?
8   A.  **Either he had not responded to the complaint or had**
9   **not followed up on addressing the complaints with**
10  **Jaime.**
11  Q.  Okay.  Now, did you ask Mr. Sayre what he had done
12  in regards to these complaints?
13  A.  **Yes.**
14  Q.  Okay.  And what did he tell you?
15  A.  **He indicated that he had addressed some of the**
16  **issues with Jaime, but clearly from what the**
17  **investigation showed was that, even if he had**
18  **talked to him about it, it hadn't done any good.**
19  **Jaime hadn't improved his attendance at all.**
20      **So it was a matter of not using the progressive**
21  **discipline process to address an attendance issue**
22  **with a manager.**
23  Q.  Did you talk to Mr. San Miguel directly about these
24  complaints?
25  A.  **Yes.**

Page 77

1   Q.  Okay.  And what was his response in as much detail
2   as you recall?
3   A.  **As I recall, he was having some personal problems**
4   **at home.  He had a young son.  He had gone through**
5   **a divorce and had to take his son to daycare on a**
6   **regular basis which interfered with his ability to**
7   **come to work at the time that he was scheduled.**
8   **Had gone through -- was having some personal issues**
9   **at home, and it was interfering with his job.**
10  Q.  And do you -- at that time did he tell you when he
11  had actually gone through the divorce or been
12  separated?
13  A.  **I don't recall how long it had been, but to my**
14  **recollection, it was still an issue for him.**
15  Q.  Did he admit to you that the complaints were valid,
16  that there was substance for the complaints?
17      MR. DICKENS:  I'm going to object.  That's
18  overly broad as to which complaints you mean.
19      Go ahead.
20  Q.  BY MR. CHOATE:  We'll break them down.  Did he
21  admit to you that he was frequently tardy?
22  A.  **Yes, he did.**
23  Q.  Did he admit to you that when he was tardy he would
24  fail to call in to advise his staff that he was
25  going to be late?  *Myrna v Fred Meyer    Exhibit*

Page 78

1   A.  **Yes, he did.**
2   Q.  Okay.  Did he admit to you that he did not
3   communicate well with his staff during this time
4   period?
5   A.  **He admitted not to calling in when he was not going**
6   **to come in.  As far as his communication to his**
7   **people, he didn't agree with that part of it as**
8   **much.  As I recall, he didn't admit to not**
9   **communicating as well as he should have.**
10  Q.  Okay.  Did you find in your investigation that he
11  wasn't communicating as he should have?
12  A.  **The absence of written tours on a regular basis was**
13  **an indicator that he wasn't communicating well to**
14  **his people.**
15  Q.  Okay.  Was there also complaints that Ms. Havard
16  when Mr. San Miguel would not show up for work
17  would prepare a tour and then Mr. San Miguel when
18  he came in late would then tear up her tour?  Do
19  you recall those complaints?
20  A.  **Yes.**
21  Q.  Did you find that there was support for that, that
22  that in fact occurred?
23  A.  **No.**
24  Q.  Did you investigate that?
25  A.  **Yes.**

Page 79

1   Q.  Okay.  What was your conclusion in that regard?
2   A.  **I -- there was no -- I had no proof, no witnesses**
3   **to Mr. San Miguel tearing up tours.**
4   Q.  Were there complaints regarding employee --
5   inconsistencies in employee discipline by Mr. San
6   Miguel?
7   A.  **You know, that part of it I don't recall as being**
8   **that big of an issue.**
9   Q.  Okay.  If you could turn to 202 -- Bates
10  No. 202417.
11  A.  **Okay.**
12  Q.  Can you tell me whose handwriting this is?
13  A.  **That's mine.**
14  Q.  Okay.  Real quickly, if we're looking at 202417,
15  418, 419, and then 420, 421, 422, 423, 424, 425,
16  426, 427, 428, 429, 430, 431, that Bates set, are
17  those all your handwritten notes?
18  A.  **Yes.**
19  Q.  Are they all part of the investigation you
20  conducted?
21  A.  **Yes.**
22  Q.  Okay.  Did you meet with Mr. Sayre before these
23  notes were taken or after, if you recall?
24  A.  **I don't recall.  I really don't.**
25  Q.  Let me just ask also.  There is a page of

