

**CHOATE LAW FIRM LLC**
TRIAL LAWYERS

ALASKA • CALIFORNIA • HAWAII

424 North Franklin Street
Juneau, Alaska 99801
Telephone (907) 586-4490
Facsimile (907) 586-6633
lawyers@choatelawfirm.com

March 8, 2006

James Dickens
Miller Nash LLP
4400 Two Union Square
601 Union Street
Seattle, WA 98101-2352



Peter Gruenstein
Gruenstein & Hickey
Resolution Plaza
1029 W. 3rd Avenue, Suite 510
Anchorage, AK 99501

        Re:    Past Due Discovery (Meet and Confer) - Upcoming Management Depositions
        Case:  *Johnson, Myrna v Fred Meyers [23003]*
        Client:  Myrna Johnson
        CLF:    23003
        D/O:    March 18, 2002

Dear Counsel:

I hand-delivered to Jim Dickens on January 24, 2006 a copy of *Plaintiff's First Requests for Production of Documents Addressed to Defendant Jaime San Miguel*. Those Requests were originally served by Ms. Fredericks on January 3, 2005. I expected a response by this time and have neither received the requested discovery nor a request for any extension of time to respond to those year old requests. Please consider this request our formal meet and confer on these past due outstanding discovery requests.

In addition, I served on February 15, 2006, *Plaintiff's Second Requests for Production of Documents to Defendants Dated February 14, 2006*. Please advise if there is going to be any delay in receiving them within the normal 30 day time period allowed by the FRCP.

Consistent with my earlier letters, please find enclosed deposition notices for Dennis Afflect, Ken Haverkost, Jim Hill and Mary Lucas for the week of April 10, 2006. I will issue subpoenas for Jim Hill and Mary Lucas as you have indicated they no longer work for your client.

Exhibit 1
page 1 of 2

– Page 2
March 8, 2006

---

I look forward to receiving the requested discovery and seeing Jim in Portland the week of April 10, 2006.

Sincerely,

Mark Choate
CHOATE LAW FIRM, LLC

cc: Client

Exhibit 1
page 2 of 2

 **CHOATE LAW FIRM** LLC
TRIAL LAWYERS

ALASKA • CALIFORNIA • HAWAII

424 North Franklin Street
Juneau, Alaska 99801
Telephone (907) 586-4490
Facsimile (907) 586-6633
lawyers@choatelawfirm.com

April 4, 2006



James Dickens
Miller Nash LLP
4400 Two Union Square
601 Union Street
Seattle, WA 98101-2352

Peter Gruenstein
Gruenstein & Hickey
Resolution Plaza
1029 W. 3rd Avenue, Suite 510
Anchorage, AK 99501

   Re: Missing Responses to Plaintiff's Second Requests for Production Dated February 14, 2006
   Case: *Johnson, Myrna v Fred Meyers [23003]*
   Client: Myrna Johnson
   CLF: 23003
   D/O: March 18, 2002

Dear Counsel:

In reviewing our records, I do not see a response to our Second Requests for Production dated February 14, 2006. They were due in mid-March. I need those responses in order to prepare for the depositions scheduled next week. Please advise me at your earliest convenience as to when they were sent or when I may expect them. Thanks.

Sincerely,

Mark Choate
CHOATE LAW FIRM, LLC

ENCLOSURE: Plaintiff's Second Requests for Production...dated February 14, 2006

cc: Client

Exhibit 2
page 1 of 1



CHOATE LAW FIRM LLC
TRIAL LAWYERS

ALASKA • CALIFORNIA • HAWAII

424 North Franklin Street
Juneau, Alaska 99801
Telephone (907) 586-4490
Facsimile (907) 586-6633
lawyers@choatelawfirm.com

April 4, 2006

COPY

James Dickens
Miller Nash LLP
4400 Two Union Square
601 Union Street
Seattle, WA 98101-2352

