James R. Dickens                                    Hon. Ralph R. Beistline
MILLER NASH LLP
4400 Two Union Square
601 Union Street
Seattle WA  98101-2352
Telephone:  (206) 622-8484

Peter Gruenstein
GRUENSTEIN & HICKEY
Resolution Plaza
1029 W. 3rd Avenue, Suite 510
Anchorage AK  99501
Telephone:  (907) 258-4338

     Attorneys for Defendants

UNITED STATES DISTRICT COURT
DISTRICT OF ALASKA

MYRNA I. JOHNSON,

          Plaintiff,

    v.                                          Case No. 1J-04-008-CV (RRB)

FRED MEYER STORES, INC., a Delaware
corporation; and JAIME SAN MIGUEL,

          Defendants.

**DECLARATION OF JAMES R. DICKENS (7/20/07) IN SUPPORT OF
DEFENDANTS' MOTION TO DISMISS WRONGFUL TERMINATION CLAIM**

     I, James R. Dickens, declare under oath as follows:

     1.     I am an attorney with Miller Nash LLP, one of the attorneys for the

defendants in the above-referenced matter.  I make this declaration based on my personal

knowledge and the records and files herein.

     2.     Attached hereto as Exhibit A are true and accurate copies of pages 1,

4, 5, 124, 156, 157, 160, 219-222, 242, and Exs. 2, 4 and 18 from the deposition of plaintiff

Myrna Johnson taken January 23, 2006.

DECLARATION OF JAMES R. DICKENS (7/20/07) IN SUPPORT OF
DEFENDANTS' MOTION TO DISMISS WRONGFUL TERMINATION CLAIM
Johnson v. Fred Meyer
Case No. 1J-04-008-CV
Page 1 of 3

SEADOCS:286559.1

MILLER NASH LLP
ATTORNEYS AT LAW
4400 TWO UNION SQUARE
601 UNION STREET, SEATTLE WA 98101-2352
TELEPHONE (206) 622-8484

3.    Attached hereto as Exhibit B are true and accurate copies of pages 1, 3, 5, 52, 56-58, 85, 86, 89, 90, and Ex. 18 from the deposition of Fred Sayre taken on January 27, 2006.

4.    These excerpts are submitted to the Court in support of defendant's contemporaneous motion to dismiss plaintiff's wrongful termination claim.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

SIGNED at Seattle, Washington, on July 20, 2007.

s/ James R. Dickens

Certificate of Service

I hereby certify that on July 20, 2007, a copy of the foregoing was served electronically on:

Mark Choate
lawyers@choatelawfirm.com

s/ James R. Dickens

MILLER NASH LLP
ATTORNEYS AT LAW
4400 TWO UNION SQUARE
601 UNION STREET, SEATTLE WA 98101-2352
TELEPHONE (206) 622-8484

DECLARATION OF JAMES R. DICKENS (7/20/07) IN SUPPORT OF
DEFENDANTS' MOTION TO DISMISS WRONGFUL TERMINATION CLAIM
Johnson v. Fred Meyer
Case No. 1J-04-008-CV
Page 2 of 3

## TABLE OF CONTENTS

| EXHIBIT | DESCRIPTION | PAGE NOS. |
|---|---|---|
| Exhibit A | Myrna Johnson deposition transcript pages | 1-15 |
| Exhibit B | Fred Sayre deposition transcript pages | 1-12 |

MILLER NASH LLP
ATTORNEYS AT LAW
4400 TWO UNION SQUARE
601 UNION STREET, SEATTLE WA 98101-2352
TELEPHONE (206) 622-8484

DECLARATION OF JAMES R. DICKENS (7/20/07) IN SUPPORT OF
DEFENDANTS' MOTION TO DISMISS WRONGFUL TERMINATION CLAIM
Johnson v. Fred Meyer
Case No. 1J-04-008-CV
Page 3 of 3

SEADOCS:286559.1

Page 1

UNITED STATES DISTRICT COURT
DISTRICT OF ALASKA

MYRNA I. JOHNSON,                        )
                                         )
          Plaintiff,                     )
                                         )
v.                                       )
                                         )
FRED MEYER STORES, INC.,                 )
a Delaware corporation;                  )
and JAIME SAN MIGUEL,                    )
                                         )
          Defendants.                    )
_____  )

Case No. J04-008 CV

DEPOSITION OF MYRNA JOHNSON
Pages 1 through 264, Inclusive
Taken: Monday, January 23, 2006
Place: Juneau, Alaska

Myrna Johnson * 1/23/2006
Johnson v. Fred Meyer * J04-008 CV (JWS)

Page 4

```
 1    A P P E A R A N C E S :

 2

 3     For the Plaintiff:      CHOATE LAW FIRM LLC
                               Mark Clayton Choate, Esq.
 4                             Jessica Srader, Esq.
                               424 North Franklin Street
 5                             Juneau, AK  99801

 6

 7     For the Defendants:     MILLER NASH LLP
                               James R. Dickens, Esq.
                               4400 Two Union Square
 8                             601 Union Street
                               Seattle, WA  98101
 9

10

11     Also present:          Jaime San Miguel

12        BE IT REMEMBERED that, pursuant to Notice of

13    Taking Deposition, and beginning on Monday, the 23rd

14    day of January, 2006, commencing at the hour of 9:00

15    a.m. thereof, in the offices of the Choate Law Firm,

16    located at 424 North Franklin Street, Juneau, Alaska,

17    before me, LYNDA BATCHELOR BARKER, Registered Diplomate

18    Reporter and Notary Public in and for the State of

19    Alaska, personally appeared:

20

21                  MYRNA JOHNSON

22

23    called as a witness by the defendant, who was

24    thereafter examined and interrogated as hereinafter set

25    forth.
```

Glacier Stenographic Reporters Inc.
glaciersteno@gci.net * 907.789.9028

Exhibit __A__ Page __2__ of __15__

Myrna Johnson * 1/23/2006
Johnson v. Fred Meyer * J04-008 CV (JWS)

Page 5

1        MONDAY, JANUARY 23, 2006

2              JUNEAU, ALASKA

3                9:00 A.M.

