CHOATE LAW FIRM LLC
424 N. Franklin Street
Juneau, Alaska 99801
Telephone: (907) 586-4490
Facsimile:  (907) 586-6633

Attorneys for Plaintiff

### UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF ALASKA AT JUNEAU

MYRNA I. JOHNSON,                                  )
                                                   )
                        Plaintiff,                 )
                                                   )
            vs.                                    )
                                                   )
FRED MEYER STORES, INC., and                       )
JAIME SAN MIGUEL,                                  )
                                                   )
                        Defendants.                )    Case No. J-04-008 CV (RRB)
                                                   )

### PLAINTIFF'S OPPOSITION TO MOTION TO
### DISMISS WRONGFUL TERMINATION CLAIM

Plaintiff MYRNA I. JONHSON has sued Defendants FRED MEYER STORES, INC.

and JAIME SAN MIGUEL for wrongfully terminating her employment at Fred Meyer in

breach of the covenant of good faith and fair dealing.  Defendants have asked this court, for a

second time, to dismiss Plaintiff's claim of wrongful termination.  In making this motion

Defendants concede that the court denied their motion for summary judgment on the same issue

over five months ago, but nonetheless argue that the court should reconsider that decision

because "the sheer volume of pleadings submitted by both sides . . . may have overshadowed

the analysis of the wrongful termination claim."[1]  As Defendants' instant motion is not

supported by any new evidence or legal analysis than that already briefed, Plaintiff incorporates

---

[1] *Defendants' Motion to Dismiss Wrongful Termination Claim* at Docket 86, p. 2, filed July 20, 2007.

1 of 50

*Johnson, Myrna v. Fred Meyer (J-04-008 CV RRB)  [23003].*
PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS WRONGFUL TERMINATION CLAIM
J-04-008 CV (RRB)

CHOATE LAW FIRM LLC
424 North Franklin Street
Juneau, Alaska  99801
(907) 586-4490

by reference her comprehensive *Opposition to Motion for Summary Judgment* and its attachments.[2]

The court must deny Defendants' motion for several reasons. First, the Defendants' motion is not timely.[3] Second, this issue was thoroughly briefed and decided, and Defendants' motion does not raise adequate grounds, pursuant to Federal Rule of Civil Procedure 60(b), for reconsidering or re-examining the court's February 9, 2007 order. Finally, Defendants' motion fails on the merits: (1) Johnson was not an "at-will" employee at Fred Meyer; (2) Johnson did not "walk off" the job on March 18, 2002; (3) a reasonable person in Johnson's position would have felt compelled to resign; (4) Defendants' adverse employment actions towards Johnson were based on improper motives and bad faith; and (5) a reasonable person would regard Defendants' actions toward Johnson as unfair. Given the fact that this issue was thoroughly briefed and decided, the only discernible reason for Defendants' instant motion is to cause Plaintiff needless delay and expense, and the court should, therefore, award Plaintiff the attorney fees and costs for defending this motion.

## I.    STANDARD FOR DISMISSAL

Motions to dismiss are viewed with disfavor and ought rarely to be granted.[4] A cause of action should not be dismissed unless it appears *beyond doubt* that the plaintiffs can prove no set of facts in support of their claim which would entitle them to relief.[5] The Court should

---

[2] *Opposition to Motion for Summary Judgment,* Docket 56 through 66, dated September 5, 2006.

[3] *Pretrial Order* at Docket 85, p. 2, dated April 5, 2007.

[4] *Gilligan v. Jamco Development Corp.*, 108 F.3d 246, 249 (9th Cir. 1997); *Hall v. City of Santa Barbara*, 833 F.2d 1270, 1274 (9th Cir. 1986) (quoting 5 Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1357, at 598 (1969)); *see also, Kollodge v. State*, 757 P.2d 1024, 1025 (Alaska 1988).

[5] *Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 811 (1993); *McLain v. Real Estate Bd. Of New Orleans, Inc.*, 444 U.S. 232, 246 (1980); *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957); *see also, Shooshanian v. Wagner*, 672 P.2d 455, 461 (Alaska 1983).

*Johnson, Myrna v. Fred Meyer (J-04-008 CV RRB) [23003].*
PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS WRONGFUL TERMINATION CLAIM
J-04-008 CV (RRB)

CHOATE LAW FIRM LLC
424 North Franklin Street
Juneau, Alaska 99801
(907) 586-4490

"take all well-pleaded allegations of material fact as true and construe them in the light most favorable to the plaintiff."[6]

Federal Rule of Civil Procedure 56(c) authorizes summary judgment if no genuine issue exists regarding any material fact and the moving party is entitled to judgment as a matter of law. The moving party must show an absence of an issue of material fact.[7] The court must view the inferences drawn from the facts in the light most favorable to the non-moving party.[8] Thus, reasonable doubts about the existence of a factual issue should be resolved against the moving party.[9] Whether there has been a breach of the covenant of good faith and fair dealing is a question of fact.[10]

## II.    FACTS[11]

### A.    December 1992 to March 11, 2002 - Johnson's Work History With Fred Meyer

In December 1992, Myrna Johnson was hired as a part-time salesperson in the shoe department of the Fred Meyer Store in Juneau, Alaska. Johnson was dedicated and exceptionally hard-working. Less than six months after she began her employment—in May 1993—she was promoted, full-time, as Manager of the Shoe Department. This promotion came with a 30% pay increase. She maintained that position until 1994 when she took a full-

---

[6] *Manshardt v. Federal Judicial Qualifications Comm.*, 408 F.3d 1154, 1156 (9th Cir. 2005); *see also, Wyler Summit Partnership v. Turner Broadcasting System, Inc.*, 135 F.3d 658, 661 (9th Cir. 1998); *Parks School of Business, Inc. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995); *see also, Dworkin v. First National Bank of Fairbanks*, 444 P.2d 777, 779 (Alaska 1968).

[7] *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).

[8] *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n,* 809 F.2d 626, 630 (9th Cir1987).

[9] *Id.* at 630-31.

[10] *Casey v. Semco Energy, Inc.*, 92 P.3d 379, 383 (Alaska 2004); *Pitka v. Interior Regional Housing Authority*, 54 P.3d 785, 789 (Alaska 2002).

[11] Plaintiff's September 5, 2006 *Opposition to Motion for Summary Judgment* includes a thorough recitation of the facts and evidence upon which Plaintiff relies. Nonetheless, in an effort to assist the court, Plaintiff has restated much of the factual section. In order to reduce paper, however, Plaintiff has not provided new copies of those exhibits. All exhibits cited herein are attached to Plaintiff's *Opposition to Motion for Summary Judgment* at Docket 56 through 66, dated September 5, 2006.

*Johnson, Myrna v. Fred Meyer (J-04-008 CV RRB) [23003].*
PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS WRONGFUL TERMINATION CLAIM
J-04-008 CV (RRB)

CHOATE LAW FIRM LLC
424 North Franklin Street
Juneau, Alaska 99801
(907) 586-4490

time position with the State of Alaska.  Though she had full time employment with the State, Johnson continued to work part-time for Fred Meyer as a closing supervisor of the shoe department at the same hourly rate she had received as a full-time employee.[12]

In September 1996, Matthew Laney, manager of the Apparel Department, told Johnson that he wanted to train her for the "career" position as Relief (2nd) Assistant Manager for the Apparel Department.[13]  This position offered more potential for responsibility, promotion and better income than she could obtain from the State.  Johnson, therefore, left her job with the State to begin full-time as a management trainee at the Fred Meyer Store in Juneau.  Under the direct supervision of Laney, Johnson went through the training program for Relief Assistant Manager, including on-the-job training and completion of a written training manual.  When she was promoted to that position, she received approximately a twenty percent (20%) pay increase.[14]

For the next four-and-a-half years, Johnson worked as the Relief Assistant Manager.  As the Relief Assistant, Johnson received the least desirable "closing" shift—from 2:00 p.m. until closing.  As part of the store management, Johnson was expected to work at least ten-hour shifts during normal times, and during the holiday seasons, twelve-hour shifts, seven days a week were not uncommon.  As the closing manager, Johnson regularly arrived at work early and worked until the job was done, often working until well after midnight.[15]  For the entire time she held that position, Johnson closed the Apparel Department at Fred Meyer, successfully performing those job duties which included completing "recovery" (i.e., preparing and straightening the store shelves and racks so that the store would be ready the next morning), assembling planograms (i.e., product specific displays that appear the same in all stores), and

---

[12] Exhibit 8 [200135].

[13] Exhibit 14, Store Management Career Paths [200315].

[14] Exhibit 1, Myrna Johnson Affidavit.

[15] Exhibit 1, Myrna Johnson Affidavit

*Johnson, Myrna v. Fred Meyer (J-04-008 CV RRB)  [23003].*
PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS WRONGFUL TERMINATION CLAIM
J-04-008 CV (RRB)

CHOATE LAW FIRM LLC
424 North Franklin Street
Juneau, Alaska  99801
(907) 586-4490

otherwise being responsible for the successful closing of the Apparel Department. Johnson never received any discipline, and her customer service was recognized as being exceptional.[16]

In February 2001, Laney left Fred Meyer, and the Lead Assistant, or First Assistant Manager, Jaime San Miguel was promoted to the Apparel Department Manager position. Johnson was subsequently promoted to take over San Miguel's position as Lead Assistant, or First Assistant Manager. One of the perks of this promotion was a change in schedule from the closing shift to the more desirable day shift. Johnson continued to work in this position from June 2001 to January 2002. Her work continued to be exemplary. There were no complaints or concerns about her ability to do her job or to perform routine tasks such as "recovery" or the set up of "planograms". In January 2002, she took her annual vacation to spend time with her extended family in the Philippines.

Soon after she returned from the Philippines, in early February, her then 17-year-old daughter ran away. For three days, she frantically searched Juneau, finally finding her mixed up with a very bad crowd. Concerned about her daughter's substance abuse problem and threats of suicide, Johnson took her to Bartlett Regional Hospital. A doctor there advised Johnson that her daughter required 24-hour supervision. Johnson decided to take her daughter to the Philippines where her large extended family could provide 24-hour supervision. Johnson, accordingly, took a leave of absence from Fred Meyer and flew back to the Philippines with her daughter, spending the better part of a month watching her, and helping her transition to this new and urgent situation.[17]

Johnson returned to Juneau on Sunday, March 10, 2002. She was immediately put on the less desirable closing shift, beginning on Tuesday, March 12, 2002. Six days later, on March 18, 2002 Johnson was terminated from her job.

---

[16] Exhibit 1, Myrna Johnson Affidavit.

[17] Exhibit 1 – Myrna Johnson Affidavit.

*Johnson, Myrna v. Fred Meyer (J-04-008 CV RRB)  [23003].*
PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS WRONGFUL TERMINATION CLAIM
J-04-008 CV (RRB)

CHOATE LAW FIRM LLC
424 North Franklin Street
Juneau, Alaska  99801
(907) 586-4490

**B.** <u>**Fred Meyer's Employment Agreement With  Myrna Johnson  - Oral &**</u>
   <u>**Written Representations**</u>

When Johnson first interviewed for a job with Fred Meyer, she completed an Employment Application.  Nowhere in that document is there any statement that her employment was to be "at will."[18]  During her application process, Johnson was asked why she was seeking employment with the company.  Her answer was succinct: "I want to work in a company that has room for promotion and has job security."[19]

Johnson received annual Salaried Employee Performance Appraisals.  Those forms do not contain one mention that the employment is "at will."  Instead, the documents necessarily look prospectively towards how employees can do a better job for the company and how they can improve as managers.  Each Appraisal ends with a request for the employee to describe their "career goals and aspirations."  In each of her annual appraisals, Johnson repeatedly expressed her desire to work hard, learn more, and eventually be promoted within the company.

Among Fred Meyer's volumes of employment materials are two manuals that describe the employment relationship with its employees—the Employee Handbook[20] and the Fred Meyer Corporate Policy Handbook.[21]  The Employee Handbook repeatedly mentions "career," and is clearly designed to foster a belief that if employees work successfully at Fred Meyer, they will be treated fairly.  Fred Meyer explicitly recognizes that "skilled, capable and dedicated employees are essential, for the overall success of our business is determined by the combined ideas, work and effort of all Fred Meyer employees."[22]  For example, under the heading "Career Opportunities" the following description is found:

---

[18] Exhibit 7 - [200001].

[19] Exhibit 15 - [201270].

[20] Exhibit 16.

[21] Exhibit 17 - [200557-200971].

[22] Exhibit 16 - [201427].

*Johnson, Myrna v. Fred Meyer (J-04-008 CV RRB)  [23003].*
PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS WRONGFUL TERMINATION CLAIM
J-04-008 CV (RRB)

CHOATE LAW FIRM LLC
424 North Franklin Street
Juneau, Alaska  99801
(907) 586-4490

CHOATE LAW FIRM LLC
424 North Franklin Street
Juneau, Alaska 99801
(907) 586-4490

1
2
3
4
5
6

> You'll find we support promoting from within the Company whenever possible at Fred Meyer. During your time with the Company, there will be opportunities for advancement and many career options available. You may decide that you would like to work for another part of the Company.  With a company as large and diverse as Fred Meyer, your career options aren't limited to just one division. We frequently promote people from the store to regional and corporate positions. *Your advancement will be based on your performance and willingness to learn and grow.  Ultimately, you are in charge of your career at Fred Meyer.*  You are encouraged to meet with your supervisor to discuss your career goals and aspirations.[23]

7
8
9

Buried deep in the back of this manual, after over fifty pages of Fred Meyer "career" propaganda and at least five blank pages for note-taking, the Employee Handbook contains the following inconspicuous disclaimer:

10
11
12
13
14

> This handbook should not be construed and does not constitute a contract, expressed or implied, guaranteeing employment for any specific duration. Although we hope your employment relationship with us is long term, either you or the Company may terminate this relationship at any time, for any reason, with or without cause or notice.  Please understand that no supervisor or representative of Fred Meyer has the authority to enter into any agreement with you for employment for any specific period of time or to make any promises or commitments contrary to the foregoing.[24]

15
16
17
18
19
20

The second manual describing the employment relationship and mutual expectations and responsibilities is the "Fred Meyer Corporate Policy Handbook."[25]   This manual, consisting of hundreds of pages of information, describes in detail employee responsibilities and consequences.  In no place does it describe employment with Fred Meyer as being "at will" or that an employee can be discharged *without cause*.  In fact, discharge is always described as a consequence of either a violation of some policy or when "necessary to protect the well-being

21
22
23

---

[23] Exhibit 16 - [201433] (emphasis added).

