James R. Dickens
MILLER NASH LLP
4400 Two Union Square
601 Union Street
Seattle WA  98101-2352
Telephone:  (206) 622-8484

Peter Gruenstein
GRUENSTEIN & HICKEY
Resolution Plaza
1029 W. 3rd Avenue, Suite 510
Anchorage AK  99501
Telephone:  (907) 258-4338

    Attorneys for Defendants

Hon. Ralph R. Beistline

MILLER NASH LLP
ATTORNEYS AT LAW
4400 TWO UNION SQUARE
601 UNION STREET, SEATTLE WA 98101-2352
TELEPHONE (206) 622-8484

UNITED STATES DISTRICT COURT
DISTRICT OF ALASKA

MYRNA I. JOHNSON,

        Plaintiff,

   v.

FRED MEYER STORES, INC., a Delaware
corporation; and JAIME SAN MIGUEL,

        Defendants.

Case No. 1J-04-008-CV (RRB)

## DECLARATION OF JAMES R. DICKENS (8/7/07) RE MOTION TO DISMISS WRONGFUL TERMINATION CLAIM

I, James R. Dickens, declare under oath as follows:

1.    I am an attorney with Miller Nash LLP, one of the attorneys for the defendants in the above-referenced matter.  I make this declaration based on my personal knowledge and the records and files herein.

2.    Attached hereto as Exhibit A is a copy of selected portions of plaintiff's complaint, including pages 1, 4 and 20.

3.    Attached hereto as Exhibit B are true and accurate copies of plaintiff's deposition, including the cover page and pages 5, 52, 53, 56, 95, 99, 106, 112, 122, 126, 128, 135, 212 and 213.  These pages principally were submitted in counsel's prior declaration on

DECLARATION OF JAMES R. DICKENS (8/7/07) RE MOTION TO DISMISS
WRONGFUL TERMINATION CLAIM
Johnson v. Fred Meyer
Case No. 1J-04-008-CV
Page 1 of 3

SEADOCS:288702.1

July 31, 2006 (docket 46) and herein to rebut some of the factual allegations by plaintiff in response to the present motion.

4.    Attached hereto as Exhibit C are pages 1, 34 and 35 of plaintiff's previous Exhibit 16 submitted in opposition to defendants' earlier motion for summary judgment.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

SIGNED at Seattle, Washington, on August 7, 2007.


s/ James R. Dickens

<div style="writing-mode: vertical">
MILLER NASH LLP
ATTORNEYS AT LAW
4400 TWO UNION SQUARE
601 UNION STREET, SEATTLE WA 98101-2352
TELEPHONE (206) 622-8484
</div>

Certificate of Service

I hereby certify that on August 7, 2007,
a copy of the foregoing was served
electronically on:

Mark Choate
lawyers@choatelawfirm.com

s/ James R. Dickens

DECLARATION OF JAMES R. DICKENS (8/7/07) RE MOTION TO DISMISS
WRONGFUL TERMINATION CLAIM
Johnson v. Fred Meyer
Case No. 1J-04-008-CV
Page 2 of 3

## TABLE OF CONTENTS

| EXHIBIT | DESCRIPTION | PAGE NOS. |
|---------|-------------|-----------|
| Exhibit A | Selected portions of plaintiff's complaint | 1-3 |
| Exhibit B | Myrna Johnson deposition transcript pages | 1-15 |
| Exhibit C | Plaintiff's Exhibit 16 | 1-3 |

MILLER NASH LLP
ATTORNEYS AT LAW
4400 TWO UNION SQUARE
601 UNION STREET, SEATTLE WA 98101-2352
TELEPHONE (206) 622-8484

DECLARATION OF JAMES R. DICKENS (8/7/07) RE MOTION TO DISMISS
WRONGFUL TERMINATION CLAIM
Johnson v. Fred Meyer
Case No. 1J-04-008-CV
Page 3 of 3

REC'D/ERL

JUN 2 8 2004

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| MYRNA I. JOHNSON, | ) |
| Plaintiff | ) |
| | ) |
| vs. | ) |
| | ) |
| FRED MEYER STORES, INC., a | ) |
| Delaware Corporation, and Jaime San | ) |
| Miguel, | ) |
| | ) |
| Defendants | ) |

**F I L E D**

MAR 1 7 2004

UNITED STATES DISTRICT COURT
DISTRICT OF ALASKA
By_____Deputy

Case No. 1J04-

**J 04 - 0 0 8   CV**

## COMPLAINT

The Plaintiff, Myrna I. Johnson ("Johnson"), appears before this Court by and through her counsel, Baxter Bruce & Sullivan, and alleges the facts set forth below in support of her cause of action against Defendants Fred Meyer Stores, Inc. ("Fred Meyer") and Jaime San Miguel ("San Miguel").