7 (Pages 76 to 79)

Beovich Walter Friend

Mary Hill                                                    October 25, 2006

Page 84

1    MR. CHOATE: Let me rephrase that question. I
2  think that's a good objection.
3  Q.  BY MR. CHOATE: If a salaried employee is scheduled
4     to come to work at seven in the morning and doesn't
5     show and hasn't called in, what is the policy at
6     Fred Meyer for dealing with the fact that the
7     employee did not show and did not call in?
8  A.  **Well, the policy is that you attempt to make --**
9     **whether you are hourly or salaried, you make an**
10    **attempt to contact the person to find out where**
11    **they are. If you are speaking to what the**
12    **discipline is for --**
13 Q.  Yes. Why don't you tell me, what's the discipline
14    for that?
15 A.  **If it's determined that there are no extenuating**
16    **circumstances and they just plain chose not to come**
17    **to work, which is what we refer to**
18    **as a no call/no show, for the first offense, it's a**
19    **written warning. If it happens again, that's a**
20    **termination offense.**
21 Q.  Okay. Now, what if the employee shows up two hours
22    late? What is the discipline?
23 A.  **That's an attendance issue. You start with**
24    **counseling, and if it continues, then you move to**
25    **the next step of discipline, which would typically**

Page 85

1     **be a written warning.**
2        **You just go through the discipline process with**
3     **the hopes that the attendance issues will correct**
4     **themselves.**
5  Q.  So if an employee is routinely tardy, and I'm
6     speaking generically, whether it's a management
7     employee or an hourly employee, then if they
8     routinely came in two hours late, that would be
9     considered to be a counseling -- initially a
10    counseling issue, and then if it continued,
11    discipline would ramp up?
12 A.  **That's correct.**
13 Q.  Who was responsible at the Juneau store in 2002 and
14    2003 to determine whether managers were working
15    during the hours that they were scheduled to work?
16 A.  **That would be the store director.**
17 Q.  And how does the store director know whether a
18    manager is working their shift?
19 A.  **Typically they're there or they get feedback from**
20    **other members of the management team.**
21 Q.  Now, during -- are managers expected to clock in
22    when they come to work?
23 A.  **No.**
24 Q.  Are they expected to clock in at all during their
25    shift?

Page 86

1  A.  **I believe that they are asked to clock in once**
2     **during the week, and that's for a time and**
3     **attendance requirement.**
4  Q.  Okay. Otherwise, there would be no way for the
5     store director to know whether a manager is showing
6     up for their shift other than the store director
7     following up on that, observing it?
8  A.  **Correct.**
9  Q.  If a manager -- managerial employee decides to
10    leave early on the shift, is that also an
11    attendance issue if they leave without giving
12    notice?
13 A.  **Yes.**
14 Q.  Again, would be responded to by a series of
15    progressive discipline?
16 A.  **Correct.**
17 Q.  Now, if a managerial employee leaves a job because
18    of a personal issue, whether it's a medical problem
19    or it's a kid daycare issue or some other reason,
20    without explanation, would that normally be
21    something which would be treated as an attendance
22    problem with counseling being the first step in
23    discipline?
24 A.  **That's correct.**
25 Q.  Did you determine in your investigation whether

Page 87

1     Mr. Sayre had ever counseled Mr. San Miguel
2     regarding his attendance issues that Ms. Havard
3     complained of?
4  A.  **As I recall, he had sat down and talked with Jaime**
5     **San Miguel about attendance issues. Yes.**
6  Q.  Do you know how -- whether he had talked about them
7     more than one time?
8  A.  **I don't recall that.**
9  Q.  I take it there was nothing in writing from
10    Mr. Sayre to Mr. San Miguel concerning his
11    attendance?
12 A.  **I don't believe there was.**
13 Q.  Okay. Similarly, based upon the documents we've
14    been given, there is -- your investigation didn't
15    find any writings from Mr. Sayre to Mr. San Miguel
16    regarding any of the other issues that Ms. Havard
17    complained about?
18 A.  **If there were any written warnings or written**
19    **verbal warnings, they would have been in Jaime San**
20    **Miguel's file.**
21 Q.  And there weren't any, were there?
22 A.  **I don't recall, sir.**
23 Q.  Okay. Now, in regards to the step discipline
24    process that you've referenced, what is that
25    process that would apply to a manager -- would the