Peter Gruenstein
Gruenstein & Hickey
Resolution Plaza
1029 W. 3rd Avenue, Suite 510
Anchorage, AK 99501

    Re:    30(b)(6) Depositions Scheduled for Next Week
    Case:    *Johnson, Myrna v Fred Meyers [23003]*
    Client:    Myrna Johnson
    CLF:    23003
    D/O:    March 18, 2002

Dear Counsel:

In preparing for next week's depositions and reviewing Jim's correspondence, I note that there's been no confirmation that Fred Meyer will produce 30(b)(6) deponents for the following identified categories of discovery:

1. The person(s) most knowledgeable in regards to any internal investigation or inquiry conducted by Fred Meyer into the circumstances leading to the termination of her employment in March 2002.
2. The person(s) most knowledgeable in regards to training provided to Myrna Johnson in regards to how to apply for Personal Leave and/or Family Medical Leave;
3. The person(s) most knowledgeable in regards to training provided to Myrna Johnson in regards to Fred Meyer Stores' discipline process, including it's progressive discipline as to "verbal warnings", written "verbal" warnings and written warnings.
4. The person(s) most knowledgeable in regards to any investigation undertaken as assertions or allegations that defendant Jaime San

Exhibit 3
page 1 of 2

– Page 2
April 4, 2006

---

          Miguel may have had improper motive in disciplining Myrna Johnson or in hiring Johnna Havard to fill Myrna Johnson's position.

5.      The person(s) most knowledgeable in regards to any investigation undertaken as to assertions or allegations that defendant Jaime San Miguel made inappropriate sexual references or comments either about Fred Meyer employees or Fred Meyer customers.

6.      The person(s) most knowledgeable in regards to all training provided by Fred Meyer Stores to Myrna Johnson in regards to how to properly make recoveries.

I need to take the 30(b)(6) depositions on these areas of inquiry in order to properly depose the identified management personnel. Please confirm in writing that you will have witnesses available for these noticed areas of inquiry *preceding* the management depositions. Thank you.

Sincerely,

Mark Choate
CHOATE LAW FIRM, LLC

cc: Client

Exhibit 3
page 1 of 2



**CHOATE LAW FIRM** LLC
TRIAL LAWYERS

ALASKA • CALIFORNIA • HAWAII

424 North Franklin Street
Juneau, Alaska 99801
Telephone (907) 586-4490
Facsimile  (907) 586-6633
lawyers@choatelawfirm.com

April 6, 2006

COPY

James Dickens
Miller Nash LLP
4400 Two Union Square
601 Union Street
Seattle, WA  98101-2352

Peter Gruenstein
Gruenstein & Hickey
Resolution Plaza
1029 W. 3rd Avenue, Suite 510
Anchorage, AK  99501

Susan K. Stahlfeld
Miller Nash LLP
4400 Two Union Square
601 Union Street
Seattle, WA  98101-2352

      Re:     Meet & Confer - Rescheduling of Depositions
      Case:  *Johnson, Myrna  v Fred Meyer [23003]*
      Client:  Myrna Johnson
      CLF:   23003
      D/O:   March 18, 2002

Dear Counsel:

This letter responds to Ms. Stahlfeld's letter of April 5, 2006 and is our formal request for a conference to meet and confer regarding:

   1)     The defendants' failure to confirm the availability of FRCP 30(b)(6) deponents for deposition next week; and
   2)     The defendants' failure to timely produce a response to Plaintiff's Second Requests for Production dated February 14, 2006.

We gave notice on February 14, 2006 of our intention to take management depositions and simultaneously requested responses to Plaintiff's First Requests for Production and served Plaintiff's Second Requests for Production.

Exhibit  4
page  1  of  2

– Page 2
April 6, 2006

---

Subsequently, we were informed by Mr. Dickens that he was unavailable for depositions in March but would be available the week of April 10, 2006. We were also assured we would receive complete discovery responses by March 26, 2006.