4

5        THE REPORTER:  I'll now swear you

6    in.  Would you raise your right hand for me,

7    please?

8              (Oath administered)

9        THE WITNESS:  I do.

10

11            MYRNA JOHNSON

12

13   having been first duly sworn by the court reporter to

14   tell the truth, the whole truth, and nothing but the

15   truth, testified as follows:

16

17              EXAMINATION

18

19   BY MR. DICKENS:

20        Q.    For the record, would you please state

21   your full name and your current residence address?

22        A.    My name is Myrna Johnson.  My residence

23   is 1850 Glenrose Avenue, Sacramento, California

24   95815.

25        Q.    Ms. Johnson, how long have you lived at

Exhibit A Page 3 of 15

Myrna Johnson * 1/23/2006
Johnson v. Fred Meyer * J04-008 CV (JWS)

Page 124

1    A.    In 30 days.

2    Q.    All right.  But you weren't being

3    suspended, were you?

4    A.    NO.

5    Q.    You weren't being fired?

6    A.    No.

7    Q.    All right.  And that's consistent with

8    the normal procedure to give, first of all, a

9    verbal warning with a written documentation, if you

10    want an employee to improve, was it not?

11    A.    He didn't give me a verbal warning.

12    Q.    Well, he read you -- that's a verbal

13    warning, because he didn't ask you to sign it, did

14    he?

15    A.    He wants me to sign it.

16    Q.    Now, wait a minute.  At the time he

17    first read it to you, isn't it true he never asked

18    you to sign it?

19    A.    No, sir.  He asked me to sign it.

20    Q.    At the beginning?

21    A.    He have a pen, and he was reading it,

22    and he was telling me to sign it.  He have a pen in

23    his hand.

24    Q.    Well, having a pen in his hand -- are

25    you testifying that it is your recollection

Myrna Johnson * 1/23/2006
Johnson v. Fred Meyer * J04-008 CV (JWS)

Page 156

1      A.    No.  Except if -- I don't know if you

2    consider like the Office Vision that he send me, as

3    part of those.

4      Q.    Anything.

5      A.    Okay.  Then I have some.

6      Q.    Let me just tell you what I'm talking

7    about so we're clear.  Any documents which relate

8    to your employment at Fred Meyer, such as Fred

9    Meyer Employee Responsibilities forms, or

10   paychecks, or benefit plans, or Office Visions, or

11   Fred Meyer personnel policies, or anything else --

12   do you have such a set of documents?

13     A.    I have a few on those that you mention.

14   I have the Office Vision, so yes.

15     Q.    All right.  And where are those?

16     A.    I gave it to my lawyer.

17     Q.    All right.  Is there anything that you

18   have in your possession or under your control, or

19   in a safety deposit box, that you have not given to

20   your attorney that relates to Fred Meyer?

21     A.    I understand your question.  No, sir, I

22   don't.

23     Q.    All right.  Let's go back to the

24   Exhibit 2.

25                 There is a heading, Roman I,

Exhibit A  Page 5 of 15

Myrna Johnson * 1/23/2006
Johnson v. Fred Meyer * J04-008 CV (JWS)

Page 157

1    "Employee conduct which will result in immediate

2    termination without prior warning."  And the first

3    one is "Dishonesty of any kind on or off the job."

4    And you understood that was a basis for immediate

5    termination, did you not?

6         A.    Yes, sir.

7         Q.    Okay.  Under 1, Section 6,

8    insubordination is also conduct that will result in

9    immediate termination.  Did you understand that?

10        A.    Yes, sir.

11        Q.    And then down under Item III, it has

12   got a heading, "The following conduct is regarded

13   and accepted as an employees's voluntary

14   resignation (quit) of his or her employment."

15   Number 1, "Walking off of the job."  Did you

16   understand that?

17        A.    Yes, sir.

18        Q.    Section III, paragraph 4, "Failure to

19   return to work from an approved leave of absence as

20   scheduled."  That's also a basis for concluding

21   that you have voluntarily quit.  Did you understand

22   that?

23        A.    Yes, sir.

24                   (Exhibit 3 duly marked)

25

Myrna Johnson * 1/23/2006
Johnson v. Fred Meyer * J04-008 CV (JWS)

Page 160

1    Q.    All right.

2                (Exhibit 4 duly marked)

3    BY MR. DICKENS:

4    Q.    Ms. Johnson, can you identify

5    Exhibit 4, please?

6    A.    Yes, sir.

7    Q.    What is it?

8    A.    This is our Employee Responsibilities,

9    same as the other exhibit.