24
25

[24] Exhibit 16 [201457]; This disclaimer is so inconspicuous among Fred Meyer's volumes of employment policies, procedures and  guidelines that Plaintiff simply overlooked it when she was compiling documents for her opposition to Defendants' Motion for Summary Judgment.

26

[25] Exhibit 17 - [200557-200971].

27
28

*Johnson, Myrna v. Fred Meyer (J-04-008 CV RRB)  [23003].*
PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS WRONGFUL TERMINATION CLAIM
J-04-008 CV (RRB)

of the company or its employees."  Violation of a Fred Meyer policy can almost always have a disciplinary consequence, up to termination.[26]

In order to effectuate its policies, Fred Meyer uses a system of progressive discipline. The company teaches its managers that discipline is to be "positive" and multi-staged.  For example, "training and counseling" are to be used before "starting a progressive discipline program."[27]  The goal of discipline is to change workplace performance in a positive, constructive way or prevent further rule violations."[28]  Fred Meyer trains its managers to use "Progressive Discipline" to give the employee the opportunity to correct performance problems.  "Fred Meyer has a progressive disciplinary policy that should be followed by all management personnel."[29]  Progressive Discipline at Fred Meyer involves two separate components: Informal Progressive Disciplinary Steps and Formal Progressive Disciplinary Steps.  Informal Steps are described as: (1) Training and counseling; and (2) Consequence line. The "Consequence line" is described as "The employee has not chosen to correct the performance issue."[30]  Formal Progressive Discipline is defined as comprising the following actions: (1) Talk with the employee; (2) Document information about your conversation; (3) Complete the Employee Warning Notice (M-1650) and have the employee sign the Employee Responsibility Form (M-1398); (4) Tell the employee that his or her job is in jeopardy and that

---

[26] Exhibit 17 - Violation of the Job Posting Program's "Promotion from Within the Company" policy; [200577] Violation of the Equal Employment Opportunity policy; [ 200583 & 200633] Violation of the Conflicts of Interest policy (employment or relatives); [200601] Violation of the Hiring People with Disabilities policy; [200603] Violation of the Hiring Minors policy; [200607] Violation of the Hiring Independent Contractors policy; [200617] Violation of the Hiring School to Work policy; [200629] Violation of the Rehiring Former Employees policy; [200637] Violation of the Transfer, Interview and Selection Process policy; [200639] are examples of this.

[27] Exhibit 48 - [202640].

[28] Exhibit 48 - [202641].

[29] Exhibit 48 - [202644].

[30] Exhibit 48 - [202644].

8 of 50

*Johnson, Myrna v. Fred Meyer (J-04-008 CV RRB)  [23003].*
PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS WRONGFUL TERMINATION CLAIM
J-04-008 CV (RRB)

CHOATE LAW FIRM LLC
424 North Franklin Street
Juneau, Alaska  99801
(907) 586-4490

copies of write ups will be put in their employee file; (5) Talk with your regional human resources supervisor to discuss how you will proceed with these steps.[31]

Fred Meyer's management training materials describe the "Steps for Positive Discipline" as: (1) Identify the performance problem; (2) Get the employee's view of the performance problem; (3) Ask the employee for a solution to the performance problem; (4) Agree on a plan to address the performance problem; (5) Give the employee a verbal or written warning; and (6) Set up a follow-up session.[32] The Fred Meyer managers deposed in this matter, Fred Sayre, Jaime San Miguel and Myrna Johnson, described the following disciplinary process:

Stage One:    Counseling: The manager chats with the person.[33]

Stage Two:    Verbal warning: If the same issue is talked about three or four days in a row and it's not done, then there's a Verbal Warning.[34]

Stage Three:    Written Verbal Warning: "If it continues to be a serious offense …then we'll sit down and have it in a written form – it is still verbal – in a written form so they will understand that the particular behavior – or that particular project has to be completed in a timely manner."[35]

(Also described as) Verbal Written Warning: "It's a warning that --- 'Look, this is what could happen if things don't change around." (Sayre 43/24 to 44/6)  The Written Warning Notice is modified by writing "Verbal" at the top of the page.[36]

---

[31] Exhibit 48 - [202645].

[32] Exhibit 48 - [202650].

[33] Exhibit 47 – [Fred Sayre Depo Transcript (FS Tr). 43/19-22].

[34] Exhibit 4 – [Jaime San Miguel Depo. Transcript (SM Tr.) 140/16 to 141/3].

[35] Exhibit 4 – [SM Tr 141/3-10].

[36] Exhibit 47 – [FS Tr 45/1-13].

*Johnson, Myrna v. Fred Meyer (J-04-008 CV RRB)  [23003].*
PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS WRONGFUL TERMINATION CLAIM
J-04-008 CV (RRB)

CHOATE LAW FIRM LLC
424 North Franklin Street
Juneau, Alaska  99801
(907) 586-4490

Stage Four:    Written Employee Warning:[37]"At the meeting with the employee, we'll state if it is a verbal warning, or this is an actual write-up, or if it's a three-day suspension…"[38]

Many Fred Meyer managers start "at the bottom," working their way up through ascending levels of expertise and responsibility, all requiring extensive amounts of on-the-job training as well as the study of written materials and the passing of tests or evaluations by supervisors.  In the Apparel division (ALE), there were 4 levels of managers; Fourth-in Charge/PIC; Relief Assistant (also called 2nd Assistant); Lead Assistant Manager (also called First Assistant) and Manager.[39]  In order to maintain consistency and quality throughout its chain of stores, Fred Meyer created its own system of in-house professional training for these positions with extensive job descriptions and training materials.  In order to be hired or promoted to a Relief Assistant Manager, Fred Meyer requires its employees to complete the ALE (Apparel) Relief Assistant Training Program.[40]  While the program has 220 pages of written materials, the two-page Performance Requirements Chart provides a good idea of the broad variety of tasks which must be mastered in order to be the Relief Assistant Manager (2nd Assistant).[41]

There is also an ALE Assistant Manager Training Program.[42]  A prerequisite to starting it is completion of the Relief Assistant Training Program.[43] A review of that manual confirms the extensive amount of training required *before* someone can become the Assistant Apparel Manager. The job description for the ALE Assistant Manager has a long list of the essential

---

[37] Exhibit 47 – [FS Tr 44/16-17].

[38] Exhibit 4 – [SM Tr 141/14-24].

[39] Exhibit 14 - Fred Meyer Store Management Career Paths – [200315].

[40] Exhibit 18 – ALE (Apparel) Relief Assistant Training Program.

[41] Exhibit 18 - [201576-201577].

[42] Exhibit 19 - [201680 – 201825].

[43] Exhibit 19 - [201736].

*Johnson, Myrna v. Fred Meyer (J-04-008 CV RRB)  [23003].*
PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS WRONGFUL TERMINATION CLAIM
J-04-008 CV (RRB)

CHOATE LAW FIRM LLC
424 North Franklin Street
Juneau, Alaska  99801
(907) 586-4490

duties and responsibilities of the position.  Among those duties include the following: (1) Ensures compliance with the divisional signing standards; (2) Ensures compliance with divisional recovery standards; (3) Coordinates and organizes merchandising of the department floor; (4) Ensures compliance with planograms; (5) Ensures implementation of visual merchandising standards; (6) Ensures compliance with the divisional folding/hanging standards; (7) Performs cashier functions, when required; and (8) Completes daily tours.[44]  One cannot be promoted to this position until demonstrating competence in all of the enumerated areas.

### C.  Six Days That Ended A Career:  March 12, 2002 to March 18, 2002

Johnson returned to Juneau from her leave of absence on Sunday, March 10, 2002.  Though Johnson was the Lead Assistant Manager with the more desirable day shift, she was immediately put on the closing schedule to start working on Tuesday, March 12, 2002.  Six days later, on March 18, 2002 she was terminated from her job.  Over a period of just six days, her career was terminated by the actions of defendant San Miguel, with the knowledge and consent of Fred Meyer upper-level management.

**March 12, 2002 (Monday):** On March 12, 2000, Johnson clocked in for work at 1:11 p.m.[45]  When she arrived, she learned from San Miguel that they were very short-handed in terms of experienced personnel.  Charlene Fontenot, the Relief (2nd) Assistant, had injured her back and would not be back until March 15th at the earliest.  Jeff Furber, a full-time PIC had been terminated.  Johnna Havard, a Relief (2nd) Assistant from the Wasilla Store, who had temporarily replaced Johnson, was going to help out at the "Spring Reset."  In that same conversation, Johnson mentioned that if her daughter had to stay in the Philippines for a long period of time, she might have to take a six-month family leave, but that this would not be

---

[44] Exhibit 20 – [200089 – 200094].

[45] Exhibit 21 [201176-201177].

*Johnson, Myrna v. Fred Meyer (J-04-008 CV RRB)  [23003].*
PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS WRONGFUL TERMINATION CLAIM
J-04-008 CV (RRB)

CHOATE LAW FIRM LLC
424 North Franklin Street
Juneau, Alaska  99801
(907) 586-4490

happening soon, and she would give him at least one month's notice.  She told him she might decide this before the end of the calendar year.[46]

On that same day, San Miguel gave Johnson a Tour (a "to do" worksheet) dated March 13, 2002.[47]  Johnson assumed that he expected it to be completed and turned in the same day. He also asked her to finish three carts of transfer Docker™ pants to the Fairbanks store.

At 10:48 p.m. that same evening, Johnson advised San Miguel that she had finished the transfer of the Docker pants, submitted check cashing violations and that "read and signs (were) in progress."[48]

That same evening, Johnson was advised by Julita Lim, a part-time PIC, that she was having problems completing a baby furniture "planogram."  A planogram is a display system which includes a complete description of how a product or product line is to be displayed, all of the assorted materials necessary for the display and normally includes all of the UPL (Universal Product Label) codes.  Lim told Johnson that San Miguel had told her to finish the planogram because Minerva Cortez, who had originally been assigned to do it, did not want to do it.[49]

Though a long-term employee, Lim had little experience with setting up planograms and Johnson immediately saw that the planogram materials were missing UPL codes. The UPLs can be typed manually but the simpler and more efficient method is to order them from Portland.  Johnson ordered the UPLs from Portland and advised San Miguel by an Office Vision at 11:39 p.m.[50] Johnson left the store after midnight.

---

[46] Exhibit 22 [300514].

[47] Exhibit 23 [200421-200422].

[48] Exhibit 24 [300513].

[49] Exhibit 22 [300514].

[50] Exhibit 25 [201174 (Bottom of Page)].

*Johnson, Myrna v. Fred Meyer (J-04-008 CV RRB)  [23003].*
PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS WRONGFUL TERMINATION CLAIM
J-04-008 CV (RRB)

CHOATE LAW FIRM LLC
424 North Franklin Street
Juneau, Alaska  99801
(907) 586-4490

CHOATE LAW FIRM LLC
424 North Franklin Street
Juneau, Alaska 99801
(907) 586-4490

**March 13, 2002 (Wednesday):**  On March 13, 2002,  Johnson again clocked into work early, at 1:17 p.m.[51]  San Miguel, who apparently was not on the floor, sent her an Office Vision just 17 minutes later at 1:34 p.m. stating:

> "Have Minerva or Julita complete this planogram TONIGHT.  It's been a week, can't wait any longer.  I want this done tonight, have them make the upl a store level.  All displays need to be sensor tag, with a scanning upl on the back bottom left, top bar worked. I'm going to scan zeroes in the am." (emphasis in original)[52]

Eight minutes later, at 1:42 p.m., while he and she were both in the store, he sent her a second Office Vision complaining (in writing) about the quality of the recovery the prior evening:

> "Please see me about recovery last night.  Lots of areas were not recovered to standard (mens dockers table/acs backpacks).  Recovery was coming along nicely the last couple weeks. Last night we took a step backwards. This morning Fred called me to the men's section to walk the ale dpt, I was embarassed by the conditions in some areas.  This is not acceptable any longer, expectations are a lot higher now, especially when the lead asst is closing.
>
> You need to walk all areas with the closing crew to ensure that recovery gets done every night. Also make sure everybody crosses out the tour as they get it done. AS part of your closing duties leave a detail ov about who work each area and what they work on throughout the night."[53]

In response, Johnson went to him to apologize if her recovery "(was) not excellent."  She explained that they were busy, it was her first day back, and there were "so much things to do."[54]

Though San Miguel expected the planogram to be completed on the evening of March 13, he had given "another long tour" to Minerva Cortez.  Because Cortez was too busy to

---

[51] Exhibit 21 [201177].

[52] Exhibit 25 [201174 (Top of Page)].

[53] Exhibit 24 [300513 (Top of Page)].

[54] Exhibit 22 [300514].