## INTRODUCTION

This is a proceeding for declaratory and injunctive relief, damages, and other appropriate legal and equitable relief to redress: (1) Defendants' unlawful acts of discrimination and harassment in employment under both state and federal law based upon Johnson's age and gender; (2) Defendants' unlawful acts of discrimination and harassment in employment under state law based upon Johnson's parenthood; (3) Defendants' retaliatory conduct towards Johnson after she requested leave under the Family Medical Leave Act ("FMLA"); (4) Defendants' wrongful discharge of Johnson in breach of the implied covenant of good faith and fair dealing; and (4) Defendants'

BAXTER BRUCE & SULLIVAN P.C.
P.O. Box 32819, Juneau Alaska 99803
Ph: (907) 789-3166
Fax: (907) 789-1913

7.    At the time of the events herein alleged, Defendant Fred Meyer was an employer within the meaning of Section 701 of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-(b), in that Defendant Fred Meyer was engaged in an industry affecting commerce and had fifteen (15) or more employees for each working day in each of twenty (20) or more calendar weeks in the current or preceding calendar year.

8.    At the time of the events herein alleged, Defendant Fred Meyer was an employer within the meaning of Section 11(b) of the ADEA, 29 U.S.C. § 630(h), in that Defendant Fred Meyer was engaged in an industry affecting commerce as defined in Section 11(h) of the ADEA, 29 U.S.C. § 630(b), and employed twenty-five (25) or more employees at all times relevant to this action.

9.    Defendant Fred Meyer was the "employer" of Johnson within the meaning of Section 101(4)(A) of the Family Medical Leave Act, 29 U.S.C. § 2611(4)(A), at all times relevant to this action.

10.    Defendant San Miguel has been an employee of Defendant Fred Meyer at its Juneau Store, was Johnson's supervisor during the time when the events set forth in this Complaint occurred, and continues to serve in a managerial position at the Juneau Store.

## FACTS

11.    Beginning in or about February, 2002 and continuing through September 25, 2002, Defendants engaged in unlawful discrimination and harassment against Myrna Johnson ("Johnson") on the basis of her gender, age, and parenthood, retaliated against Johnson after she sought a leave of absence under the FMLA to care for her daughter, wrongfully discharged Johnson and in doing so breached the covenant of good faith and fair dealing, and subsequently engaged in intentional tortuous interference with Johnson's relationship with another employer. The particulars in support of Johnson's claims are set forth below.

12.    Johnson was an employee of the Juneau Store for ten (10) years prior to Defendants' termination of her employment.

*Johnson v. Fred Meyer Stores, Inc., and Jaime San Miguel*, Case No. 1J04-____
Complaint
Page 4 of 22

BAXTER BRUCE & SULLIVAN P.C.
P.O. Box 32819, Juneau Alaska 99803
Ph: (907) 789-3166
Fax: (907) 789-1913

Exhibit _A_ Page _2_ of _3_

1 | prevent their recurrence in the future, and to prevent other employees of Defendant
2 | Fred Meyer from experiencing such unlawful behavior.

3

4 | ## COUNT V

5 | ### Johnson v. Fred Meyer Stores, Inc. and Jaime San Miguel

6 | ### WRONGFUL DISCHARGE

7 | 116.    Plaintiff repeats and re-alleges all preceding allegations of this Complaint

8 | as if fully set forth herein.

9 | 117.    Defendants breached their common law duty of good faith and fair dealing

10 | by terminating Plaintiff when she left work because she was emotionally distraught

11 | over Defendants' unlawful discriminatory, harassing, and retaliatory conduct towards

12 | her.

13 | **WHEREFORE**, Plaintiff prays that this Court will:

14 | (a)    Enter judgment in favor of Plaintiff for back and front pay.

15 | (b)    Enter judgment in favor of Plaintiff and against Defendants, for

16 | compensatory damages – including, but not limited to, damages for mental anguish,

17 | loss of esteem, humiliation, and damage to Plaintiff's business reputation -- and

18 | punitive damages, together with interest.

19 | (c)    Retain jurisdiction to ensure Defendants' compliance with any Order

20 | issued by this Court.