*Johnson, Myrna v Fred Meyer       Exhibit*

Beovich Walter Friend

Mary Hill                                                          October 25, 2006

Page 92

1 A. As I recall, he was given a last and final warning.
2 Q. Okay. In your -- okay. If you could, then,
3    explain to me where a last and final warning fits
4    within the progressive discipline system you just
5    discussed.
6 A. It's a written warning that says "last and final"
7    at the top, and that means that we're not -- we
8    won't do any more written warnings, we won't do any
9    other discipline, that when you are given a last
10   and final warning, if you violate the rule again,
11   you can expect to be discharged.
12 Q. Now, in giving a last and final warning, had you
13   concluded that Mr. San Miguel had already been
14   given the series of progressive discipline steps
15   before then, before that, or did you jump to that
16   step?
17 A. We jumped to that step based on the fact that he
18   had been counseled by the store director. But due
19   to the fact he was department manager and we had
20   found that it was a pretty serious attendance
21   issue, we decided that he deserved to receive a
22   last and final warning, and that he understood that
23   he could not continue to miss time as he had
24   previously.
25 Q. And the form that would have had the last and final

Page 93

1    warning, it would say "last and final," like
2    handwritten at the top of the written warning form?
3 A. That's correct.
4 Q. Okay. And do you recall issuing that?
5 A. Yes.
6 Q. And who would have signed off on that?
7 A. It would have been the regional vice-president and
8    myself and Mr. San Miguel. And probably Fred as
9    well.
10 Q. Now, in that same process or trip, did you reach
11   certain conclusions regarding Mr. Sayre's
12   management practices that resulted in some form of
13   discipline for Mr. Sayre?
14 A. You know, I don't recall if we disciplined
15   Mr. Sayre that trip.
16 Q. Did you discipline him at some other point?
17 A. I believe we did.
18 Q. And what -- if you recall, what was the discipline
19   for?
20 A. For failing to address issues in his store.
21 Q. Including the one with Mr. San Miguel?
22 A. That's correct.
23 Q. Okay. Do you recall -- you've identified all of
24   the handwritten documents as being in your own
25   handwriting that are part of this Exhibit 1 --

Page 94

1    Could you just briefly go through the OVs that
2    are part of this set which are in Exhibit 1 and
3    confirm that these are the type of documents that
4    would have been kept in your investigative file.
5    Many of them are sort of from Johnna Havard to
6    herself and then appear to have been forwarded to
7    you.
8 A. (Witness complies.)
9    These are all the Office Visions that pertain
10   to the Johnna Havard complaint. They would have
11   all been in the same file.
12 Q. Okay. And they would have been kept in the regular
13   course of business?
14 A. That's correct.
15 Q. Would you have kept in that same file any
16   communications with Mr. Sayre regarding this that
17   would have been in writing?
18 A. Yes.
19 Q. So if they're not there -- as you recall -- strike
20   that.
21    As you recall, there were at least some
22   communications to Mr. Sayre in this regard that
23   were in writing?
24 A. I would assume so.
25 Q. Now, as a result of your investigation, at some

Page 95

1    point in time Mr. Sayre was also disciplined for,
2    in part, failing to address the complaints
3    regarding Mr. San Miguel; is that right?
4 A. That's correct.
5 Q. And do you recall what discipline was given to
6    Mr. Sayre?
7 A. I don't. As I recall, he was given a warning
8    notice for failing to address issues in his store.
9    I really can't speak to anything else.
10 Q. And was it your understanding when that notice --
11   did you give him that warning notice?
12 A. I don't believe I did. I believe the RVP did, the
13   regional -- the RVS, the regional vice-president
14   did.
15 Q. Do you know who that was at the time?
16 A. I believe it was either John Santos or Greg
17   Sandeno.
18 Q. Do you know -- that would have been, in terms of
19   your progressive disciplinary process, the stage
20   after counseling and before suspension?
21 A. That's correct.
22 Q. And part of that written warning was for
23   Mr. Sayre's failure to address complaints about
24   Mr. San Miguel?
25 A. That's correct.