We have received no response to our very specific Second Requests for Production dated February 14, 2006. That discovery requested the production of documents identified in the depositions of Mr. San Miguel and Mr. Sayre taken in late January. It is now April 6, 2006, with only a day and a half of the business week before I must travel for next week's scheduled depositions and I have received *no* responses to those requests other than Ms. Stahlfeld's vague assertion that "documents are being sent via overnight delivery." In addition, I have not received confirmation that Fred Meyer will produce 30(b)(6) deponents for each of the areas of inquiry identified in our 30(b)(6) Notice.

The defendants' failure to respond to our discovery requests in a timely fashion and to confirm the availability of 30(b)(6) deponents makes it impossible to proceed with the scheduled depositions. We will need to reschedule for a date no less than ten (10) working days after I receive the requested discovery and confirmation that Fred Meyer will produce 30(b)(6) deponents for all identified areas of inquiry.

If I do not receive the requested discovery and confirmation by April 14, 2006, I will file a Motion to Compel Production with the Court. In addition, I reserve the right to request that the Court extend the close of discovery because of these delays.


Sincerely,

/s/

Mark Choate
CHOATE LAW FIRM, LLC

cc: Client

Exhibit 4
page 1 of 2



**CHOATE LAW FIRM** LLC
TRIAL LAWYERS

ALASKA • CALIFORNIA • HAWAII

424 North Franklin Street
Juneau, Alaska 99801
Telephone (907) 586-4490
Facsimile (907) 586-6633
lawyers@choatelawfirm.com

July 6, 2006         Faxed Only to: (206) 622-7485

James Dickens
Miller Nash LLP
4400 Two Union Square
601 Union Street
Seattle, WA 98101-2352



Peter Gruenstein
Gruenstein & Hickey
Resolution Plaza
1029 W. 3rd Avenue, Suite 510
Anchorage, AK 99501

    Re:    Request for Status of Discovery Responses
    Case:  *Johnson, Myrna v Fred Meyers [23003]*
    Client:  Myrna Johnson
    CLF:  23003
    D/O:  March 18, 2002

Dear Counsel:

We propounded PLAINTIFF'S THIRD REQUESTS FOR PRODUCTION OF DOCUMENT DATED MAY 26, 2006 more than a month ago. Would you please advise us immediately as to when we will receive the requested discovery?

Sincerely,

Mark Choate
CHOATE LAW FIRM, LLC

cc: Client

Exhibit 5
page 1 of 1



**CHOATE LAW FIRM** LLC
TRIAL LAWYERS

ALASKA • CALIFORNIA • HAWAII

424 North Franklin Street
Juneau, Alaska 99801
Telephone (907) 586-4490
Facsimile (907) 586-6633
lawyers@choatelawfirm.com

July 14, 2006                                  Faxed Only to: (206) 622-7485

James Dickens
Miller Nash LLP
4400 Two Union Square
601 Union Street
Seattle, WA  98101-2352



    Re:    Defendants' Responses to Plaintiff's Third Requests for Production of
            Documents Dated May 26, 2006
    Case:   *Johnson, Myrna  v Fred Meyers [23003]*
    Client:  Myrna Johnson
    CLF:   23003
    D/O:   March 18, 2002

Dear Jim:

On July 11, 2006 we received Defendants' Responses to Plaintiff's Third Requests for Production of Documents Dated May 26, 2006. In response to our RFP No. 25, you provided document nos. 202414 – 202438G. The documents fall within two categories: (1) "Office Vision" emails relating to complaints regarding Jaime San Miguel's management, and (2) hand-written notes which appear to both memorialize and perhaps comment upon those same complaints. Neither the author nor the creation dates of the hand-written notes are identified.

Succinctly, these documents should have been produced much earlier in this litigation. On January 5, 2005, Plaintiff's First Requests for Production of Documents was served on your office by Ms. Johnson's prior counsel. I asked in early January of 2006 that you respond to that production request and you did so on March 22, 2006. In RFP No. 5, Fred Meyer was asked to: *"Please produce all statements…referring, relating to or pertaining to any fact or issue in this matter or the conduct that is the subject of this litigation."* You stated that any statement had been or would be provided with those responses.