10   Q.    But just signed on April 1, 1997?

11   A.    Yes.

12   Q.    Any different understanding about this

13   one than the prior one?  I'm sorry.  Did you

14   understand my question?

15   A.    I didn't understand what you say.

16   Q.    Well, between the sneezing -- I'll try

17   again.

18                Ms. Johnson, with regard to No. 4,

19   is your understanding of the information on it the

20   same as for Exhibit 2, that first Employee

21   Responsibilities form?

22   A.    I understand, sir.  Yes.

23   Q.    Okay.

24                MR. DICKENS:  Mark this, please.

25                (Exhibit 5 duly marked)

Exhibit A Page 7 of 15

Myrna Johnson * 1/23/2006
Johnson v. Fred Meyer * J04-008 CV (JWS)

Page 219

1    BY MR. DICKENS:

2        Q.    Ms. Johnson, for the record, would you

3    please identify Exhibit 18?

4        A.    This is the Employee Warning Notice.

5        Q.    Is this the one we discussed earlier

6    that Mr. San Miguel read to you when you were in

7    the meeting with him and Mr. Sayre?

8        A.    Yes, sir.

9        Q.    And had you ever issued one of these to

10   another employee?

11       A.    Yes.

12       Q.    Had you ever recommended that someone

13   else above you issue one of these to another

14   employee?

15       A.    Yes, sir.

16       Q.    And what is the purpose?

17       A.    The Employee Warning Notice is to make

18   sure that the employee understand that, if they do

19   not -- that there is some -- their performance is

20   not up to the standard, and they are given enough

21   time to put it up to the standard, or else they

22   will either be sometimes suspended or demoted or

23   terminated.

24       Q.    Now, as you remember it, did

25   Mr. San Miguel read each of the handwritten and

**Myrna Johnson * 1/23/2006**
**Johnson v. Fred Meyer * J04-008 CV (JWS)**

Page 220

1    printed sections on this Employee Warning Notice?

2        A.    Excuse me, sir?

3        Q.    Sure.  As you recall, Ms. Johnson, did

4    Mr. San Miguel read to you each of the printed and

5    handwritten responses or comments on this Employee

6    Warning Notice?

7        A.    Yes, sir.

8        Q.    All right.  So for Item 1, it says,

9    preprinted, "State exactly where, when, and what

10   employee did or said to incur this notice."  And

11   dates of infraction -- it is written, if I can read

12   this correctly, like 3-13 through 3-17, 2002.  Is

13   that what you understand it to say?

14       A.    Yes.

15       Q.    And it says, "Myrna didn't complete her

16   hours worked as directed by the manager.  ALE

17   department recovery is not getting done at night."

18       A.    He said "Myrna didn't complete her tour

19   work as directed by the manager."

20       Q.    Tour work.

21       A.    "ALE department recovery is not getting

22   done at night.

23       Q.    Let me stop you there.  Hold on.

24   That's what he wrote there, and he read that to

25   you?

Myrna Johnson * 1/23/2006
Johnson v. Fred Meyer * J04-008 CV (JWS)

Page 221

1    A.    Yes, sir.

2    Q.    And that's what he had been telling you

3    previously in those OVs that we just reviewed;

4    isn't that right?

5    A.    Yes, sir.

6    Q.    And you concurred that was his opinion

7    at that time, right?

8    A.    Yes.

9    Q.    And the second one, the printed

10   statement is "State exactly what performance is

11   expected of the employee in the future and steps to

12   be taken to improve or correct performance."  And

13   he wrote, "Myrna is expected to complete all tasks

14   assigned by the manager.  All work done need to" --

15   A.    "All work done need to conform to Fred

16   Meyer standard."

17   Q.    Go ahead and finish it.

18   A.    "Manager to write daily tour for Myrna

19   to complete.  These tours need to be turned in

20   every day for manager review."

21   Q.    Okay.  And so this is consistent with

22   the comments that Mr. San Miguel had been making to

23   you about the tour wasn't getting done, and he

24   wanted to get it done; isn't that right?

25   A.    Yes, sir.

Myrna Johnson * 1/23/2006
Johnson v. Fred Meyer * J04-008 CV (JWS)

Page 222

1    Q.    And the next section, 3, the printed

2   statement is:  "Is the employee being suspended

3   without pay for this infraction?"  It says "Circle

4   One," and it's circled "No."

5                So you understood you were not

6   being suspended, didn't you?

7    A.    Yes, sir.

8    Q.    Okay.  And reading Question 4, it says,

9   "State what form of discipline the employee may

10  expect for failure to comply with this

11  rule/standard in the future."  And he's written,

12  "If Myrna doesn't show any improvement in the next

13  30 days, she'll be removed from her position as an

14  ALE assistant manager."  So that's what he read to

15  you?

16   A.    Yes, sir.

17   Q.    So what you heard is, you knew you had

18  30 days to bring up your performance to the

19  standards that Mr. San Miguel thought should be

20  achieved; isn't that right?

21   A.    No, sir.

22   Q.    "No, sir," what?  You didn't think you

23  had 30 days?

24   A.    He mean 30 days.

25   Q.    Yes.

Myrna Johnson * 1/23/2006
Johnson v. Fred Meyer * J04-008 CV (JWS)

Page 242

1    Q.    Didn't you tell her on April 30, 2002,

2    about a month after you left Fred Meyer, that,

3    "When I left the meeting with Mr. Sayre and

4    Mr. San Miguel, I felt I had quit my job"?

5    A.    I was so embarrassed to say I was

6    fired, sir.  Even now, I -- because --

7    Q.    My question is, isn't that what you

8    told Erin Collins on April 30, 2002, "when I left,

9    I felt I had quit my job"?

10    A.    If that is was that says, the paperwork

11    says.