*Johnson, Myrna v. Fred Meyer (J-04-008 CV RRB)  [23003].*
PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS WRONGFUL TERMINATION CLAIM
J-04-008 CV (RRB)

complete the planogram, Johnson started it.[55]  Johnson, once again, worked past midnight to

complete the planogram.  Johnson sent an Office Vision to San Miguel at 12:38 a.m. (March

14) that she had completed it, but because of the time, would have to take care of some

cleaning and straightening the following day:

> "I finished the planogram for the baby furniture deck. I will check for back stock
> tomorrow.  …will straighten the other side tomorrow (shelf)
>
> I hope that my recovery is up to standard this time.
>
> Most of the tour for the night was done.  Thanks, Myrna"[56]

**March 14, 2002 (Thursday):**  On March 14, 2002, at 11:17 a.m., San Miguel

forwarded an earlier Office Vision originally dated March 6, 2002 to Johnson.  The subject was

"Excellence in Execution":

> "We have a huge opportunity to drive sales and improve our profitability by
> (indiscipherable) EXECUTION of the plan directed by management.  There are several
> items in ALE that I have personally discussed with all of you on previous meetings and
> we still struggle to get it done to standard in a timely manner.  We can't continue to
> operate like this, I need all of you to hug and embrace your dpts and all changes.
>
> I know there is a lot going on, but we need to be focused on sales planning, execution
> and follow up.  Taking a week to get something done, is not in the schedules lined out
> by DXA on previous communications.  Enough said; If you are executing the
> plan/tours/bulletins/s&mnotes/ thank you; If not DIG IN ….. only two kinds of
> employees survive in retail.. The Fast and the Furious."[57]

After working almost twelve hours the previous day, Johnson clocked back into work at 1:20

p.m.[58]  Johnna Havard, who was scheduled to work the early morning shift, had called in sick,

**CHOATE LAW FIRM LLC**
424 North Franklin Street
Juneau, Alaska  99801
(907) 586-4490

---

[55] Exhibit 22 [300514].

[56] Exhibit 26 [201248 (Bottom of Page)].

[57] Exhibit 27 [201251].

[58] Exhibit 21 [201177].

*Johnson, Myrna v. Fred Meyer (J-04-008 CV RRB)  [23003].*
PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS WRONGFUL TERMINATION CLAIM
J-04-008 CV (RRB)

and because of Havard's absence, Johnson had to straighten out the children's section.  The store was very busy.[59]

That afternoon Johnson was called into San Miguel's office where he told her that a lot of spots were missed the night before.  He showed her a long list of the spots and then inexplicably showed her photos of bad recoveries that occurred while she was gone.  He said her recovery was better than those but that she had still missed "spots."[60]  He also gave her a three -page Tour of work to be completed that night.[61]

Johnson explained that they had been very busy the night before.  San Miguel reiterated that they must follow standards and if someone was going to lose his or her job, it would not be him.  He then mentioned that he knew she was having some family problems.  Johnson asked that he please not involve her family situation—that she had been in the store the preceding day from 1:30 p.m. (actually 1:20 p.m.) to almost midnight (actually to 12:48 a.m.), hadn't even taken a lunch, and did not feel that her work performance had been affected by her daughter's situation.[62]  San Miguel then said he didn't like the way she had set up the baby furniture planogram—even though Johnson had set it up "by the book" as taught and previously instructed by San Miguel.  This time, however, San Miguel wanted something different.

Johnson left San Miguel's office "very sad."  That evening she explained to the night crew San Miguel's complaints about the recovery.  Those employees were unhappy because like Johnson, they had felt they had done a good job the night before.[63]  Despite the confusion created by San Miguel's sudden disapproval of everything she was doing, she continued to do her job, working late again that evening.[64]  Because San Miguel changed the requirements and

---

[59] Exhibit 22 [300514].

[60] Exhibit 22 [300514].

[61] Exhibit 23A, Tour (03/14/02) [200423-200425].

[62] Exhibit 22 [300514].

[63] Exhibit 28 [Paz Carillo Affidavit for ASHRC].

[64] Exhibit 22 [300515].

*Johnson, Myrna v. Fred Meyer (J-04-008 CV RRB)  [23003].*
PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS WRONGFUL TERMINATION CLAIM
J-04-008 CV (RRB)

CHOATE LAW FIRM LLC
424 North Franklin Street
Juneau, Alaska  99801
(907) 586-4490

wanted something different than what was specifically called for in the planogram instructions, Johnson spent the whole evening making new UPL(s) and adjusting the planogram.

At 10:07 p.m. Johnson sent an Office Vision to San Miguel giving him an update on her progress:

> "I fixed the baby furniture deck as much as I can.  Those items on the top were supposed to be for display.  I ran out of time to vaccum (sic) and built the display.   I will finished them tomorrow.
>
> I tried to type UPL for the end cap printer not working.  I had been very busy tonight.  Minerba and I were both back ups at SG20.
>
> I talk to all the night crew tonight and we are committing to our goal of excellence.  We will work on perfection every night.  Give us a little time to straighten everything and we will get there.
>
> Thank You,
> Myrna" [65]

**March 15, 2002 (Friday):**  Johnson returned to work on Friday, clocking in at 1:15 p.m.  Havard got sick on the job and had to go home.  Havard had been rearranging the children's section, leaving a quick layout with instructions for Sita Catli and Sara Dexter to finish the job.  They were both confused when Johnson arrived so she helped them follow Havard's instructions and layout.  Once again, the store was very busy and Johnson worked until around midnight.[66]

**March 16, 2002 (Saturday):**  Johnson clocked into work at 1:33 p.m..  As the store was having a 50% of clearance event, it was crowded with out-of-town shoppers.  Havard informed

---

[65] Exhibit 29 [201216].

[66] Exhibit 22 [300515].

16 of 50

*Johnson, Myrna v. Fred Meyer (J-04-008 CV RRB)  [23003].*
PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS WRONGFUL TERMINATION CLAIM
J-04-008 CV (RRB)

CHOATE LAW FIRM LLC
424 North Franklin Street
Juneau, Alaska  99801
(907) 586-4490

CHOATE LAW FIRM LLC
424 North Franklin Street
Juneau, Alaska 99801
(907) 586-4490

Johnson when she arrived that the apparel (ALE) closing cashier, Jennifer Kipple, had called in sick. The only person with experience to replace Kipple on the closing shift was Julita Lim.[67]

At 3:03 p.m., while Johnson worked the busy clearance sale short one cashier, San Miguel sent the following Office Vision to her:

> "As of today 03/16/02, the Bfn planogram still not done 100% as outlined on the tour dated 03/13/02. This is unacceptable (sic)!!!!!!! The front endcap still notsigned, backstock not worked, snugride callback not completed, kick & play / 1st bouncer still out of place and no display set on top of the deck…….
>
> You have till MONDAY 7:00am to complete this project. I will not accept anymore excuses on why isn't done.
>
> Bfn: Tour: Planograms gondola/deck/deck end/ done all upl up. All backstock worked including boards on container/top bars/ stockroom. All displays set on the deck as per pogo. No bfn product left on ale stockroom/all have to go in to the container. Thanks Jaime"[68]

Forty minutes later, at 3:43 p.m., San Miguel sent another Office Vision, with more work for Johnson:

> "All these items have to be completed on sunday 03/17/07.
>
> Ads in all depts. Set by 7:00 a.m. including outpost areas. All signing to standard.
> Ads scan 100% by 9:00 am/Ad audit turn in to Fred
> Top ten executed/Signed copy left on my desk
> Stockroom clean and organized at closing time/All salvage done.
> Checkstand ends set as per period planner.
> Merchandising notes executed in all dpts. Copy to section heads/Sign master copy filed in the book.
> Clearance execution/All racks to the back of dpts or aligned on a row from front to back. All clearance racks sized with rings and price pointed. Execute RTW clearance pricing (ov sent separately).
> All rms tables and sets recovered to planogram.
> Don't forget to ov me every night with a passdown log. I want detail.

---

[67] Exhibit 22 [300515-300516].

[68] Exhibit 30 [201309 (Top of Page)].

*Johnson, Myrna v. Fred Meyer (J-04-008 CV RRB) [23003].*
PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS WRONGFUL TERMINATION CLAIM
J-04-008 CV (RRB)

CHOATE LAW FIRM LLC
424 North Franklin Street
Juneau, Alaska 99801
(907) 586-4490

Thanks.
Jaime

PS – You forgot to ov the quest items to Steve and Joe Nichols…..Not good….. [69]

Johnson, received two demanding Office Visions from San Miguel, while in the middle of a major clearance sale and short her normal closing cashier.  At 6:00 p.m. that evening, Julita Lim, took her dinner break (normally one-half hour).  Lim did not return for almost two-and-one-half hours.  Johnson was forced to work as back-up cashier, PIC, and still finish all of the Tours and work assigned by San Miguel.  She worked until past midnight on Saturday evening.

Johnson was subsequently informed by Lim that Lim had spent the extended dinner break with San Miguel and Havard at a going away dinner for Havard.  San Miguel was aware that the shift was already one cashier short and that Lim's prolonged absence would require Johnson to take care of Lim's duties, plus Kipple's duties (the sick cashier), complete her normal duties and comply with the two Office Visions received earlier that day.[70]

**March 17, 2002 (Sunday):**  Johnson started work at approximately 1:30 p.m.  Upon arriving, she was met by Sara Dexter who told her that San Miguel had asked the day staff to report to him about the quality of Johnson's recovery.  Dexter warned Johnson that she should "watch her back" because San Miguel was planning something against her.  She told Johnson that Havard had been very vocal about wanting to move to Juneau to be the Lead Assistant and had started dating another Fred Meyer employee, Jeff Smith.

Rhonda Cox was interviewed by the Alaska State Commission for Human Rights on January 15, 2003.  She confirmed that San Miguel had asked her to secretly send an Office

---

[69] Exhibit 31 [201310].

[70] Exhibit 22 [300515].

*Johnson, Myrna v. Fred Meyer (J-04-008 CV RRB)  [23003].*
PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS WRONGFUL TERMINATION CLAIM
J-04-008 CV (RRB)

CHOATE LAW FIRM LLC
424 North Franklin Street
Juneau, Alaska 99801
(907) 586-4490

Vision to him to complain about the recovery.  She stated that San Miguel would give "projects" to Johnson to do at night when in fact, recovery was supposed to be the sole task.[71]

Having received the warnings from Dexter, Johnson continued to do her work, doing her best to respond to the Office Visions sent by San Miguel on the March 14.  In addition, on Sunday, all of the week's store specials had to be prepared for opening on Monday.  This means that prices had to be changed and any special sale displays set up.  The store places the advertisement in the Sunday paper for the week's sales.  She was responsible for all of this, plus cleaning the stock room and all other things that needed to be done.  Once again, she worked until almost midnight.  In six days she had worked approximately 66 hours.

**March 18, 2002 (Monday):**  On March 18, 2002, Johnson clocked into work at 1:17 p.m.  She met with San Miguel briefly to update him on what had happened the day before. She updated him on all projects that had been assigned including finishing a shoe audit that Jeff Smith, who had also attended the dinner party with San Miguel the evening before, was unable to complete.[72]

San Miguel had no comments about her progress or activities.  Johnson took the store cell phone and went downstairs where she was met by Sita Catli who asked for assistance in completing a Levi's petite planogram.  Johnson was interrupted about half-way through the project by San Miguel asking her to come upstairs.  He then sent her back down because he needed to take care of something else, and Johnson returned to help Catli.  Johnson was then called back by San Miguel.[73]

San Miguel said that he wanted to meet with her in the Store Director Fred Sayre's office.  The office was small and cramped.  Sayre sat at his desk with San Miguel hovering over Johnson's shoulder, between her and the door. With no preamble or discussion, San Miguel showed her a Written Employee Warning Notice and began reading the text of it to her.

---

[71] Exhibit 32 [Rhonda Cox ASHRC Interview 1/15/03 p. 1 pp8].

[72] Exhibit 22 [300516-300517].

[73] Exhibit 22 [300516-300517].

*Johnson, Myrna v. Fred Meyer (J-04-008 CV RRB)  [23003].*
PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS WRONGFUL TERMINATION CLAIM
J-04-008 CV (RRB)

CHOATE LAW FIRM LLC
424 North Franklin Street
Juneau, Alaska 99801
(907) 586-4490

When he finished, he told her to sign it. The Written Employee Warning Notice was an advanced form of discipline, which only occurs after the employee has previously been through a series of less formal discipline including counseling, verbal warnings, and "written" verbal warnings. None of this had occurred. The notice stated that Johnson, who had worked until midnight or later for the last six days was unable to perform recovery and closing correctly and that she would be "removed from her position" as ALE Lead Assistant Manager if her work did not improve in 30 days.[74]

Intimidated by the circumstances and the small room with two large men, Johnson began crying.[75] San Miguel stood blocking the door.[76] Johnson had never had any form of discipline in the past,[77] and could not understand how with no prior discipline taking place, she could suddenly be at a stage of discipline that was going to result in her termination or demotion. She began sobbing uncontrollably. It was clear to her that no matter what she did, no matter how long or diligently she worked, San Miguel was going to find deficiencies in her work.

Johnson continued crying, deeply embarrassed and humiliated to be trapped in the small room with San Miguel demanding she sign the written Employee Warning Notice. (In fact, signature is not required by the employee). Unable to collect herself emotionally, intimidated and overwhelmed with the thought that she was going to lose her job, she left the room to go to the Apparel Stock room to regain her composure. No effort was made by either San Miguel or Sayre to talk with Johnson. No effort was made to see how she was doing.[78] In fact, no effort was made to advise her that the meeting could continue after she composed herself. Despite her ten years of work for Fred Meyer and her outstanding contributions and efforts, within

---

[74] Exhibit 22 [300516-300517]; Exhibit 1,Myrna Johnson Affidavit; Exhibit 49, Employee Warning Notice [20217].