21 | (d)    Award Plaintiff reasonable attorneys' fees together with the costs of

22 | this action.

23 | (e)    Award such other and further legal and equitable relief as may be

24 | necessary and appropriate to redress fully Defendants' breach of the covenant of good

25 | faith and fair dealing and the financial and emotional consequences ensuing from

26 | Defendants' wrongful discharge of Plaintiff.

27

28

29

30

BAXTER BRUCE & SULLIVAN P.C.
P.O. Box 32819, Juneau Alaska 99803
Ph: (907) 789-3166
Fax: (907) 789-1913

Exhibit  A  Page 3  of 3

Page 1

# UNITED STATES DISTRICT COURT
## DISTRICT OF ALASKA

MYRNA I. JOHNSON,                    )
                                     )
          Plaintiff,                 )
                                     )
v.                                   )
                                     )
FRED MEYER STORES, INC.,             )
a Delaware corporation;             )
and JAIME SAN MIGUEL,                )
                                     )
          Defendants.                )
_____)

Case No. J04-008 CV


### DEPOSITION OF MYRNA JOHNSON
Pages 1 through 264, Inclusive
Taken: Monday, January 23, 2006
Place: Juneau, Alaska

Myrna Johnson * 1/23/2006
Johnson v. Fred Meyer * J04-008 CV (JWS)

Page 5

1           MONDAY, JANUARY 23, 2006

2               JUNEAU, ALASKA

3                 9:00 A.M.

4

5           THE REPORTER:  I'll now swear you

6       in.  Would you raise your right hand for me,

7       please?

8               (Oath administered)

9           THE WITNESS:  I do.

10

11               MYRNA JOHNSON

12

13      having been first duly sworn by the court reporter to

14      tell the truth, the whole truth, and nothing but the

15      truth, testified as follows:

16

17               EXAMINATION

18

19      BY MR. DICKENS:

20          Q.    For the record, would you please state

21      your full name and your current residence address?

22          A.    My name is Myrna Johnson.  My residence

23      is 1850 Glenrose Avenue, Sacramento, California

24      95815.

25          Q.    Ms. Johnson, how long have you lived at

Myrna Johnson * 1/23/2006
Johnson v. Fred Meyer * J04-008 CV (JWS)

Page 52

1    manager?

2        A.    Yes.  That's all we have.

3        Q.    Okay.  Did you talk to Mr. Laney about

4    the situation?

5        A.    Yes.

6        Q.    And did you and Mr. Laney and

7    Mr. San Miguel, all three, talk about it?

8        A.    Yes.

9        Q.    How was it resolved then, just --

10        A.    Then we came out of the stockroom as

11    friends again.

12        Q.    All right.  Were you not friends before

13    that?

14        A.    No, we are friends.  That means as if

15    nothing happened, as if we had no misunderstanding.

16        Q.    And as friends, did you ever invite

17    Mr. San Miguel to your house?

18        A.    Yes.

19        Q.    How many times?

20        A.    Numerous times, sir.

21        Q.    What were the occasions?

22        A.    He was at my house on my daughter's

23    birthday when I used to live on Nancy street.  His

24    family, his father and his kids and brothers, were

25    at my house on July 4th to watch the fireworks.

Myrna Johnson * 1/23/2006
Johnson v. Fred Meyer * J04-008 CV (JWS)

Page 53

1    Q.    Any other times?

2    A.    There's a few more, but I don't really

3    remember when are the dates.

4    Q.    Would it be fair to say, before

5    Mr. San Miguel became the apparel manager, that you

6    and he got along reasonably well at work, and you

7    also were friendly outside of work?

8    A.    Yes, sir.

9    Q.    Okay.  Did Mr. San Miguel talk to your

10   husband?

11   A.    Yes.

12   Q.    Was there any time before January 2002

13   when you thought that Mr. San Miguel, for one

14   reason or another, was unhappy with you?

15   A.    No.

16   Q.    Okay.  Did Mr. San Miguel ever, before

17   January 2002, give you a performance evaluation?

18   A.    Yes, sir.

19   Q.    How was it?

20   A.    It was good.

21   Q.    Okay.

22       MR. CHOATE:  We have been going

23   just about an hour.  Whenever you have time to make

24   a natural break --

25       MR. DICKENS:  Just a few more

Myrna Johnson * 1/23/2006
Johnson v. Fred Meyer * J04-008 CV (JWS)

Page 56

1  Q.  Did you work on that skill?

2  A.  I did on that -- I work on that skill,

3  sir.