Beovich Walter Friend

Mary Hill                                                October 25, 2006

Page 100

1    conversations or in-person meetings with Fred Sayre
2    regarding either Jaime San Miguel or Myrna Johnson?
3  A.  **Would you say that again, please.**
4  Q.  Sure.  In fact, let me rephrase the question.
5        At this time do you have any independent
6    recollection that you did make notes of any
7    conversations either on the phone or in person with
8    Fred Sayre regarding Jaime San Miguel and the
9    complaints by Johnna Havard?
10 A.  **You mean do I have recollection of specific**
11     **conversations?**
12 Q.  No.  Do you have recollection of specifically
13   making any notes of any discussions?
14 A.  **No.**
15 Q.  Would you look at Exhibit 1, document stamped
16   No. 202418.
17 A.  **Okay.**
18 Q.  For the record, those are handwritten notes.  Whose
19   handwritten notes are those?
20 A.  **Mine.**
21 Q.  Can you tell us what those notes reflect.
22 A.  **I believe that this is Jaime's response to the --**
23     **what was going on with Johnna Havard and issues he**
24     **was having with her.**
25 Q.  Was this in response to the complaints from

Page 101

1    Ms. Havard?
2  A.  **Yes.**
3  Q.  And then documents stamped Nos. 202420 through
4    202431, are those simply some of your handwritten
5    notes based on interviews of different people at
6    the Juneau store?
7  A.  **Yes.**
8  Q.  Can you tell us at this time if those handwritten
9    notes were in person or over the telephone or based
10   on interviews?
11 A.  **They were in person.**
12 Q.  So you were at the Juneau store?
13 A.  **Yes.**
14 Q.  Now, during the time that you had responsibility
15   for the Juneau store as a human resources
16   representative for Fred Meyer, that would have
17   covered 2001, 2002 and part of 2003?
18 A.  **Correct.**
19 Q.  And for the salaried employees in the Juneau store
20   during that time frame, what was their employment
21   status?
22 A.  **They were at-will.**
23 Q.  And what do you understand employment at-will to
24   be?
25     MR. CHOATE:  I'm going to object to your

Page 102

1    question as going outside the course -- outside of
2    my direct examination.
3        MR. DICKENS:  Well, Counsel, I don't think
4    given what you raised that they do.
5        Go ahead, please.
6        MR. CHOATE:  That's fine.
7  A.  **What I understand at-will to mean is that the**
8      **employer reserves the right to terminate at any**
9      **time as well as the associate reserves the right to**
10     **quit at any time.**
11 Q.  BY MR. DICKENS:  Now, you had a lot of questions by
12   counsel with regard to progressive discipline
13   steps.  From your experience at Fred Meyer, were
14   all those steps required to terminate a salaried
15   employee at the Juneau store in 2001, 2002 or 2003?
16 A.  **No.**
17 Q.  Are you familiar with a document called a Fred
18   Meyer Employee Responsibilities form?
19 A.  **Yes, I am.**
20     MR. CHOATE:  Again, Jim, this is so far out, I
21   mean out of the scope of my questions for her.  If
22   you want to open this all up, we can go a lot
23   longer.
24     But I'm going to object to you using her
25   deposition to bring in information either for trial

Page 103

1    testimony or something to deal with the summary
2    judgment.  This is way outside of what I asked and
3    what the court set the limits on.
4        MR. DICKENS:  It's not outside, and I'll
5    explain it to the court if we have to do that.
6    It's not at all.
7        MR. CHOATE:  Sure.
8  Q.  BY MR. DICKENS:  Now, with regard to the Fred Meyer
9    employee responsibilities form, are there actions
10   that are set forth in that form that would be a
11   basis for immediate termination?
12 A.  **Yes.**
13 Q.  Now, you mentioned during direct examination a last
14   and final warning given to Mr. San Miguel.  Can you
15   clarify the circumstances under which that would be
16   given to a salaried employee.
17 A.  **If we determine that -- when we do an investigation**
18     **and we determine that the actions or behavior of**
19     **the salaried associate is such that -- we hold them**
20     **to a higher standard than we do the people that**
21     **they supervise simply because their job is to be**
22     **the role model for adherence to the policy.**
23     **So if we through the course of an investigation**
24     **determine that they have violated a rule, rather**
25     **than go through a suspension or something like**

Beovich Walter Friend