Similarly, in RFP No. 19, Fred Meyer was requested to: *"Produce any document referring, relating or pertaining to verbal or written complaints or expressions of concern from any employee of the Juneau Store regarding San Miguel from 2000 to present."* Your answer was "there are none."

Exhibit 6
page 1 of 2

James Dickens – Page 2
July 14, 2006

Finally, in 30(b)(6) depositions, when I was attempting to obtain copies of prior Office Vision emails from this time period, I was specifically told under oath that there were no other Office Vision emails related to this matter or available as they had been destroyed in the migration to a Lotus Notes system.

For these reasons, document nos. 202414 – 202438G, received on July 11, 2006 are a surprise. They deal with complaints about Jaime San Miguel's management style, absenteeism, discipline, treatment of female subordinates, store "tours", recovery and other issues directly related to the disciplinary event which we allege was a constructive discharge of our client.

In the same vein, the extensive hand-written notes by an unknown author describing complaints about San Miguel are clearly responsive to both our earlier discovery and the facts at issue in this case. They should have been produced earlier, in time for us to address their content with the defendants and other Fred Meyer management personnel who have been deposed.

While I'm sure their earlier omission was unintentional, I don't think their late production is justified by the argument that we didn't ask specifically for them earlier. We have sought exactly this type of information since I began discovery in this matter. These documents raise a number of questions which I'm certain will require the reopening of discovery, at least for the limited purposes of inquiring into their content, the events which form the basis for these complaints, the author and approximate creation dates of the hand-written notes and any action taken in regards to these. We'll of course also need to authenticate them in some fashion.

I know you're going into trial and I will be out the next three weeks. Nonetheless, we're going to need to either agree to extend discovery for a reasonable amount of time to address these late-produced documents or I'll have to ask the Court for relief. Please let me know your thoughts on this. I'll be in Seattle from Monday to Wednesday, July 17-19 at the ATLA Convention. If you'll have your legal secretary give my office a call, they can set up a time for us to talk.

Sincerely,

Mark Choate
CHOATE LAW FIRM, LLC

cc: Client

Exhibit 6
page 2 of 2

Page 55

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA AT JUNEAU


MYRNA I. JOHNSON,

    Plaintiff,

  vs.                  No. J-04-008-CV (RRB)

FRED MEYER STORES, INC., and

JAIME SAN MIGUEL,

    Defendants.


VIDEOTAPED DEPOSITION OF MARY LUCAS HILL

Volume 2, Pages 55-107

Taken on behalf of Plaintiff


October 25, 2006

\*    \*    \*

Mary Hill                                                                      October 25, 2006

Page 72

1   you had this communication with Mr. Sayre?
2   A.  I believe it was John Santos initially.
3   Q.  And was this a face-to-face meeting or something
4       over the telephone?
5   A.  We had gone up and met with Fred face to face, Fred
6       Sayre.
7   Q.  And what was the -- do you recall approximately
8       when that was, that meeting?
9   A.  I don't. I'm sorry.
10  Q.  Do you recall if it was in the fall of 2002 or
11      after Christmas?
12  A.  I really don't remember --
13  Q.  When you --
14  A.  -- when we made the trip there.
15  Q.  I'm sorry. I apologize for talking over you.
16      When you made this trip to visit the Juneau
17      store, what was the purpose for the trip?
18  A.  Because of problems with Fred not addressing issues
19      in his store, we went up to sit down and have a
20      conversation with him about that.
21  Q.  Now, did you -- when you -- had you reached the
22      conclusion that there were problems with Fred not
23      addressing problems in his store, that Fred was not
24      doing his job?
25  A.  We sat down with him to discuss that part of his