12    Q.    Well, that's what it does say.  I'm

13    asking if you did say that?

14    A.    Yes.

15        MR. DICKENS:  Would you mark that,

16    please?

17        (Exhibit 22 duly marked)

18    BY MR. DICKENS:

19    Q.    Ms. Johnson, can you identify

20    Exhibit 22, please?

21    A.    This is -- I typed this to recall what

22    happened from March 12 to March 18.

23    Q.    Okay.  When did you prepare it?

24    A.    After I found out that -- on the 20th.

25    Q.    Well, when after the 20th?

Exhibit A  Page 12 of 15

# FRED MEYER EMPLOYEE RESPONSIBILITIES

he majority of the firm's employees are successful in their jobs. They realize that following company policies and procedures are essential to their wn best interest and to the success of the firm. In fairness to all concerned, you need to know and understand the principal reasons for the action utli below:

I   **Employee Conduct Which Will Result In Immediate Termination Without Prior Warning:**

1. Dishonesty of any kind—ON OR OFF THE JOB. Some examples:
   a. Unauthorized conversion to personal use or removal of company money, merchandise, or other property from company premises; committed alone or in conjunction with another person(s).
   b. Giving or receiving unauthorized credit or price discounts on merchandise sold or purchased in our stores. Unauthorized price discounts would include "AD" prices when such are NOT available to the public.
   c. "Grazing" or consuming merchandise without prior payment. This also includes distressed and salvage merchandise regardless of condition.
   d. Placing unpaid for merchandise in pocketbooks, pockets, or any other place of possible concealment.
   e. Falsification of company records—this includes time cards and time sheets.
   f. Making or accepting any unauthorized long distance telephone calls.
2. Failure to Record Sales on the Cash Register. Clarification:
   a. All customers' purchases must be recorded on the cash register at the correct selling price. Individual customer sales must be recorded as separate transactions. Do not combine or "bunch" sales.
   b. If a customer leaves the correct amount of money for his/her purchase while you are waiting on another customer, you are to record the departed customer's money (purchase) immediately after completing transaction of present customer.
   c. Each customer is to be offered a cash register or change receipt for the exact amount of his/her purchase.
3. Reporting for work under the influence of alcoholic beverages or unlawful narcotics or drugs; or consuming or possessing alcoholic beverages or unlawful narcotics or drugs during your work shift or on company premises.
4. Negligence in handling of cash and/or negotiable instruments which results in a loss to the company.
5. Deliberate destruction of company or employee's property; or any reckless act which results in a loss to the company or injury to an employee or customer.
6. Insubordination, such as willfully disobeying the instructions of an authorized person-in-charge, or disrespectful conduct toward a supervisor or person-in-charge.
7. Gross discourtesy to a customer.
8. Conviction of a crime directly or indirectly related to the company, its employees, or its property, or one which affects the employee's ability to perform his or her duty.
    Ringing up your own or your immediate family's purchases. Processing your own or your immediate family's check(s), any negotiable instrument(s) (or any transaction involving a purchase, refund or layaway). Immediate family also includes non-relatives living in the same household.
10. Failure to sign the Sales Data Card and failure to record your employee identification number on registers where I.D. is required.
11. Other employment-related misconduct which is determined by the company to be of an equally serious nature.

II  **Employee Conduct Which Will Result In Disciplinary Action But Which Usually Results In Termination After Prior Warning:**

1. Failure to perform work as required.
2. Customer complaints.
3. Failure to comply with written company policies and procedures. Some examples:
   a. Working "free time" or working overtime without specific approval of the person-in-charge.
   b. Violation of company safety policies and procedures.
4. Any conduct which otherwise interferes with or obstructs the normal operation of business. Some examples:
   a. Excessive tardiness or absenteeism.
   b. Giving out of confidential business information.
   c. Upon notice from the company, failure of an employee to immediately make good a bad check(s) or charge(s) drawn on the employee account.
5. Negligence in handling cash and/or negotiable instruments even though such negligence does not result in a loss.

III **The Following Conduct Is Regarded And Accepted As An Employee's Voluntary Resignation (Quit) Of His/Her Employment:**

1. Walking off of the job.
2. Refusal to work a scheduled shift.
3. Failure to personally notify the P.I.C. of an absence prior to the scheduled work shift. (First incident—3 day suspension)
4. Failure to return to work from an approved leave of absence as scheduled.
5. Failure to return to work when called back from lay-off.

## EMPLOYEE ACKNOWLEDGEMENT

I acknowledge that I have read and understand the above principal causes for discharge, disciplinary action and resignation. I have clarified any questions with my immediate supervisor, Trainer or the Personnel Department and understand this summary does not constitute an employment contract.