[75] Exhibit 33, Myrna Johnson Transcript (MJ Tr) [125/25 to 128/6].

[76] Exhibit 33, [MJ Tr. 122/1-23].

[77] Exhibit 4, Jaime San Miguel transcript (JSM Tr.) [100/19 to 101/1].

[78] Exhibit 4 [JSM Tr 264/22 to 265/5].

*Johnson, Myrna v. Fred Meyer (J-04-008 CV RRB) [23003].*
PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS WRONGFUL TERMINATION CLAIM
J-04-008 CV (RRB)

minutes, San Miguel and Sayre had called Human Resources in Portland to report that Johnson had "walked off" the job when she left the room to cry in the break room downstairs.[79]

Immediate steps were made to post Johnson's hard-earned job on the company's internal system.  Within days, Havard, 23 years old, young, pretty and single, had replaced Johnson.  Johnson only learned that her position was terminated when she called Time and Attendance the following morning to make sure that the time she missed from work on Monday afternoon and evening would be logged to her personal leave account.[80]

Since Sayre and San Miguel were bowling buddies and had participated in her termination, Johnson attempted to bring her wrongful termination to upper management as she had not "walked off" the job and had been mistreated by San Miguel.  Her calls to both, Dennis Affleck, the Regional Apparel Supervisor and Mary Lucas, at Human Resources, were initially unreturned.  Affleck did eventually leave a voice message stating that he would not intervene and any concerns Johnson had would have to be raised with Fred Sayre.[81]

Subsequently, Johnson ran into Lucas on an airplane.  She asked to speak with Lucas when Lucas was in Juneau.  At that meeting, Johnson requested that Lucas investigate what occurred as she wanted to return to her job.  Lucas said she would speak with San Miguel. Johnson heard nothing further thereafter from Lucas or anyone else at Fred Meyer.

**D.  Jaime San Miguel – Relevant History**

San Miguel began working in Alaska in August 1991 at the College Road McDonalds. In September, 1991 he took a part-time job at the Airport Way Fred Meyer as a shoe sales associate.[82]  That job became full-time in December 1991.[83]  In the summer of 2003, he was transferred to the College Road Fred Meyer, where he became section head of the men's

---

[79] Exhibit 4 [JSM Tr. 257/1-18].

[80] Exhibit 22 [300516-300517].

[81] Exhibit 21 [300517].

[82] Exhibit 4 - [JSM Tr. 33/19-25].

[83] Exhibit 4 - [JSM Tr. 36/2-7].

*Johnson, Myrna v. Fred Meyer (J-04-008 CV RRB)  [23003].*
PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS WRONGFUL TERMINATION CLAIM
J-04-008 CV (RRB)

CHOATE LAW FIRM LLC
424 North Franklin Street
Juneau, Alaska  99801
(907) 586-4490

apparel department.[84]  He became the apparel PIC (Person-in-Charge, also known as 4th Assistant) in the Fall of 2004.[85]  In February 1995, he entered apparel management training.[86] He was promoted to Relief Assistant Manager at the Soldotna store and held that position until January 1996.[87]  In March 1996, San Miguel was transferred to Juneau where he was promoted to be the Apparel Department Assistant Manager.[88]  He was subsequently promoted to the Apparel Department Manager position in 2001 when Matthew Laney left.

In the Spring or Summer of 2001, San Miguel went through a turbulent and emotionally exhausting divorce.  His attendance was erratic.  He frequently came into work late and left early.  He would often break down crying.  He was unable to do his job.  Notwithstanding this, there were no disciplinary consequences and Fred Meyer, instead, tolerated his erratic performance, attendance and emotional outbreaks.  Johnson and his other co-workers successfully picked up his slack in order to help him through his difficult time.

San Miguel always made it clear that he preferred younger women, both as employees and as potential dating partners.  In a sworn Affidavit presented to the EEOC, Matthew Laney, San Miguel's previous supervisor, stated in this regard:

- Two older female employees related to him that San Miguel told them "if I could, I'd get rid of you and just hire cute ones."
- San Miguel remarked on a number of occasions that he was interested in dating Kaylana Haase, a female co-worker.  Good-looking young women captured his attention.[89]

---

[84] Exhibit 4 - [JSM Tr. 37/20-22].

[85] Exhibit 4 - [JSM Tr. 38/14-18].

[86] Exhibit 4 - [JSM Tr. 71/19-23].

[87] Exhibit 4 - [JSM Tr. 73/18-74/14].

[88] Exhibit 4 - [JSM Tr. 74/17-22].

[89] Exhibit 34 – [Affidavit of Matthew Laney].

*Johnson, Myrna v. Fred Meyer (J-04-008 CV RRB)  [23003].*
PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS WRONGFUL TERMINATION CLAIM
J-04-008 CV (RRB)

CHOATE LAW FIRM LLC
424 North Franklin Street
Juneau, Alaska  99801
(907) 586-4490

CHOATE LAW FIRM LLC
424 North Franklin Street
Juneau, Alaska  99801
(907) 586-4490

1
2
3

        Another female employee, Maranda Willburn, in her sworn Affidavit also commented that San Miguel showed favoritism to young, attractive female employees.[90]  Other employees commented about San Miguel's "laziness" and "poor work habits."  When seeing a pretty, young female customer, he would make comments such as, "I'd give her a job anytime."[91]

4
5
6
7
8

        Once divorced, San Miguel became even more explicit in discussing his sexual interests with subordinates, asking female employees to set him up with someone who was "hot."  His discussions centered on sports and "girls."  Because San Miguel was a bowling buddy of the Store Manager, Sayre, he was seen to be part of a "good old boys network" that his largely female staff had no way of accessing.

9
10
11

        When Johnson left to the Philippines in early February with her daughter on emergency leave, San Miguel, in describing the replacement he wanted, said *"Don't send me an old hag, send me someone young and beautiful."*[92]

12

### E.  Havard Replaces Johnson Only To Experience A Similar Campaign

13
14
15
16
17

        In six days, San Miguel had accomplished his goal of replacing Johnson with Johnna Havard.  Havard was young, pretty and single and had no children.  Unsurprisingly, San Miguel kept Havard on the day shift (the same one he worked) and subsequently asked her out.  His attitude towards her abruptly changed when he learned that she had become engaged to Jeff Smith.

18
19
20

        Interestingly, Havard, who worked days during the week of March 11 to March 18, 2002, saw no problems with the recoveries done by Johnson.  After confirming that San Miguel had complained to her about the quality of Johnson's recoveries, Havard testified that "it

21
22
23

_____

24   [90] Exhibit 35 – [Affidavit of Maranda Wilburn].

25   [91] Exhibit 5 – [Affidavit of Sallie Tenwolde].

26   [92] Exhibit 6 - [Sarah Dexter Affidavit at p. 2].

27   *Johnson, Myrna v. Fred Meyer (J-04-008 CV RRB)  [23003].*
     PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS WRONGFUL TERMINATION CLAIM
28   J-04-008 CV (RRB)

wasn't major stuff … it was minor … it wasn't really an issue"[93] and stated that there was no difference in the recoveries done by Johnson than those done while Johnson was on vacation.[94]

Havard stayed in Juneau for another week or two after Johnson's termination before returning north to move her belongings to Juneau.  During that time, there was no difference in the recoveries after Johnson left than when Johnson was doing them.[95]  She learned of the opening of the Lead Assistant position by way of a call from San Miguel.[96]  He asked her if she wanted to come down to the Juneau store and work as a Lead assistant.[97]  There was no formal interview.  She was basically "handed the job."[98]

After announcing her engagement to Jeff Smith in the summer of 2002, there was a change in the way San Miguel treated her.[99]  Suddenly, "anything she did wasn't done right or wasn't done good enough or up to [San Miguel's] expectations."[100]  San Miguel's criticisms were both oral and in emails.[101]  There was no difference in the quality of her work which would cause San Miguel to become more critical of her.[102]  She felt that she was treated differently because she had become engaged.[103]

Whereas before her engagement, San Miguel had communicated with her primarily in face-to-face meetings, after her engagement "she constantly got Office Visions saying that

[93] Exhibit 36 - Johanna Havard Depo Transcript [JH Tr. 15/14-21].

[94] Exhibit 36 - [JH Tr 15/22-25].

[95] Exhibit 36 - [JH Tr 19/8-12].

[96] Exhibit 36 - [JH Tr 19/13-18].

[97] Exhibit 36 - [JH Tr 19/19-25].

[98] Exhibit 36 - [JH Tr  20/14-21].

[99] Exhibit 36 - [JH Tr 26/18-22].

[100] Exhibit 36 - [JH Tr 26/23 to 27/1].

[101] Exhibit 36 - [JH Tr 27/5-8].

[102] Exhibit 36 - [JH Tr 27/15-20].

[103] Exhibit 36 - [JH Tr 28/9 to 29/2].

24 of 50

*Johnson, Myrna v. Fred Meyer (J-04-008 CV RRB)  [23003].*
PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS WRONGFUL TERMINATION CLAIM
J-04-008 CV (RRB)

CHOATE LAW FIRM LLC
424 North Franklin Street
Juneau, Alaska  99801
(907) 586-4490

things weren't done right."[104]  Yet, her motivation and job performance had not changed and she continued to do the best job she could do.[105]

Because of the way San Miguel started treating her, she regularly went home crying because she felt she wasn't good enough for the job.  She complained to Fred Sayre and she called Dennis Affleck because San Miguel didn't appreciate her work or would take credit personally for the work she did when corporate people were visiting.[106]  Her complaints to Dennis Affleck or Fred Sayre were "swept under the rug."[107]  In order to avoid San Miguel and his treatment of her, she eventually transferred out of apparel to Fred Meyer Jewelers—even though it meant a $5/hour pay cut and an inability to pay her bills.[108]

Before she became engaged to Jeff Smith, San Miguel asked her to come over to his home to do some Latin dancing.  She rebuffed his advancements, feeling that they were inappropriate and unprofessional.[109]  Havard also complained about San Miguel's behavior with other women in the store.  San Miguel spent a large amount of time "flirting" and acting in an "inappropriate manner" with Felicia Kohnen.[110]  He would "eye" attractive women who walked by him in the store.[111]  Hispanic workers were treated more favorably than Asians by San Miguel.[112]  On at least two separate occasions San Miguel asked Havard to "fix him up

---

[104] Exhibit 36 - [JH Tr 29/10-17].

[105] Exhibit 36 - [JH Tr 29/18-22].

[106] Exhibit 36 - [JH Tr 32/22 to 33/6].

[107] Exhibit 36 - [JH Tr 29/23 to 30/12].

[108] Exhibit 36 - [JH Tr 31/4-8; 34/15-22].

[109] Exhibit 36 - [JH Tr 44/22 to 45/21].

[110] Exhibit 36 - JH Tr 45/22 to 46/24].

[111] Exhibit 36 - [JH Tr 47/2 to 47/7].

[112] Exhibit 36 - [JH Tr 47/8 to 48/1].

*Johnson, Myrna v. Fred Meyer (J-04-008 CV RRB)  [23003].*
PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS WRONGFUL TERMINATION CLAIM
J-04-008 CV (RRB)

CHOATE LAW FIRM LLC
424 North Franklin Street
Juneau, Alaska 99801
(907) 586-4490

with dates or with hot women."  This was while he was dating Kaylonna Haase, another store employee.[113]

After Havard became engaged, San Miguel began treating her very differently.  She was given less favorable shifts (closing & graves).[114]  San Miguel regularly gave her long tours which could not possibly be completed during a shift.  Whereas prior to her engagement, San Miguel accepted the fact that sometimes because of staffing shortages, work simply could not be completed within a shift, after her engagement, this was no longer an acceptable excuse.[115]

By late 2002, Havard was sure that San Miguel was trying to push her out of the job.[116] No matter what she did, she was unable to satisfy San Miguel's demands.[117] By December 2002, Havard, a previously healthy 23-year-old woman, was rushed to the hospital with stress-related chest pains.[118]

Unlike Johnson who simply worked harder when criticized by San Miguel, Havard was more vocal in terms of her concerns regarding her treatment.  In an email to Mary Lucas and Jim Hill, dated October 6, 2002, she complained of being "treated unfairly".  She described being put on an opening shift (6 a.m. to 4 p.m.), then having to work graveyard that same day starting at 11:00 p.m., and being "set up to fail." [119]  In response, she was instructed to speak about this with Fred Sayre, San Miguel's bowling partner.[120]  On October 10, 2002, Havard responded that she had already gone to the store director twice and nothing had changed.[121]  On

---

[113] Exhibit 36 - [JH Tr 49/2-22].

[114] Exhibit 36 - [JH Tr 52/21 to 53/1].

[115] Exhibit 36 - [JH Tr 54/16 to 55/20].

[116] Exhibit 36 - [JH Tr 56/3 to 57/3].

[117] Exhibit 36 - [JH Tr 57/4-13].

[118] Exhibit 36 - [JH Tr 63/16 to 64/3].

[119] Exhibit 37 - [202438].

[120] Exhibit 38 - [202435 (Top of the Page)].

[121] Exhibit 39 - [202437].