4  Q.  Now, as the first assistant, what

5  schedule did you work, then, that year of 2001?

6  A.  I am the opening manager.

7  Q.  So what hours did you have?

8  A.  8:00 till 5:00.

9  Q.  That's 8:00 a.m. to 5:00 p.m.?

10  A.  That was the schedule.

11  Q.  Now, when were schedules prepared at

12  Fred Meyer during the calendar year 2001?

13  A.  Excuse me, sir?

14  Q.  Sure.  Isn't it true that schedules are

15  posted by the department manager for the following

16  week?

17  A.  Yes.

18  Q.  And what was the work week at Fred

19  Meyer?

20  A.  Sunday to Saturday.

21  Q.  When were those schedules prepared?

22  A.  It has to be posted at least before

23  Friday of the previous week.

24  Q.  All right.  Just to make sure we are

25  clear, by Friday, January 19, 2006, the department

Exhibit B   Page 5 of 15

Myrna Johnson * 1/23/2006
Johnson v. Fred Meyer * J04-008 CV (JWS)

Page 95

1    A.    Yes.  We bought our ticket, and after

2    seven days, we left.

3    Q.    Oh, you had to have a seven-day advance

4    notice?

5    A.    Yes.

6    Q.    Was that because the ticket price was

7    less if you had seven days' notice?

8    A.    I think that was when the available

9    flights and everything.  I'm not very sure why.

10    Q.    All right.  You went to the

11    Philippines, got your daughter situated, and you

12    stayed with her for about a month?

13    A.    Less -- a few days less than one month.

14    I think around two weeks, sir, two or three weeks.

15    Q.    Well, we'll look at that.  My

16    recollection is that you left like on February the

17    12th and returned on March the 10th, 2002.

18    A.    That is what I applied for my leave of

19    absence, but I don't think I leave here in Juneau

20    because I have to -- when I bought the ticket, we

21    still have to --

22    Q.    Oh, all right.  So you took the leave,

23    but you stayed in Juneau for another week?

24    A.    Yes.  And now I remember, because we

25    have to wait -- we have to -- we were here, but he

Exhibit _B_ Page _6_ of _15_

Myrna Johnson * 1/23/2006
Johnson v. Fred Meyer * J04-008 CV (JWS)

Page 99

1    you were telling me, you went into the store on

2    Monday, which would have been March 11, 2002?

3         A.    No, sir.

4         Q.    All right.

5         A.    What I was telling you was, I got here

6    in town.  The next day, I call Mr. San Miguel.  I

7    told him I was in town.  I am ready to work.  So he

8    said, "why don't you come in on the 12th?"  So

9    he -- so he put me on the schedule to work on the

10   12th, the 13th, the 14th, and then the 15th.  He

11   gave me the schedule that I am supposed to work on

12   the phone.  I was not on the schedule.

13        Q.    I understand that.

14        A.    Yes.  He gave me the schedule on the

15   phone.

16        Q.    All right.  So you came back.  You are

17   telling me you called him and said, "I'm back."

18   And then you and he talked about when you should

19   come to work, and he gave you some time frames,

20   correct?

21        A.    Yes.

22        Q.    All right.  Now, do you recall going to

23   work on Monday, March 11th, or was it Tuesday,

24   March 12th?  Or do you recall at all?

25        A.    I work on the 12th.  I don't recall the

Myrna Johnson * 1/23/2006
Johnson v. Fred Meyer * J04-008 CV (JWS)

Page 106

1   outlining various things in the department that

2   need to be addressed during -- during the time when

3   the employees are there?

4        A.    Yes, sir.

5        Q.    Like you need to face the shelves.  You

6   need to replenish certain product.  You need to

7   clean up certain areas, et cetera, things like

8   that?

9        A.    Yes, sir.

10       Q.    Okay.  Did Mr. San Miguel talk to you

11  about issues that had arisen because Ms. Fontenot

12  was off and they were shorthanded?

13       A.    Yes.

14       Q.    Did he express to you that he was

15  hoping that, now that you were back, you'd be able

16  to address these?

17       A.    Yes.

18       Q.    Okay.  Any other discussion you and he

19  had that sticks in your mind that related to

20  anything other than work the first day you got

21  back?

22       A.    He told -- he asked me how was my

23  daughter.  And he also said that the standards

24  were -- were higher, and then he told me about the

25  baby furniture.