Page 73

1       job was to address issues as they arose. And --
2   Q.  And when you -- you described that as a counseling
3       session?
4   A.  Yes.
5   Q.  Okay. Did you believe at that time that his work
6       performance was deficient in that regard?
7   A.  Yes.
8   Q.  And what was the basis for your conclusions or your
9       conclusion that his work performance was deficient?
10  A.  Because as issues arose in the store, they were not
11      addressed by Fred.
12  Q.  Okay. And what issues do you mean, to the best of
13      your recollection?
14  A.  There was -- to the best of my recollection, there
15      were issues in a number of different departments of
16      the store and that one of them was in apparel.
17  Q.  Was the issue in apparel solely complaints by
18      Ms. Havard or were there other complaints?
19  A.  No. Johnna Havard's complaint was the one that we
20      were dealing with in apparel.
21  Q.  In terms of responding to her complaint, did you
22      treat her complaint as being only about Mr. San
23      Miguel's tardiness or attendance or was it wider or
24      broader than that?
25  A.  Her complaint was wider and broader than just Jaime

Page 74

1       San Miguel's attendance.
2   Q.  And when you met with Mr. Sayre, was it for the
3       purpose of dealing with broader issues than just
4       Mr. San Miguel's attendance and tardiness?
5   A.  Yes.
6   Q.  What were the issues that you met with Mr. Sayre
7       about in regards to Mr. San Miguel?
8   A.  Complaints that he was not present when he said he
9       was going to be, that he was scheduled to arrive at
10      a certain time -- on the schedule to arrive at a
11      certain time and would consistently arrive later
12      than that, and then there were complaints about his
13      failure to communicate to his people.
14  Q.  And did you investigate those complaints?
15  A.  Yes.
16  Q.  Okay. And was that investigation one of your job
17      duties at Fred Meyer?
18  A.  Yes.
19  Q.  Okay. And as a result of that investigation, did
20      you reach some conclusions as to whether those
21      complaints were valid?
22  A.  Yes.
23  Q.  Okay. What -- and with as much detail as possible,
24      can you -- let's -- first of all, just in general
25      describe to me your conclusion, and we'll go

Page 75

1       through what your investigation entailed.
2   A.  Well, the conclusions based on my conversations
3       with a number of people in that department were
4       that Jaime was not working like he was scheduled to
5       work, that he was coming in late on a pretty
6       regular basis, and that there was a lot of
7       confusion as to who was supposed to do what with
8       regard to assignment of duties.
9   Q.  Okay. And what was the -- why was there confusion?
10      What did your investigation determine in that
11      regard?
12  A.  Well, the main complaint from the people that I
13      spoke with that worked for him was that there was
14      either no direction or a change of direction after
15      direction was initially given and that he was
16      missing from work on a pretty regular basis.
17  Q.  Were there complaints about Mr. San Miguel -- any
18      complaints of him kicking objects or kind of
19      physically acting out?
20  A.  My notes show that one of the people that I spoke
21      with said that he -- they knew him to have a temper
22      problem and that they cited a time in I think the
23      warehouse or the freight -- where the freight was
24      that they had witnessed him kick a box of freight.
25  Q.  Now, in regards to these complaints, are they the

### Page 76

1. normal sort of complaints that would have supposed
2. to have gone to the store director?
3. **A. Yes.**
4. Q. Okay. And did you in your investigation find that
5. this information had gone to the store director but
6. Mr. Sayre had not acted upon or not responded to
7. the complaints?
8. **A. Either he had not responded to the complaint or had**
9. **not followed up on addressing the complaints with**
10. **Jaime.**
11. Q. Okay. Now, did you ask Mr. Sayre what he had done
12. in regards to these complaints?
13. **A. Yes.**
14. Q. Okay. And what did he tell you?
15. **A. He indicated that he had addressed some of the**
16. **issues with Jaime, but clearly from what the**
17. **investigation showed was that, even if he had**
18. **talked to him about it, it hadn't done any good.**
19. **Jaime hadn't improved his attendance at all.**
20. **So it was a matter of not using the progressive**
21. **discipline process to address an attendance issue**
22. **with a manager.**
23. Q. Did you talk to Mr. San Miguel directly about these
24. complaints?
25. **A. Yes.**