Er lvee ___Myrna J. Johnson___    Date ___12-02-92___
PLEASE PRINT NAME

Employee Signature ___Myrna Johnson___                         **200010**

Location ___Juneau, Alaska___    Department ___Deli___
M-1398  12/88  19         Distribution:  WHITE ORIGINAL—Personnel;  CANARY COPY—Store/plant File;  PINK COPY—Employee

Exhibit __A__ Page __13__ of __15__

# FRED MEYER EMPLOYEE RESPONSIBILITIES

*...e majority of the firm's employees are successful in their jobs. They realize that following company policies and procedures are essential to their ...vn best interest and to the success of the firm. In fairness to all concerned, you need to know and understand the principal reasons for the action ...utline'' below:*

**I    Employee Conduct Which Will Result In Immediate Termination Without Prior Warning:**

1. Dishonesty of any kind—ON OR OFF THE JOB. Some examples:
   a. Unauthorized conversion to personal use or removal of company money, merchandise, or other property from company premises; committed alone or in conjunction with another person(s).
   b. Giving or receiving unauthorized credit or price discounts on merchandise sold or purchased in our stores. Unauthorized price discounts would include "AD" prices when such are NOT available to the public.
   c. "Grazing" or consuming merchandise without prior payment. This also includes distressed and salvage merchandise regardless of condition.
   d. Placing unpaid for merchandise in pocketbooks, pockets, or any other place of possible concealment.
   e. Falsification of company records—this includes time cards and time sheets.
   f. Making or accepting any unauthorized long distance telephone calls.
2. Failure to Record Sales on the Cash Register. Clarification:
   a. All customers' purchases must be recorded on the cash register at the correct selling price. Individual customer sales must be recorded as separate transactions. Do not combine or "bunch" sales.
   b. If a customer leaves the correct amount of money for his/her purchase while you are waiting on another customer, you are to record the departed customer's money (purchase) immediately after completing transaction of present customer.
   c. Each customer is to be offered a cash register or change receipt for the exact amount of his/her purchase.
3. Reporting for work under the influence of alcoholic beverages or unlawful narcotics or drugs; or consuming or possessing alcoholic beverages or unlawful narcotics or drugs during your work shift or on company premises.
4. Negligence in handling of cash and/or negotiable instruments which results in a loss to the company.
5. Deliberate destruction of company or employee's property; or any reckless act which results in a loss to the company or injury to an employee or customer.
6. Insubordination, such as willfully disobeying the instructions of an authorized person-in-charge, or disrespectful conduct toward a supervisor or person-in-charge.
7. Gross discourtesy to a customer.
8. Conviction of a crime directly or indirectly related to the company, its employees, or its property, or one which affects the employee's ability to perform his or her duty.
9. Ringing up your own or your immediate family's purchases. Processing your own or your immediate family's check(s), any negotiable instrument(s) (or any transaction involving a purchase, refund or layaway). Immediate family also includes non-relatives living in the same household.
10. Failure to sign the Sales Data Card and failure to record your employee identification number on registers where I.D. is required.
11. Other employment-related misconduct which is determined by the company to be of an equally serious nature.

**II    Employee Conduct Which Will Result In Disciplinary Action But Which Usually Results In Termination After Prior Warning:**

1. Failure to perform work as required.
2. Customer complaints.
3. Failure to comply with written company policies and procedures. Some examples:
   a. Working "free time" or working overtime without specific approval of the person-in-charge.
   b. Violation of company safety policies and procedures.
4. Any conduct which otherwise interferes with or obstructs the normal operation of business. Some examples:
   a. Excessive tardiness or absenteeism.
   b. Giving out of confidential business information.
   c. Upon notice from the company, failure of an employee to immediately make good a bad check(s) or charge(s) drawn on the employee's account.
5. Negligence in handling cash and/or negotiable instruments even though such negligence does not result in a loss.

**III    The Following Conduct Is Regarded And Accepted As An Employee's Voluntary Resignation (Quit) Of His/Her Employment:**

1. Walking off the job.
2. Refusal to work a scheduled shift.
3. Failure to personally notify the P.I.C. of an absence prior to the scheduled work shift. (First incident—3 day suspension)
4. Failure to return to work from an approved leave of absence as scheduled.
5. Failure to return to work when called back from lay-off.

## EMPLOYEE ACKNOWLEDGEMENT

I acknowledge that I have read and understand the above principal causes for discharge, disciplinary action and resignation. I have clarified any questions with my immediate supervisor, Trainer or the Personnel Department and understand this summary does not constitute an employment contract.

Employee _Myrna Johnson_    Date _4/1/97_
                PLEASE PRINT NAME

Employee Signature _Myrna Johnson_

Location _JN/ALE_    Department _ALE_

M-1398   12/88    Distribution: WHITE ORIGINAL—Personnel   CANARY COPY—Store/plant File; PINK COPY—Employee

Exhibit _4_ Date _1/23/06_
Witness _Myrna Johnson_    200023
Lynda Batchelor Barker, RDR   1 page

FROM : Baxter Bruce Sullivan          FAX NO. : 789-1913          Dec. 08 2003 04:12PM  P7

# Employee Warning Notice

(Please Print)

LOC: _158_        PR SECTION: _ACE_

_Johnson_                _Myrna_

Last Name                First                Middle          Employee Number: _276177_

You are hereby notified that your employment performance is unsatisfactory in the following respects. Improvement must be made for you to continue your employment with Fred Meyer, Inc.

1. State exactly where, when, and what employee did or said to incur this notice.                                    YES  NO
   Date(s) of Infraction: _3/13 - 3/17_                    19 _2002_  Prior verbal warnings? ☒  ☐
   - Myrna didn't complete her tour work as directed by
     the Mgr.
   - Ace Dpt Recovery is not getting done at night.