*Johnson, Myrna v. Fred Meyer (J-04-008 CV RRB)  [23003].*
PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS WRONGFUL TERMINATION CLAIM
J-04-008 CV (RRB)

CHOATE LAW FIRM LLC
424 North Franklin Street
Juneau, Alaska  99801
(907) 586-4490

CHOATE LAW FIRM LLC
424 North Franklin Street
Juneau, Alaska 99801
(907) 586-4490

December 12, 2002, she reported a number of times throughout the Fall that San Miguel simply had not shown up or had arrived late for work.[122]  Subsequently, she complained of San Miguel's repeated unexplained absences and failure to come in when scheduled.  On December 29, 2002, she wrote an email, subsequently forwarded to Mary Lucas on January 11, 2003, that San Miguel was a "no show/no call."[123]  On January 11, 2003, she made a note and then forwarded it to Mary Lucas confirming a "no show" by another employee, Tonia Avila.  Despite having informed San Miguel about his, nothing happened to Avila.[124]

On January 15, 2003, Havard sent an Office Vision to Mary Lucas succinctly summarizing her experiences with San Miguel:

"May, I did talk with Dennis when he came and I still feel like my voice is not heard. I don't want to "burn my bridges" with Dennis but I still feel like there will be no justice brought upon Mr. San Miguel.  When I was explaining to Dennis that Jaime no shows and is always late, he said that I was keeping tabs on my Manager.  In a way I am but I also feel that he is not leading by example of an apparel manager.  His employees see this and this is how they get away with it.  For example (and this did happen), our relief assistant (Tonia Avila) called in on Jan 1. Now from working with some other managers in the past, if you call-in on the 1st of January, you are automatically termed.  Also from talking with Dennis, I also feel by him not caring about the situations that I have come across, that he doesn't care to lose another dedicated employee.  Mr. San Miguel may be a good manager in some other aspects but from what I have observed and the situations I have been in with him, I feel like he knows that he can and will get away with anything his heart desires, even if it's against policy."[125]

On February 9, 2003, Havard again noted San Miguel's "excessive tardiness."[126]  None of Havard's complaints were acted upon by management at Fred Meyer.  Havard was forced to leave her job, and San Miguel retained his position as Apparel Manager.  His personnel file reflects none of the complaints by Havard or the investigation into them by Mary Lucas.

---

[122] Exhibit 40 - [202438F & G].

[123] Exhibit 41 - [202438B].

[124] Exhibit 42 - [202438C].

[125] Exhibit 43 - [202416].

[126] Exhibit 44 - [202414 – 202415].

*Johnson, Myrna v. Fred Meyer (J-04-008 CV RRB)  [23003].*
PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS WRONGFUL TERMINATION CLAIM
J-04-008 CV (RRB)

### III.    DISCUSSION

#### A.  **Defendants' *Motion to Dismiss Wrongful Termination Claim* is not timely.**

Pursuant to the court's March 28, 2007 Minute Order,[127] the parties' counsel conferred and agreed that there are no outstanding procedural *or legal issues* appropriate for resolution by motion.[128]  Accordingly, on April 5, 2007, this court issued a Pretrial Order.  In that order, the court set the trial date and scheduled deadlines for several pretrial matters.  The court also confirmed that "[t]he time for the filing of pretrial motions has expired[.]"[129]  As with other pretrial procedural rules, the purpose of the pretrial order is "to secure the just, speedy, and inexpensive determination of a reaction,"[130] and the court's pretrial order "shall not be modified except when upon a showing of good cause and by leave of the district court judge . . .."[131]

Defendants have given no reasonable justification, much less shown good cause, for filing their motion several months after the case was certified as ready for trial, and almost a year after the dispositive motion deadline.  Instead, despite the fact that the issue has been comprehensively briefed and decided, Defendants assert that "it makes sense *to defendants* to focus on the wrongful termination claim now as opposed to a later date, such as a motion for a directed verdict."[132]  Plaintiff strongly objects to Defendants' attempt to extend the deadline at this late date in order to re-litigate an issue that the court has already found is an issue for the fact finder to decide.  Defendants' action seriously undermines the purpose for the pretrial scheduling order in that it unjustly forces Plaintiff's counsel to divert attention and valuable time from trial preparation in order to defend an untimely, previously decided motion.  For

---

[127] Docket 83.

[128] *See, Plaintiff's Certification Case is Ready for Trial*, Docket 84-1, dated April 3, 2007.

[129] *Pretrial Order*, Docket 85, dated April 5, 2007.

[130] Fed. R. Civ. P. 1.

[131] Federal Rules of Civil Procedure 16(b)

[132] *Defendants' Motion to Dismiss Wrongful Termination Claim* at Docket 86, p. 2, filed July 20, 2007 (emphasis added).

*Johnson, Myrna v. Fred Meyer (J-04-008 CV RRB)  [23003].*
PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS WRONGFUL TERMINATION CLAIM
J-04-008 CV (RRB)

CHOATE LAW FIRM LLC
424 North Franklin Street
Juneau, Alaska 99801
(907) 586-4490

these reasons, Plaintiff asks the court to strike Defendants' motion as untimely and award her the costs associated with defending this motion.

**B.  This court has already concluded that genuine issues of material fact exist from which the trier of fact could conclude that Defendants' actions were based on improper motives or were unfair.**

This court, on Defendants' motion, has already denied summary judgment on this issue. Defendants did not ask the court to reconsider that motion five months ago when it was issued. Nor do Defendants provide any justification for the court to set aside that order.  They have not shown any mistake, inadvertence, surprise, or excusable neglect.[133]  Defendants have not proffered any newly discovered evidence.[134]  They can't claim fraud.[135]  They have provided no justification whatsoever for the court to re-examine its February 9, 2007 Order.  Instead, Defendants' current motion is nothing more than an attempt to take a second bite at the apple, so to speak.  Plaintiff strenuously objects to the waste of time and resources, Defendants' current motion has and will cost both Plaintiff and the court.  Defendants' motion is an improper attempt to re-litigate an issue that has been decided.  Accordingly, Plaintiff asks the court to deny Defendants' frivolous motion and award her the costs associated in defending it.

**C.  Defendants' motion to dismiss fails on the merits.**

In essence, Defendants argue that because Johnson left an intimidating, emotionally charged confrontation with her two, large male supervisors in order to regain her composure, she voluntarily resigned her position at Fred Meyer, and therefore, the court should dismiss her claims.  For several reasons, Defendants' argument lacks merit.  First, Johnson's employment relationship with Fred Meyer was not "at-will," and Defendants' actions toward Johnson constituted a breach of Johnson's employment agreement.  Second, there is a genuine issue of material fact as to whether Johnson "walked off" the job on March 18, 2002.  Third, even if

---

[133] Federal Rule of Civil Procedure 60(b)(1).

[134] Federal Rule of Civil Procedure 60(b)(2).

[135] Federal Rule of Civil Procedure 60(b)(3).

*Johnson, Myrna v. Fred Meyer (J-04-008 CV RRB)  [23003].*
PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS WRONGFUL TERMINATION CLAIM
J-04-008 CV (RRB)

CHOATE LAW FIRM LLC
424 North Franklin Street
Juneau, Alaska  99801
(907) 586-4490

Johnson's actions could be construed as a voluntary "walk-off," they constituted a constructive discharge in that a reasonable person in Johnson's position would have felt compelled to resign. Fourth, Defendants' adverse employment actions towards Johnson were based on improper motives and bad faith in breach of the covenant of good faith and fair dealing. Finally, a reasonable person would regard Defendants' actions toward Johnson as unfair in breach of the covenant of good faith and fair dealing.

### 1. The oral representations and personnel manuals of Fred Meyer were included in the employment contract such that Ms. Johnson could only be discharged "for cause" and pursuant to Fred Meyer's progressive discipline process

Defendants ask the court to dismiss Johnson's case. In sum, they assert that Johnson's wrongful discharge claim is limited because she was an at-will employee. In making this argument, Defendants ignore volumes of Fred Meyer employment materials, and essentially take for granted that a disclaimer, buried[136] deep in the back of Fred Meyer's employment handbook, was adequate to create an "at-will" employment relationship between Johnson and Fred Meyer. However, Defendants' position is contrary to well-established Alaska law.

Under Alaska law, where employers indicate that termination will occur only for cause, they must comply or be liable for damages.[137] Employment policy manuals may create a "for-cause" employment agreement, and whether a given manual creates a "for-cause" employment

---

[136] In fact, the disclaimer was so inconspicuous that "Plaintiff simply must have missed [it] in assembling the hundreds of pages" of Fred Meyer employment materials for her Opposition to Defendants' July 31, 2006, motion for summary judgment.

[137] *Rutledge . Alyeska Pipeline Service Company,* 727 P.2d 1050, 1056 (Alaska 1986) ("it is well recognized that where employers indicate that termination will only occur for cause, they must comply or be liable for damages.") (citing *Toussaint v. Blue Cross & Blue Shield*, 292 N.W.2d 880, 892 (1980)); *see also, Jones v. Central Peninsula General Hosp.*, 779 P.2d 783, 789 (Alaska 1989).

*Johnson, Myrna v. Fred Meyer (J-04-008 CV RRB) [23003].*
PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS WRONGFUL TERMINATION CLAIM
J-04-008 CV (RRB)

CHOATE LAW FIRM LLC
424 North Franklin Street
Juneau, Alaska 99801
(907) 586-4490

relationship must be determined on the particular facts of each case.[138]  In *Jones v. Central Peninsula General Hosp.*, the Alaska Supreme Court reasoned:

> While an employer need not establish personnel policies or practices, where an employer chooses to establish such policies and practices and makes them known to its employees, the employment relationship is presumably enhanced. The employer secures an orderly, cooperative and loyal work force, and the employee the peace of mind associated with job security and the conviction that he will be treated fairly. No pre-employment negotiations need take place and the parties' minds need not meet on the subject; nor does it matter that the employee knows nothing of the particulars of the employer's policies and practices or that the employer may change them unilaterally. It is enough that the employer chooses, presumably in its own interest, to create an environment in which the employee believes that, whatever the personnel policies and practices, they are established and official at any given time, purport to be fair, and are applied consistently and uniformly to each employee. The employer has then created a situation "instinct with an obligation.[139]

The question of whether Johnson was discharged for good cause, or whether she was discharged for another reason is a question for the trier of fact.[140]  The *Jones* Court also held that if an employer desires to keep employees from relying upon the personnel manual as modifying their employment contract, the employer must *"clearly* and *conspicuously* tell[ ] their employees that the manual is not part of the employment contract and that their jobs are terminable at the will of the employer with or without reason."[141]  Personnel manuals with clear and conspicuous disclaimers will "instill no reasonable expectations of job security and do not give employees any reason to rely on representations in the manual."[142]

---

[138] *Jones,* 779 P.2d at 787; *See also, Skagway City School Board v. Davis,* 543 P.2d 218, 222 (Alaska 1975); *Hammack v. Parker Drilling Co.,* 930 F.2d 27,  27 (9th Cir. 1991) (noting that under Alaska law, an employee handbook's promise to fire only for good cause may modify an at-will employment agreement and stating, "The *Jones* court's approval of *Toussaint* makes it unlikely that Alaska courts would distinguish between oral and written employer statements."); *Violett v. Pay N' Save Stores, Inc.,* 909 F.2d 1490 (9th Cir. 1990).

[139] *Jones,* 779 P.2d at 786 (quoting *Toussaint v. Blue Cross & Blue Shield of Michigan,* 408 Mich. 579, 292 N.W.2d 880 at 885 (1980)).

[140] *Jones,* 779 P.2d at 789 (citing *Toussaint,* 292 N.W.2d at 896).

[141] *Jones,* 779 P.2d at 787 (emphasis added).

[142] *Jones,* 779 P.2d at 788.

*Johnson, Myrna v. Fred Meyer (J-04-008 CV RRB)  [23003].*
PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS WRONGFUL TERMINATION CLAIM
J-04-008 CV (RRB)

CHOATE LAW FIRM LLC
424 North Franklin Street
Juneau, Alaska 99801
(907) 586-4490

As discussed in great detail *supra*, Fred Meyer relies upon two primary manuals to describe the employment relationship with its employees; the Employee Handbook and the Fred Meyer Corporate Policy Handbook. These manuals repeatedly emphasize the concept that if Fred Meyer employees work hard, they will be treated fairly and rewarded with a "career" in the company[143] (i.e., "doing what one does as a permanent occupation or lifework or for which one trains and which is undertaken as a permanent calling").[144] The Fred Meyer Corporate Policy Handbook[145] describes in detail employee responsibilities and consequences. Discharge is always described as a consequence of either a violation of some policy or when "necessary to protect the well-being of the company or its employees." Violation of a Fred Meyer policy almost always has a disciplinary consequence, up to termination.[146] There simply is no need for such consequences if employees cannot expect the corollary; if they follow the policies, they will not be subject to discipline including possible termination. Fred Meyer effectuates its policies with a progressive discipline system beginning with informal counseling,[147] followed by a verbal warning,[148] followed by a "verbal written warning"[149] (i.e. a Written Warning Notice with the word "verbal" written at the top), and finally a Written Warning Notice.[150]

---

[143] Exhibits 16 & 17.

[144] Webster's Online Dictionary.

[145] Exhibit 17 - [200557-200971].

[146] Exhibit 17 - Violation of the Job Posting Program's "Promotion from Within the Company" policy; [200577] Violation of the Equal Employment Opportunity policy; [ 200583 & 200633] Violation of the Conflicts of Interest policy (employment or relatives); [200601] Violation of the Hiring People with Disabilities policy; [200603] Violation of the Hiring Minors policy; [200607] Violation of the Hiring Independent Contractors policy; [200617] Violation of the Hiring School to Work policy; [200629] Violation of the Rehiring Former Employees policy; [200637] Violation of the Transfer, Interview and Selection Process policy; [200639] are examples of this.