Myrna Johnson * 1/23/2006
Johnson v. Fred Meyer * J04-008 CV (JWS)

Page 112

1    A.    I think so that I can see how bad

2    recoveries before was.

3    Q.    And did this, as you understood it, tie

4    in with his earlier statement to you that standards

5    had been raised and were going to be implemented,

6    higher standards?

7    A.    That the standard has been raised.  We

8    use that all the time to motivate our employees.

9    Q.    So how did Tuesday go then, or the

10   second day go -- Wednesday, I guess it is?

11   A.    He send me an e-mail about the baby

12   furniture plan-o-gram.

13   Q.    Okay.  And what was that e-mail

14   addressing, regarding the baby furniture

15   plan-o-gram?

16   A.    That Minerva and Julita haven't

17   finished the baby furniture plan-o-gram.

18   Q.    Did you assign the baby plan-o-gram to

19   Minerva and Julita?

20   A.    No.

21   Q.    Then why were they working on it, if

22   you had not assigned it to them?

23   A.    Mr. San Miguel assigned it to them

24   prior to, when I was gone.

25   Q.    But then you were supervising them

Myrna Johnson * 1/23/2006
Johnson v. Fred Meyer * J04-008 CV (JWS)

Page 122

1      A.      Yes.  We were standing in there, and he

2   said, "Come on in here."

3      Q.      All right.  So you went into Fred

4   Sayre's office, and he's got a separate office as

5   the store director?

6      A.      Yes, sir.

7      Q.      Did you sit down?

8      A.      He make a gesture for me to sit down.

9   I sit down.

10     Q.      And was Mr. San Miguel standing or

11  sitting?

12     A.      Standing.

13     Q.      And where was Mr. Sayre?

14     A.      Sitting at his desk.

15     Q.      All right.  What happened at that

16  point?

17     A.      He put out a written warning notice and

18  start to read it to me.

19     Q.      Well, which "he"?

20     A.      Mr. San Miguel.

21     Q.      All right.  Are you saying he stood

22  there, or he sat down and read it to you?

23     A.      He stood blocking the door.

24     Q.      Well, the door was closed, wasn't it?

25     A.      Yes, he close it.  So I was sitting,

Myrna Johnson * 1/23/2006
Johnson v. Fred Meyer * J04-008 CV (JWS)

Page 126

1    already by the time he finish reading it.  I was

2    already crying.

3        Q.    Did you expect this?

4        A.    No.

5        Q.    You just told me earlier that you had

6    received several OVs that week from Mr. San Miguel

7    which were critical of your job performance, had

8    you not?

9        A.    In the course of the job, sir, we

10   always receive OVs a lot of time, and also because

11   I know that I am doing a good job.

12       Q.    Well, you just told me a few minutes

13   ago that Mr. San Miguel told you the very first

14   thing that standards are going to be higher when

15   you returned.  Didn't he tell you that?

16       A.    He tell that to me because he was

17   showing me all those that has not been done.

18       Q.    All right.  Let's go back to the

19   meeting on March the 18th, 2002.  You start to cry.

20   Do you say anything else to Mr. Sayre or

21   Mr. San Miguel at that time?

22       A.    I was crying so hard, sir, and I said,

23   "I need to go.  I need to go."

24       Q.    Go where?

25       A.    Downstairs, where I have more space and

Myrna Johnson * 1/23/2006
Johnson v. Fred Meyer * J04-008 CV (JWS)

Page 128

1      A.     I don't understand the question, sir.

2   I get a little bit confused on that.

3      Q.     Let me ask you this.  What else did

4   Mr. Sayre say?

5      A.     Nothing.  He look at me there, while I

6   was crying, and I stood up.

7      Q.     Did he say anything to you about,

8   "Don't leave.  If you do, it will be considered a

9   quit"?

10     A.     No, sir.

11     Q.     Are you sure?

12     A.     Yes.

13     Q.     As a first assistant under Fred Meyer

14   policy in effect in March 2002, who at the store,

15   if anyone, had authority to terminate an employee

16   at your level?

17     A.     Mr. San Miguel and Mr. Sayre.

18     Q.     Do you know if Mr. San Miguel actually

19   had authority, or if it only could be Mr. Sayre?

20     A.     Mr. San Miguel.

21     Q.     And on what do you base that

22   conclusion?