### Page 77

1. Q. Okay. And what was his response in as much detail
2. as you recall?
3. **A. As I recall, he was having some personal problems**
4. **at home. He had a young son. He had gone through**
5. **a divorce and had to take his son to daycare on a**
6. **regular basis which interfered with his ability to**
7. **come to work at the time that he was scheduled.**
8. **Had gone through -- was having some personal issues**
9. **at home, and it was interfering with his job.**
10. Q. And do you -- at that time did he tell you when he
11. had actually gone through the divorce or been
12. separated?
13. **A. I don't recall how long it had been, but to my**
14. **recollection, it was still an issue for him.**
15. Q. Did he admit to you that the complaints were valid,
16. that there was substance for the complaints?
17.     MR. DICKENS: I'm going to object. That's
18. overly broad as to which complaints you mean.
19.     Go ahead.
20. Q. BY MR. CHOATE: We'll break them down. Did he
21. admit to you that he was frequently tardy?
22. **A. Yes, he did.**
23. Q. Did he admit to you that when he was tardy he would
24. fail to call in to advise his staff that he was
25. going to be late?

### Page 78

1. **A. Yes, he did.**
2. Q. Okay. Did he admit to you that he did not
3. communicate well with his staff during this time
4. period?
5. **A. He admitted not to calling in when he was not going**
6. **to come in. As far as his communication to his**
7. **people, he didn't agree with that part of it as**
8. **much. As I recall, he didn't admit to not**
9. **communicating as well as he should have.**
10. Q. Okay. Did you find in your investigation that he
11. wasn't communicating as he should have?
12. **A. The absence of written tours on a regular basis was**
13. **an indicator that he wasn't communicating well to**
14. **his people.**
15. Q. Okay. Was there also complaints that Ms. Havard
16. when Mr. San Miguel would not show up for work
17. would prepare a tour and then Mr. San Miguel when
18. he came in late would then tear up her tour? Do
19. you recall those complaints?
20. **A. Yes.**
21. Q. Did you find that there was support for that, that
22. that in fact occurred?
23. **A. No.**
24. Q. Did you investigate that?
25. **A. Yes.**

### Page 79

1. Q. Okay. What was your conclusion in that regard?
2. **A. I -- there was no -- I had no proof, no witnesses**
3. **to Mr. San Miguel tearing up tours.**
4. Q. Were there complaints regarding employee --
5. inconsistencies in employee discipline by Mr. San
6. Miguel?
7. **A. You know, that part of it I don't recall as being**
8. **that big of an issue.**
9. Q. Okay. If you could turn to 202 -- Bates
10. No. 202417.
11. **A. Okay.**
12. Q. Can you tell me whose handwriting this is?
13. **A. That's mine.**
14. Q. Okay. Real quickly, if we're looking at 202417,
15. 418, 419, and then 420, 421, 422, 423, 424, 425,
16. 426, 427, 428, 429, 430, 431, that Bates set, are
17. those all your handwritten notes?
18. **A. Yes.**
19. Q. Are they all part of the investigation you
20. conducted?
21. **A. Yes.**
22. Q. Okay. Did you meet with Mr. Sayre before these
23. notes were taken or after, if you recall?
24. **A. I don't recall. I really don't.**
25. Q. Let me just ask, also. There is a page of

Mary Hill                                                          October 25, 2006