2. State exactly what performance is expected of the employee in the future and steps to be taken to improve or correct performance: _Myrna is expected to complete all task_
   Assigned by the Manager. All tours Done need to conduct
   to Fred Meyer standards. Mgr to write Daily Tour for Myrna to
   complete these tours need to be turn I_ every day for Mgr review.

3. (a) Is the employee being suspended without pay for this infraction? (circle one)  YES  (NO)
   (b) If YES – Give beginning date: _____  ending date: _____

4. State what form of discipline the employee may expect for failure to comply with this rule/standard in the future.
   If Myrna dies'l show any Improvement in the next
   30 Days she'll be removed from her position as a ACE
   Asst Mgr.

5. State the employee's remarks after this notice was issued.

It is our sincere desire that your performance attain a satisfactory level so no further action will be necessary.

Employee's Signature (optional): _____

Manager's Signature: _____          Title: _ACE Mgr_

Witness: _____          Today's Date: _3/18/2002_  19

INSTRUCTIONS:  PLEASE READ AND FOLLOW CAREFULLY.

1. This four-part notice is to be used for recording all details of an employee's failure to comply with part(s) of company policies, procedures and/or standards.
2. All areas of this notice must be completed as fully as possible. Lacking such completion may compromise the validity of this warning notice.
3. Review the Employee Responsibilities Form (M-1398) with the employee and have him/her sign a new one and attach to the respective copies of this notice. DO NOT highlight, underline or mark beside any of the issues on the form. Marking on or altering the form may compromise its usefulness.

Exhibit _A_ Page _15_ of _15_

A. FIRST (white) copy to be sent immediately to Human Resources/NO HRD
B. SECOND (yellow) copy to be kept with supervisor's files.
C. THIRD (pink) copy to be given to employee.

Exhibit _18_    Date _1/23/06_
Witness _Myrna Johnson_    _300136_
Lynda Batchelor Barker, RDR

_LMab_

Page 1

UNITED STATES DISTRICT COURT

DISTRICT OF ALASKA

MYRNA I. JOHNSON,          )
                           )
        Plaintiff,         )
                           )
v.                         )
                           )
FRED MEYER STORES, INC.,   )
a Delaware corporation;    )
and JAIME SAN MIGUEL,      )
                           )
        Defendants.        )
_____)

Case No. J04-008 CV (JKS)

VIDEOTAPED DEPOSITION OF FRED SAYRE
Pages 1 through 105, Inclusive
Taken:  Friday, January 27, 2006
Place:  Juneau, Alaska

Fred Sayre * 1/27/2006
Johnson v. Fred Meyer * J04-008 CV (JWS)

Page 3

1    A P P E A R A N C E S:

2

3    For the Plaintiff:          CHOATE LAW FIRM LLC
                                  Mark Clayton Choate, Esq.
4                                 Jessica Srader, Esq.
                                  424 North Franklin Street
5                                 Juneau, AK  99801

6

     For the Defendants:         MILLER NASH LLP
7                                 James R. Dickens, Esq.
                                  4400 Two Union Square
8                                 601 Union Street
                                  Seattle, WA  98101
9

10

11

12       BE IT REMEMBERED that, pursuant to Notice of

13   Taking Videotaped Deposition, and beginning on Friday,

14   the 27th day of January, 2006, commencing at the hour

15   of 9:07 a.m. thereof, in the offices of the Choate Law

16   Firm, located at 424 North Franklin Street, Juneau,

17   Alaska, before me, LYNDA BATCHELOR BARKER, Registered

18   Diplomate Reporter and Notary Public in and for the

19   State of Alaska, personally appeared:

20

21            FRED SAYRE

22

23   called as a witness by the plaintiff, who was thereafter

24   examined and interrogated as hereinafter set forth.

25

Glacier Stenographic Reporters Inc.
glaciersteno@gci.net * 907.789.9028

Exhibit B  Page 2 of 12

Fred Sayre * 1/27/2006
Johnson v. Fred Meyer * J04-008 CV (JWS)

Page 5

1           Can I have you raise your right

2    hand for me, please?

3               (Oath administered)

4           THE WITNESS:  I do.

5           THE REPORTER:  Thank you.  You may

6    proceed.

7

8               FRED SAYRE

9

10   having been first duly sworn by the court reporter to

11   tell the truth, the whole truth, and nothing but the

12   truth, testified as follows:

13

14               EXAMINATION

15

16   BY MR. CHOATE:

17       Q.     Good morning, Mr. Sayre.

18       A.     Good morning.

19       Q.     We know each others from -- our

20   daughters went to school together, right?

21       A.     Correct.

22       Q.     Okay.  Have you ever been deposed

23   before?

24       A.     No.

25       Q.     Okay.  So this is your first time?

Exhibit B Page 3 of 12

Fred Sayre * 1/27/2006
Johnson v. Fred Meyer * J04-008 CV (JWS)

Page 52

1    and that kind of stuff.

2        Q.    Did she, at some point, begin crying?

3        A.    I believe so.

4        Q.    Okay.  And in terms of crying, did it

5    appear that she was emotionally upset?

6        A.    Yeah.

7        Q.    I mean, did it look like she was -- she

8    was faking it, or did it look like she was

9    really --

10       A.    No, she was --

11       Q.    -- really upset?

12       A.    She looked like she was upset and mad.

13       Q.    And did she begin crying at any certain

14   phase, or did she -- of the conversation?