[147] Exhibit 47 – [Fred Sayre Depo Transcript (FS Tr). 43/19-22].

[148] Exhibit 4 – [SM Tr 140/16 to 141/3]

[149] Exhibit 4 – [SM Tr 141/3-10]

[150] Exhibit 47 – [FS Tr 44/16-17]

*Johnson, Myrna v. Fred Meyer (J-04-008 CV RRB)  [23003].*
PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS WRONGFUL TERMINATION CLAIM
J-04-008 CV (RRB)

CHOATE LAW FIRM LLC
424 North Franklin Street
Juneau, Alaska 99801
(907) 586-4490

CHOATE LAW FIRM LLC
424 North Franklin Street
Juneau, Alaska  99801
(907) 586-4490

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Buried deep in the back of the employee handbook—after over fifty pages of Fred Meyer "career" propaganda and at least five blank pages for note-taking—the Employee Handbook contains the following disclaimer:

> This handbook should not be construed and does not constitute a contract, expressed or implied, guaranteeing employment for any specific duration. Although we hope your employment relationship with us is long term, either you or the Company may terminate this relationship at any time, for any reason, with or without cause or notice.  Please understand that no supervisor or representative of Fred Meyer has the authority to enter into any agreement with you for employment for any specific period of time or to make any promises or commitments contrary to the foregoing.[151]

Above the copyright information on a back page in the "Corporate Policy Manual," with searching, the following disclaimer can also be found:

> This handbook is not intended to, and indeed does not bestow any additional rights to employment or employment benefits to Fred Meyer Stores employees. In addition, Fred Meyer reserves the right to depart from these guidelines and to take action up to and including immediate discharge when, in its opinion, such action is necessary to protect the well-being of the company or its employees.[152]

These disclaimers are neither "conspicuous" nor "clear."  The manuals set out in exacting detail Fred Meyer's policies, and warn that a deviation from those policies can result in discipline up to discharge.  The disclaimers are easily overlooked because most employees do not look past the main text of the manual or to the copyright page for information about their employment.

Second, the disclaimers do not advise how the manual's exacting description of expected conduct and policies is not part of the employment agreement between the parties. When the manual says you must follow these policies or face discipline, the employee's

---

[151] Exhibit 16 [201457]; This disclaimer is so inconspicuous among Fred Meyer's volumes of employment policies, procedures and  guidelines that Plaintiff simply overlooked it when she was compiling documents for her opposition to Defendants' Motion for Summary Judgment.

[152] Exhibit 16 - [200566].

*Johnson, Myrna v. Fred Meyer (J-04-008 CV RRB)  [23003].*
PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS WRONGFUL TERMINATION CLAIM
J-04-008 CV (RRB)

reasonable expectation is that adherence to those policies will not subject him or her to discipline.

Companies, such as Fred Meyer, with the need to create a dedicated and skilled work force must offer something more to their workers than the promise that they can be terminated at any time for any reason, including a bad one. Accordingly, in the context of salaried employees such as Johnson, Fred Meyer promises a career, expects and exacts enormous efforts with the "career carrot" but if inconvenient, or for no good reason at all, demotes or terminates that employee without consideration for whether there was "just cause." In order to dupe its employees into this relationship, Fred Meyer specifically and intentionally avoids advising employees, especially salaried employees, that their employment is "at will." Instead, Fred Meyer makes every effort to sell the prospect of long-term employment through oral representations and writings. Several Fred Meyer employees, including Johnson, Mary Droddy and Rhonda Cox, all stated in sworn affidavits that they were never told or explained that their employment was "at will" or informed in any fashion that they could be terminated for a good reason, no reason or even a bad reason. Instead, they describe the representations made to them, which caused them to work long and hard hours for Fred Meyer, as being one "for cause": If they perform their jobs and follow company policy and rules, they can expect long-term employment or Fred Meyer careers.[153]

Fred Meyer's oral and written representations create the impression, contrary to the disclaimers, that Fred Meyer employees are to be provided with certain job protections. Accordingly, Johnson had every reason to believe that she had job security and that she would only be disciplined, including demotion or termination, according to Fred Meyer policies, practices and procedures. Fred Meyer should not be allowed to instill reasonable expectations of job security or dreams of a "career" in the company, and then withdraw the basis for those expectations when the employee's performance is no longer desired. Minimally, given the lack of conspicuity and clarity of the disclaimers in the multitude of materials provided to employees in contrast with, the repeated references to long-term employment with the company

CHOATE LAW FIRM LLC
424 North Franklin Street
Juneau, Alaska 99801
(907) 586-4490

---

[153] Exhibit 1 – Myrna Johnson Affidavit; Exhibit 45 – Mary Droddy Affidavit; Exhibit 46 – Rhonda Cox Affidavit.

*Johnson, Myrna v. Fred Meyer (J-04-008 CV RRB)  [23003].*
PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS WRONGFUL TERMINATION CLAIM
J-04-008 CV (RRB)

as the product of hard work and adherence to policies and procedures, a genuine issue of fact exists as to whether the combination of writings and oral representations to Johnson by Fred Meyer created a "for cause" employment relationship.

As discussed Johnson was terminable only for cause.  Therefore, one of the questions to be resolved is whether Fred Meyer breached its employment agreement with Johnson.  Fred Meyer, through San Miguel and Sayre, failed to follow its own progressive discipline policy in this matter.  For example, Johnson was unaware that she had been subject to any stage of discipline prior to the meeting of March 18, 2002.  She did not understand or realize that the Office Visions sent by San Miguel were the first stage or even second stage of the disciplinary process.[154]  In fact, Johnson had only worked four days when she received the Office Visions which San Miguel describes as being "verbal warnings."  None of those Office Visions utilize any of the language followed by the disciplinary process, whether it is described as "counseling" or "warnings."  Johnson was never asked to give her view of the performance problem or to propose a solution.  This was, of course, because she was doing her job as she has always done, in the manner that she was trained.  All work is subject to reasonable limitations based upon hours available for the tasks, number of tasks, individuals available to work, etc.  As demonstrated earlier, the week of March 12, 2002 was very busy.  There were critical absences by Havard and other employees.  A major store event occurred on Saturday, March 16 (50% clearance sale).  Johnson, did the very best that she could do, working to midnight or later every day.[155]

Furthermore, because San Miguel's complaints were never identified as being the initiation of a disciplinary process, it is still not clear what stage of discipline was being imposed on March 18, 2002.  For example, both San Miguel and Sayre describe the meeting in various ways.  Sayre says it was to "chat with her" because OVs were not getting done.[156]

---

[154] Exhibit 1 – Myrna Johnson Affidavit.

[155] Exhibit 1 – Myrna Johnson Affidavit

[156] Exhibit 47 – [FS Tr 40/5-16].

*Johnson, Myrna v. Fred Meyer (J-04-008 CV RRB)  [23003].*
PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS WRONGFUL TERMINATION CLAIM
J-04-008 CV (RRB)

CHOATE LAW FIRM LLC
424 North Franklin Street
Juneau, Alaska  99801
(907) 586-4490

CHOATE LAW FIRM LLC
424 North Franklin Street
Juneau, Alaska 99801
(907) 586-4490

Sayre describes the Employee Warning Notice[157] as being a "verbal written warning" even though the word "verbal" is not on the page and was not on the page when shown to Johnson.[158]  San Miguel described the purpose of the meeting was to talk with Johnson …and to issue a "verbal warning".[159]  According to San Miguel, the document they showed to Johnson "was not going to be put in her personnel file."[160]  Johnson, however, was presented with a completed Written Employee Warning that threatened her with removal from her position in 30 days if her work did not improve.  Johnson had worked at Fred Meyer long enough to appreciate the seriousness of this disciplinary action.[161]  In fact, because she did not realize or understand that San Miguel was treating the Office Visions as Stage One: Counseling discipline and Stage Two: Verbal Warning discipline, she was shocked to find that she was at a Stage Four "Written Employee Warning Notice" on March 18, 2002[162]—a  violation of Johnson's employment agreement with Fred Meyer.

## 2.  Johnson did not "walk off" the job on March 18, 2002.

Minimally, a genuine issue of fact exists as to whether Johnson "walked off" the job on March 18 when she left Sayre's office sobbing uncontrollably.   First, Johnson did not hear Sayre's threat that if she left the room, then it would be considered a "voluntary termination."  Even if Sayre did make the threat, the fact finder could easily conclude that the threat was unreasonable or that Johnson did not hear him because she was crying so hard and was so emotionally bereft.

Second, Johnson's actions after leaving the room are inconsistent with someone knowingly "walking off" the job.  For instance, when Johnson left the office, if she was in fact

---

[157] Exhibit 49 - [201217].

[158] Exhibit 47 – [FS Tr 44/18-22].

[159] Exhibit 4 – [SM Tr 200/1-19].

[160] Exhibit 4 – [SM Tr 201/2-5].

[161] Exhibit 51 - [MJ Tr.151/8-12]; Exhibit 1 – Myrna Johnson Affidavit.

[162] Exhibit 1 – Myrna Johnson Affidavit

*Johnson, Myrna v. Fred Meyer (J-04-008 CV RRB)  [23003].*
PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS WRONGFUL TERMINATION CLAIM
J-04-008 CV (RRB)

"walking off" the job, one would have expected her to leave Fred Meyer.  Instead, she went downstairs to the Apparel stock room, used exclusively by Apparel personnel with a small work area.  She continued to cry there and eventually was advised by fellow employees to return upstairs to actually get a copy of the document read to her by San Miguel.  When she asked for a copy, San Miguel told her that he would give her a copy once she signed it—despite the fact that signing the form is not required.

Third, Johnson took sick leave that afternoon because she could not stop crying.  The fact finder could easily conclude that this was both permitted and reasonable under the circumstances.  The record is replete with other managers coming and going.  One of the perks of management is that if you work 60-plus-hour weeks, you are not tied to a time clock.  The fact finder in this matter could conclude that under the circumstances, it was reasonable for her to go home as she was unable to stop crying at work.

Fourth, the following morning, Johnson called to advise Time and Attendance to debit her Sick Leave Account with the hours missing from the prior afternoon.  Notwithstanding the fact that Johnson had no difficulty in working 11-hour shifts on a routine basis, if she missed some portion of a shift, she had it debited from her Sick Leave.  The fact finder could find that this is inconsistent with Fred Meyer's claim that Johnson knowingly "walked off" the job on March 18, 2002.  In reality, it was on March 19, 2002, when talking with Time and Attendance, that Johnson first learned that her position had been terminated.

### 3. Even if Johnson's actions could be construed as a voluntary "walk-off," she was constructively discharged because a reasonable person in Johnson's position would have felt compelled to resign

Defendants argue that "Plaintiff . . . cannot reasonably argue she was constructively discharged by Fred Meyer."  "Constructive discharge is not an independent cause of action, but merely satisfies the discharge element in a claim for wrongful discharge."[163]  Where an employer makes working conditions so intolerable that the employee is forced into an

_____

[163] *City of Fairbanks v. Rice,* 20 P.3d 1097, 1102, n. 7 (Alaska 2000); *Pitka v. Interior Regional Housing Authority*, 54 P.3d 785, 790 (Alaska 2002).

*Johnson, Myrna v. Fred Meyer (J-04-008 CV RRB)  [23003].*
PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS WRONGFUL TERMINATION CLAIM
J-04-008 CV (RRB)

CHOATE LAW FIRM LLC
424 North Franklin Street
Juneau, Alaska  99801
(907) 586-4490

involuntary resignation, the employer is as liable for any illegal conduct involved therein as if it had formally discharged the employee.[164]  To establish constructive discharge it is not necessary that the employee actually "prove that the employer acted with a specific intent of causing the employee to resign."[165]  Rather the employee "has the burden of showing that a reasonable person in the employee's position would have felt compelled to resign."[166]  A constructive discharge may result from a "sustained campaign of harassment" against an employee.[167]

In making their argument, Defendants rely on *Pitka v. Interior Regional Housing Authority*[168] for the propositions that "criticism of job performance does not create intolerable workplace conditions" and that "plaintiff's subjective belief that 'she might lose her job' or be demoted is not relevant."[169]  Defendants' reliance is misplaced.

First, contrary to Defendants' assertion, *Pitka* does not establish a general rule that a plaintiff's subjective belief that she might lose her job or be demoted is irrelevant.  Instead, the court, without any analysis on the issue, merely summarized the trial court's decision: "The *trial court* found that Pitka's fear that she might lose her job and her belief that she had been demoted were products of her own assumptions but that her subjective beliefs were not relevant."[170]

Next, the facts of *Pitka* are easily distinguished from the case at bar.  In *Pitka*, the plaintiff (Pitka) "was dissatisfied with her conditions of employment and the results of [a]

[164] *Beard v. Baum*, 796 P.2d 1344, 1350 (Alaska 1990) (Beard I).

[165] *Cameron v. Beard*, 864 P.2d 538, 547 (Alaska 1993).

[166] *Cameron*, 864 P.2d at 547.

[167] *Cameron*, 864 P.2d at 547.

[168] *Pitka v. Interior Regional Housing Authority*, 54 P.3d 785 (Alaska 2002).

[169] *Defendants' Motion to Dismiss Wrongful Termination Claim* at 6, Docket 86, filed July 20, 2007.

[170] *Pitka*, 54 P.3d at 790.