23     A.     Because he is our immediate boss.

24     Q.     Have you ever known a situation where

25   the department manager had the authority to fire a

Myrna Johnson * 1/23/2006
Johnson v. Fred Meyer * J04-008 CV (JWS)

Page 135

1    saying he thought you had a bad recovery?

2        A.    Yes.

3        Q.    All right.  So that led to the meeting

4    on the 18th.  Now, let's finish that up and then we

5    can take a break here.

6                You left the room and went

7    downstairs crying?

8        A.    Yes, sir.

9        Q.    And when you say "downstairs," is that

10   in the back area where the product is stored?

11       A.    That is in our apparel stockroom.

12       Q.    I'm sorry.  What do you call it?

13       A.    We call it apparel stockroom.

14       Q.    Oh.  Apparel stockroom.  All right.

15   And who was there?

16       A.    I think Sarah Dexter, Monica Batsch,

17   and Annmarie.

18       Q.    What is Annmarie's last name?

19       A.    I think it was Stout.

20       Q.    And what did you tell them was the

21   reason why you were crying?

22       A.    I was crying, and I said, "I think he

23   was trying to get rid of me."

24       Q.    Now, why would you say that?  You'd

25   worked for the man for six years.  You had reported

Page 212

1    of employment where a supervisor and you disagree

2    as to whether something had been done consistent

3    with the supervisor's desires?

4         A.    I -- no, sir.

5         Q.    That happens, doesn't it?

6         A.    Because there were times like, as I

7    said, the space is -- it is not as big as what it

8    should be.  Then I have to -- we have to adjust.

9              And during Mr. Laney's time, we

10   can adjust.  If the space is small and the

11   plan-o-gram -- and so we adjust.  We put -- because

12   there are some stuff, like you do two facings, like

13   two merchandise.  If the space is small, we only do

14   one facing so that every item reflects.

15             With Mr. Laney, that will work as

16   long as it looks nice.  With Mr. San Miguel, he

17   would have to follow by the book.  So that is why,

18   when I started working for Mr. San Miguel, I do it

19   whatever the book says.  His policy is, "Do not

20   think.  Do it."

21        Q.    Right.  So what I heard you say is,

22   Mr. Laney didn't always go by the book, and

23   Mr. San Miguel says he's going by the book, and he

24   wanted you to just follow that and not improvise,

25   is that --

Page 213

1    A.    That's why I change.  Before, with

2  Mr. Laney, we cannot do it exactly the same.  We

3  have to find ways to put it up, but just very

4  close, the closest we can.

5                    With Mr. San Miguel, it has to be

6  by the book.  So I adjust -- I change.  I don't

7  think.  I follow the book.

8    Q.    Okay.  There is nothing wrong with

9  following the book?

10    A.    No.  Actually, it is a lot easier.

11                    (Exhibit 16 duly marked)

12  BY MR. DICKENS:

13    Q.    Ms. Johnson, can you identify

14  Exhibit 16 for me, please?

15    A.    Yes, sir.

16    Q.    What is it?

17    A.    This was the picture of the baby

18  furniture, the plan-o-gram.

19    Q.    Taken by whom?

20    A.    I'm not very sure who took this.

21    Q.    When was it taken?

22    A.    After I -- after I was not working

23  there anymore.

24    Q.    And where are the originals?

25    A.    Might be in our house.

Exhibit B  Page 15 of 15

*"Always strive to offer Customers the service, selection, quality and price that satisfies them, for by doing that we will serve our Customers well and continue to prosper and grow."*
–Fred G. Meyer



# Employee Handbook



# FredMeyer

MJ Exhibit 16    Page 1 of 35

201424

Exhibit __C__ Page __1__ of __3__

15

*The policies stated in this handbook are intended as guidelines only and are subject to change at the sole discretion of the Company. This handbook should not be construed as and does not constitute a contract, expressed or implied, guaranteeing employment for any specific duration. Although we hope your employment relationship with us is long term, either you or the Company may terminate this relationship at any time, for any reason, with or without cause or notice. Please understand that no supervisor or representative of Fred Meyer has the authority to enter into any agreement with you for employment for any specified period of time or to make any promises or commitments contrary to the foregoing.*

*In the event of any conflict between the provisions contained in any applicable collective bargaining agreement, the collective bargaining agreement shall govern in all cases with respect to employees covered by such agreement.*

MJ Exhibit 16

Page 34 of 35

64

16

Exhibit __C__ Page __2__ of __3__



*MJ Exhibit 16    Page 35 of 35*

201458

Exhibit C Page 3 of 3

17