Page 88

1   same process apply to a manager as to an hourly
2   employee for discipline?
3 A. Yes.
4 Q. What is Fred Meyer -- what is the Fred Meyer step
5   discipline process, sort of in a nutshell? I know
6   you gave courses on it, so I'm sure you know it.
7 A. **Verbal warning, counseling, and then you move to**
8   **written warning, and then you move to suspension,**
9   **which typically we would not suspend a salaried**
10  **employee. If we did, it would be a suspension with**
11  **pay, which doesn't happen quite often. And then**
12  **termination would be the ultimate step.**
13 Q. Now, you mentioned just earlier something called a
14  written verbal warning. Can you tell me within
15  this stepped or progressive process, verbal,
16  counseling, written, suspension, termination, where
17  does a written verbal warning fit in that process?
18 A. **It's just documentation that a verbal warning was**
19  **given.**
20 Q. So is a written verbal warning -- does that occur
21  before counseling?
22 A. **No. It's just documentation of counseling.**
23 Q. Okay. Okay. Can you tell me the difference
24  between a written verbal warning and a written
25  warning?

Page 89

1 A. **A written warning is a warning that is put in**
2   **writing and given to the associate.**
3 Q. Is the associate required to sign that?
4 A. **Yes.**
5 Q. How does that differ from a written verbal warning?
6 A. **A written verbal is just another way of saying a**
7   **verbal warning. It is just documentation that a**
8   **verbal warning was given.**
9 Q. Is there a form for written verbal warnings?
10 A. **No.**
11 Q. Okay. So how is a written verbal warning supposed
12  to be documented for Fred Meyer in 2002, 2003?
13 A. **Typically it's either a note that is written that**
14  **documents that you counseled an employee on a**
15  **certain date or sometimes managers will use the**
16  **written warning form and write "verbal warning" on**
17  **the top of it, but it is not given to the**
18  **associate. It is just a way to document that they**
19  **were verbally warned or counseled.**
20 Q. When you say it's not given to the associate, does
21  that mean the associate is not shown it?
22 A. **That's correct.**
23 Q. So it's just something the manager would keep
24  within the file itself but wouldn't be something
25  given to the associate for them to look at or

Page 90

1   review because it's not a written warning?
2 A. **That's right.**
3 Q. And you -- one of your many hats that you wore at
4   Fred Meyer was that you taught a course on
5   progressive discipline to your managers; is that
6   right?
7 A. **That's right.**
8 Q. As a result of your investigation at Fred Meyer of
9   the complaints regarding Mr. San Miguel, did you
10  ever determine how many times he had been tardy or
11  late for work?
12 A. **I don't recall how many.**
13 Q. Do you recall whether it was more than five?
14 A. **I believe it was. Yes.**
15 Q. More than ten?
16 A. **I really don't recall how many times it was.**
17 Q. Would it be correct to say that as a result of your
18  investigation you determined that it was sort of an
19  ongoing practice on his part, it wasn't something
20  that just happened once or twice?
21 A. **That would be correct.**
22 Q. And as a result of your investigation, did you --
23  was there a decision to impose some form of
24  progressive discipline on Mr. San Miguel?
25 A. **Yes.**

Page 91

1 Q. Who made that decision?
2 A. **As I recall, it was a joint decision between**
3   **myself, the regional vice-president, and I believe**
4   **that I partnered with the employee relations**
5   **department in Portland.**
6 Q. And do you recall who you would have dealt with in
7   Portland?
8 A. **I don't recall if it was an employee relations**
9   **administrator or the manager there, Cindy Thornton.**
10 Q. And is it unusual or out of the ordinary at Fred
11  Meyer for you to impose discipline that did not
12  include the store manager as part of the
13  disciplinary process?
14 A. **No. Not when we are on site addressing an issue.**
15  **The store manager will -- the store director will**
16  **be a part of the process, but if regional HR comes**
17  **in to do an investigation and determines that there**
18  **is some discipline that needs to be dispensed,**
19  **especially in light of the fact that we were having**
20  **issues with the store director addressing issues,**
21  **it would have made perfect sense to partner on an**
22  **issue and dispense the discipline at that time.**
23 Q. And what discipline, if you recall, was given to --
24  imposed on Mr. San Miguel as a result of your
25  investigation?