15       A.    I can't remember when she started

16   crying.

17       Q.    Okay.  And when she began crying, what

18   did Mr. San Miguel say?

19       A.    I don't know -- remember what Jaime

20   said.  I think I said, "Well, let's wait a second

21   here," if I remember right.  And then during that

22   time, I believe she said, "I should just quit," and

23   I said, "No, that's not what we want."  I remember

24   saying that.  "No, we don't want you to quit."  We

25   are all meeting and --

Fred Sayre * 1/27/2006
Johnson v. Fred Meyer * J04-008 CV (JWS)

Page 56

1    BY MR. CHOATE:

2        Q.    Do you understand that that is one of

3    Ms. Johnson's allegations, is that he set her up so

4    that when she met with you, she would break down?

5        A.    No, I didn't.

6        Q.    You don't understand that?

7        A.    I don't understand that.

8        Q.    Okay.  Now, you told her that if she

9    left the room, that that would be walking off the

10   job, and that would end her job?

11       A.    Yes.  That would be a voluntary

12   resignation.

13       Q.    When she walked out of the room, was

14   she crying?

15       A.    I don't remember if she was crying or

16   not.

17       Q.    Okay.  Do you remember hearing her

18   outside your room crying as she left?

19       A.    Not -- not that I'm aware of.

20       Q.    Okay.  She left for some period of

21   time, and then did she return?

22       A.    I believe she returned to ask for the

23   notice that was --

24       Q.    That's No. 18 there?

25       A.    Yes, this one.

Exhibit B  Page 5 of 12

Fred Sayre * 1/27/2006
Johnson v. Fred Meyer * J04-008 CV (JWS)

Page 57

1      Q.    Okay.  Now, when -- before she left,

2    did you or Mr. San Miguel ask her to sign that

3    notice?

4      A.    I didn't ask her to sign it, no.

5      Q.    Was it your intention to have her sign

6    it?

7      A.    If we were to give her the verbal

8    warning, yes.

9      Q.    Well, what -- were you not going to

10   give her a verbal warning?

11     A.    We never got to the chance to do it.

12     Q.    Was it your intention, though, to give

13   her the verbal warning?

14     A.    Yes.

15     Q.    So it was your intention to give her a

16   verbal warning, No. 18, and have her sign it?

17     A.    Yeah.

18     Q.    Okay.  Now, she came back and she asked

19   for a copy.  At that --  yes?

20     A.    Yes.

21     Q.    Okay.  At that point in time, did

22   Mr. San Miguel ask her to sign it?  Do you recall?

23     A.    I don't recall.

24     Q.    Okay.  Did you ask her to sign it?

25     A.    Not that I recall.

Fred Sayre * 1/27/2006
Johnson v. Fred Meyer * J04-008 CV (JWS)

Page 58

1    Q.    Okay.  Did you give her a copy?

2    A.    I do believe so, yes.

3    Q.    Okay.  It was you that gave her a copy,

4  not Mr. San Miguel; isn't that right?

5    A.    I gave her a copy.

6    Q.    Okay.  Did you subsequently inform Fred

7  Meyer corporate that Ms. Johnson had walked off the

8  job?

9    A.    Yes, I did.

10    Q.    Okay.  Did you make any efforts or

11  attempts after that to talk to her, to find out

12  what had happened in that session?

13    A.    Generally, I don't, no.  I have had

14  people walk out before, and I didn't pursue them

15  before.

16    Q.    So the fact that she had worked for

17  nine, nine-and-a-half years for your company and at

18  least in the six prior days had worked something

19  like 65, 66 hours, that didn't give her, in your

20  mind, any expectation that someone would say, "Hey,

21  look.  Are you having a bad day?  What is going on?

22  Did we not approach this right?"  Didn't do that,

23  did you?

24    A.    No, I did not.

25    Q.    Okay.  Now, do you recall, at some

Fred Sayre * 1/27/2006
Johnson v. Fred Meyer * J04-008 CV (JWS)

Page 85

1    A.    She got upset when he started -- I

2  don't know if he was reading this or started

3  talking to her more about it.  She got more upset

4  and said, "Well, I ought to just quit."  And that's

5  when I reminded her, "No, we are here talking about

6  this.  We don't want you to do that.  That's

7  definitely not what we want.  You are a long-term

8  employee, and we want you -- if you do walk out,

9  then that's your -- you know, if you walk out, it

10  is a voluntary resignation.  I just want to remind

11  you of that."

12    Q.    Did she respond to that comment?

13    A.    She calmed down.  She didn't really

14  respond.  She just kind of looked at me, if I

15  remember right, and calmed down.  And then she got

16  upset again, once Jaime was going more into this,

17  and then she ended up walking out the door.

18    Q.    Did you make any other comments to her

19  about not walking out?

20    A.    I believe Jaime did and myself.  "No,

21  we don't -- we are here talking to you.  We don't

22  want you to leave."

23    Q.    Okay.  What did you expect would be the

24  result of that conference with Ms. Johnson?

25    A.    That she would understand where Jaime

Exhibit __B__ Page __8__ of _12_

Fred Sayre * 1/27/2006
Johnson v. Fred Meyer * J04-008 CV (JWS)

Page 86

1   was coming from, what the expectations of the store

2   were, and for her, the outcome of her to succeed.