*Johnson, Myrna v. Fred Meyer (J-04-008 CV RRB)  [23003].*
PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS WRONGFUL TERMINATION CLAIM
J-04-008 CV (RRB)

CHOATE LAW FIRM LLC
424 North Franklin Street
Juneau, Alaska  99801
(907) 586-4490

grievance she filed with her employer, the Interior Regional Housing Authority [IRHA]."[171] The basis for Pitka's grievance was that another department was "spontaneously taking over [her] job duties," and that her supervisor was "jumping into her work and taking over her duties."[172]    After filing her grievance, Pitka informed her employer that she would "not return to work until issues can be resolved in a professional manner" and that she "expect[ed] to be compensated financially for any time missed."  Pitka then left work and never returned.[173] Despite Pitka's unilateral decision to leave work, IRHA did not terminate her employment.[174] Instead, IRHA followed its policies and procedures, investigated Pitka's complaints, provided her with a hearing and addressed each of her concerns.[175]    Nonetheless, dissatisfied with the grievance process, Pitka sued IRHA, claiming, among other things, that she was constructively discharged because her work conditions were so intolerable she had to resign.[176]    Pitka alleged that she was humiliated by the executive director's criticism that she was a complainer, that the grievance decision was incomplete, and that she could no longer work under the executive director.[177]    The trial court found "that there was no evidence of a campaign against Pitka or evidence of any effort to force her to resign."[178]    In affirming the trial court's decision, the Alaska Supreme court held that "criticism of job performance *alone* is not enough to create intolerable work conditions."[179]    The court noted that "Pitka had not pointed to any other comments or remarks that might be viewed as evidence of a campaign against her."

---

[171] *Pitka*, 54 P.3d at 785.

[172] *Id.* at 786.

[173] *Id.*

[174] *Pitka*, 54 P.3d at 789.

[175] *Pitka*, 54 P.3d at 789.

[176] *Id.* at 790.

[177] *Pitka*, 54 P.3d at 790.

[178] *Pitka*, 54 P.3d at 790.

[179] *Id.* at 790 (emphasis added).

*Johnson, Myrna v. Fred Meyer (J-04-008 CV RRB)  [23003].*
PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS WRONGFUL TERMINATION CLAIM
J-04-008 CV (RRB)

CHOATE LAW FIRM LLC
424 North Franklin Street
Juneau, Alaska  99801
(907) 586-4490

Accordingly, the court concluded that "the facts of [*Pitka*] are legally insufficient to establish a claim for wrongful discharge."[180]

 In contrast, the record of this case is sufficient to support a claim of constructive discharge.  Johnson does not rely on San Miguel's unreasonable criticism of her work performance as the sole basis for her claim.  Instead, the evidence shows that San Miguel wanted to replace Johnson with Havard.  In order to remove Johnson from her position as Lead Assistant, San Miguel needed to have her either terminated or demoted.  In order to do this, he initiated a sustained campaign of harassment against Johnson that culminated in an intimidating, emotionally charged confrontation in a small room with two, large male supervisors.

First, San Miguel changed Johnson's schedule from the usual day shift to the less desirable closing shift.  Johnson had worked the closing shift for years as the Relief Assistant Manager from 1996 to 2001, and one of the perks of being promoted to Lead Assistant was the more desirable day shift hours.  Upon Johnson's return to Fred Meyer after her leave, she was immediately put on the closing shift, and Havard was given Johnson's day shift schedule.

Next, San Miguel increased Johnson's workload.  All work is, of course, subject to reasonable limitations based upon hours available for the tasks, number of tasks, individuals available to work, etc.  The main objective for the closing shift at Fred Meyer was "recovery," which was always a product of how much time was available.  Nonetheless, San Miguel tasked Johnson with additional projects, including several long tours and a "planogram."  During that week, the store was frequently short-handed.  Havard's absences on two days resulted in Johnson picking up additional uncompleted management duties.  In addition, Johnson struggled to keep the Apparel Department going during a 50% off clearance sale in which her lead cashier (Kipple) was sick and her only back-up cashier, Lim left for more than two hours for a prolonged dinner break with San Miguel and Havard.  The record reflects that Johnson certainly spent an enormous amount of time at work that week, clocking in usually before 1:30 p.m. for a 2:00 p.m. shift, and leaving around midnight or later.

---

[180] *Id.* at 790.

*Johnson, Myrna v. Fred Meyer (J-04-008 CV RRB)  [23003].*
PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS WRONGFUL TERMINATION CLAIM
J-04-008 CV (RRB)

CHOATE LAW FIRM LLC
424 North Franklin Street
Juneau, Alaska  99801
(907) 586-4490

Third, San Miguel orchestrated a campaign of daily and unceasing oral and written complaints and harassment of unreasonable and unsupported criticisms of Johnson's work. The purported reason for San Miguel's chief criticisms was the recoveries from March 12 to March 17, 2002. As has been demonstrated, there's no question that Johnson was capable of performing quality recoveries. She had done so for years as the closing Relief Assistant Manager from 1996 to 2001. Her previous Manager, Laney, described Johnson as someone who was an "excellent employee…led by example…was devoted to her job…completed her work in a timely manner…and always outworked her project list."[181]

Johnson's fellow employees have testified that her recoveries did not suddenly deteriorate or become sub-par that week. Havard, who was a trained Fred Meyer manager, testified that at the same time San Miguel was complaining about Johnson's recoveries, that anything she saw was "minor", "not an issue."[182] There was no difference between the recoveries after Johnson returned from vacation as compared with the recoveries while she was on vacation.[183] Paz Carillo stated under oath that everything "was in order" at the close of business the previous day.[184] Rhonda Cox, who was asked by San Miguel to report "secretly" to him about Johnson's recoveries, stated that Johnson's recovery was fine.[185] Similarly, Sarah Dexter stated that the Apparel department she was responsible for, "looked good" when she had arrived for the day shift on March 17, 2002.[186]

There is also a large amount of evidence that San Miguel's criticisms about the planogram were pretextual. As noted earlier, Johnson knew how to assemble planograms and had been doing so for years. Planograms and the display of merchandise in Fred Meyer stores is not something which is dependent upon an individual manager's subjective opinions. In fact,

---

[181] Exhibit 34 – [Matthew Laney Affidavit, p. 2].

[182] Exhibit 36 - [JH Tr 15/10-21].

[183] Exhibit 36 - [JH Tr 15/22-25].

[184] Exhibit 28 - [Paz Carillo Affidavit for ASHRC].

[185] Exhibit 32 - [Rhonda Cox ASCHR Interv 1/15/03]; Exhibit. 46 – Rhonda Cox Affidavit.

[186] Exhibit 6 - [Sarah Dexter Aff, p. 3].

*Johnson, Myrna v. Fred Meyer (J-04-008 CV RRB) [23003].*
PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS WRONGFUL TERMINATION CLAIM
J-04-008 CV (RRB)

CHOATE LAW FIRM LLC
424 North Franklin Street
Juneau, Alaska 99801
(907) 586-4490

Fred Meyer has a highly detailed instruction manual in this regard titled the "Visual Merchandising Standards Manual" (VMSM). Johnson was taught to follow the VMSM. Nonetheless, San Miguel stated he wanted the baby furniture display done "differently" than what was called for in the planogram. Johnson did her best to meet his deviation from standards, but since she was only trained in following the VMSM and planogram instructions, and San Miguel did not adequately explain what he expected, Johnson was never able to satisfy his demands despite repeated efforts. San Miguel's subsequent mistreatment of Havard demonstrates not only a course of improper conduct, in violation of the law, but also a method or *modus operandi* which San Miguel used with anyone he wanted to remove from that position.

Fourth, San Miguel used his unsupported criticisms of Johnson's job performance as a pretext for an advanced form of employee discipline. San Miguel set up an emotional confrontation with Johnson trapped in a small, confined space with San Miguel and Fred Sayre—both large men. In this meeting, San Miguel presented a Written "Employee Warning Notice" to Johnson.[187] Prior to that meeting Johnson was unaware that she had been subject to any discipline—including "informal" stage discipline. When Johnson was presented with a Written "Employee Warning Notice" on March 18, 2002, and was advised that she had received a "Prior Verbal Warning" [checkbox is checked], she was caught completely off guard. From her training and experience with Fred Meyer, she knew that was the final stage of discipline before suspension or termination.[188] Not only was she receiving the final stage of discipline, she had apparently already gone through the earlier stages of discipline without ever being aware that they had occurred. It was only at San Miguel's deposition on January 24, 2006 that Johnson learned that San Miguel had initiated the informal disciplinary process by giving her a "verbal warning"—within one (1) day of her return from emergency leave.[189]

---

[187] Exhibit 49 - Employee Warning Notice [201217].

[188] Exhibit 1 – Myrna Johnson Affidavit.

[189] Exhibit 4 – [JSM Tr 197/7 to 198/1].

*Johnson, Myrna v. Fred Meyer (J-04-008 CV RRB) [23003].*
PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS WRONGFUL TERMINATION CLAIM
J-04-008 CV (RRB)

CHOATE LAW FIRM LLC
424 North Franklin Street
Juneau, Alaska 99801
(907) 586-4490

CHOATE LAW FIRM LLC
424 North Franklin Street
Juneau, Alaska 99801
(907) 586-4490

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Fifth, as Johnson sobbed uncontrollably, San Miguel demanded she sign the advanced form of discipline which threatened her removal from her position as Lead Assistant.  While signing the form is not a requirement, San Miguel refused to give Johnson a copy unless she signed the form.  Deeply embarrassed and humiliated, Johnson told the men she had to leave the room and did so in an effort to collect herself emotionally.

Sixth, while Johnson did not hear Sayre threats, he threatened that if she left the room, it would be considered a voluntary "walk off" from the job.  Since there had been no informal discipline, and Johnson had worked unceasingly and unsuccessfully for the prior six straight days to respond to San Miguel's escalating complaints, she knew that San Miguel was going to have her fired or demoted.  Under these circumstances, Sayre's threat was unreasonable.

Finally, while Johnson went downstairs to regain her composure in the Apparel stock room, San Miguel and Sayre called the Portland headquarters for Fred Meyer, where the decision was made to describe Johnson's tearful exodus from the room as a "walk-off" from the job and a "voluntary termination".  The following day, after collecting herself emotionally, Johnson contacted Fred Meyer to learn to her surprise, that she had been terminated.

Although any one of these events alone may not be sufficient to support a claim for constructive discharge, when viewed in the totality and in the light most favorable to Johnson, they could, and most likely will, lead a reasonable person in Johnson's position to conclude that Fred Meyer, through San Miguel and Sayre, had made working conditions so intolerable that Johnson was forced into an involuntary resignation.

**4.  <u>Defendants' adverse employment actions towards Johnson were based on improper motives and bad faith in breach of the covenant of good faith and fair dealing</u>**

Though the court has already decided that "genuine issues of material fact exist from which the trier of fact could conclude that Defendants' actions were based on improper motives or were unfair[,]" Defendants ask the court, more than 5 months later, to re-examine the issue.  Defendants incorrectly assert that "[t]here is no evidence in this case that plaintiff's termination involved any action taken to unfairly deprive Ms. Johnson of any benefit under her *at-will*

*Johnson, Myrna v. Fred Meyer (J-04-008 CV RRB)  [23003].*
PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS WRONGFUL TERMINATION CLAIM
J-04-008 CV (RRB)

CHOATE LAW FIRM LLC
424 North Franklin Street
Juneau, Alaska 99801
(907) 586-4490

relationship with Fred Meyer." However, Defendants' analysis for a subjective breach of the covenant of good faith and fair dealing is contrary to Alaska law, and, as discussed above, they incorrectly assert that Johnson was an "at-will" employee at Fred Meyer.

Like all contracts, Johnson's employment agreement with Fred Meyer included an implied covenant of good faith and fair dealing.[190] Defendants are correct in their assertion that breach of this covenant can be either subjective or objective.[191] The subjective, "good faith" component of the covenant, however, has a broader application than Defendants assert. Specifically, the covenant prohibits an employer from "acting with a subjectively improper motive, *such as* when it 'discharges an employee for the purpose of depriving him or her of one of the benefits of the contract.'"[192] The question is whether the employer's actions were "made in *bad faith*,"[193] and an example of *per se* bad faith is when the employer terminates the employee for the purpose of depriving the employee of one of the benefits of the contract.[194]

The record in this case demonstrates that San Miguel's motive for terminating Johnson's employment was improper and/or unlawful. Specifically, Johnson was forced out of her job because San Miguel wanted to replace her with Havard. The replacement of a ten-year proven employee with a young woman who worked less than a month, was motivated by a desire to replace the older worker with a younger one who may be "more available" to San Miguel. In this regard, there is extensive testimony by Havard and other employees of San Miguel's overt and unprofessional comments and actions towards young women. Plaintiff's

---

[190] *Era Aviation v. Seekins,* 973 P.2d 1137, 1139 (Alaska 1999); *Ramsey v. City of Sand Point*, 936 P.2d 126, 133 (Alaska 1997).

[191] *Pitka v. Interior Regional Housing Authority*, 54 P.3d 785, 789 (Alaska 2002); *See also, Ramsey,* 936 P.2d at 133; *Chijide v. Maniilaq Association of Kotzebue, Alaska,* 972 P.2d 167, 172 (Alaska 1999); *Belluomini v. Fred Meyer of Alaska*, 993 P.2d 1009, 1012-1014 (Alaska 1999).

[192] *Pitka,* 54 P.3d at 789 (citing *Era Aviation,* 973 P.2d at 1139; *Ramsey,* 936 P.2d at 133) (internal citations omitted) (emphasis added); *see also, Belluomini,* 993 P.2d at 1012.

[193] *Pitka,* 54 P.3d at 789 (emphasis added).

[194] *Leudtke v. Nabors Alaska Drilling, Inc.*, 834 P.2d 1220, 1224 (Alaska 1992); *see also, Jones,* 779 P.2d at 789; *Mitford v. de Lasala*, 666 P.2d 1000, 1007 (Alaska 1983); *Hagans, Brown & Gibbs v. First National Bank of Anchorage,* 783 P.2d 1164, 1168 (1989).