10 (Pages 88 to 91)

Beovich Walter Friend

Exhibit ___7___
page _4_ of _5_

Page 92

1  A. As I recall, he was given a last and final warning.
2  Q. Okay. In your -- okay. If you could, then,
3     explain to me where a last and final warning fits
4     within the progressive discipline system you just
5     discussed.
6  A. It's a written warning that says "last and final"
7     at the top, and that means that we're not -- we
8     won't do any more written warnings, we won't do any
9     other discipline, that when you are given a last
10    and final warning, if you violate the rule again,
11    you can expect to be discharged.
12 Q. Now, in giving a last and final warning, had you
13    concluded that Mr. San Miguel had already been
14    given the series of progressive discipline steps
15    before then, before that, or did you jump to that
16    step?
17 A. We jumped to that step based on the fact that he
18    had been counseled by the store director. But due
19    to the fact he was department manager and we had
20    found that it was a pretty serious attendance
21    issue, we decided that he deserved to receive a
22    last and final warning, and that he understood that
23    he could not continue to miss time as he had
24    previously.
25 Q. And the form that would have had the last and final

Page 93

1     warning, it would say "last and final," like
2     handwritten at the top of the written warning form?
3  A. That's correct.
4  Q. Okay. And do you recall issuing that?
5  A. Yes.
6  Q. And who would have signed off on that?
7  A. It would have been the regional vice-president and
8     myself and Mr. San Miguel. And probably Fred as
9     well.
10 Q. Now, in that same process or trip, did you reach
11    certain conclusions regarding Mr. Sayre's
12    management practices that resulted in some form of
13    discipline for Mr. Sayre?
14 A. You know, I don't recall if we disciplined
15    Mr. Sayre that trip.
16 Q. Did you discipline him at some other point?
17 A. I believe we did.
18 Q. And what -- if you recall, what was the discipline
19    for?
20 A. For failing to address issues in his store.
21 Q. Including the one with Mr. San Miguel?
22 A. That's correct.
23 Q. Okay. Do you recall -- you've identified all of
24    the handwritten documents as being in your own
25    handwriting that are part of this Exhibit 1.

Page 94

1     Could you just briefly go through the OVs that
2     are part of this set which are in Exhibit 1 and
3     confirm that these are the type of documents that
4     would have been kept in your investigative file.
5     Many of them are sort of from Johnna Havard to
6     herself and then appear to have been forwarded to
7     you.
8  A. (Witness complies.)
9     These are all the Office Visions that pertain
10    to the Johnna Havard complaint. They would have
11    all been in the same file.
12 Q. Okay. And they would have been kept in the regular
13    course of business?
14 A. That's correct.
15 Q. Would you have kept in that same file any
16    communications with Mr. Sayre regarding this that
17    would have been in writing?
18 A. Yes.
19 Q. So if they're not there -- as you recall -- strike
20    that.
21    As you recall, there were at least some
22    communications to Mr. Sayre in this regard that
23    were in writing?
24 A. I would assume so.
25 Q. Now, as a result of your investigation, at some

Page 95

1     point in time Mr. Sayre was also disciplined for,
2     in part, failing to address the complaints
3     regarding Mr. San Miguel; is that right?
4  A. That's correct.
5  Q. And do you recall what discipline was given to
6     Mr. Sayre?
7  A. I don't. As I recall, he was given a warning
8     notice for failing to address issues in his store.
9     I really can't speak to anything else.
10 Q. And was it your understanding when that notice --
11    did you give him that warning notice?
12 A. I don't believe I did. I believe the RVP did, the
13    regional -- the RVS, the regional vice-president
14    did.
15 Q. Do you know who that was at the time?
16 A. I believe it was either John Santos or Greg
17    Sandeno.
18 Q. Do you know -- that would have been, in terms of
19    your progressive disciplinary process, the stage
20    after counseling and before suspension?
21 A. That's correct.
22 Q. And part of that written warning was for
23    Mr. Sayre's failure to address complaints about
24    Mr. San Miguel?
25 A. That's correct.