3   That's what you want your employees to do.

4       Q.      Now, was the Employee Warning Notice a

5   termination of Ms. Johnson?

6       A.      No.

7       Q.      And Mr. San Miguel had no authority to

8   terminate her, did he?

9       A.      No.

10      Q.      What was your reaction when she got up

11  and walked out the door?

12      A.      I was -- well, shocked and saddened.  I

13  mean, I didn't have any kind of -- you just look at

14  somebody walk out the door, and you don't know what

15  you did to -- to prompt that.

16      Q.      Did you think that either you or

17  Mr. San Miguel took any action or made any comments

18  that reasonably would result in the employee

19  getting up and leaving?

20      A.      No.

21      Q.      Did you and Mr. San Miguel talk to each

22  other, then, after she left, about your reaction?

23      A.      About our reaction?

24      Q.      Yes.

25      A.      Yeah.

Exhibit B Page 9 of 12

Fred Sayre * 1/27/2006
Johnson v. Fred Meyer * J04-008 CV (JWS)

Page 89

1   what you told us here today?

2        A.      Correct.

3        Q.      And then what response or comment did

4   she make?

5        A.      She said, "It sounds like that she

6   voluntarily resigned her position."

7        Q.      And did she tell you to take any other

8   action?

9        A.      No.

10       Q.      Did she say she was going to take any

11  action regarding paperwork?

12       A.      I believe she was going to put in the

13  resignation, yes.

14       Q.      All right.  Now, did you play any role

15  in the decision, when an employee like Ms. Johnson

16  leaves, as to whether or not she's eligible for

17  rehire?

18       A.      I don't play in that role.  That's

19  something corporate does.

20       Q.      Well, did you make any recommendation

21  to Ms. Lucas that Myrna Johnson not be eligible for

22  rehire?

23       A.      No, I did not.

24       Q.      Would you have been happy to have her

25  come back, if she'd come back and sought

Fred Sayre * 1/27/2006
Johnson v. Fred Meyer * J04-008 CV (JWS)

Page 90

1   reemployment?

2        A.    Yes.

3        Q.    Did she do that?

4        A.    No.

5        Q.    Did she ever get in touch with you?

6        A.    No.

7        Q.    Never even called and said, "I'm sorry,

8   I lost it.  I really don't want to leave Fred

9   Meyer.  I'd like to continue my career at Fred

10  Meyer"?

11       A.    Not that I'm aware of, no.

12       Q.    Do you have any information that she

13  got in touch with anyone else at Fred Meyer about

14  returning?

15       A.    Not that I'm aware of.

16       Q.    Was the first you heard of any

17  complaint on behalf of Ms. Johnson, when you

18  received the letter from the attorney that was

19  previously marked?

20       A.    Yes.

21       Q.    Okay.  And did you have any other

22  involvement in responding until the lawsuit, and

23  you started being interviewed?

24       A.    No.

25       Q.    All right.  Mr. Sayre, did you play any

FROM : Baxter Bruce Sullivan    FAX NO. : 789-1913    Dec. 08 2003 04:12PM P7

# Employee Warning Notice

(Please Print)    LOC: _158_    PR SECTION: _ACE_

Johnson    Myrna    Employee Number: _276177_

Last Name    First    Middle

You are hereby notified that your employment performance is unsatisfactory in the following respects. Improvement must be made for you to continue your employment with Fred Meyer, Inc.

1. State exactly where, when, and what employee did or said to incur this notice.    YES  NO
   Date(s) of infraction: 3/13 - 3/17    ~~19~~ 2002  Prior verbal warnings? ☒ ☐
   - Myrna didn't complete her tour work as directed by the Mgr.
   - ACE Dept Recovery is not getting done at night.

2. State exactly what performance is expected of the employee in the future and steps to be taken to improve or correct performance: Myrna is expected to complete all task assigned by the manager. all work done need to conform to Fred Meyer standards. Mgr to write Daily Tour for Myrna to complete, these turns need to be turn I. everyday for Mgr review.

3. (a) Is the employee being suspended without pay for this infraction? (circle one) YES  (NO)
   (b) If YES – Give beginning date: _____ ending date: _____

4. State what form of discipline the employee may expect for failure to comply with this rule/standard in the future.
   I. Myrna doesn't show any Improvement in the next 30 Days. she'll be removed from her position as a ACE Asst Mgr.

5. State the employee's remarks after this notice was issued.

It is our sincere desire that your performance attain a satisfactory level so no further action will be necessary.

Employee's Signature (optional): _____

Manager's Signature: _____    Title: ACE Mgr
Witness: _____    Today's Date: 3/18/2002  19___

Exhibit _B_ Page _12_ of _12_

INSTRUCTIONS: PLEASE READ AND FOLLOW CAREFULLY
1. This four-part notice is to be used for recording all details of an employee's failure to comply with part(s) of company policies, procedures and/or standards.
2. All areas of this notice must be completed as fully as possible. Lacking such completion may compromise the validity of this warning notice.
3. Review the Employee Responsibilities Form (M-1398) with the employee and have him/her sign a new one and attach to the respective copies of this notice. DO NOT highlight, underline or mark beside any of the issues on the form. Marking on or altering the form may compromise its usefulness.

Exhibit    Date    1/23/06
300136
Witness    Myrna Johnson

A. FIRST (white) copy to be sent immediately to Human Resources/NO HRD.
B. SECOND (yellow) copy to be kept with supervisor's files.