*Johnson, Myrna v. Fred Meyer (J-04-008 CV RRB) [23003].*
PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS WRONGFUL TERMINATION CLAIM
J-04-008 CV (RRB)

argument here is not that Johnson was terminated simply because she was older. Rather, it is that when given the opportunity to put a younger, pretty and single worker in Johnson's position, San Miguel orchestrated her termination, effectively discriminating against her because of her age. The facts that San Miguel expressed a preference for *"someone young and beautiful,"* rather than *"a hag"*[195] combined with Havard's vocal desire to take over Johnson's position, and then Havard was essentially "handed the job" immediately after Johnson's discharge support this theory. San Miguel's subsequent mistreatment of Havard demonstrates San Miguel's *modus operandi* for removing people from that position.

Next, it is clear from the record that Johnson was an important, valued Fred Meyer employee so long as she was absolutely reliable, and as soon as Johnson had to take family medical leave to deal with her daughter's problems, she was no longer viewed as a valuable member of the organization. When Johnson returned to Fred Meyer, she informed San Miguel that she may need to take another leave of absence towards the end of the year if her daughter's condition did not improve. San Miguel's harsh and unrelenting campaign to orchestrate Johnson's demotion or termination—just days after she returned from her emergency leave— was motivated by a false perception that Johnson was no longer reliable or dependable.

Finally, as discussed above, there is, at minimum, a factual dispute as to whether Johnson's employment relationship with Fred Meyer was "at-will." The covenant of good faith and fair dealing is implied in every contract in order to effectuate the reasonable expectations of the parties to an agreement.[196] In this case, Johnson had every reasonable expectation that if she worked diligently and adhered to Fred Meyer policies and procedures, she could expect a "career" in the Fred Meyer organization with certain protections, including that she would only be disciplined, including demotion or termination, according to Fred Meyer policies, practices and procedures. Because San Miguel engaged in a sustained campaign in order to orchestrate Johnson's demotion or termination, she was necessarily deprived of all the benefits of her

---

[195] Exhibit 6 - [Sarah Dexter Affidavit at p. 2].

[196] *Mitford v. de Lasala*, 666 P.2d 1000, 1007 (Alaska 1983).

*Johnson, Myrna v. Fred Meyer (J-04-008 CV RRB)  [23003].*
PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS WRONGFUL TERMINATION CLAIM
J-04-008 CV (RRB)

CHOATE LAW FIRM LLC
424 North Franklin Street
Juneau, Alaska 99801
(907) 586-4490

employment contract with Fred Meyer, including the progressive discipline process and ultimately, her continued employment, benefits, and her "career" as a Fred Meyer manager.

**5. A reasonable person would regard Defendants actions toward Johnson as unfair, and thus, in breach of the covenant of good faith and fair dealing**

The objective aspect of the covenant of good faith and fair dealing requires that the employer act in a manner that a reasonable person would regard as fair.[197]  The Alaska Supreme Court has previously explained that examples of objective breaches of the covenant of good faith and fair dealing would include disparate employee treatment, terminations on grounds that were unconstitutional, and firings that violated public policy.[198]  An employer's failure to treat like employees alike can constitute a breach of the covenant.[199]  Furthermore, terminating an employee in violation of a public policy, such as gender discrimination, age discrimination, or in response to leave taken pursuant to the Family Medical Leave Act, constitutes a breach of the covenant of good faith and fair dealing.[200]

The record demonstrates that Johnson was a very capable, hard-working employee. For years, San Miguel relied upon Johnson to work sixty-plus-hour weeks.  The Affidavits from co-workers confirm that Johnson was primarily responsible for keeping the floor going. San Miguel was not noted for being particularly hard-working or diligent.  In fact, when San Miguel was going through a situation quite similar to Johnson's (i.e., his personal divorce), his attendance and work performance was erratic and inconsistent.  He frequently had emotional outbreaks, including one that led to a hospitalization.  He was unable to do his job.  He frequently came into work late and left early.  Throughout that time period, it was Johnson upon whom he relied.  It was her ability and work ethic which kept the Apparel Department

[197] *Finch v. Greatland Foods, Inc.*, 21 P.3d 1282, 1286-87 (Alaska 2001); *Ramsey*, 936 P.2d at 133.

[198] *ERA Aviation, Inc. v. Seekins*, 973 P.2d 1137, 1139 (Alaska 1999); *Luedtke v. Nabors Drilling, Inc.* 834 P.2d 1220, 1224 (Alaska 1992) (Luedtke II).

[199] *Holland v. Union Oil Co. of Cal., Inc.*, 993 P.2d 1026, 1032 (Alaska 1999); *Belluomini v. Fred Meyer of Alaska, Inc.*, 993 P.2d 1009, 1012-13 (Alaska 1999); *Alaska Marine Pilots v. Hendsch*, 950 P.2d 98, 109 (Alaska 1997).

[200] *See generally, Kinzel v. Discovery Drilling, Inc.*, 93 P.3d 427, 437 (Alaska 2004).

*Johnson, Myrna v. Fred Meyer (J-04-008 CV RRB)  [23003].*
PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS WRONGFUL TERMINATION CLAIM
J-04-008 CV (RRB)

CHOATE LAW FIRM LLC
424 North Franklin Street
Juneau, Alaska 99801
(907) 586-4490

CHOATE LAW FIRM LLC
424 North Franklin Street
Juneau, Alaska 99801
(907) 586-4490

going, and which guaranteed that San Miguel's work was done when he was unable to do it himself.  Notwithstanding this, there were no disciplinary consequences for San Miguel and Fred Meyer, instead, tolerated his erratic performance, attendance and emotional outbreaks.

Less than eight months later, Johnson went through similar personal problems requiring her to take an emergency leave.  When she returned, she told San Miguel that she might have to leave again later in the year if her daughter remained in the Philippines and if her daughter's condition did not improve.  Unlike San Miguel, who appears to have been afforded constant allowances for his behavior and conduct by his male supervisors (with whom he plays baseball and watches football), Johnson was subjected to an advanced form of employee discipline and then terminated for leaving an intimidating and emotionally charged confrontation.

Even after Johnson was discharged, Fred Meyer ignored San Miguel's attendance and work performance deficiencies.  Specifically, despite numerous complaints by Havard regarding San Miguel's excessive tardiness and absences,[201] and an investigation into Havard's documented complaints and recommendation for discipline by Mary Lucas, San Miguel's personnel file contains no record of that investigation or subsequent disciplinary action.  None of Havard's complaints were acted upon by management at Fred Meyer, and San Miguel retained his position as Apparel Manager.  This history establishes that Johnson, as a similarly situated employee, was held to a different standard and treated differently.

Next, despite clear objective standards for completing recoveries and planograms, Johnson was held to a different "subjective" standard.  Fred Meyer appears to argue that whether Johnson was successfully performing her job duties can only be decided by San Miguel (i.e., that it is San Miguel's "subjective" decision, which can be challenged by no one, that is the only opinion that matters).  However, this flies in the face of the extraordinary training, procedures and manuals in place which determine how work at Fred Meyer was to be performed.  It is refuted not only by co-workers who observed Johnson's work at that time and will comment that she was motivated, hard-working, diligent and competent, and that there was

[201] Exhibit 44 - [202414 – 202415].

47 of 50

*Johnson, Myrna v. Fred Meyer (J-04-008 CV RRB)  [23003].*
PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS WRONGFUL TERMINATION CLAIM
J-04-008 CV (RRB)

no decrease in the quality of work during her shifts. It is also refuted by Johnson's long work-hours and own record of responding to San Miguel's Office Visions, making every effort to comply with his escalating demands. The fact that San Miguel deviated from the Fred Meyer objective standards and instead, held Johnson to his own subjective standard was an objective breach of the covenant of good faith and fair dealing.

Third, at the time of Johnson's discharge, Fred Meyer had a progressive discipline policy. The fact that San Miguel deviated from that policy, bypassing all informal methods of employee discipline and moving directly to the Employee Written Warning, was an objective breach of the covenant of good faith and fair dealing.

Fourth, genuine issues of fact exist as to whether San Miguel's conduct was designed and intended to accomplish the removal of Johnson, an over-40-year-old married woman, in order to replace her with a younger, pretty and single woman, Havard. San Miguel's comments in searching for Johnson's temporary replacement support this argument: "if it is a woman, send somebody young and beautiful…and not a hag."[202] The fact finder could also conclude that Havard's statements to other employees prior to Johnson's return from the Philippines that she would take Johnson's job if offered, and the immediate replacement by Johnson with Havard, demonstrate discriminatory intent. This is clearly a violation of objective good faith and fair dealing.

Finally, subjecting Johnson to a pattern of harassing conduct, could itself amount to disparate treatment in breach of the covenant of good faith and fair dealing. San Miguel's subsequent mistreatment of Havard demonstrates not only a course of improper conduct, in violation of the law, but also a method or *modus operandi* which San Miguel used with anyone he wanted to remove from that position.

For all of the above reasons, Plaintiff asks the court to deny Defendants' motion on the merits. Furthermore, because the current motion was decided in the court's previous Order on Summary Judgment, and therefore, the only discernible reason for the current motion is to

---

[202] Exhibit 6 – [Sarah Dexter Aff, 10/24/02 at p. 2]

*Johnson, Myrna v. Fred Meyer (J-04-008 CV RRB) [23003].*
PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS WRONGFUL TERMINATION CLAIM
J-04-008 CV (RRB)

CHOATE LAW FIRM LLC
424 North Franklin Street
Juneau, Alaska 99801
(907) 586-4490

cause Plaintiff needless delay and expense, the court should award Plaintiff attorney fees and costs for defending this motion.

## IV.    CONCLUSION

Defendants have misconstrued well-established Alaska law and ignored important evidence in an attempt to re-litigate an issue after the deadline for filing dispositive motions. Not only is the motion to dismiss untimely and an improper attempt to re-litigate an issue that was thoroughly briefed and decided, the court must dismiss the motion because it fails on the merits: (1) Johnson was not an "at-will" employee at Fred Meyer; (2) Johnson did not "walk off" the job on March 18, 2002; (3) a reasonable person in Johnson's position would have felt compelled to resign; (4) Defendants' adverse employment actions towards Johnson were based on improper motives and bad faith; and (5) a reasonable person would regard Defendants' actions toward Johnson as unfair.  Because the only discernible reason for Defendants' instant motion is to cause Plaintiff needless delay and expense, the court should award Plaintiff attorney fees and costs for being forced to defend this motion.

DATED this 30th day of July 2007, at Juneau, Alaska.


Respectfully submitted,
CHOATE LAW FIRM LLC


s/ *Jessica L. Srader*

_____
JESSICA L. SRADER
424 N. Franklin Street
Juneau, AK 99801
Phone: (907) 586-4490
Fax: (907) 586-6633
EM: lawyers@choatelawfirm.com
AK Bar: 0412105

Attorneys for Plaintiff

49 of 50

*Johnson, Myrna v. Fred Meyer (J-04-008 CV RRB)  [23003].*
PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS WRONGFUL TERMINATION CLAIM
J-04-008 CV (RRB)

CHOATE LAW FIRM LLC
424 North Franklin Street
Juneau, Alaska  99801
(907) 586-4490

**PROOF OF SERVICE**

STATE OF ALASKA, FIRST JUDICIAL DISTRICT AT JUNEAU

I am employed in the City and Borough of Juneau, State of Alaska. I am over the age of 18 and not a party to the within action. My business address is 424 N. Franklin Street, Juneau, AK 99801.

On July 30th, 2007, I served the foregoing document described as ***Plaintiff's Opposition to Motion to Dismiss Wrongful Termination Claim,*** on the interested parties in this action by serving the original true copies, addressed as follows:

James Dickens                          Peter Gruenstein
Miller Nash LLP                        Gruenstein & Hickey
Attorney For: Fred Meyers              Attorney For: Fred Meyers
4400 Two Union Square                  500 L Street, Suite 401
601 Union Street                       Anchorage, AK 99501
Seattle, WA 98101-2352                 Phone: (907) 258-4338
Phone: (206) 622-8484                  Fax: (907) 258-4350
Fax: (206) 622-7485

☐ By mail, I deposited such envelope(s) in the mail at Juneau, Alaska, with postage thereon fully prepaid.

I am readily familiar with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. postal service on that same day with postage thereon fully prepaid at Juneau, Alaska, in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after the date of deposit for mailing in affidavit.

☐ By personal service, I delivered such envelope(s) by hand to the ☐ office(s); ☐ the court box of the addressee(s).

☐ By facsimile, I transmitted such documents from Juneau, Alaska, to the offices of the addressee(s).

☐ By email, I transmitted such documents from Juneau, Alaska, to the email address of the addressee(s).

☒ By electronic service through the court of record's electronic service system.

☐ (State) I declare under penalty of perjury under the laws of the State of Alaska that the foregoing is true and correct.

☒ (Federal) I declare that I am employed in the office of a member of the Bar of this Court, at whose direction the service was made.

Executed on July 30, 2007, at Juneau, Alaska.

_____
s/ Annya Ritchie

CHOATE LAW FIRM, LLC

*Johnson, Myrna v. Fred Meyer (J-04-008 CV RRB)  [23003].*
PLAINTIFF'S OPPOSITION TO MOTION TO DISMISS WRONGFUL TERMINATION CLAIM
J-04-008 CV (RRB)

CHOATE LAW FIRM LLC
424 North Franklin Street
Juneau, Alaska 99801
(907) 586-4490